UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.                                                    Case No. 23 Cr. 347 (JGK)

ALEXANDER MASHINSKY,                 **ORAL ARGUMENT REQUESTED**

Defendant.


**DEFENDANT ALEXANDER MASHINSKY'S MEMORANDUM OF LAW IN SUPPORT
OF HIS MOTIONS *IN LIMINE***


MUKASEY YOUNG LLP
570 Lexington Avenue, Suite 3500
New York, New York 10022
Tel: (212) 466-6400

*Counsel for Alexander Mashinsky*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

MOTION ONE: TO ALLOW INTO EVIDENCE FULL VIDEO INTERVIEWS .......................2

     A.     Legal Standard ....................................................................................3
     B.     Argument ............................................................................................5

MOTION TWO: THE GOVERNMENT AND ITS WITNESSES SHOULD BE PROHIBITED
     FROM ARGUING OR INSINUATING THAT "EXCESS BUYING" OF CEL IS AN
     ILLEGAL OR WRONGFUL ACT ...........................................................................7

MOTION THREE: TO PRECLUDE IMPROPER SUMMARY CHARTS AND SUMMARY
     WITNESS TESTIMONY ......................................................................................11

MOTION FOUR: TO PERMIT THE DEFENSE TO INTRODUCE OUT-OF-COURT
     COMMUNICATIONS FOR A NON-HEARSAY PURPOSE .........................................15

     A.     Mr. Mashinsky's Instructions To His Team Are Not Hearsay ..........................15
     B.     Reports And Other Information That Mr. Mashinsky's Team Provided To Him—
           And That Supported The Good-Faith Basis For His Charged Misstatements—
           Are Not Hearsay ..........................................................................17
     C.     Evidence Of Mr. Mashinsky's Questions Seeking Guidance Regarding His Public
           Statements Is Admissible ................................................................18

MOTION FIVE: TO PRECLUDE THE GOVERNMENT FROM REFERRING TO OR
     INTRODUCING ANY EVIDENCE RELATING TO THE
     CELSIUS BANKRUPTCY ...................................................................................19

     A.     Evidence Relating To The Celsius Bankruptcy Is Irrelevant................................20
     B.     Any Minimal Probative Value Of The Celsius Bankruptcy Is Substantially
           Outweighed By The Myriad Dangers That Such Evidence Poses.........................23
     C.     If The Government Is Permitted To Introduce Evidence Relating To The Celsius
           Bankruptcy, The Defense Must Be Permitted To Meet It ...................................25

MOTION SIX: TO ADMIT DEFENSE EVIDENCE RESPONSIVE TO THE
     GOVERNMENT'S THEORY THAT MR. MASHINSKY WITHDREW ASSETS
     FROM CELSIUS BECAUSE HE KNEW IT WOULD FAIL.........................................28

CONCLUSION....................................................................................................31

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Otis Elevator Co.*,
No. 11-10200, 2012 WL 5493383 (E.D. Mich. Nov. 13, 2012) ............................................ 13

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ................................................................................................ 8, 9

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) .............................................................................................................. 4

*Cameron v. New York City Dept. of Educ.*,
15 Civ. 9900; 2018 WL 1027710 (S.D.N.Y. Feb. 21, 2018) ................................................ 16

*Cohen v. Stevanovich*,
722 F. Supp. 2d 416 (S.D.N.Y. 2010) ................................................................................. 10

*Colson v. Cupp*,
449 F.2d 730 (9th Cir. 1971) ............................................................................................... 10

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) .............................................................................................................. 8

*Fagiola v. Nat'l Gypsum Co. AC & S, Inc.*,
906 F.2d 53 (2d. Cir. 1990) ................................................................................................. 12

*GFL Advantage Fund, Ltd. v. Colkitt*,
272 F.3d 189 (3d Cir. 2001) ............................................................................................ 9, 10

*Gurary v. Winehouse*,
190 F.3d 37 (2d Cir. 1999) .................................................................................................... 8

*Hammerschmidt v. United States*,
265 U.S. 182 (1924) ............................................................................................................ 25

*HTC Corp. v. Tech. Properties Ltd.*,
No. 5:08 Civ. 0082-PSG, 2013 WL 4782598 (N.D. Cal. Sept. 6, 2013) ............................... 24

*In re Apple Computer Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) ............................................................................................... 5

*In re: Celsius Network LLC*,
647 B.R. 631 (Bankr. S.D.N.Y. Jan. 4, 2023) ...................................................................... 23

*Kelly v. United States*,
  590 U.S. 391 (2020) ................................................................................ 25

*Lloyd v. United States*,
  226 F.2d 9 (5th Cir. 1955) ....................................................................... 13

*Longman v. Food Lion, Inc.*,
  197 F.3d 675 (4th Cir. 1999) ..................................................................... 4

*Nanopierce Techs., Inc. v. Southridge Cap. Mgmt.*,
  No. 02 Civ. 0767; 2008 WL 1882702 (S.D.N.Y. Apr. 21, 2008) ........................... 9

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ..................................................................... 23

*Old Chief v. United States*,
  519 U.S. 172 (1997) ................................................................................ 24

*Oran v. Stafford*,
  226 F.3d 275 (3d Cir. 2000) ....................................................................... 5

*S.E.C. v. Malenfant*,
  784 F. Supp. 141 (S.D.N.Y. 1992) ......................................................... 8, 15

*S.E.C. v. Masri*,
  523 F. Supp. 2d 361 (S.D.N.Y. 2007) .......................................................... 8

*Santa Fe Indus., Inc. v. Green*,
  430 U.S. 462 (1977) .................................................................................. 9

*Set Capital LLC v. Credit Suisse Group. AG*,
  996 F.3d 64 (2d Cir. 2021) ..................................................................... 9, 10

*Steele v. United States*,
  222 F.2d 628 (5th Cir. 1955) ..................................................................... 12

*Sullivan & Long, Inc. v. Scattered Corp.*,
  47 F.3d 857 (7th Cir. 1995) ........................................................................ 9

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) .................................................................................. 4

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
  985 F.2d 1190 (2d Cir. 1993) ...................................................................... 5

*United States v. Balboa, 12 Cr. 196 (PAC)*,
  2013 WL 6196606 (S.D.N.Y. Nov. 27, 2013) ........................................................ 19

*United States v. Barnwell*,
  No. 15 CR. 620 (NSR), 2017 WL 1063457 (S.D.N.Y. Mar. 20, 2017) .......................... 12, 15

*United States v. Bellomo*,
  176 F.3d 580 (2d Cir. 1999) ........................................................ 16

*United States v. Biaggi*,
  909 F.2d 662 (2d Cir. 1990) ........................................................ 28

*United States v. Brandt*,
  196 F.2d 653 (2d Cir. 1952) ........................................................ 29

*United States v. Bray*,
  139 F.3d 1104 (6th Cir. 1998) ........................................................ 12

*United States v. Certified Environ. Services, Inc.*,
  753 F.3d 72 (2d Cir. 2014) ........................................................ 17

*United States v. Conlin*,
  551 F.2d 534 (2d Cir. 1977) ........................................................ 12

*United States v. Contorinis*,
  692 F.3d 136 (2d Cir. 2012) ........................................................ 4

*United States v. Dawkins*,
  999 F.3d 767 (2d Cir. 2021) ........................................................ 16

*United States v. Denton*,
  556 F.2d 811 (6th Cir. 1977) ........................................................ 11

*United States v. Dupree*,
  706 F.3d 131 (2d Cir. 2013) ........................................................ 16

*United States v. Fullwood*,
  342 F.3d 409 (5th Cir. 2003) ........................................................ 13, 14

*United States v. Grajales-Montoya*,
  117 F.3d 356 (8th Cir. 1997) ........................................................ 14

*United States v. Grinage*,
  390 F.3d 746 (2d Cir. 2004) ........................................................ 12

*United States v. Guadagna,*
  183 F.3d 122 (2d Cir. 1999) ........................................................................... 25

*United States v. Hild,*
  644 F.Supp.3d 7 (S.D.N.Y. 2022) ................................................................... 17

*United States v. James,*
  607 F.Supp.3d 246 (E.D.N.Y. 2022) .......................................................... 18, 19

*United States v. Morin,*
  538 F. App'x. 1 (2d Cir. 2013) ....................................................................... 14

*United States v. Mulheren,*
  938 F.2d 364 (2d Cir. 1991) ........................................................................... 10

*United States v. Oguns,*
  921 F.2d 442 (2d Cir. 1990) ........................................................................... 18

*United States v. Oloyede,*
  933 F.3d 302 (4th Cir. 2019) .......................................................................... 11

*United States v. Quattrone,*
  441 F.3d 153 (2d Cir. 2006) ...................................................................... 16, 29

*United States v. Regent Off. Supply Co.,*
  421 F.2d 1174 (2d Cir. 1970) .......................................................................... 25

*United States v. Rhodes,*
  229 F.3d 659 (7th Cir. 2000) .......................................................................... 25

*United States v. Scales,*
  594 F.2d 558 (6th Cir. 1979) .......................................................................... 12

*United States v. Silver,*
  864 F.3d 102 (2d Cir. 2017) ........................................................................... 10

*United States v. Sittenfeld, 20 Cr. 142 (DRC),*
  20 Cr. 142 (DRC), 2022 WL 2192955 (S.D. Ohio June 17, 2022) ....................... 19

*United States v. Smyth,*
  556 F.2d 1179 (5th Cir. 1977) ........................................................................ 12

*United States v. Spalding,*
  894 F.3d 173 (5th Cir. 2018) .......................................................................... 11

*United States v. Starr*,
   816 F.2d 94 (2d Cir. 1987) ........................................................................ 25

*United States v. Williams*,
   930 F.3d 44 (2d Cir. 2019) .................................................................. 30, 31

*UPS Store, Inc. v. Hagan*,
   No. 14CV1210, 2017 WL 3309721 (S.D.N.Y. Aug. 2, 2017) ................................ 12

*Wielgos v. Commonwealth Edison Co.*,
   892 F.2d 509 (7th Cir. 1989) ...................................................................... 4

## FEDERAL REGULATIONS

Title 17 C.F.R. § 240.10b .................................................................................. 4

## FEDERAL RULES

Fed. R. Evid. 102 ............................................................................................. 3

Fed. R. Evid. 106 ........................................................................................ 4, 31

Fed. R. Evid. 401 .................................................................................. 4, 16, 27

Fed. R. Evid. 402 ............................................................................................. 3

Fed. R. Evid. 403 .................................................................................. 23, 24, 27

Fed. R. Evid. 602 ........................................................................................... 13

Fed. R. Evid. 701 ........................................................................................... 12

Fed. R. Evid. 1006 ............................................................................... 11, 12, 14

## OTHER AUTHORITIES

Basaria, Karim, *Summary Exhibits and the Confrontation Clause: Looking Behind the
   Hearsay Rule for Evidentiary Implications of Crawford's Progeny*,
   The Journal of Law and Criminology Northwestern Vol. 102, No. 3, 875-76 ...................... 14

*Celsius AMA April 15,* 2022,
   https://www.youtube.com/watch?v=Yciv1MpxhEA ............................................ 6, 7

*Celsius Network Custody F*AQ,
   https://support.celsius.network/hc/en-us/articles/4838161060381-Custody-FAQ ................. 7

*FTX files amended reorganization plan, expects $14.5 bn-$16.3 bln for distribution* (May 9, 2024, 4:44 AM EDT),
    https://www.reuters.com/technology/ftx-files-amended-reorganization-plan-expects-between-145-bln-163-bln-2024-05-07/ .................................................................................. 21

*Historical Snapshot – 27 May 2022*,
    https://coinmarketcap.com/historical/20220527/ ................................................. 30

*Ionic Digital Inc. Mining Co Common Stock FAQs as of February 1, 2024,*
    https://odysseytrust.com/wp-content/uploads/2024/01/Ionic_Digital_FAQs.pdf.................. 21

Ligon, Cheyenne, *Delaware Judge Approves FTX Estate's Bankrupty Plan*
    (Oct. 7, 2024, 4:50 PM EDT),
    https://www.coindesk.com/policy/2024/10/07/delaware-judge-approves-ftx-estates-bankruptcy-plan/ ......................................................................................................... 21

Salzberg, Mark, *Who Owns the Crypto: Bankruptcy Court Rules That Customers Do Not Own The Deposited Crypto* (Nov. 29, 2023),
    https://www.restructuring-globalview.com/2023/11/us-who-owns-the-crypto-bankruptcy-court-rules-that-customers-do-not-own-the-deposited-crypto/ ............................................. 23

Sigalos, MacKenzie, *From $10 billion to zero: How a crypto hedge fund collapsed and dragged many investors down with it* (July 1, 2022, 3:30 PM EDT),
    https://www.cnbc.com/2022/07/11/how-the-fall-of-three-arrows-or-3ac-dragged-down-crypto-investors.html ................................................................................................. 27

Thayer, *Preliminary Treatise on Evidence* 264 (1898) ................................................. 3

*What Really Happened to LUNA Crypto?* (Sep. 20, 2022, 11:57 AM EDT),
    https://www.forbes.com/sites/qai/2022/09/20/what-really-happened-to-luna-crypto/ ........... 27

Wise, J. Eric, *Determining Cryptocurrency Ownership in Bankruptcy* (March 23, 2023)*,*
    https://www.alston.com/en/insights/publications/2023/03/determining-cryptocurrency-ownership-in-bankruptcy ....................................................................................... 23

Defendant Alexander Mashinsky, by counsel, respectfully submits this Memorandum of Law in support of his motions *in limine* to: (1) allow into evidence the full video interviews referred to in the indictment; (2) prohibit the government from arguing or insinuating that "excess buying" of CEL token is an illegal or wrongful act; (3) preclude improper summary charts and summary witness testimony; (4) permit the defense to introduce out-of-court communications for a non-hearsay purpose; (5) preclude the government from referring to or introducing any evidence relating to the Celsius bankruptcy; and (6) admit defense evidence responsive to the government's theory that Mr. Mashinsky withdrew assets from Celsius because he knew the company would fail.

## PRELIMINARY STATEMENT

The indictment in this matter is unwieldy and confusing.  Over 46 pages and 91 paragraphs, it describes 11 categories of alleged misstatements embedded within hundreds of hours of videos.  It then detours into alleged price manipulations alleged to have occurred at times that are not specified.  The indictment often uses the Celsius company's name and the defendant's name interchangeably, failing to distinguish between the two, and putting the defense in the impossible position of not knowing which acts are attributable to the defendant and which are attributable to others.  Adding to the confusion, the government has taken the curious position that, save for one person, none of Celsius's former executives have material information about the case, notwithstanding the indictment's repeated references to the actions of "others working at Celsius" and Mashinsky's "inner circle" and "co-conspirators."  The unfortunate result of all this ambiguity is that three months before trial, the defense has little specific information with which to prepare its case.

The cryptic nature of the government's case is all the more troubling in light of a recent trend that we fully expect to see at this trial: that is, a prosecution case that does not present testimony from percipient witnesses, but instead relies on cherrypicked snippets of video clips and electronic messages read into the record by a U.S. Attorney's Office paralegal or government agent, who, by design, has no knowledge of the underlying facts and thus cannot be cross-examined about the substance of what they are reading. The government often bolsters this approach with a slew of pre-trial motions seeking to preclude the defense from offering countervailing statements and other evidence, effectively denying the jury a fair and balanced presentation to aid its search for the truth.

This unusual level of opacity poses a constitutional danger to the defendant. The defense team is well-acquainted with the case law and standards and practices in this district governing bills of particulars, identification of co-conspirators, Jencks Act material and witness lists. Of course, a lot of those standards developed before the era of cases, such as this, founded upon prodigious amounts of digital discovery. That said, we do not seek those forms of relief herein. The pretrial rulings sought herein simply seek fair and timely disclosure, the setting of limits and conditions on the government's presentation of evidence, and some assurance that the defense can introduce its own evidence to defend the case. Absent this relief, this case risks becoming a boundless and unfair trial-by-surprise.

### MOTION ONE: TO ALLOW INTO EVIDENCE FULL VIDEO INTERVIEWS

The indictment in this case contains approximately 38 quotes Mr. Mashinsky made in weekly Celsius videos, media interviews, Celsius website posts, and social media announcements. *See* Indict. ¶¶ 3, 15-71. The government intends to introduce an assortment of these excerpts (and others) at trial. As set forth below, these alleged misstatements should not be

assessed in a vacuum but should be considered in the context of the whole video, interview or statement.  The standalone snippets selected by the government will create a misimpression. Mr. Mashinsky respectfully moves *in limine* for the Court to admit in evidence the full video interviews in which he made the alleged fraudulent statements.

The full interviews are *directly relevant* to the essential elements of materiality and intent for the charged offenses.  The full interviews are probative of the "total mix" of information available to a reasonable investor and are probative of whether the alleged misstatement "significantly alters the total mix," thereby rendering it material.  The full interviews are also essential for the jury to assess Mr. Mashinsky's intent.  For example, whether the alleged misstatement was said in the context of puffery, in response to a question, or in relation to a specific current event, speaks directly to Mr. Mashinsky's intent.  Moreover, the snippets presented by the government will otherwise be misleading and fundamentally unfair unless completed.

As non hearsay that is relevant to essential elements of the charged offenses, the full video interviews are admissible.

## A.    Legal Standard

The Federal Rules of Evidence should be construed to administer every proceeding fairly to the end of ascertaining the truth and securing a just determination.  *See* Fed. Rules of Evidence 102.  The Federal Rules of Evidence favor admission of relevant evidence. *See* Fed. R. Evid. 402; *see also* Thayer, *Preliminary Treatise on Evidence* 264 (1898) (provisions that all relevant evidence is admissible with certain exceptions is the conception of a rational system of evidence).

Under Rule 401, evidence is "relevant" if "it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401.

Federal Rule of Evidence 106 provides that "[i]f a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time. The adverse party may do so over a hearsay objection." Fed. R. Evid. 106. For example, if a defendant in a murder case admits that he owned the murder weapon, but also simultaneously states that he sold it months before the murder, then admitting only the ownership statement creates a misimpression. There, the prosecution "should not be permitted to invoke the hearsay rule and . . . allow the misleading statement to remain unrebutted." *See id.,* 2023 Amendment, n1.

A necessary element of securities fraud is that the defendant must have made a statement that was "misleading as to a *material* fact." *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) (emphasis added); *see also* 17 C.F.R. § 240.10b-5(b). For a fact to be material, "there must be a substantial likelihood that the disclosure of the . . . fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *see also United States v. Contorinis*, 692 F.3d 136, 143 (2d Cir. 2012) ("To be material, information must 'alter[ ] the 'total mix' of information available.'").

The total-mix-of-information standard is an "objective" one, *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999), and it is "hard to pin down in the abstract" because it is highly "fact-specific." *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 517 (7th Cir. 1989). However, the total mix of information includes everything from "data sent to shareholders by

[the] company," to "'information already in the public domain and facts known or reasonably available to the shareholders.'" *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1198, 1199 (2d Cir. 1993) (citations omitted).

Courts consider many diverse sources to be part of the "total mix." For instance, press releases by a defendant corporation are in the total mix. *See Oran v. Stafford*, 226 F.3d 275, 283 (3d Cir. 2000) (considering press releases by both the defendant and the FDA). Articles in publications such as *Business Week* and *The Wall Street Journal* are part of the total mix. *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989).

**B.    Argument**

If snippets of the alleged misstatements plucked from the videos are included in the total mix of information available to investors, then the entire video is also in the total mix of information available to investors. Every question or answer in that video would have been available for investors' consideration. This is not a scenario where the complete videos are not part of the total mix because a class of investors did not practically access or understand certain statements. *See contra United Paperworkers Int'l Union*, 985 F.2d at 1198–99 (information not part of total mix reasonably available to investors "if 'the true' is 'buried' in unrelated discussions"). The full videos were available to the investors just the same as the specific statements from the videos.

The full interviews are also relevant not just to materiality but to intent. Mr. Mashinsky's demeanor, spontaneity, images appearing on the screen during the interview, scope of issues he's discussing at that point in time, and additional mitigating statements in the interview are just some examples of what would be lost in assessing Mr. Mashinsky's intent if the full statements are hidden from the jury.

For example, the jury will be asked to assess whether Mr. Mashinsky criminally intended to defraud investors when he referred to Celsius having clarity from regulators.

Mr. Mashinsky's alleged December 2021 interview statement is that regulators "looked into us and said these guys know what they're doing." Indict. ¶ 41. The indictment leaves an incomplete picture; only a few lines after Mr. Mashinsky's quote in the December 2021 interview, the article disclosed that "[f]inancial regulators in states such as Alabama, Kentucky, New Jersey, and Texas have launched inquiries or 'cease and desist' orders to Celsius[.]" Westfal Decl. Ex. 1 (at page 02954168). That information is undoubtedly part of the total mix.

Or as to Mr. Mashinsky's April 2022 statement that "there's not—no legal issues at least with the services that Celsius provides," (Indict. at ¶ 41) there is a complete statement that drastically alters the meaning to the government's selection. Only a few minutes before this statement was made, Mr. Mashinsky stated the following in response to a request from his video co-host that "the [public] chat is kinda curious if we can talk more about the update that we just had and what this means for the evolution of Celsius going forward":

> So, we always, as we say, we need to stay compliant. And when new regulation or clarification happens, we usually have to make changes or adjustments. In this case, our U.S. users who are not accredited are basically going to have a different set of services and we have to separate the accredited, non-accredited in the U.S., and that's what we launched last week. I think the team did a very good job of kind of explaining the steps that you have to take. If you are accredited, you can become accredited in our system and Anthony will talk about that in a minute. And then basically nothing changes for you. If you're international, nothing changes for you. But if you're a retail U.S. user, there will be some restrictions. Again, everything you already have, all the assets you have on the platform, nothing changes there. But any new additional things you want to do, there's going to be some restrictions or some services that are available. And services that are no longer available as far as earning yield. Everything else, loans and new services we are adding like credit cards and others, all of those things will continue to be available to retail users.

Available at https://www.youtube.com/watch?v=Yciv1MpxhEA (beginning at 03:00). The indictment also omits that this completed statement tracks a Celsius blog post available in the

total mix of information about the company's new Custody offering and linked the blog to the video, available at: https://support.celsius.network/hc/en-us/articles/4838161060381-Custody-FAQ; also embedded within the video description at https://www.youtube.com/watch?v=Yciv1MpxhEA, and an email announcement of all the changes to the Earn program titled, "*Important Celsius Update For U.S. Clients*."  That announcement made clear that, as a result of ongoing discussions with regulators, "there will be changes to the way our Earn product will work for our users based in the United States."  Westfal Decl. Ex. 2 (at page 00462430).  These two written announcements were published on April 12, 2022, and Mr. Mashinsky's weekly video was held three days later on April 15, 2022.  The complete context matters.

The government is parsing out statements in ways that create a warped impression of his interviews and the full truth.  These are just two examples illustrating the need for the Court to allow admission of the entire video statements.

Defense counsel makes this motion *in limine* with judicial efficiency in mind.  While we request that the entire interviews of varying lengths be admitted; we by no means intend to play every full interview at trial.  Rather, admitting the entire interview allows the jury to consider the total mix if necessary, and for the parties to avoid issues of cutting completeness clips or the defense disclosing its trial strategies prematurely.

### MOTION TWO: THE GOVERNMENT AND ITS WITNESSES SHOULD BE PROHIBITED FROM ARGUING OR INSINUATING THAT "EXCESS BUYING" OF CEL IS AN ILLEGAL OR WRONGFUL ACT

The indictment alleges that Mr. Mashinsky engaged in a series of transactions in Celsius's proprietary CEL token in order to artificially raise the price of CEL and induce others to purchase the token.  Indict. ¶¶ 81, 83, 87.  But the indictment does not point to any of the typical market manipulation practices that are intended to mislead investors by artificially affecting

market activity such as wash sales, matched orders, or rigged prices. "Such conduct, closely resembling fraud, is patently manipulative, serving no purpose other than to transmit false information to the market and artificially affect prices." *S.E.C. v. Masri*, 523 F. Supp. 2d 361, 367 (S.D.N.Y. 2007) (internal citations omitted). In such cases, "[t]he defendant's manipulative intent can be inferred from the conduct itself." *Id.*

There can be no such inference here because those unlawful practices did not take place. Instead, the government's theory appears to be that Celsius's purchases of CEL token in quantities greater than necessary to pay users their weekly CEL rewards was manipulative in that it was meant to "artificially support the price of CEL." Indict. ¶ 66. The government's formulation of so-called "excess buying" is a strawman. CEL purchases, even purchases in "excess" of what was necessary to pay rewards, are not inherently illegal. This Court should preclude the government from arguing that such acts are per se manipulative.

"Manipulative" is "virtually a term of art when used in connection with securities markets." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976). "It connotes intentional or willful conduct designed to deceive or defraud investors by controlling or *artificially* affecting the price of securities." *Id*. (emphasis added). "*Artificially*" means that "an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security." *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007). Deception "arises from the fact that investors are misled to believe "'that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators.'" *Id.* (quoting *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999)); *accord S.E.C. v. Malenfant*, 784 F. Supp. 141, 144 (S.D.N.Y. 1992) ("The central purpose of section 9(a) is not to prohibit market transactions which may raise or lower the price of

securities, but to keep an open and free market where the natural forces of supply and demand determine a security's price.") (citation omitted).  So, an act is manipulative if it is designed to deceive or defraud others by "send[ing] a false pricing signal to the market."  *Set Capital LLC v. Credit Suisse Group. AG*, 996 F.3d 64, 76 (2d Cir. 2021) (quoting *ATSI Communications*, 493 F.3d at 100).

Simple purchases of CEL token in the market—even if above what the government deems the amount necessary to pay rewards—were lawful and not "patently manipulative" the way "wash sales, matched orders or rigged prices" are.  *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977).  The prosecution cannot reasonably argue to the contrary.  *See GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 207 (3d Cir. 2001) ("it is unreasonable to infer unlawful intent from lawful activity") (internal quotes and citation omitted); *Id.* at 211 (trading "is neither deceptive nor manipulative when carried out in accordance with SEC rules and regulations").  They should not be permitted to do so.  *See, e.g.,* Indict. ¶ 83(b).

Nor can the government argue that the volume of the transactions is probative of manipulative intent.  *See, e.g.*, *Nanopierce Techs., Inc. v. Southridge Cap. Mgmt.*, No. 02 Civ. 0767, 2008 WL 1882702, at *2 (S.D.N.Y. Apr. 21, 2008) ("Unusually large sales, without a doubt, cannot be the basis for a market manipulation claim after *ATSI*."); *ATSI Communications Inc.*, 493 F.3d at 101 ("[S]hort selling—even in high volumes—is not, by itself, manipulative."); *GFL Advantage Fund*, 272 F.3d at 209 ("[S]hort selling, even in large volumes, is not in and of itself unlawful and therefore cannot be regarded as evidence of market manipulation."); *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 864 (7th Cir. 1995) (rejecting argument that the defendant's "unprecedented massive short selling" violated § 9(a)(2) of the Exchange Act,

because no "false impression of supply or demand" was created when there "were real buyers, betting against [the defendant]").

Even knowing that prices may rise or fall because of a transaction is not evidence of manipulative intent. *See Set Capital LLC*, 996 F.3d at 77 (open-market trading "is not, by itself, manipulative . . . even when it impacts the market price for a security"); *United States v. Mulheren*, 938 F.2d 364, 368 (2d Cir. 1991) ("When the transaction is effected for an investment purpose, the theory continues, there is no manipulation, even if an increase or diminution in price was a foreseeable consequence of the investment."); *GFL Advantage Fund*, 272 F.3d at 209 (potential to impact prices is a "natural consequence[] of a lawful and carefully regulated trading practice" and "not evidence of unlawful market manipulation"); *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 426 (S.D.N.Y. 2010) (trading not manipulative "even assuming that the effect of such trading was to depress the price" of a security). Every purchase, every sale can theoretically affect the market. Accordingly, there should be no argument that an impact on the price of CEL due to the natural consequence of buy or sell transactions is somehow manipulative.

For all these reasons, the Court should preclude the prosecution from arguing that a series of CEL transactions, even if greater than necessary for CEL rewards, or in large volumes, or that impacted the CEL price, necessarily constitutes manipulation or manipulative intent. Such an argument not only misstates the governing law but encourages the jury to draw improper conclusions. *Cf. Colson v. Cupp*, 449 F.2d 730, 731 (9th Cir. 1971) ("When the lawfulness of an act depends upon the guilty intent with which the act was done, it is patently wrong to tell a jury that it can infer the requisite intent simply from proof that a defendant did the act."); *United States v. Silver*, 864 F.3d 102, 118 (2d Cir. 2017) (vacating conviction where jury received

overbroad instruction that improperly "captured lawful conduct" and thus "could not have received a correct interpretation of the law"). This Court must preclude any prosecutorial attempt to bootstrap manipulative intent to lawful conduct.

### MOTION THREE: TO PRECLUDE IMPROPER SUMMARY CHARTS AND SUMMARY WITNESS TESTIMONY

This trial is expected to involve vast amounts of electronic evidence. The government's exhibits will likely include untold numbers of video recordings, email, text messages and other electronically stored information. In recent trials involving similar kinds of evidence, the government has called an agent or U.S. Attorney's Office paralegal as a summary witness to read select portions of the videos or electronic messages and/or present them in a summary chart. *See, e.g., United States v. Menendez*, 23 Cr. 490 (SHS); *United States v. Costanzo*, 22 Cr. 281 (JPO); *United States v. Milton*, 21 Cr. 478 (ER).

Federal Rule of Evidence 1006 provides that the proponent of evidence "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court" so long as the proponent makes "the originals or duplicates available for examination of copying, or both, by other parties at a reasonable time and place." Fed. R. Evid. 1006. Of course, the summary or chart must be accurate, authentic and properly introduced before it may be admitted in evidence. *See United States v. Denton*, 556 F.2d 811, 816 (6th Cir. 1977). A chart cannot be "a skewed selection of *some* of the documents to further the proponent's theory of the case." *United States v. Oloyede*, 933 F.3d 302, 311 (4th Cir. 2019) (citations omitted). That is, Rule 1006 does not authorize the admission of summary evidence for the purpose of generating a narrative to support the prosecution's theory of the case. *See United States v. Spalding*, 894 F.3d 173, 185 (5th Cir. 2018) ("'[B]ecause summaries are elevated under Rule 1006 to the position of evidence,' we

have warned, 'care must be taken to omit argumentative matter in their preparation lest the jury believe that such matter is itself evidence of the assertion it makes'" (quoting *United States v. Smyth*, 556 F.2d 1179, 1184 n.12 (5th Cir. 1977)); *United States v. Bray*, 139 F.3d 1104, 1110 (6th Cir. 1998) ("[I]nformation on the [Rule 1006] summary [must not be] embellished by or annotated with the conclusions of or inferences drawn by the proponent"). "[A] summary may . . . be considered as too conclusory or as emphasizing too much certain portions of the Government's case, or as presenting incompetent facts." *United States v. Scales*, 594 F.2d 558, 564 (6th Cir. 1979). "A chart which for any reason presents an unfair picture can be a potent weapon for harm, and permitting the jury to consider it is error." *United States v. Conlin*, 551 F.2d 534, 539 (2d Cir. 1977) (citing *Steele v. United States*, 222 F.2d 628, 630 (5th Cir. 1955)). Accordingly, "[t]rial courts may take care that such unfair summaries are not presented to juries." *Scales*, 594 F.2d at 564.

A summary witness may testify using "a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006; *see also Fagiola v. Nat'l Gypsum Co. AC & S, Inc.*, 906 F.2d 53, 57 (2d. Cir. 1990) (explaining a summary witness's role as providing "foundation testimony connecting [a summary] with the underlying evidence summarized"). "'[A] summary witness for the Government' cannot tell the jury 'what [is] in the evidence' and 'what inferences to draw from it' under Federal Rule of Evidence 701." *United States v. Barnwell*, No. 15 CR. 620 (NSR), 2017 WL 1063457, at *2 (S.D.N.Y. Mar. 20, 2017) (quoting *United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004). "'[G]reat care must be taken to ensure that the proposed summary contains no annotation or suggestion, even inferential, that may be considered argumentative.'" *UPS Store, Inc. v. Hagan*, No. 14CV1210, 2017 WL

3309721, at *5 (S.D.N.Y. Aug. 2, 2017) (quoting *Anderson v. Otis Elevator Co.*, No 11-10200, 2012 WL 5493383, at *3 (E.D. Mich. Nov. 13, 2012)).  And "[s]ummary witnesses are not to be used as a substitute for, or a supplement to, closing argument." *United States v. Fullwood*, 342 F.3d 409, 414 (5th Cir. 2003).

In sum, "a trial court is charged with grave responsibilities . . . to insure that an accused is not unjustly convicted in a 'trial by charts,' however impressive the array produced."  *Lloyd v. United States*, 226 F.2d 9, 17 (5th Cir. 1955).

"Trial by chart" rather than by percipient witnesses is a real danger.  In *United States v. Costanzo*, 22 Cr. 281 (SDNY) (JPO), a bribery case, four different U.S. Attorney's Office paralegals testified to several different summary charts and phone data. The government also used multiple agent-witnesses to read into the record electronic messages and communications that the agents were not party to and about which they had no knowledge.  Similarly, in *United States v. Milton*, 21 Cr. 478 (SDNY) (ER), the government called an agent who was not involved in the investigation to read at length from summary charts.  The uninformed agent admitted that she knew little about the case and that her chart showed "what [the prosecutor] and his colleagues asked [her] to show." (Trial Tr. 2433:13-15, Sep. 30, 2022, ECF No. 238). *See also id.* at 2434:12 ("I was told what should be included on the charts, yes.").

Of course, these paralegal and agent "summary witnesses" are hardly "witnesses" at all. They have no personal knowledge of the operative facts as per Fed. R. Evid. 602.  They are more akin to "broadcasters" or "readers" who simply read into the record the statements of other declarants, from charts the witness did not prepare. The government thereby can present its case using witnesses on the stand who are insulated from cross-examination about the contents of their charts, and present the statements of declarants who never take the stand and are never

subjected to cross-examination.  This can result in the summary witness essentially making an unrebuttable argument to the jury during the course of the trial.  *Fullwood,* 342 F.3d at 413 ("The purpose [of summary testimony] is not simply to allow the Government to repeat its entire case-in-chief shortly before jury deliberations.").

While not binding law, there has been at least some suggestion that summary charts may, in certain circumstances, implicate Confrontation Clause issues as well.  "[I]f a summary exhibit is being offered, if it was prepared in anticipation of litigation, and if the statements contain the results of subjective determinations of what is important and how it should be presented, then the Confrontation Clause demands that the defendant be given the opportunity to cross-examine the preparer of the summary."  Karim Basaria, *Summary Exhibits and the Confrontation Clause*: *Looking Beyond the Hearsay Rule for Evidentiary Implications of Crawford's Progeny*, The Journal of Law and Criminology Northwestern Vol. 102, No. 3, p. 875-76 (2012). https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=7439&context=jclc. As the Eighth Circuit put it: "The rule appears to contemplate . . . that a summary . . . will have been prepared by a witness available for cross-examination, not by the lawyers trying the case." *United States v. Grajales-Montoya*, 117 F.3d 356, 361 (8th Cir. 1997) (internal citations omitted). "Fed. R. Evid. 1006 does not allow for the admission of a summary . . . that was prepared by a lawyer trying the case and that restates and distills other properly admitted exhibits.  In fact, we believe that such a summary is a written argument."  *Id.; cf. United States v. Morin,* 538 F. App'x. 1, 3 (2d Cir. 2013) (Confrontation Clause was not violated where the defendant "was able to question the government agent who prepared" the summary chart, "as to the chart's accuracy.").

To avoid any potential prejudice or delay, the Court should order the government to disclose its summary charts, the identity of all those involved in preparing each chart, and a summary of any expected summary testimony, sufficiently in advance of trial to provide the defendant with a meaningful opportunity to move against the charts and/or prepare for cross-examination. *See, e.g., Barnwell*, 2017 WL 1063457, at *3.

### MOTION FOUR: TO PERMIT THE DEFENSE TO INTRODUCE OUT-OF-COURT COMMUNICATIONS FOR A NON-HEARSAY PURPOSE

The defense does not yet know which alleged misrepresentations the government will seek to introduce at trial. The defense is aware of the *categories* of misstatements that are described in the indictment, along with certain examples disclosed by the government. As to the market manipulation charges, the defense previously sought clarity from the government regarding the particular transactions that form the basis of the charges. ECF No. 69, at ¶ 5. The government responded, in sum and substance, that every CEL token purchase by Celsius throughout its four-year history is within scope of the manipulation charges. *Id.* at ¶ 6.

While still in the dark as to the fundamentals of the government's case, the defense expects that it will seek to introduce at least three essential categories of electronic documents and communications for a non-hearsay purpose. The Court should permit the defense to introduce such material into evidence.

### A.    Mr. Mashinsky's Instructions To His Team Are Not Hearsay

The defense will seek to introduce documentary and testimonial evidence reflecting Mr. Mashinsky's instructions to his team on various subjects. Although the defense cannot anticipate every topic that it will need to address at trial, one seems likely given the parties' dispute during the Rule 15 briefing. To the extent the government argues that CEL token purchases made by Celsius employees are all attributable to Mr. Mashinsky, the defense must be able to introduce

Mr. Mashinsky's repeated instructions that Celsius should either: (1) buy *less than* 100% of the amount of CEL tokens needed for customer rewards on public exchanges, or (2) generate revenue for the company through excess *sales* of CEL token via its OTC desk. *See, e.g.,* Westfal Decl. Exs. 3 and 4.  Both instructions undercut the government's core allegation that Mr. Mashinsky intended to artificially inflate the price of CEL token through excess purchases on exchanges and are therefore relevant.  Fed. R. Evid. 401; *United States v. Quattrone*, 441 F.3d 153, 188 (2d Cir. 2006) ("[S]o long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry.").

As to the government's expected hearsay objection, the law in the Second Circuit is clear that orders and instructions such as these are imperative rather than declarative statements and may be offered for the fact that they were said, and not for their truth.  *United States v. Dawkins*, 999 F.3d 767, 789 (2d Cir. 2021) (citing *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999) ("Statements offered as evidence of commands . . . rather than for the truth of the matter asserted therein, are not hearsay.")); *Cameron v. New York City Dept. of Educ.*, 15 Civ. 9900 (KMW), 2018 WL 1027710, at *5 (S.D.N.Y. Feb. 21, 2018) ("In general, commands are not hearsay unless they are used to prove the truth of an implicit assertion.") (citing *United States v. Dupree*, 706 F.3d 131, 136-37 (2d Cir. 2013) (holding that order was not hearsay because it consisted "primarily of imperative statements" and was a "verbal act")).  Mr. Mashinsky has no intention of using his out-of-court instructions to prove that his team followed them—*i.e.*, for their truth.  Rather, he intends to introduce such evidence to show that he provided those imperatives throughout the very period he was supposedly inflating the price of CEL token to artificial levels.

**B.    Reports And Other Information That Mr. Mashinsky's Team Provided To Him—And That Supported The Good-Faith Basis For His Charged Misstatements—Are Not Hearsay**

The law in this district requires the government to prove "that [the defendant] did not *believe* the statements were true at the time that he made them."  *United States v. Hild*, 644 F.Supp.3d 7, 26 (S.D.N.Y. 2022) (emphasis in original) (Abrams, J.).  Accordingly, the defense must be permitted to introduce the electronic documents and communications that Mr. Mashinsky received in his role as CEO that provided the good-faith basis for his public statements.   The defense will not be offering such material for the truth of any assertions within them, but rather to establish Mr. Mashinsky's good faith belief in the truth of his own statements.

The law in the Second Circuit is clear that documents and communications are admissible for just that non-hearsay purpose.  *United States v. Certified Environ. Services, Inc.*, 753 F.3d 72, (2d Cir. 2014) (ordering new trial and finding district court abused discretion in excluding evidence that "was not offered for its truth but to show that the statements occurred and that, given their effect on the defendants' state of mind, they provided a good faith basis for the defendants' actions.").

By way of example, the indictment alleges that Mr. Mashinsky lied when he allegedly stated in a December 2021 interview that "[t]he regulators looked into us and said these guys know what they're doing."  Indict. ¶ 41.  Mr. Mashinsky should be permitted to show that his statement was informed by his communications with Roni Cohen-Pavon, who was responsible for Celsius's interactions with regulators, including the SEC.  That is, Mr. Mashinsky was informed by Mr. Cohen-Pavon in a WhatsApp message only a few weeks prior in which he reported to Mr. Mashinsky that the "*SEC has confirmed to the states that we are a good actor and cooperating.  That's why we got the extension in NJ and now got another one on Alabama.  Hopefully that will ease some of the pressure*."  Westfal Decl. Ex. 5.  The reports and information

17

that Mr. Mashinsky received from his team are admissible for the non-hearsay purpose of establishing the good faith basis for his public statements.

### C.    Evidence Of Mr. Mashinsky's Questions Seeking Guidance Regarding His Public Statements Is Admissible

Mr. Mashinsky's WhatsApp communications with Mr. Cohen-Pavon show a clear pattern of Mr. Mashinsky seeking advice about whether he can announce something on an AMA, Twitter, or otherwise, including the company's CEL token buybacks.  Westfal Decl. Ex. 6.  Those communications from Mr. Mashinsky are admissible for two reasons.  First, it is blackletter law that questions are not hearsay.  *United States v. Oguns*, 921 F.2d 442, 449 (2d Cir. 1990)  ("An inquiry is not an 'assertion,' and accordingly is not and cannot be a hearsay statement.") (citation omitted).  Second, the statements are probative of Mr. Mashinsky's state of mind and rebut the alleged fraud.  Mr. Mashinsky does not seek to introduce the guidance he sought from Mr. Cohen-Pavon about other, unrelated topics, but rather about the very subject matters charged in the indictment as a years-long continuing scheme.

In cases where the government argues that the "Defendant's business was almost entirely fraudulent[,]" as it appears here, courts have not hesitated to admit evidence to disprove such a theory.  *See, e.g., United States v. James*, 607 F.Supp.3d 246, 257-58 (E.D.N.Y. 2022) (provisionally admitting evidence where "the Court is presently unaware of even a single non-fraudulent claim billed by Defendant, or more broadly, a non-fraudulent area of Defendant's billing practice.").  Here, the indictment alleges a fraudulent "yearslong scheme" to manipulate the price of CEL token through supposedly undisclosed "excess" purchases.  Indict. ¶¶ 6, 53.  Despite the defense's attempts for clarity on the scope of the case, the government has not narrowed its manipulation allegations to any particular time periods or transactions.  Rather, just like *James*, the defense expects the government to argue that Mr. Mashinsky's alleged

manipulation comprised hundreds of thousands of CEL token transactions spanning years. *See* 607 F.Supp.3d at 258; ECF No. 69, at ¶¶ 5-6; Indict ¶ 89 (charging wire fraud manipulation scheme from 2018 through June 2022).

The indictment asserts that Mr. Mashinsky's alleged scheme relied on the undisclosed nature of Celsius's purchases for its success in order to deceive the public and artificially manipulate the price of CEL. Indict. ¶ 53. Mr. Mashinsky's pattern of asking Mr. Cohen-Pavon whether he or Celsius could *announce* buybacks of CEL token therefore undercuts the government's underlying theory of prosecution and charges of uninterrupted fraudulent and manipulative intent. To the contrary, such repeated requests for permission and advice from the company's in-house lawyer bespeak an executive who was acting in good faith and consistently seeking to be transparent with the Celsius community. That is relevant and admissible evidence. *See United States v. Balboa, 12 Cr. 196 (PAC),* 2013 WL 6196606, at *3 (S.D.N.Y. Nov. 27, 2013); *James,* 607 F.Supp.3d at 257-58; *United States v. Sittenfeld,* 20 Cr. 142 (DRC), 2022 WL 2192955, at *13 (S.D. Ohio June 17, 2022) (admitting evidence that public official "had always supported such development projects, that could tend to negate any inference that might otherwise arise that Sittenfeld's intent was to exchange support for the project for campaign contributions as part of quid pro quo").

The Court should permit the defense to introduce these three categories of non-hearsay evidence to rebut the government's allegations and allow Mr. Mashinsky to present his defense.

**MOTION FIVE: TO PRECLUDE THE GOVERNMENT FROM REFERRING TO OR INTRODUCING ANY EVIDENCE RELATING TO THE CELSIUS BANKRUPTCY**

As previewed in Mr. Mashinsky's motion to strike the indictment's references to the Celsius bankruptcy, *see* ECF Nos. 42, 44, the defense moves to preclude the government from introducing any evidence relating to the bankruptcy filing or even mentioning the fact of the

filing.  Even if the government could make out some tangential relevance of the bankruptcy to

this case, its minimal probative value is substantially outweighed by the danger of unfair

prejudice, confusion, misleading the jury, and undue delay.  The Court need look no further than

the government's use of FTX's bankruptcy filing during the trial of Sam Bankman-Fried to see

the grave danger to Mr. Mashinsky's due process rights posed by allowing evidence of a

bankruptcy filing.

### A.    Evidence Relating To The Celsius Bankruptcy Is Irrelevant

In its recent prosecution of former FTX CEO Sam Bankman-Fried for securities fraud,

commodities fraud, and wire fraud—the same charges filed against Mr. Mashinsky—the

government moved to **exclude** evidence relating to the FTX corporate bankruptcy.  *United States*

*v. Bankman-Fried*, Case No. 22 Cr. 673 (LAK), ECF No. 204 at 49-53 (S.D.N.Y. Aug. 14, 2023).

The government's explanation was simple: "while the fact that the FTX and Alameda entities

declared bankruptcy on November 11, 2022, will certainly be put before the jury, the bankruptcy

proceeding itself is not relevant to whether the defendant is guilty of the charged offenses."  *Id.*

at 50.  It continued: "Evidence about the bankruptcy is not probative of the defendant's mental

state or the existence of a scheme to defraud, and **therefore it has no place in the trial**."  *Id.*

(emphasis added).  Judge Kaplan granted the government's motion that "all evidence and

argument about the bankruptcy proceeding—besides the fact that FTX and Alameda declared

bankruptcy—should be precluded."  *Id.* at 53; 22 Cr. 673 (LAK), ECF No. 289 at 12-13.

Mr. Mashinsky agrees that evidence about the underlying bankruptcy proceedings has no

place in the trial.  Nor does the simple "fact" of the bankruptcy filing.  The real reason the

government wants to introduce the fact of the bankruptcy is simple: bankruptcy is often linked

(erroneously) with failure, corruption and fraud and it will be used as a code word for "customer

losses."  But that is misleading.  In *Bankman-Fried*, after the government referred to "the fact" of the bankruptcy, it offered or elicited that "customers lost 8 billion dollars" approximately *97 times* during the trial.  Yet FTX has now proposed an amended bankruptcy plan that would distribute more than 100% of the value of customer claims.[1]  The judge overseeing FTX's bankruptcy approved that plan, which reportedly will repay customers "an average of 118% of the value of their holdings at the time FTX filed for bankruptcy in November of 2022, though some could get up to 140%[.]"[2]

Here, distributions are already underway.  According to a recent status report from Celsius's bankruptcy plan administrator, the defense understands that the company has either distributed or announced the distribution of more than $3.73 billion[3] in value to its customers, and that it will be distributing additional "net assets" in the future, which currently total another $665 million.  *See In re: Celsius Network LLC*, Case No. 22-10964 (MG), Dkt. No. 7637 (Plan Administrator's First Status Report on Distributions) at 7, 22-23, 33 (Bankr. S.D.N.Y. Aug. 26, 2024).

The point is simple: loss is not an element of any of the fraud charges, and bankruptcy doesn't equate with loss in any event.  The government should thus be precluded from using "the fact" of a bankruptcy filing to make inflammatory and misleading arguments about loss.

---

[1] *FTX files amended reorganization plan, expects $14.5 bln - $16.3 bln for distribution*, Reuters (May 9, 2024), available at: https://www.reuters.com/technology/ftx-files-amended-reorganization-plan-expects-between-145-bln-163-bln-2024-05-07/ ("Crypto exchange FTX will have between $14.5 billion to $16.3 billion to pay its creditors and customers, according to an amended reorganization plan filed by the company . . . The plan put forward by FTX creates a 'convenience class' for creditors with claims of $50,000 or lower, under which it anticipates that [a] majority of the creditors will receive about 118% of the amount of their claims within 2 months.").

[2] Ligon, Cheyenne, *Delaware Judge Approves FTX Estate's Bankruptcy Plan*, Coindesk (October 7, 2024), available at: https://www.coindesk.com/policy/2024/10/07/delaware-judge-approves-ftx-estates-bankruptcy-plan/.

[3] Celsius's bankruptcy distribution to date includes approximately 32.6 million shares of a bitcoin mining company called Ionic Digital valued at $20 per share, or approximately $652 million in value.  *See* Celsius Creditor FAQs at 1, available at: https://odysseytrust.com/wp-content/uploads/2024/01/Ionic_Digital_FAQs.pdf.

The government's strained efforts to drag the Celsius bankruptcy into this trial are lame. The government argues that Celsius's bankruptcy is relevant because it happened "such a short time after Mashinsky offered investors false and misleading reassurances about the safety of their assets[.]" ECF No. 43, at 26-27.  But the only statement by Mr. Mashinsky that the government cited was dated May 27, 2022, more than a month-and-a-half before Celsius's bankruptcy filing. *Id.* (citing Indict. ¶ 45).  The government has identified no evidence that Mr. Mashinsky, or any other executive at Celsius, was even contemplating the possibility of bankruptcy on May 27, 2022.  In fact, the defense expects the evidence to show that Celsius did not engage any bankruptcy advisors until after the June 12, 2022 pause on customer withdrawals.  Westfal Decl. Ex. 7 (at pages 00079936-37) (Minutes of June 12, 2022 Meeting of Board of Directors).

The government also cites three uncharged statements by Mr. Mashinsky about the ownership of customers' crypto assets in the Earn program.  *See* ECF No. 43 at 27 ("These are your coins, not our coins.").  Each of those uncharged statements pre-dated Celsius's July 2022 bankruptcy filing by more than a year, including one from July 24, 2020, and another in November 2019.  *Id.*  The government has cited no authority to overcome the overwhelming body of law that fraud-by-hindsight is an impermissible fraud theory in the Second Circuit.  *See* ECF No. 44 at 15-16.

In evaluating the supposed relevance of a July 2022 corporate bankruptcy filing to alleged misrepresentations about the ownership of customer crypto assets going back as early as 2019, it is critical to recognize that the ownership of customer cryptocurrency in Earn programs was a complex legal issue that was not resolved until ***after*** the Celsius bankruptcy filing—that is, years after Mr. Mashinsky's public statements that the government alleges to have been knowing and willful misrepresentations:

> Who owns the cryptocurrency assets deposited in Earn Accounts (defined below)
> by Celsius's account holders before the July 15, 2022 petition date (the "Petition
> Date")?  This is a gating issue at the center of many disputes in this case.

*In re: Celsius Network LLC*, 647 B.R. 631, 636 (Bankr. S.D.N.Y. Jan. 4, 2023).[4]  The idea that

Mr. Mashinsky anticipated the outcome of a hotly disputed bankruptcy-law issue that would not

be resolved until ***years later*** strains credulity.  If that is the government's fraud theory as to the

three uncharged statements cited in its opposition to Mr. Mashinsky's motion to strike, the

defense objects, and the government should be precluded from introducing any such alleged

misstatements into evidence.  *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("[W]e

have refused to allow plaintiffs to proceed with allegations of 'fraud by hindsight.'  Corporate

officials need not be clairvoyant; they are only responsible for revealing those material facts

reasonably available to them.") (citations omitted); *see also* ECF No. 44 at 15-16 (collecting

cases rejecting fraud by hindsight).

**B.    Any Minimal Probative Value Of The Celsius Bankruptcy Is Substantially Outweighed By The Myriad Dangers That Such Evidence Poses**

Even accepting the government's strained theories of relevance, the minimal probative

value of evidence relating to the Celsius bankruptcy is substantially outweighed by the dangers

that evidence poses to Mr. Mashinsky's right to a fair trial.  Fed. R. Evid. 403.  The government

itself has acknowledged those dangers in similarly charged cases.  *Bankman-Fried*, 22 Cr. 673

(LAK), ECF No. 204 (gov't motions *in limine*) at 51 (evidence relating to bankruptcy "is certain

---

[4]  *See also* Wise, J. Eric, *Determining Cryptocurrency Ownership in Bankruptcy* (March 23, 2023), available at: https://www.alston.com/en/insights/publications/2023/03/determining-cryptocurrency-ownership-in-bankruptcy ("Cryptocurrency is new, and ***there is no body of developed law*** precisely defining title to digital assets.  What account holders are entitled to will be ***cases of first impression***[.]") (emphases added); Salzberg, Mark, *Who Owns the Crypto: Bankruptcy Court Rules that Customers Do Not Own the Deposited Crypto* (November 29, 2023), available at: https://www.restructuring-globalview.com/2023/11/us-who-owns-the-crypto-bankruptcy-court-rules-that-customers-do-not-own-the-deposited-crypto/ ("Who owns cryptocurrency held by a cryptocurrency exchange? . . . The answer to this question will have huge significance, both in terms of creditor recoveries as well as preferential transfer liability exposure.  The ownership issue ***first arose*** in the Chapter 11 cases field by Celsius Network LLC and its affiliated debtors[.]") (emphasis added).

to confuse the jury" and "will unnecessarily prolong the trial").  References to Celsius's bankruptcy at trial pose a grave risk of unfair prejudice.  *See HTC Corp. v. Tech. Properties Ltd.*, No. 5:08 Civ. 0082-PSG, 2013 WL 4782598, at *2 (N.D. Cal. Sept. 6, 2013) ("A reference to bankruptcy may trigger visceral reactions among jurors and the court believes such a reaction carries a risk of substantial unfair prejudice.").

On top of the fact that a declaration of bankruptcy is not a permanent death knell for investors, or a proxy for losses, it can stoke anger from the jury targeted at the defendant, evoke sympathy for victims, and lead to a verdict based on raw emotion rather than evidence.  Such tactics have no place in a criminal trial.  *See Old Chief v. United States*, 519 U.S. 172, 180 (1997) ("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."); Advisory Committee's Notes on Federal Rule of Evidence 403 ("'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.").  Yet the language of the indictment and the government's opposition to Mr. Mashinsky's motion to strike suggest that it is planning to exploit the bankruptcy in this case.  Indict. ¶¶ 42-43 (alleging that the July 2022 Celsius bankruptcy filing "*proved the falsity*" of claims by Mr. Mashinsky 15 months earlier in April 2021); ECF No. 43 at 26 ("This event, termed the 'Pause,' was not a pause but a *permanent injunction*, as Celsius filed for bankruptcy only one month later . . .") (emphasis added).  Even giving the government the benefit of the doubt as to the tangential relevance of the Celsius bankruptcy, such minimal probative value is substantially outweighed by the dangers posed by such evidence.  The Court therefore should preclude all evidence relating to the Celsius bankruptcy under Federal Rule of Evidence 403.

**C.    If The Government Is Permitted To Introduce Evidence Relating To the Celsius Bankruptcy, The Defense Must Be Permitted To Meet It**

If the government is permitted to introduce evidence relating to the Celsius bankruptcy, Mr. Mashinsky should be permitted to introduce evidence that the bankruptcy was caused by a confluence of factors, and that he never intended to cause any losses or harm to Celsius customers.  Such evidence is highly relevant, and such context essential in a fraud case in which the government must prove that causing injury to Celsius customers was "an 'object of the fraud.'"  *Kelly v. United States*, 590 U.S. 391, 402 (2020); *see also Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924) (Fraud requires the "wrongful purpose of injuring one in his property rights."); *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) ("[T]he proof must demonstrate that the defendant had a conscious knowing intent to defraud and that the defendant contemplated or intended some harm to the property rights of the victim."); *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (To prove fraud, the government must "prove that defendants *contemplated* some actual harm or injury to their victims.  Only a showing of intended harm will satisfy the element of fraudulent intent.") (emphasis in original); *United States v. Regent Off. Supply Co.*, 421 F.2d 1174, 1181 (2d Cir. 1970) ("[T]he purpose of the scheme 'must be to injure.'").

The defense cannot say with certainty at this stage how the government intends to use Celsius's bankruptcy filing at trial.  But if the Court allows the evidence, Mr. Mashinsky must be permitted to respond.  *United States v. Rhodes*, 229 F.3d 659, 661 (7th Cir. 2000) ("Evidence relevant to undercut a charge is no less relevant to bolster it; the standard under Rule 401 is symmetric.").  If the government plans to suggest that the bankruptcy filing is proof of customer loss, then the defense must be permitted to introduce evidence from the bankruptcy proceeding to show that customers may not suffer any losses at all.  Mr. Mashinsky also must be permitted to

show that to date, Celsius has paid out or announced the distribution of more than $3.73 billion to its customers, and that the company plans to continue distributing additional value in the future. *In re: Celsius Network LLC*, Case No. 22-10964 (MG), Dkt. No. 7637 (Plan Administrator's First Status Report on Distributions), at 33. For example, the defense understands that Celsius is currently seeking to recover more than $3 billion in assets from various counterparties in adversary proceedings and avoidance actions. *See, e.g., Celsius Network Limited, et al. v. Tether Ltd., et al.*, Case No. 22-10964 (MG), Dkt. No. 7594 (Bankr. S.D.N.Y. Aug. 9, 2024) (adversary proceeding to recover 39,542.42 Bitcoin from Tether, currently valued at approximately $2.5 billion); *Celsius Network Limited v. Equities First Holdings, LLC*, Case No. 22-10964 (MG), Adv. Proc. 23-01167, Dkt. No. 57 (Bankr. S.D.N.Y. Dec. 22, 2023) (adversary proceeding to recover confidential amount for breach of contract, believed to be more than $300 million); *In re FTX Trading Ltd.*, Case No. 22-1106 (JTD), Dkt. No. 22774 (Celsius Litigation Administrator's Response to Debtors' Objection to Proofs of Claim), at 8 (Bankr. D. Del. Aug. 12, 2024) (action to recover "no less than $444,457,844" from FTX).

If the government intends to suggest that somehow the Celsius bankruptcy reflects Mr. Mashinsky's intent, then it is essential that Mr. Mashinsky be permitted to rebut that allegation. The categories of evidence needed to do so will likely include the following:

- Evidence that for nearly a year before the bankruptcy, Mr. Mashinsky was focused on de-risking Celsius's portfolio and repeatedly instructed his team to achieve that objective. *See, e.g.,* Westfal Decl. Exs. 8-10.

- Evidence that Celsius's bankruptcy filing followed the collapse of Terra Luna and the de-pegging of its UST stablecoin from the price of the U.S. dollar—a cataclysmic market event that: (i) caused the crypto industry to lose nearly $60 billion in value overnight, *What Really Happened to LUNA Crypto*, Forbes (Sept. 21, 2022), available at:

https://www.forbes.com/sites/qai/2022/09/20/what-really-happened-to-luna-crypto/ ("When the Luna crypto network collapsed, it's estimated that $60 billion got wiped out of the digital currency space."); (ii) caused cryptocurrency prices to crater across the entire industry, *see id.* ("It's estimated that the Luna crash ended up tanking the price of bitcoin and causing an estimated loss of $300 billion in value across the entire cryptocurrency space."); and (iii) forced several of Celsius's institutional customers and competitors to file for bankruptcy. *See, e.g.,* Sigalos, M., *From $10 Billion to Zero: How a Crypto Hedge Fund Collapsed and Dragged Many Investors Down With It*, CNBC (July 11, 2022), available at: https://www.cnbc.com/2022/07/11/how-the-fall-of-three-arrows-or-3ac-dragged-down-crypto-investors.html ("The fall of Three Arrows Capital can be traced to the collapse in May of terraUSD (UST), which had been one of the most popular U.S. dollar-pegged stablecoin projects."); *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943, Dkt. No. 1 (Voluntary Petition for Non-Individuals Filing for Bankruptcy) (Bankr. S.D.N.Y. July 5, 2022).

- Evidence that this confluence of events, followed by false rumors connecting Celsius to the Terra Luna collapse, and a run on the bank led to the unanimous decision by Celsius's board of directors to pause customer withdrawals. Westfal Decl. Ex. 7 at 2-3.

This is the evidence that the defense has currently identified as necessary to respond to the government's expected attempt to use Celsius's bankruptcy to suggest that customers are certain to suffer losses, or that somehow Mr. Mashinsky intended that result. The defense will likely need to introduce additional evidence as it learns more about the government's trial strategy.

In sum, the Court should preclude the government from mentioning the Celsius bankruptcy or introducing any evidence relating to it under Federal Rules of Evidence 401 and 403. Adding complex and prejudicial bankruptcy proceedings to an already complicated cryptocurrency criminal trial will guarantee massive delay and confusion and would open the floodgates to a trial within a trial. The evidence should be excluded.

**MOTION SIX: TO ADMIT DEFENSE EVIDENCE RESPONSIVE TO THE GOVERNMENT'S THEORY THAT MR. MASHINSKY WITHDREW ASSETS FROM CELSIUS BECAUSE HE KNEW IT WOULD FAIL**

It appears the government intends to introduce the following evidence about Mr. Mashinsky's withdrawal of his "non-CEL crypto assets" from Celsius in May 2022:

- On or about May 10, 2022, Mr. Mashinsky allegedly "held millions of dollars' worth of crypto assets on Celsius's platform excluding his CEL holdings." Indict. ¶ 46.

- On or about May 15, 2022, Mr. Mashinsky allegedly "withdrew approximately $2.9 million worth of non-CEL crypto assets from his Celsius accounts." *Id.*

- On or about May 27, 2022, Mr. Mashinsky allegedly "withdrew an additional approximately $5.1 million worth of non-CEL crypto assets from his Celsius accounts." *Id.*

- By that time, Mr. Mashinsky allegedly "had removed almost all of his non-CEL crypto assets from the Celsius platform, leaving Mashinsky with only approximately $1 million worth of non-CEL assets on Celsius's platform by the end of May 27, 2022." *Id.*

- On that same day, May 27, 2022, Mr. Mashinsky allegedly told Celsius customers on an AMA that "we all have our money in the same platform. I have millions of dollars of my money on the platform as well. And obviously we're in it together." *Id.* at ¶ 45.

Thus, the government seemingly intends to argue that Mr. Mashinsky's withdrawals evince a consciousness of guilt: that is, Mr. Mashinsky lied to customers on the May 27, 2022 AMA and concealed that he was withdrawing his own "non-CEL crypto assets" from Celsius because he knew it was a sinking ship. *See* ECF No. 43 at 26 (arguing that "Mashinsky protected himself by withdrawing millions of dollars' worth of his own assets from the very platform he assured customers was solvent (Indict. ¶ 46).").

The defense must be permitted to show the second half of that story, the half that explains the innocent reason Mr. Mashinsky withdrew his non-CEL crypto assets in May 2022. *See United States v. Biaggi*, 909 F.2d 662, 692 (2d Cir. 1990) (ordering new trial based on district

court's error in excluding evidence "highly significant to a fair presentation of defense[,]" which was "exacerbated when the Government presented evidence of [the defendant's] consciousness of guilt"); *United States v. Brandt*, 196 F.2d 653, 657 (2d Cir. 1952) ("Conversely the jury should be entitled to weigh the importance of a contrary attitude on [the defendants'] part."); *see also Quattrone*, 441 F.3d at 188 ("[S]o long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry.").

The government knows the answer. Mr. Mashinsky's former counsel already explained it to the SEC in a January 2023 presentation (about six months before the indictment) and then told the government about that presentation in a May 2023 attorney proffer (about two months before the indictment). The presentation is attached to this motion as Westfal Decl. Exhibit 11, and shows the following:

- In 2022, Mr. Mashinsky received 1099s from Celsius for 2021 that totaled $15,362,041.25. Westfal Ex. 11 (at pages 03434387 through 03434395).

- Between May 16 and May 27, 2022, Mr. Mashinsky withdrew approximately $8 million in crypto assets from Celsius and placed them in his Coinbase wallet so he could convert them into U.S. dollars. *Id.* (at pages 03434396 to 03434397).

- Between May 15 and July 15, 2022, Mr. Mashinsky transferred approximately $8.6 million from his Coinbase account to his Fidelity account in 33 transfers of the $250,000 daily limit, one transfer of $215,000, and one transfer of $135,740. *Id.* (at pages 03434396 and 03434398-99).

- Between June 16 and July 8, 2022, Mr. Mashinsky made $5 million in tax payments from his Fidelity account to the IRS and the New York State Department of Taxation and Finance. *Id.* (at pages 03434400 through 03434403).

- In October 2022, Mr. Mashinsky made another $5.7 million in tax payments to the IRS. *Id.* (at pages 03434404 through 03434405).

- Between January 19, 2022 and April 30, 2022—*i.e.*, in the months leading up to the withdrawals highlighted by the government—Mr. Mashinsky <u>deposited</u>

more than $6.4 million into his Celsius accounts, meaning his net withdrawals between January and May 27, 2022 were approximately $1.6 million, followed by the approximately $10.7 million in tax payments in the ensuing months. *Id.* (at page 03434406).

- At the time of the June 12, 2022 pause, Mr. Mashinsky had more than 57 million CEL tokens on the Celsius platform. *Id.* (at page 03434407).

Thus, on May 27, 2022, when, according to the government, Mr. Mashinsky was apparently done emptying his Celsius accounts, the CEL tokens in his Celsius accounts were worth more than $30 million.[5] The 57 million CEL tokens never left Mr. Mashinsky's accounts thereafter, and he has not received any financial benefit from those tokens since the pause.

This evidence provides critical context to withdrawals that the government apparently deems consciousness of guilt; it completes the narrative to show that Mr. Mashinsky withdrew assets from Celsius *to pay his taxes*, not because he believed the company was going under; and it shows that Mr. Mashinsky did not lie to customers on May 27, 2022 when he told them he had millions of dollars on the platform.

If the government opposes the admission of such evidence on hearsay grounds, it is wrong there, too. In *United States v. Williams*, 930 F.3d 44 (2d Cir. 2019), the Second Circuit recognized that the common law rule of completeness covered "not only writings taken out of context, but also . . . the truncated use of *acts*, declarations, and conversations." *Id.* at 59 (emphasis added) (citation omitted). The Court described as "simply not correct" the government's suggestion that "evidence proffered under the rule of completeness may be excluded whenever not independently admissible due to the hearsay rule." *Id.* at 60. Instead, the Court ruled that:

> [W]hen the omitted portion of a statement [or act] is *properly* introduced to correct a misleading impression or place in context that portion already admitted, it is *for this very reason* admissible for a valid, *nonhearsay* purpose: to explain and ensure

---

[5] Historical CEL token price available at: https://coinmarketcap.com/historical/20220527/.

> the fair understanding of the evidence that has already been introduced. As we have
> said before, "even though a statement may be hearsay," it nevertheless "must be
> placed in evidence if necessary to explain the admitted portion [of this statement],
> to place the admitted portion in context, to avoid misleading the jury, or to ensure
> the fair and impartial understanding of the admitted portion."

*Id.* (emphasis in original) (citations omitted). Recently amended Federal Rule of Evidence 106 now captures this ruling: "If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time. The adverse party may do so over a hearsay objection." Fed. R. Evid. 106; *see also* Committee Note (1) on 2023 Amendment ("An example is the defendant in a murder case who admits that he owned the murder weapon, but also simultaneously states that he sold it months before the murder. The statement about selling the weapon corrects a misimpression only if it is offered for its truth. In such cases, Rule 106 operates to allow the completing statement to be offered as proof of a fact.").

The government's narrative about Mr. Mashinsky's withdrawals from Celsius in May 2022 is incomplete and misleading without the evidentiary context for why those withdrawals occurred. The Court should grant Mr. Mashinsky's motion and permit the defense to provide that necessary context to the jury.

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Mashinsky respectfully requests that the Court grant his motions *in limine* and order the relief requested herein.

31

Dated:  New York, New York
        October 11, 2024

MUKASEY YOUNG LLP

 /s/ Michael F. Westfal
Marc L. Mukasey
Torrey K. Young
Michael F. Westfal

570 Lexington Avenue, Suite 3500
New York, NY 10022
Tel: (212) 466-6400
Email: michael.westfal@mukaseylaw.com

*Counsel for Alexander Mashinsky*