UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| UNITED STATES OF AMERICA |
| v. |
| ALEXANDER MASHINSKY, |
| Defendant. |

Case No. 23 Cr. 347 (JGK)

**REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE (<u>LETTER ROGATORY</u>)**

**FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK TO THE APPROPRIATE AUTHORITY IN THE FEDERAL REPUBLIC OF GERMANY, GREETINGS:**

The United States District Court for the Southern District of New York presents its compliments to the appropriate Central Authority of the Federal Republic of Germany and requests international judicial assistance to obtain evidence to be used in a criminal prosecution before this Court in the above-captioned matter (the "Action"). A trial in this matter is scheduled at present for January 28, 2025, in New York, New York, United States of America.

The District Court requests the assistance described herein as necessary in the interests of justice. The assistance requested is that the appropriate Central Authority of the Federal Republic of Germany, or the appropriate judicial authority of the Federal Republic of Germany, obtain the sworn deposition testimony of Johannes Treutler, a citizen of Germany residing in Berlin, for use as evidence in the Action. The District Court believes that the evidence sought is relevant and material to the issues in dispute in this case, as Mr. Treutler's testimony could "challenge central aspects of the [G]overnment's allegations" against the defendant, Alexander Mashinsky ("Defendant"). *See* Exhibit A (November 8, 2024 Memorandum Opinion & Order) at pages 18-21.

This request is made pursuant to, and in conformity with, 28 U.S.C. § 1781 and the Mutual Legal Assistance Treaty ("MLAT") between the United States and Germany signed October 14, 2003 and entered into force October 18, 2009, which allows United States federal judges to submit a request directly to the German Central Authority and allows the German Central Authority to respond in the same manner. The District Court is authorized by 28 U.S.C. §§ 1781 and 1782 to extend similar assistance on request of the judicial authorities of Germany.

The Action involves a criminal prosecution by the United States Department of Justice ("DOJ") of Defendant Alexander Mashinsky, a citizen of the United States. *See* Exhibit B (Indictment).

The United States District Court for the Southern District of New York, through the offices of the representatives of the Defendant, is prepared to reimburse your court and/or office for all costs incurred in executing the instant Letter Rogatory and the assurance of its highest consideration.

| | |
|---|---|
| **SENDER:** | The Honorable John G. Koeltl<br>United States District Judge<br>United States Courthouse for the Southern<br>   District of New York<br>500 Pearl Street, Courtroom 14A<br>New York, New York 10007<br>United States of America<br>Don Fletcher, Case Manager<br>(212) 805-0107<br>donnie_fletcher@nysd.uscourts.gov |
| **CENTRAL AUTHORITY OF THE REQUESTED STATE:** | Federal Ministry of Justice<br>Mohrenstraße 37<br>10117 Berlin<br>+49 (0) 3018 580-0<br><br>Senate Department for Justice, Berlin<br>Salzburger Straße 21 – 25<br>10825 Berlin<br>+49 (0)30 9013-3140 |
| **PERSON TO WHOM THE EXECUTED REQUEST IS TO BE RETURNED:** | The Honorable John G. Koeltl<br>United States District Judge<br>United States Courthouse for the Southern<br>   District of New York<br>500 Pearl Street, Courtroom 14A<br>New York, New York 10007<br>United States of America<br>Don Fletcher, Case Manager<br>(212) 805-0107<br>donnie_fletcher@nysd.uscourts.gov |

**IN CONFORMITY WITH 28 U.S.C. § 1781, THE UNDERSIGNED APPLICANT HAS THE HONOR TO SUBMIT THE FOLLOWING REQUEST:**

| | |
|---|---|
| **REQUESTING JUDICIAL AUTHORITY:** | The Honorable John G. Koeltl<br>United States District Judge<br>United States Courthouse for the Southern<br>    District of New York<br>500 Pearl Street, Courtroom 14A<br>New York, New York 10007<br>United States of America<br>Don Fletcher, Case Manager<br>(212) 805-0107<br>donnie_fletcher@nysd.uscourts.gov |
| **TO THE COMPETENT AUTHORITY OF THE FEDERAL REPUBLIC OF GERMANY:** | Federal Ministry of Justice<br>Mohrenstraße 37<br>10117 Berlin<br>+49 (0) 3018 580-0<br><br>Senate Department for Justice, Berlin<br>Salzburger Straße 21 – 25<br>10825 Berlin<br>+49 (0)30 9013-3140 |

| NAMES AND ADDRESSES OF THE PARTIES AND THEIR REPRESENTATIVES: | United States Department of Justice:<br><br>Allison Nichols<br>Adam Hobson<br>Peter Davis<br>United States Attorney's Office, Southern District of New York<br>26 Federal Plaza, 37th Floor<br>New York, New York 10278<br>United States of America<br>Allison.Nichols@usdoj.gov<br>Adam.Hobson@usdoj.gov<br>Peter.Davis2@usdoj.gov<br><br><br>Defendant Alexander Mashinsky:<br><br>Marc L. Mukasey<br>Torrey K. Young<br>Michael F. Westfal<br>Mukasey Young LLP<br>570 Lexington Avenue, Suite 3500<br>New York, New York 10022<br>United States of America<br>Marc.mukasey@mukaseylaw.com<br>Torrey.young@mukaseylaw.com<br>Michael.westfal@mukaseylaw.com |
|---|---|

## FACTS

The United States Department of Justice has brought charges in the United States against Alexander Mashinsky, a citizen of the United States. *See* Exhibit B (Indictment). The DOJ alleges that Mr. Mashinsky founded and controlled Celsius Network LLC and its related entities (collectively, "Celsius"), which was a cryptocurrency company where customers could deposit crypto assets and earn interest. The Indictment alleges that Mr. Mashinsky orchestrated a scheme to defraud Celsius's customers by misleading them about core aspects of Celsius's business, including the success and profitability of the company and the nature of the investments that Celsius made with customer funds. The Indictment also alleges that Mr. Mashinsky and other individuals at Celsius conspired to manipulate, and in fact manipulated, the price of Celsius's proprietary cryptocurrency token, which was called CEL.

The Indictment charges Mr. Mashinsky in seven criminal counts. Counts One through Three ("Fraud Counts") charge that Mr. Mashinsky committed securities fraud, commodities fraud, and wire fraud on customers of Celsius by making false and misleading statements about

Celsius's financial condition and operations. Counts Four through Seven ("Manipulation Counts") charge Mr. Mashinsky with committing securities fraud, market manipulation, and wire fraud by manipulating the price of CEL token, as well as conspiring with others to manipulate the price of CEL token. The DOJ's manipulation theory includes the allegation that Celsius secretly purchased more CEL tokens on cryptocurrency exchanges than the company represented to the public in order to artificially inflate the price of CEL token.

With respect to the Fraud Counts, one of the categories of allegedly false and misleading statements made by Mr. Mashinsky was that Celsius employed a market-neutral trading strategy and did not make so-called "directional bets," which the Indictment describes as "gambling on the future value of cryptocurrencies by taking long or short positions in various crypto assets[.]" *See* Ex. B at ¶ 31. Johannes Treutler, who served as the head of Celsius's Yield Desk and who executed various trading strategies for Celsius, is quoted in the Indictment as allegedly informing Mr. Mashinsky that, with respect to a proposed trading strategy, "[n]o matter how we structure those momentum trades we would take a directional bet." *See* Ex. B at ¶ 32. It also appears that Mr. Treutler may have engaged in directional trading throughout the second half of 2021, without disclosing that activity to Mr. Mashinsky until January 2022, after the trading had resulted in significant losses for Celsius. *See* Ex. A at 19-20.

With respect to the Manipulation Counts, it appears that Mr. Treutler was primarily responsible for executing Celsius's weekly purchases of CEL tokens on cryptocurrency exchanges. Mr. Treutler was also the head of Celsius's over-the-counter ("OTC") desk, which appears to have been responsible for executing OTC sales of CEL tokens in response to inbound purchase requests from Celsius customers. The DOJ has disclosed to the Defendant excerpts of notes from five meetings that it has held with Mr. Treutler or his attorney between December 14, 2022 and January 18, 2023. In several respects, those excerpts appear to contradict the DOJ's allegations against Mr. Mashinsky, including as follows:

1. Mr. Treutler reported to the DOJ that he "*did not understand*" the language used by Mr. Mashinsky and others at Celsius "*as manipulation talk at the time*."

2. At times Mr. Treutler wanted [another Celsius employee] to buy more CEL token as a hedge for Celsius's over-the-counter CEL token sales. Sometimes the purchases were more than Mr. Mashinsky and other executives were prepared to authorize.

3. Mr. Treutler and [his supervisor] believed that hedging [*i.e.*, buying CEL tokens to offset over-the-counter CEL sales] was a very important aspect of the OTC desk and [his supervisor] expressed concern about depleting Celsius's treasury supply of CEL tokens too fast. Mr. Treutler reported to the DOJ that Mr. Mashinsky and his co-founder wanted Celsius to hedge [*i.e.*, buy] less.

4. Mr. Mashinsky and his co-founder were interested in generating proceeds from over-the-counter sales of CEL tokens and wanted to monetize Celsius's CEL token treasury.

5. When asked by the Federal Bureau of Investigation ("FBI") if Mr. Mashinsky ever instructed him to support the price of CEL by eliminating sellers from the order book, Mr. Treutler responded that he never received such an instruction from Mr. Mashinsky.

6. When asked by the FBI if Celsius was manipulating the market for CEL token, Mr. Treutler denied that such manipulation took place.

7. When asked by the FBI if Mr. Mashinsky ever directed him to make the market for CEL token look stronger by purchasing CEL in the market, Mr. Treutler responded that Mr. Mashinsky did not ask him to execute any purchases of CEL token.

8. When asked by the FBI if Mr. Mashinsky wanted to enable the use of CEL token as collateral for loans by making the market for CEL token appear stronger, Mr. Treutler denied that was the case and explained that Mr. Mashinsky was focused on increasing the utility of CEL token for Celsius's customers.

9. When asked by the FBI if he had knowledge that Celsius was consistently buying more CEL token than what it had represented to the public, Mr. Treutler responded, "*No, definitely not*."

### EVIDENCE TO BE OBTAINED

Defendant Alexander Mashinsky seeks to obtain sworn deposition testimony from Johannes Treutler in Germany in order to support his trial defense.

| | |
|---|---|
| **EVIDENCE TO BE OBTAINED:** | The taking of sworn, transcribed, video-recorded deposition testimony of Johannes Treutler, a third-party witness in this matter. |
| **IDENTITY AND ADDRESS OF PERSON TO BE EXAMINED:** | Johannes Treutler<br>██████████ Germany ████████ |
| **PRIOR ADDRESSES OF PERSON TO BE EXAMINED:** | ██████████ Germany<br>██████████ Germany |

## QUESTIONS PROPOSED TO MR. TREUTLER

Defendant Alexander Mashinsky seeks permission to ask Mr. Treutler questions concerning the same subject matter about which Mr. Treutler and/or his attorney have already spoken to the United States Department of Justice on at least five separate occasions, as well as other matters pertinent to the Indictment. Such questions would encompass the time period from 2019 through 2022, and would concern, for example:

1. Whether Mr. Treutler entered into a criminal conspiracy with Mr. Mashinsky to manipulate the price of CEL token through excess purchases on cryptocurrency exchanges.

2. Whether Mr. Treutler received instructions from Mr. Mashinsky to purchase an excess amount of CEL token in order to artificially inflate the price of CEL token.

3. Whether Mr. Treutler received instructions from Mr. Mashinsky to sell CEL token via the company's OTC desk in order to generate revenue for Celsius, and if so, the timing of those instructions and whether they were followed.

4. Whether Mr. Treutler received instructions from Mr. Mashinsky to use CEL tokens from Celsius's treasury to pay weekly customer rewards instead of purchasing CEL tokens on cryptocurrency exchanges, and if so, the timing of those instructions and whether they were followed.

5. Whether Celsius's written procedures for purchasing CEL token on cryptocurrency exchanges (which Mr. Treutler drafted) were intended to manipulate the price of CEL token.

6. Whether those written procedures were reviewed and approved by Celsius's Executive Committee, in house lawyers and outside counsel.

7. Whether Mr. Treutler purchased CEL tokens on cryptocurrency exchanges in a manner consistent with Celsius's written procedures.

8. Whether Mr. Treutler purchased CEL tokens using Celsius's "CNC" subaccount on the FTX cryptocurrency exchange at the direction of Mr. Mashinsky, Roni Cohen-Pavon, or any other Celsius executive or employee, and if so, at whose direction, specifically.

9. Whether Mr. Treutler received written instructions to move the price of CEL token to $7, $8, and $9.99 from Mr. Mashinsky or Mr. Cohen-Pavon, and if the latter, whether those instructions were ever shared with Mr. Mashinsky.

10. Whether Mr. Treutler's weekly reporting of his CEL token transactions to Mr. Mashinsky and the Celsius Executive Committee included his purchases of CEL token in Celsius's CNC subaccount on the FTX cryptocurrency exchange, and if not, why he excluded those purchases from his weekly reporting.

11. Whether Mr. Treutler ever reported his purchases of CEL tokens in Celsius's CNC subaccount on the FTX cryptocurrency exchange to Mr. Mashinsky or the Celsius Executive Committee.

12. The circumstances surrounding the trading strategy that Mr. Treutler allegedly discussed with Mr. Mashinsky according to paragraph 32 of the Indictment. *See* Exhibit B.

13. Whether Mr. Treutler executed a directional trading strategy at the instruction of Mr. Mashinsky, Mr. Cohen-Pavon, or any other Celsius executive or employee, and if so, at whose direction, specifically, and whether he ever disclosed such trading to Mr. Mashinsky.

## RIGHTS OF WITNESSES

Under the Fifth Amendment to the United States Constitution, a witness may not be compelled to provide testimony that the witness believes would tend to incriminate him.  Nor may a witness be compelled to provide testimony that is protected by the attorney-client privilege.  Otherwise, during deposition testimony, a party is permitted to state objections to questions posed by the opposing party, the witness is directed to answer the question, and the objections are then decided by the presiding judge after the deposition and in advance of trial.

## SPECIAL METHODS OR PROCEDURES TO BE FOLLOWED

The District Court respectfully requests, with respect to the sworn deposition testimony being sought, and to the extent not prohibited by German law:

1. that the appropriate Central Authority or judicial authority place Mr. Treutler under the following oath prior to the taking of deposition testimony: "*In the testimony you are about to give, do you swear, affirm, and promise to tell the truth, the whole truth, and nothing but the truth?  Do you further understand that if you do not tell the truth, you could be subject to the penalties of law for committing perjury?*";

2. that the questions be posed to Mr. Treutler in English, and that a United States Court Certified Interpreter qualified in English and German be present at all times to interpret the questions posed and the answers provided, as necessary.  To the extent an interpreter is needed, the interpreter shall be sworn to a similar oath whereby he or she swears to provide an accurate interpretation of the questions posed and the testimony provided;

3. that the parties be permitted to refer the witness to documents previously produced or made available in the United States proceedings;

4. that the parties be permitted either to ask questions directly of Mr. Treutler, or request additional questions to be asked by the appropriate Central Authority or judicial authority that obtains the evidence requested herein; and

5. that the sworn testimony from Mr. Treutler be transcribed verbatim by a court reporter and recorded by video to allow for presentation to the jury in the United States in a manner that would replicate in-trial testimony, and that any video recording of the

deposition shall be transported back to the United States by attorneys for Mr. Mashinsky in a manner agreed to by the parties.

## REQUEST FOR NOTIFICATION OF THE TIME AND PLACE FOR THE EXECUTION OF THE REQUEST

The appropriate Central Authority or judicial authority for the Federal Republic of Germany will be asked in due course to liaise with the parties listed below in order to identify a date for the deposition.  Given the January 28, 2025 trial date, the District Court would appreciate the assistance of the Federal Republic of Germany in fulfilling this request as expeditiously as possible.

United States Department of Justice:

Allison Nichols
Adam Hobson
Peter Davis
United States Attorney's Office, Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278
United States of America
Allison.Nichols@usdoj.gov
Adam.Hobson@usdoj.gov
Peter.Davis2@usdoj.gov

Defendant Alexander Mashinsky:

Marc L. Mukasey
Torrey K. Young
Michael F. Westfal
Mukasey Young LLP
570 Lexington Avenue, Suite 3500
New York, New York 10022
United States of America
Marc.mukasey@mukaseylaw.com
Torrey.young@mukaseylaw.com
Michael.westfal@mukaseylaw.com

## RECIPROCITY

The District Court is authorized by 28 U.S.C. §§ 1781 and 1782 to extend similar assistance on request of the judicial authorities of the Federal Republic of Germany.

## MEDIA INTEREST

Please note that there has been extensive media coverage in relation to this case, and it is envisaged that such coverage will continue.

9

**DATE OF REQUEST:**                  _____, 2024


**SIGNATURE AND SEAL OF THE**     BY: _____
**REQUESTING AUTHORITY:**        The Honorable John G. Koeltl
                                  United States District Judge
                                  United States Courthouse for the Southern
[Seal]                             District of New York
                                  500 Pearl Street, Courtroom 14A
                                  New York, New York 10007
                                  United States of America
                                  Don Fletcher, Case Manager
                                  (212) 805-0107
                                  donnie_fletcher@nysd.uscourts.gov

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────

UNITED STATES OF AMERICA,

      - against -               23-cr-347 (JGK)

ALEXANDER MASHINSKY,           MEMORANDUM OPINION AND
                             ORDER

               Defendant.
─────────────────────────────────

**JOHN G. KOELTL, District Judge:**

The defendant, Alexander Mashinsky, was charged in a seven-count indictment on July 11, 2023 (the "Indictment"). ECF No. 1. The Indictment charges the defendant with securities fraud, commodities fraud, wire fraud, market manipulation, and conspiracy to commit securities fraud, wire fraud, and market manipulation. The defendant has moved, pursuant to Rule 15 of the Federal Rules of Criminal Procedure and 28 U.S.C. § 1783(a), to preserve the testimony of six witnesses who reside outside the United States. For the following reasons, the motion is **granted in part** and **denied in part**.

**I.**

The Indictment alleges that, from 2018 through June 2022, the defendant engaged in two interrelated criminal schemes in connection with his operation of Celsius Network LLC and its related entities (collectively, "Celsius"). The first alleged scheme involved false and misleading statements that the

defendant purportedly made to customers to induce them to invest their assets with Celsius, and the second alleged scheme involved manipulative trading in CEL, Celsius's native crypto token.

According to the Indictment, in 2018, the defendant founded Celsius and served as its CEO. Indictment ¶¶ 1, 10. The defendant marketed Celsius as a safe place for customers to deposit their crypto assets and earn interest. Id. ¶ 1. By the fall of 2021, Celsius had become one of the largest cryptocurrency platforms in the world. Id. ¶ 4.

The first alleged scheme involved Celsius's "Earn Program," through which customers could invest their crypto assets with Celsius and earn returns—weekly "rewards" payments. Id. ¶ 12. The Indictment alleges that the defendant repeatedly made public misrepresentations about core aspects of Celsius's business and financial condition to induce retail investors to invest their assets in the Earn Program. Id. ¶ 2. The defendant allegedly misrepresented, among other things, Celsius's profitability and the risks associated with depositing crypto assets with Celsius. Id. ¶¶ 2, 15–47. For example, the Indictment alleges that the defendant assured Celsius's customers that Celsius was not making "directional bets"—that is, gambling on the future value of cryptocurrencies by taking long or short positions in various

2

crypto assets—but instead was earning yield on Celsius's
customers' investments through a market-neutral strategy. Id.
¶ 31. However, the defendant allegedly knew that, contrary to
his representations, Celsius was not market-neutral and instead
regularly used customer assets to take risky bets on the future
value of crypto assets. Id.

The second alleged scheme involved CEL, Celsius's native
crypto token, which was launched sometime in 2018. Id. ¶¶ 5, 14.
The defendant and Celsius touted CEL as a worthy investment and
encouraged Earn Program investors to receive their weekly
rewards in CEL. See id. ¶ 14.

The Indictment charges that the defendant, who was a large
holder of CEL and stood to benefit from an increase in its
price, worked with others at Celsius to manipulate the price of
CEL. Id. ¶¶ 6, 49-50. Initially, despite Celsius's efforts to
promote CEL, the price of CEL remained low; by the end of
October 2019, CEL was trading at approximately $0.05 per token.
See id. ¶ 51. The defendant publicly represented that Celsius
would purchase in the market only the amount of CEL necessary to
pay investors their weekly CEL rewards. Id. ¶ 53. However, to
inflate the price of CEL artificially, in July 2020, Celsius
(allegedly at the defendant's direction) began to purchase
excess CEL in the market—approximately three times more CEL than

3

Celsius needed to pay rewards. Id. ¶¶ 54-55. The defendant and other Celsius executives also personally purchased CEL to prop up CEL's price. Id. ¶¶ 7, 57-59. As a result, the price of CEL rose from approximately $0.40 in late July 2020 to approximately $5.50 by the end of 2020. Id. ¶ 55. Celsius continued these practices through much of 2021 and in early 2022. See id. ¶¶ 64, 67.

The Indictment also alleges that the defendant repeatedly made false and misleading statements about Celsius's CEL market activity. Id. ¶¶ 56, 60-63, 65-66. In these statements, the defendant falsely claimed that the price increase in CEL was due to "organic" demand, when in reality the price increase was due to Celsius's own excess market purchases. See id. ¶ 56. The defendant also allegedly made false and misleading statements regarding his own CEL trading activity. Id. ¶¶ 69-71.

By artificially inflating the price of CEL, the defendant allegedly reaped approximately $42 million from his personal sales of CEL. Id. ¶ 8.

On July 11, 2023, the defendant and Roni Cohen-Pavon, Celsius's Chief Revenue Officer, were charged in the Indictment. See ECF No. 1.

On September 13, 2023, Cohen-Pavon pleaded guilty, pursuant to a cooperation agreement, to four counts of the Indictment. See ECF No. 32.

On January 12, 2024, the defendant filed a motion to dismiss Counts Two and Six of the Indictment and to strike surplusage from the Indictment (the "motion to dismiss").[1]

On February 20, 2024, the Court set the trial date in the defendant's case as January 28, 2025. See ECF No. 54.

**II.**

On September 14, 2024, the defendant filed a motion to preserve the testimony of six witnesses residing outside the United States. See ECF No. 68. The defendant seeks permission to take the depositions of five witnesses who are outside the subpoena power of the Court, and to subpoena for trial one United States citizen who currently resides in Israel. The six witnesses are: Cohen-Pavon, Daniel Leon, Johannes Treutler, Ron Sabo, Yaron Shalem, and Yarden Noy. The Government opposes the motion. See ECF No. 72.

**A.**

Cohen-Pavon is an Israeli citizen who resides in Israel. The Indictment alleges that Cohen-Pavon and the defendant were

---

[1] The Court addresses the motion to dismiss in a separate order dated today.

co-conspirators in the alleged market manipulation scheme involving CEL. The defendant argues that Cohen-Pavon is a material witness on both the market manipulation and fraud charges. As to the market manipulation charges, the defendant claims that Cohen-Pavon provided legal advice to Celsius regarding its CEL market activity from 2019 and 2022, and that, in 2021, Cohen-Pavon and several other Celsius employees disregarded explicit instructions from the defendant to sell CEL and instead chose to buy CEL. As to the fraud charges, the defendant asserts that the defendant sought advice from Cohen-Pavon regarding his public statements about Celsius, and that in some cases Cohen-Pavon deliberately decided not to correct or advise the defendant about the alleged inaccuracy of the defendant's statements. Cohen-Pavon is a cooperating witness and is expected to testify at the trial in January.

**B.**

Leon was Celsius's co-founder and former President, Chief Operating Officer, and Chief Strategy Officer. Leon is a United States and Israeli citizen who resides in Israel. The defendant claims that Leon, like Cohen-Pavon, was part of the group of Celsius employees who disregarded the defendant's instructions to sell—rather than buy—CEL throughout 2021. The defendant also asserts that Leon had contemporaneous knowledge of unauthorized

directional trading and substantial losses in these positions, which were not disclosed to the defendant, and that Leon drafted a blog post, issued by Celsius in June 2022, that stated that "Celsius has the reserves . . . to meet obligations, as dictated by our comprehensive liquidity risk management framework," even though in reality Celsius's business was in trouble. Indictment ¶ 47. The defendant also points to Leon's WhatsApp conversations with Cohen-Pavon, which the defendant claims suggest that Cohen-Pavon deliberately decided not to correct perceived inaccuracies in the defendant's public statements regarding Celsius.

On August 1, 2024, defense counsel emailed counsel for Leon, seeking an interview in preparation for trial. Westfal Decl. ¶ 10a, ECF No. 69. On August 12, 2024, Leon's counsel responded that Leon was not available for an interview, that Leon was unwilling to return to the United States to testify at the trial, and that Leon was unwilling to sit for a pre-trial deposition in Israel. Id. ¶ 10c.

### c.

Treutler, a German citizen who resides in Germany, was Celsius's former Senior Token Analyst and head of Celsius's Yield Desk. With respect to the market manipulation charges, the defendant alleges that Treutler was responsible for Celsius's weekly CEL purchases from 2019 through 2021, and that, from May

2021 through January 2022, Treutler bought hundreds of millions of dollars' worth of CEL on the FTX cryptocurrency exchange through a secret Celsius subaccount at the instruction of, or with the knowledge of, Cohen-Pavon, Leon, Sabo, and Shalem. However, Treutler allegedly provided inaccurate reporting on his CEL purchases in order to conceal these purchases from the defendant and the rest of the company. With respect to the fraud charges, Treutler is quoted in the Indictment's allegations regarding the directional trading positions that Celsius purportedly took at the direction of the defendant. See Indictment ¶ 32. The defendant also alleges that Treutler himself conducted directional trading in 2021 at the direction of, or with the knowledge of, Cohen-Pavon, Leon, Sabo, and Shalem, and that this trading activity was not disclosed to the defendant until 2022.

On June 10, 2024, defense counsel emailed counsel for Treutler to request an interview in preparation for trial, but Treutler's counsel declined. Westfal Decl. ¶ 11a. On August 5, 2024, defense counsel asked Treutler's counsel if Treutler would be willing to come to the United States to testify at trial and if Treutler would sit for a deposition in Germany before the trial. Id. ¶ 11b. Treutler's counsel confirmed that Treutler would not consent to either proposal. Id.

D.

Sabo was Celsius's former Head of Research and was appointed to manage Celsius's CEL purchases beginning in March 2021. Sabo is an Israeli citizen whose last known residence is in the Netherlands. According to the defendant, Sabo can testify that Treutler's CEL purchases on FTX in 2021 were contrary to the defendant's explicit instructions and were not reported to the defendant. The defendant contends that Sabo can also testify regarding CEL purchases that Sabo made on behalf of Celsius, at Cohen-Pavon's direction, that were not reported to the defendant. Beginning in March 2021, Sabo allegedly became responsible for setting Celsius's weekly strategy for CEL purchases and sales. The defendant further claims that Sabo was aware of the directional trading that Treutler and others conducted in 2021, but—instead of reporting that trading to the defendant—Sabo participated in an apparent effort to conceal that activity.

Defense counsel has been in contact with counsel for Sabo since around June 20, 2024. See id. ¶ 12a. On June 25, 2024, defense counsel learned that the Government had informed Sabo's counsel that Sabo had at one point been a subject of the Government's investigation. Id. On July 30, 2024, Sabo's counsel informed defense counsel that Sabo was unwilling to participate

9

in a trial prep interview or to come to the United States to testify at trial. Id. ¶ 12c. On August 1, 2024, Sabo's counsel confirmed that Sabo would not come to the United States to testify at trial or sit for a video deposition in his country of residence. Id. ¶ 12d.

**E.**

Shalem was Celsius's former Chief Financial Officer and is an Israeli citizen who resides in Israel. Shalem was responsible for providing weekly financial reporting to the defendant. The defendant claims that, throughout 2021, Shalem's financial reporting understated Celsius's CEL purchases by hundreds of millions of dollars, and that Shalem appears to have deleted from his weekly reporting to the defendant references to Celsius's trading accounts in which Treutler conducted unauthorized directional trading.

On February 28, 2024, defense counsel emailed Shalem to request an interview as part of trial preparation. Id. ¶ 13a. On August 1, 2024, defense counsel asked Shalem by email if he was willing to come to the United States to testify at trial, and if he was willing to sit for a video deposition in Israel before trial. Id. ¶ 13b. Defense counsel received no response from Shalem. See id. ¶ 13d. On August 27, 2024, defense counsel emailed Shalem again, reiterating the same requests. See id.

¶ 13c. Defense counsel again received no response. See id.
¶ 13d.

### F.

Noy, an Israeli citizen who resides in Israel, was
Celsius's former outside counsel and then in-house counsel and
Head of Regulation. According to the defendant, Noy bore primary
responsibility for reviewing all aspects of the company's
marketing in 2021 and 2022, including the defendant's weekly
"Ask Mashinsky Anything" sessions, or "AMAs," in which the
defendant spoke in a live broadcast to the Celsius community and
took questions from Celsius's existing and prospective
customers. The defendant alleges that Noy can testify about
advice that Noy conveyed to the defendant about several of the
purportedly fraudulent misrepresentations charged in the
Indictment. The defendant also claims that Noy, along with
Cohen-Pavon, chose not to advise the defendant about certain
perceived inaccuracies in other statements that the defendant
had made.

Defense counsel first contacted Noy to ask for an interview
on April 17, 2024, but did not receive a response. See id.
¶ 14a. On August 1, 2024, defense counsel followed up with Noy
by email; Noy responded and asked for more time. Id. ¶ 14b. On
August 19, 2024, defense counsel asked Noy if Noy was willing to

come to the United States to testify at trial, and if he was willing to sit for a video deposition in Israel before trial. Id. ¶ 14c. Noy responded on August 27, 2024, stating that he was still looking for legal representation. Id. ¶ 14d. Later that day, defense counsel again asked Noy to confirm whether he was willing to come to the United States to testify at trial or to sit for a deposition in Israel. Id. Defense counsel has received no response from Noy. Id. ¶ 14e.

### III.

Pursuant to Federal Rule of Criminal Procedure 15, a court may order the deposition of a witness to preserve testimony for trial where there are "exceptional circumstances and in the interest of justice." Fed. R. Crim. P. 15(a)(1). To establish exceptional circumstances under Rule 15, the movant must show that "(1) the prospective witness is unavailable for trial, (2) the witness' testimony is material, and (3) the testimony is necessary to prevent a failure of justice." United States v. Cohen, 260 F.3d 68, 78 (2d Cir. 2001).[2] In general, "the discretion afforded district courts to decide Rule 15 motions is considerable." United States v. Fargesen, No. 21-cr-602, 2022 WL 4110303, at *2 (S.D.N.Y. Sept. 8, 2022).

---

[2] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

"Unavailability is to be determined according to the practical standard of whether under the circumstances the [movant] has made a good-faith effort to produce the person to testify at trial." United States v. Johnpoll, 739 F.2d 702, 709 (2d Cir. 1984). Movants need not present proposed witnesses' affidavits or prior statements to establish unavailability. Fargesen, 2022 WL 4110303, at *3; see also United States v. Vilar, 568 F. Supp. 2d 429, 438 (S.D.N.Y. 2008). Rather, "[c]ourts may accept the assertions of counsel on the facts relating to unavailability, as long as those assertions are neither conclusory nor speculative." Fargesen, 2022 WL 4110303, at *3; see also United States v. Grossman, No. 03-cr-1156, 2005 WL 486735, at *3 (S.D.N.Y. Mar. 2, 2005).

Testimony is material if it is "highly relevant to a central issue in the case." Vilar, 568 F. Supp. 2d at 440. "There is no requirement that the testimony being sought must surely acquit the defendant." United States v. Alexandre, No. 22-cr-326, 2022 WL 9843495, at *2 (S.D.N.Y. Oct. 17, 2022). Rather, it is enough that the testimony sought would "challenge central aspects of the [G]overnment's allegations." Id. As with unavailability, the Court may rely solely on the movant's representations to find the materiality requirement satisfied. Vilar, 568 F. Supp. 2d at 440. However, even if the proposed testimony would be material, "a court may properly deny a motion

13

to depose if the proposed testimony would be cumulative."
Fargesen, 2022 WL 4110303, at *2.

When the first two requirements of the Rule 15 "exceptional circumstances" test are met, the third requirement, "necessity to prevent a failure of justice, is likely satisfied if there are no substantial countervailing factors militating against the taking of the deposition." United States v. Wey, No. 15-cr-611, 2017 WL 237651, at *24 (S.D.N.Y. Jan. 18, 2017).

28 U.S.C. § 1783, meanwhile, provides that a court may issue a subpoena to a United States national who is in a foreign country requiring the appearance of that person as a witness before the court "if the court finds that particular testimony . . . is necessary in the interest of justice."

**IV.**

With respect to Cohen-Pavon, the Government has represented that it intends to call him as a witness at trial. See Gov't Opp. at 15, ECF. No. 72. Cohen-Pavon's counsel has also represented to defense counsel that, after Cohen-Pavon testifies in the Government's case, Cohen-Pavon is willing to testify as part of the defense case. See Westfal Decl. ¶ 9(c). The defendant accordingly no longer seeks a pre-trial deposition of Cohen-Pavon. See Def. Reply at 2 n.2, ECF No. 74. Therefore, the defendant's motion to depose Cohen-Pavon is **denied as moot.**

**V.**

With respect to the four remaining non-United States citizen witnesses, the defendant has established that the three requirements of Rule 15's "exceptional circumstances" test have been met.

**A.**

The Government does not dispute that Treutler, Sabo, Shalem, and Noy live abroad, are outside the subpoena power of the Court, and—despite the defendant's efforts to produce these four witnesses for trial—are unwilling to come to the United States to testify at trial (or, at a minimum, did not respond to defense counsel's requests). In short, these witnesses are unavailable to testify at trial.

Rather, the Government argues that the defendant must establish not only the witnesses' unavailability for trial but also the witnesses' willingness to sit for a deposition. In support, the Government relies on a line from the Second Circuit Court of Appeals' decision in United States v. Whiting, 308 F.2d 537 (2d Cir. 1962). In Whiting, the Court of Appeals stated that "the moving party has the burden of demonstrating the availability of the proposed witnesses and their willingness to appear." Id. at 541.

However, this statement in Whiting appears to be dicta and has generally not been relied upon. In Whiting, the Court of Appeals held that it was not an abuse of discretion for the trial court to deny the defendant's successive motions under Federal Rule of Civil Procedure 15 to take the depositions of five persons located in Brazil. The Court of Appeals held that such a motion is addressed to the discretion of the trial court, and the District Court "properly characterized [the first motion] as 'vague and indefinite.'" Id. at 541. The successive motion was denied when it was made at twenty minutes after three on the opening day of trial. Id. at 541–42. The Court of Appeals held: "We think that the District Court was well within its allowable discretion in denying a motion made only after a considerable delay . . . and on the eve of trial." Id. at 542. The Court of Appeals did not rely on any failure to show that the witnesses had not agreed to testify. More recently, in examining the requirements for authorizing the deposition of a witness prior to trial pursuant to Rule 15, the Court of Appeals noted the requirement that the witness be "unavailable for trial" without including a requirement that the witness be available for the deposition. Cohen, 260 F.3d at 78.

More recent decisions in this District have rejected the Government's argument that the movant must show that a proposed witness would voluntarily sit for a deposition in response to

compulsion abroad. See, e.g., Vilar, 568 F. Supp. 2d at 439
("Neither the text of Rule 15 nor binding case law concerning
the Rule provide any basis to conclude that, in resolving a Rule
15 motion, courts must consider the witness's willingness to
voluntarily appear at a deposition in a foreign country. Rather,
. . . in order to resolve a motion under Rule 15, courts need
only look to the witness' unavailability 'for trial' and not to
whether they have actually consented to make themselves
available for the deposition."); United States v. Epskamp, No.
12-cr-120, 2013 WL 12175097, at *1 (S.D.N.Y. Oct. 3, 2013)
("[W]hether or not a witness would be willing to testify at the
deposition is irrelevant in deciding a Rule 15 motion.").[3]

     The reasoning in cases like Vilar is persuasive. As the
court in Vilar explained, Rule 15(e) expressly provides that
"[a] defendant may not be deposed without that defendant's
consent," Fed R. Crim. P. 15(e) (emphasis added), but Rule 15
makes no such provision as to other deponents. See Vilar, 568 F.
Supp. 2d at 439; cf. Wey, 2017 WL 237651, at *24 (explaining
that, even if the Rule 15 "exceptional circumstances"
requirements are satisfied, "because [the deponent] is a

---

[3] But see United States v. Ramirez, No. 20-cr-22, 2024 WL 4007794, at *1 n.1
(S.D.N.Y. Aug. 30, 2024) (finding that "Whiting appears to remain good law"
and thus constitutes "binding case law"). However, Ramirez's motion was also
untimely because it was made within three weeks of the trial in a case that
had been pending for almost five years. See id. at *1.

defendant in this matter his deposition may only proceed with his consent"). In addition, courts in this District that have granted Rule 15 motions make no mention of such a requirement. See, e.g., Alexandre, 2022 WL 9843495, at *3; Fargesen, 2022 WL 4110303, at *2-3; Grossman, 2005 WL 486735, at *3.

For these reasons, the defendant need not show that Treutler, Sabo, Shalem, and Noy would appear voluntarily for depositions to establish unavailability under Rule 15. All that Rule 15 unavailability requires is that the defendant establish that the witnesses are unavailable to testify at trial. In this case, the defendant has made that showing.

**B.**

The defendant has established that the anticipated testimony of Treutler, Sabo, Shalem, and Noy would be material.

With respect to the alleged market manipulation, the Indictment charges the defendant with directing Celsius to conduct excess purchases of CEL in order to inflate the price of CEL artificially and with making false and misleading statements about Celsius's CEL market activity. The defendant contends, however, that—contrary to what the Indictment alleges—the defendant explicitly instructed his team consistently to sell CEL, but certain individuals, including Cohen-Pavon, Leon, Treutler, Sabo, and Shalem, disregarded these instructions and

18

instead purchased excess CEL throughout 2021. Moreover, the
defendant claims that these individuals failed to disclose these
purchases to the defendant and, on some occasions,
misrepresented this CEL activity to the defendant. The defendant
has submitted extensive documentation that appears to provide
some support for the defendant's assertions. Because the
anticipated testimony would tend to reflect that people other
than the defendant purportedly made the excess purchases of CEL
without the defendant's knowledge, such testimony would
"challenge central aspects of the [G]overnment's allegations"
and is therefore material.

        The Government responds that the Indictment alleges that
there were periods in 2021 when Celsius was selling CEL, and
that testimony about how the defendant instructed executives to
sell CEL in 2021 would not be exculpatory. But the issues of
exactly when and how long those periods were, and whether the
defendant in general was urging the purchase of CEL to inflate
the price of the token, will be important issues at the trial,
and the proposed witnesses' testimony would be material on these
points.

        With respect to the alleged fraud, the Indictment charges
the defendant with making public misrepresentations about core
aspects of Celsius's business and financial condition to induce

retail investors to invest their assets with Celsius. But the
defendant contends that Cohen-Pavon, Leon, Treutler, Sabo, and
Shalem directed, engaged in, or were aware of the directional
trading positions that Celsius took, but failed to disclose this
activity to the defendant until January 2022, after these
positions had already resulted in significant losses for
Celsius. The defendant also claims that Cohen-Pavon, Leon, and
Noy deliberately chose not to correct or advise the defendant
about perceived inaccuracies in some of the defendant's public
statements. As with the manipulation charges, the defendant
supports his assertions with documentary evidence. The testimony
of these witnesses would be material because the testimony would
"tend to disprove" the Government's assertion that the defendant
made these public statements with the requisite fraudulent
intent. Alexandre, 2022 WL 9843495, at *4.

Additionally, the Government argues that deposition
testimony from the proposed witnesses would be cumulative, in
view of Cohen-Pavon's anticipated testimony at trial and
documentary evidence that the defendant could introduce at
trial. Although some of the witnesses' anticipated testimony
could indeed be cumulative, especially of Cohen-Pavon's
testimony and testimony by the defendant's other proposed
witnesses, "the fact that other documents and testimony may also
be relevant to the defense does not mean that the witnesses'

testimony will be so cumulative as to be immaterial." Id.; see also Fargesen, 2022 WL 4110303, at *4. The proposed testimony would be material to several central issues in this case and could help the defendant present "the most thorough defense possible." Alexandre, 2022 WL 9843495, at *5; see also United States v. Mohamed, No. 18-cr-603, 2020 WL 1545522, at *6 (E.D.N.Y. Apr. 1, 2020) ("[A]s a practical matter, if the parties establish a method of conducting these depositions, I see no reason why the defendants should not depose all of their witnesses to present the most thorough defense.").

Accordingly, the testimony sought from Treutler, Sabo, Shalem, and Noy would be material for purposes of Rule 15.

## C.

Because the defendant has established the unavailability and materiality requirements, the third requirement, necessity to prevent a failure of justice, is likely satisfied "so long as there are no substantial countervailing factors militating against the taking of depositions." Fargesen, 2022 WL 4110303, at *5. Countervailing factors may include, for example, "any undue expense to the non-moving party and significant delays in trying the matter." Alexandre, 2022 WL 9843495, at *3. At this point, no countervailing factors weigh sufficiently against the taking of the depositions in this case.

The Government contends that the defendant waited too long to seek these depositions and that permitting these depositions now would require a delay of the January 2025 trial date. The Government represents that execution of letters rogatory to depose the witnesses in Germany or the Netherlands could take over a year. <u>See</u> Gov't Opp. at 9. Furthermore, even if the letters rogatory are granted, there is no guarantee that the witnesses would be questioned directly by the Government or defense counsel, or that an unwilling witness could be compelled to sit for a deposition at all. <u>See</u> <u>id.</u> at 9–10. Meanwhile, the Government could use the Mutual Legal Assistance Treaty ("MLAT") to request Rule 15 depositions in Israel, but the Government represents that the MLAT process in Israel still takes two months at a minimum and often a year or longer. <u>See</u> <u>id.</u> at 10.

However, these concerns are speculative. <u>See</u> <u>Alexandre</u>, 2022 WL 9843495, at *5 ("[T]here is no reason that Defendant should not be permitted to <u>try</u> to obtain the testimony before the scheduled trial date. This is especially so given that the Government may have tools at its disposal that could help speed up the process."). The Government's speculations may prove to be correct, but that is not a reason not to try now. The defense represents that at this time it is not seeking a delay of the January 2025 trial date, which was set in February 2024. This is not a situation where the Court could find at this point that

22

the request is simply made too late. See United States v. Menendez, No. 23-cr-490, 2024 WL 2214906, at *3 (finding "the potential delay in trying the matter" to militate against granting the motion where the trial had already begun three days before the motion was made); Ramirez, 2024 WL 4007794, at *1 (finding the defendant's motion untimely where the defendant "ha[d] been on notice for years" of what the Government intended to prove, yet waited until three weeks before trial to make the motion). In this case, the parties have over ten weeks before the trial is scheduled to begin to attempt to obtain the deposition testimony of the proposed witnesses.

However, the defendant's delay in making this motion cannot be overlooked. There was nothing to prevent the defendant from making this motion months ago. The defendant was indicted in July 2023, and the Indictment's allegations clearly state the charges against the defendant. The defendant learned that Cohen-Pavon was a cooperating witness in September 2023. Although the defendant claims that the defense needed all this time to sort through the discovery produced by the Government and points to the fact that the Government made a document production as recently as May 2024, the Government had previously made substantial document productions in August and September 2023—well over a year ago. See Oct. 3, 2023 Status Conf. Tr. at 2:3-6, ECF No. 36. Moreover, that Treutler, Sabo, Shalem, and Noy

might provide testimony relevant to the defendant's asserted defenses should have been clear to the defendant, at least based on the proposed witnesses' roles and responsibilities at Celsius and the allegations contained in the Indictment. The proposed witnesses' identities and job responsibilities at Celsius were all known to the defendant.

In any event, the defendant states that he does not seek any delay of the trial at this time. See Def. Reply at 14. The defendant is authorized to attempt to seek the depositions of Treutler, Sabo, Shalem, and Noy before the trial is scheduled to begin. If, because of the defendant's delay in making this motion, the depositions cannot be arranged without an adjournment, then the fault lies with the defendant. Based on all of the submissions of the parties, the testimony sought is not so material that the defendant would be denied a fair trial without it—particularly with the testimony of Cohen-Pavon, as well as the possibility of the subpoenaed testimony of Leon, which the Court addresses in more detail below.

Finally, the Government expresses concern regarding the format and reliability of any foreign depositions that might take place. Specifically, the Government points out that the questioning would likely be conducted by a foreign judge with limited availability for cross-examination, and that the

inability of this Court to hold witnesses in contempt for false testimony might render any testimony obtained unreliable or otherwise unusable in court. However, if the defendant is able to arrange for the testimony of the witnesses and questions of reliability or admissibility arise, these issues can be addressed in motions in limine closer to trial. See, e.g., Alexandre, 2022 WL 9843495, at *6; Fargesen, 2022 WL 4110303, at *6; Vilar, 568 F. Supp. 2d at 440 n.10.

Accordingly, the Rule 15 necessity to prevent a failure of justice requirement is satisfied. The motion to depose Treutler, Sabo, Shalem, and Noy is **granted.**

**VI.**

With respect to Leon, the defendant seeks a subpoena pursuant to 28 U.S.C. § 1783 requiring Leon to appear as a live witness at trial. It is undisputed that Leon is a United States citizen, and the parties appear to agree that a showing of "exceptional circumstances" under Rule 15 is sufficient to satisfy the "necessary in the interest of justice" standard of § 1783.

As with the non-United States citizen witnesses, the defendant has made this "exceptional circumstances" showing as to Leon. Leon is unwilling to testify at trial and is therefore unavailable. Leon's anticipated testimony would also be

material: the defendant asserts that Leon will testify that he
instructed Treutler to purchase CEL in order to raise the price
of CEL at Cohen-Pavon's—and not the defendant's—instructions,
and that Leon's testimony will shed light on the financial
motivation that allegedly led a group of employees, including
the proposed witnesses, to disregard the defendant's
instructions. And the defendant's request for a § 1783 subpoena,
although delayed, was not made so late as to warrant denial of
the motion outright.

     For these reasons, the defendant's request pursuant to
§ 1783 for a subpoena requiring the appearance of Leon at trial
is **granted.**

CONCLUSION

     The Court has considered all of the arguments of the
parties. To the extent not specifically addressed above, the
arguments are either moot or without merit. For the foregoing
reasons, the defendant's motion to preserve the testimony of
material witnesses residing outside the United States is **denied
as moot** as to Cohen-Pavon, and **granted** as to Treutler, Sabo,
Shalem, and Noy. Further, the defendant's request, pursuant to
28 U.S.C. § 1783, to serve a subpoena requiring Leon to appear
at trial is **granted.**

The Court orders that the depositions be recorded by video
to allow for presentation to the jury in a manner that would
replicate in-trial testimony. The parties are directed to confer
and work in good faith to identify appropriate next steps,
including to arrange for the depositions to occur as soon as
possible. See Fargesen, 2022 WL 4110303, at *5. While not
directing it to take any specific actions, the Court also asks
the Government to consider using MLATs or other processes for
seeking international assistance that might expedite the
necessary coordination with Dutch, German, and Israeli
officials. See United States v. McLellan, 959 F.3d 442, 476 (1st
Cir. 2020). The Clerk is respectfully directed to close ECF No.
68.

**SO ORDERED.**

**Dated:**     **New York, New York**
          **November 8, 2024**

                                        _____
                                        **John G. Koeltl**
                                **United States District Judge**

# EXHIBIT B

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

UNITED STATES OF AMERICA

       -v.-

ALEXANDER MASHINSKY and
RONI COHEN-PAVON,

             Defendants.

------------------------------------------------------------------ x

:
:
:
:
:
:
:
:
:
:
:

**SEALED INDICTMENT**

23 Cr.

**23 CRIM 347**

**Overview**

1.     From at least in or about 2018 through in or about June 2022, ALEXANDER MASHINSKY, the defendant, orchestrated a scheme to defraud customers of Celsius Network LLC and its related entities (collectively, "Celsius"), the cryptocurrency company he founded, and, together with Celsius's Chief Revenue Officer, RONI COHEN-PAVON, the defendant, and other Celsius employees, orchestrated a scheme to inflate the price of Celsius's proprietary token, CEL. In the first scheme, MASHINSKY misled customers about core aspects of Celsius's business, including the success and profitability of Celsius and the nature of the investments that Celsius made with customer funds. In sum and substance, MASHINSKY portrayed Celsius as a modern-day bank, where customers could safely deposit crypto assets and earn interest. In truth, however, MASHINSKY operated Celsius as a risky investment fund, taking in customer money under false and misleading pretenses and turning customers into unwitting investors in a business far riskier and far less profitable than what MASHINSKY had represented. In the second scheme, MASHINSKY, COHEN-PAVON, and other Celsius employees illicitly manipulated the price of CEL, thereby causing the public to purchase CEL at inflated prices, which personally benefitted

MASHINSKY and COHEN-PAVON because they were secretly selling their own CEL at prices that they knew did not reflect the token's true market value.

2.     Celsius was a crypto asset platform that, among other things, allowed its customers to earn returns on their crypto assets in the form of weekly "rewards" payments, to take loans secured by their crypto assets, and to custody their crypto assets. Celsius billed itself as the "safest place for your crypto" and urged potential customers to "unbank" themselves by moving their crypto assets to Celsius. ALEXANDER MASHINSKY, the defendant, directly marketed Celsius to retail customers located in the United States and abroad. Throughout his tenure as Chief Executive Officer ("CEO") of Celsius, MASHINSKY repeatedly made public misrepresentations regarding core aspects of Celsius's business and financial condition in order to induce retail customers to provide their crypto assets to Celsius and continue to use Celsius's services. MASHINSKY misrepresented, among other things, the safety of Celsius's yield-generating activities, Celsius's profitability, the long-term sustainability of Celsius's high rewards rates, and the risks associated with depositing crypto assets with Celsius.

3.     ALEXANDER MASHINSKY, the defendant, aggressively promoted Celsius through media interviews, his own Twitter account, and Celsius's website. MASHINSKY's most common method of public communication, though, was his weekly "Ask Mashinsky Anything" sessions, or "AMAs," in which he would speak in a live broadcast directly to the Celsius community and take questions about Celsius from customers and prospective customers. Celsius then posted recordings of these AMAs to Celsius's website and YouTube channel, where they continued to be publicly available. MASHINSKY made so many false and misleading statements in the AMAs that Celsius employees from multiple departments began to review the AMAs after they had aired, flag false and misleading statements by MASHINSKY, and, at times, edit

MASHINSKY's misrepresentations out of the recorded versions of the AMAs posted to the internet. But, despite warnings from other Celsius employees, MASHINSKY continued to misrepresent the nature of Celsius's core business activities on live broadcasts. Moreover, neither MASHINSKY nor Celsius ever issued corrections to notify the public and those who had watched the live recorded versions of the AMAs that certain of MASHINSKY's statements were untrue or misleading.

4.     As ALEXANDER MASHINSKY, the defendant, falsely portrayed Celsius as a safe and secure institution, Celsius's customer base grew exponentially. Many of those customers were retail investors rather than large institutions. By in or about the fall of 2021, Celsius had grown to become one of the largest crypto platforms in the world, purportedly holding approximately $25 billion in assets at its peak.

5.     Under the direction and leadership of ALEXANDER MASHINSKY, the defendant, Celsius also launched its own native crypto token, CEL, through an initial coin offering ("ICO") in or about 2018 designed to raise money to fund Celsius's operations. During and after this ICO, MASHINSKY falsely claimed that Celsius had sold all the CEL tokens that it had made available for sale to the public during the ICO for a total raise of $50 million. In reality, Celsius failed to sell more than one-third of the 325 million CEL tokens it had made available for sale and only raised approximately $32 million through the ICO.

6.     After the CEL token ICO, ALEXANDER MASHINSKY and RONI COHEN-PAVON, the defendants, and others working at Celsius orchestrated a yearslong scheme to mislead customers and market participants regarding the market value and interest in CEL such that Celsius's assets would appear more valuable than they were and so that MASHINSKY and COHEN-PAVON were able to sell CEL at inflated prices. They did so by manipulating the price

of CEL through causing Celsius to spend hundreds of millions of dollars purchasing CEL in the open market with the objective of artificially supporting and inflating the price of CEL. At various times during MASHINSKY's tenure, MASHINSKY, COHEN-PAVON, and their co-conspirators also caused Celsius to use its own customer deposits to fund these market purchases of CEL in order to prop up CEL's price, without disclosing this fact to Celsius's customers.

7.    To further the scheme to manipulate CEL, ALEXANDER MASHINSKY, the defendant, repeatedly made false and misleading public statements concerning the nature of Celsius's market activity and the extent to which Celsius itself was responsible for artificially supporting and inflating the price of CEL, thus making it appear that there was broader market interest in CEL than actually existed. While MASHINSKY at various points publicly stated that Celsius was purchasing CEL in the market to pay customers their weekly CEL rewards, in reality and as MASHINSKY knew, Celsius purchased volumes of CEL well in excess of the amount required to pay weekly CEL rewards. These excess purchases of CEL were directed by MASHINSKY, RONI COHEN-PAVON, the defendant, and their co-conspirators in order to artificially support the price of CEL. In certain instances, MASHINSKY and other Celsius executives also personally purchased CEL for the purpose of artificially supporting CEL's price.

8.    Artificially inflating the price of CEL allowed ALEXANDER MASHINSKY and RONI COHEN-PAVON, the defendants, and other Celsius executives to sell their own CEL holdings for a substantial profit. MASHINSKY personally reaped approximately $42 million in proceeds from his sales of CEL, and COHEN-PAVON personally reaped at least $3.6 million in proceeds from his sales of CEL. At various times, MASHINSKY made false and misleading public statements about his own sales of CEL, claiming that he was not selling CEL, when, in reality, he was taking advantage of the upward price manipulation he had orchestrated by

4

contemporaneously selling huge quantities of his CEL on the market, including, on occasion, to Celsius itself.

9.      By in or about mid-2022, due at least in part to the fraud perpetrated by ALEXANDER MASHINSKY, the defendant, Celsius was already in a dire financial situation. Celsius was in such a weakened position that it could not withstand the drop in crypto asset prices that occurred beginning in or about May 2022—including, specifically, the drop in the price of CEL—and the resulting surge in Celsius customer withdrawals. ALEXANDER MASHINSKY, the defendant, nevertheless continued to publicly tout the safety of Celsius and encourage customers to continue to deposit crypto on the Celsius platform, even as MASHINSKY himself withdrew almost all his non-CEL personal crypto deposits, worth millions of dollars, from the Celsius platform. On or about June 12, 2022, Celsius announced that it was halting all customer withdrawals from the Celsius platform. At that time, hundreds of thousands of Celsius customers—many of whom were retail investors—still had approximately $4.7 billion worth of crypto assets on the Celsius platform, none of which they could access. On or about July 13, 2022, Celsius filed for Chapter 11 bankruptcy.

**Background on Celsius and the Defendants**

10.      At all times relevant to this Indictment, ALEXANDER MASHINSKY, the defendant, was the CEO of Celsius. In or about February 2018, MASHINSKY and a co-founder incorporated Celsius Network Inc. in Delaware and Celsius Network Limited in the United Kingdom ("U.K."). Celsius was initially headquartered in the U.K. but moved its headquarters to Hoboken, New Jersey in 2021. Celsius also had an office in Manhattan, where many of its senior officers worked. In or about March 2018, Celsius launched its platform and began accepting crypto assets from customers. Beginning during the COVID pandemic, Celsius employees

predominantly worked from their homes. MASHINSKY predominantly worked from his Manhattan apartment and sometimes held meetings with Celsius executives there.

11.    RONI COHEN-PAVON, the defendant, is an attorney who was previously a partner at a prominent overseas law firm and joined Celsius as the Chief Revenue Officer in or about 2020. COHEN-PAVON was part of the inner circle of ALEXANDER MASHINSKY, the defendant, at Celsius and was one of the most senior executives at the company. COHEN-PAVON, like MASHINSKY, was a significant holder of CEL, having been provided a large amount of CEL upon joining Celsius, including, in part, to compensate him for legal services he had previously provided to Celsius prior to formally joining Celsius as an employee.

12.    Celsius's primary public offering was its "Earn" program, through which Celsius offered a platform for customers to provide their cryptocurrency assets to Celsius to invest. In exchange for providing their crypto assets, including Bitcoin, to Celsius, customers were told that they would earn returns through Celsius's investment of those assets. Celsius marketed the Earn program to the public as a profit-making opportunity. Celsius pooled customer assets and deployed them through retail lending, institutional lending, investments, exchange trading, and other profit-seeking strategies. Celsius advertised that these deployment strategies would generate yield, and Celsius would then pay customers weekly interest, or "rewards" based on the purported yield that Celsius was earning. The core marketing pitch to Earn program investors, which ALEXANDER MASHINSKY, the defendant, repeated in multiple forums, was that Celsius could generate yield for its customers by safely lending their crypto assets to institutions, but unlike banks—which kept most of the profits from investing customer deposits for themselves—Celsius would return the majority of the profits back to its customers.

13.     In addition to its Earn program, Celsius offered retail investors a "Custody" program and a "Borrow" program.  Custody account holders simply could use the Celsius platform to store their cryptocurrency assets.  Celsius offered its Borrow customers retail loans pursuant to which the customer would receive either fiat currency or stablecoins in exchange for posting crypto assets as collateral with Celsius.  Celsius required its retail loans to be fully collateralized and many were over-collateralized.  Once the loans were repaid under the terms of the loan agreement between the Borrow customer and Celsius, Celsius was obligated to return the collateral to the borrower.

14.     Celsius also launched CEL, its own native crypto token, in or about 2018.  Earn customers could receive their weekly rewards in CEL rather than in other crypto assets.  There was also a secondary market for CEL through which investors could buy and sell CEL.  Celsius pooled the proceeds from the sale of CEL to the public for general use in Celsius's business operations.  ALEXANDER MASHINSKY, the defendant, and Celsius touted CEL as an investment and MASHINSKY encouraged the public to purchase CEL, including by repeatedly promoting the fact that the price of CEL was increasing.  MASHINSKY and Celsius also, at times, equated the value of CEL with the overall strength of Celsius's business and with the positive future prospects for Celsius.

**MASHINSKY's Misrepresentations Regarding Celsius's Business**

15.     Throughout his time as CEO of Celsius, ALEXANDER MASHINSKY, the defendant, frequently made public statements about Celsius's financial condition and operations, including during weekly AMAs hosted by MASHINSKY, through MASHINSKY's Twitter account, and through frequent public interviews and appearances.  In these public statements, MASHINSKY regularly made false and misleading statements about core aspects of Celsius's

financial condition and business operations in order to suggest that Celsius was a safe and low-risk investment opportunity for retail crypto customers, when the truth was the opposite. Among other misrepresentations, MASHINSKY made false and misleading statements regarding (i) the amount of money Celsius raised through its ICO; (ii) Celsius's profitability, the sustainability of its rewards rates, and the percentage of its revenue it returned to customers; (iii) Celsius's market-neutral trading strategy; (iv) Celsius's uncollateralized loans; (v) institutional counterparty defaults; (vi) the degree to which Celsius had clarity or comfort from regulators regarding the viability of its business model; (vii) the safety of customer assets; and (viii) Celsius's solvency and liquidity in the days and weeks leading up to the June 12, 2022 "Pause" on customer withdrawals that portended Celsius's filing for bankruptcy shortly thereafter.

*MASHINSKY's Misrepresentations Regarding ICO Success*

16.     The efforts of ALEXANDER MASHINSKY, the defendant, to deceive the public about the reliability and profitability of Celsius's model began near its inception. One of Celsius's first steps after formation was to launch its token, CEL, through an ICO in order to raise money and fund Celsius's operations and other initiatives. The size of the capital raise was relevant to Celsius's customers both because it increased the amount of cash the company had on hand to make good on its promised payments to customers and because it signaled the market's belief in the financial health and long-term viability of the business model. As is described in further detail below, MASHINSKY repeatedly misrepresented how much money Celsius had raised in connection with the ICO, and then caused Celsius to engage in an elaborate series of self-dealing and deceptive transactions designed to paper over MASHINSKY's false statements and make his false statements appear true.

17.    In or about March of 2018, Celsius offered CEL for sale to the public through an ICO.  The features of the CEL token and the terms applicable to sales of CEL to the public were described in a "whitepaper" publicly issued by Celsius.  Under the terms of the whitepaper, Celsius would create 700 million CEL tokens, with Celsius retaining 325 million CEL tokens for itself in its treasury, making 325 million CEL available for sale to the public, and retaining the remaining 50 million but releasing them if and when the CEL price hit certain benchmarks.  Celsius set a "hard cap," or maximum sale amount, of $50 million for the ICO, including any sales that occurred during the pre-sale period.  Per the terms of the CEL whitepaper, any tokens that went unsold during the pre-ICO period and ICO period would be "burned," i.e., permanently destroyed and taken out of circulation, thereby reducing the overall float of CEL.

18.    Contemporaneous with and after the ICO, ALEXANDER MASHINSKY, the defendant, falsely and publicly stated that Celsius had raised the full $50 million, meaning that Celsius had sold all the CEL tokens it had made available for sale to the public through the ICO. In reality, and as MASHINSKY knew, Celsius had fallen far short of its goal and raised only approximately $32 million through the ICO.  A substantial portion of the CEL available for sale— approximately 117 million of 325 million tokens—had not been sold.

19.    Rather than correct his misrepresentations about the amount of money raised from the ICO, ALEXANDER MASHINSKY, the defendant, and others at Celsius working at his direction, engaged in an elaborate effort to make MASHINSKY's false claims appear true by arranging for an entity controlled by MASHINSKY to enter into a token sale agreement to purchase "up to $18,000,000" worth of CEL, corresponding to 117 million tokens—the approximate number of tokens that had gone unsold.  The token sale agreement required MASHINSKY's entity to remit payment for the tokens within 90 days, or by approximately the

end of June 2018.  But neither MASHINSKY nor the entity that he controlled ever paid for the tokens, and in June 2018 the 117 million CEL tokens remained unsold.  Under the terms of the whitepaper, the 117 million unsold CEL tokens should have been burned, but Celsius neither burned the tokens nor publicly disclosed that it was deviating from the terms of its own whitepaper and thus fundamentally altering CEL's value proposition.

20.    In or about late 2019, with the public still unaware that the ICO was never fully funded and that more than one-third of the available CEL tokens had gone unsold, Celsius and ALEXANDER MASHINSKY, the defendant, yet again attempted to provide cover for MASHINSKY's misrepresentations.  This time, Celsius converted the token sale agreement into a "loan agreement" under which Celsius gave an entity controlled by MASHINSKY a loan against the 117 million CEL that MASHINSKY's entity had never even purchased.  Under the terms of the loan agreement, Celsius held the 117 million tokens as collateral against the loan, and MASHINSKY's entity was permitted to sell the tokens on the secondary market and transfer the proceeds of those sales to Celsius as partial repayment on the loan.  Executives at Celsius expressed concerns to MASHINSKY and others that this "loan agreement" was really just a free option for MASHINSKY to purchase CEL if the token price went above the ICO sale price, and a senior executive resigned in part because of his objection to this self-dealing transaction.  A month later, Celsius and MASHINSKY's entity executed yet another loan agreement that superseded the prior agreement.  This superseding loan agreement required MASHINSKY to post additional collateral in the form of his equity interest in Celsius and required that he repay the loan in full within 48 months.

21.    Ultimately, ALEXANDER MASHINSKY, the defendant, neither repaid the loan nor consummated the purchase of the 117 million unsold CEL.  Instead, in or about April 2020,

Celsius decided to retain the 117 million CEL and place those tokens in Celsius's treasury, effectively nullifying the prior loan agreement and doubling down on Celsius's violation of the terms of its own whitepaper. Initially, Celsius maintained the 117 million tokens in a segregated account and placed restrictions on Celsius's use of these tokens. In or about December 2020, however, Celsius removed any such restrictions regarding the use of the 117 million tokens, effectively returning the 117 million tokens to Celsius's treasury for use at Celsius's discretion.

22.     In the end, neither ALEXANDER MASHINSKY, the defendant, nor any entity subject to his control, ever had to satisfy the purported loan agreements, and the 117 million CEL went unsold. Neither MASHINSKY nor Celsius ever disclosed that, contrary to the representations made publicly by MASHINSKY, 117 million CEL made available during the ICO had not been sold, or that Celsius had violated the terms of its whitepaper by returning these tokens to the treasury rather than destroying the unsold tokens and taking them out of circulation. Nor did MASHINSKY or Celsius ever correct MASHINSKY's prior false public statements that Celsius had raised $50 million through the ICO.

23.     ALEXANDER MASHINSKY, the defendant, fully understood that Celsius had, in truth and in fact, raised only approximately $32 million in connection with the CEL token ICO and that a portion of the tokens available for sale had gone unsold. Nevertheless, throughout his tenure as Celsius's CEO, MASHINSKY publicly and repeatedly claimed, falsely, that Celsius had raised $50 million in connection with the CEL token ICO. Indeed, as late as in or about November 2021, MASHINSKY continued to falsely claim in public statements that Celsius had raised $50 million from the ICO.

*MASHINSKY's Misrepresentations Regarding Profitability and Revenue-Sharing*

24.     ALEXANDER MASHINSKY, the defendant, repeatedly made false and misleading statements about one of the core tenets of Celsius's overall business model and the

11

sustainability of that business—that Celsius was profitable and that the high reward rates that Celsius paid to its customers on a weekly basis reflected its earnings.  The extent to which Celsius was profitable was relevant and material to customers' decisions to invest in the Earn program, since Celsius' profitability would determine whether Celsius could make good on its promised yields and whether customers would be able to recover their assets if they decided to withdraw from the program.  The profitability of the platform also informed Earn customers' decisions about how to receive the return on their investment.  Some customers elected to receive the profits from their investments in CEL rather than in Bitcoin or other widely traded cryptocurrencies because they believed MASHINSKY's claims that Celsius was profitable and because the value of CEL was supposed to be a proxy for the overall strength and health of Celsius.  Similar considerations informed the trading decisions of purchasers of CEL.  Customers of Celsius's Borrow program chose to commit their collateral to Celsius in exchange for loans based on an assessment of the risk to which their collateral would be subject during the pendency of the loan.  That risk assessment was informed by MASHINSKY's statements about the profitability of the platform.

25.    Yet representations made by ALEXANDER MASHINSKY, the defendant, about Celsius's profitability were false.  In reality, and as MASHINSKY knew, Celsius did not earn enough yield to support the high weekly reward rates paid to customers and Celsius was an unprofitable company for much of its existence.  Internally, MASHINSKY regularly discussed with other Celsius executives that the company had serious financial problems—including that the company was not profitable and not able to generate sufficient yield on its customers' assets to support its high reward rates.  But publicly, at the same time these concerns about profitability and sustainability were being raised inside Celsius, MASHINSKY presented Celsius as a profitable

12

and financially stable company that was a safe and secure place for customers to earn yield on their crypto assets.

26.    ALEXANDER MASHINSKY, the defendant, also falsely claimed that Celsius returned 80 percent of its revenues back to Celsius customers in the form of the weekly rewards payments, retaining the remaining 20 percent of its revenues to fund its operations and as profit. This representation was false.  In truth, and as MASHINSKY knew, for the vast majority of Celsius's existence, Celsius did not even perform a calculation when setting its rewards rates to determine what 80 percent of revenue would be.  Instead, Celsius determined its rewards rates primarily based on marketing concerns, looking at its competitors' rates and trying to beat them. As a result, Celsius's weekly rewards rates bore little relationship to Celsius's revenue streams. Sometimes, Celsius's rewards to customers fell well below 80 percent of its revenues—rendering MASHINSKY's claims that Celsius was sharing 80 percent of its revenues with its customers false.  But across Celsius's existence, Celsius's rewards payments were well in excess of 80 percent of its revenues, making its high rewards rates unsustainable in the long-term.  Internal Celsius data presented to MASHINSKY, other Celsius executives, and Celsius's Board of Directors showed that Celsius's reward payments for 2021 represented approximately 120 percent of its revenue.  In other words, Celsius paid out far more in rewards than it had even earned in revenues, while telling customers that the high rewards were not subsidized and were based on Celsius's profitable business model.  Despite being repeatedly warned by other Celsius employees and executives that Celsius's rewards rates were too high and not sustainable because Celsius was not generating enough yield to support them, MASHINSKY resisted lowering rewards rates and continued to publicly claim that Celsius's rewards rates were determined based on the yield it generated, which, as MASHINSKY knew, was false.

27.    In non-public contexts, ALEXANDER MASHINSKY, the defendant, and other Celsius executives described the relationship between rewards and yield in terms that were almost the exact opposite of the false and misleading statements MASHINSKY made in public to customers and potential customers. For example, on or about June 9, 2021, RONI COHEN-PAVON, the defendant, stated that the 80 percent return claim was a "marketing statement" and that Celsius's customers have "zero exposure" to any vagaries in the amount of yield Celsius could generate. In the same conversation, MASHINSKY said that Celsius "pay[s] out of our balance sheet if we cannot create yield" and characterized the rewards rates as a "balance sheet liability to all these retail lenders," rather than as a percentage of revenue, as he publicly claimed. MASHINSKY further admitted that for "most of" 2019, Celsius had "paid more than 100 percent," calling it an example of "where we tried to build our community and effectively take the loss." MASHINSKY never made similar acknowledgments to the public; instead, he routinely and falsely stated, for example, that "we're only paying what we earn."

28.    ALEXANDER MASHINSKY, the defendant, misrepresented Celsius's profitability and how Celsius supported its high rewards payments throughout his tenure as CEO. For example, in or about May 2020, while he was being presented with internal financial data that showed that Celsius was not profitable, had not been profitable in 2019, and that "[e]xpenses are way more than revenue," MASHINSKY falsely stated to the public in his AMAs that "Celsius is profitable right now, and we announced we were profitable for 2019, we're profitable month to month to month." Similarly, in or about 2022, after MASHINSKY had been repeatedly presented with financial data showing that Celsius was not profitable and that the yield that Celsius was earning deploying customers' assets was inadequate to support its high rewards rates, MASHINSKY still continued to falsely claim in his public statements that Celsius's reward rates

14

were based on its investment earnings and that its rates were sustainable, including, for example claiming: "Remember, we get institutions to pay us so we can pay you. When in history have institutions paid the average person anything? They don't like it, believe me, they hate paying us that yield. Right. And then we take most of it and deliver it to you."

29.    Celsius also suffered huge and undisclosed losses that were fundamentally inconsistent with its public claims of profitability, as ALEXANDER MASHINSKY, the defendant, was well aware. These losses at times cut so far into any purported profits that Celsius was generating that Celsius effectively had to use other customers' deposits to continue to pay out its unsustainably high rewards rates. For example, in or about early 2021, MASHINSKY and other Celsius executives discovered that Celsius had a sizable "hole" in its balance sheet representing an asset-liability mismatch caused primarily by a shortfall of hundreds of millions of dollars' worth of Bitcoin. This hole had been caused, at least in part, by Celsius making large purchases of CEL using Bitcoin deposited by its customers. Had these customers requested withdrawals of the Bitcoin they had deposited, Celsius would have had insufficient Bitcoin available to satisfy redemption demands. Celsius had to replace these missing customer crypto assets by purchasing them in the market, but because the price of Bitcoin had risen substantially, Celsius suffered a sizable loss in the process. Multiple Celsius employees and executives brought the asset-liability mismatch to MASHINSKY's attention during the first half of 2021. Nonetheless, MASHINSKY continued to claim publicly during this time: "We are profitable. . . . The yield that is generated is actual yield. It's not subsidized. It's not paid with either investors' money or some tokens that you printed or whatever."

30.    Even as Celsius's financial condition deteriorated from in or about late 2021 through Celsius's "Pause" in June 2022, ALEXANDER MASHINSKY, the defendant, continued

to misrepresent Celsius' profitability.  For example, Celsius's Chief Financial Officer informed MASHINSKY in late April 2022, "we are hemorrhaging $7.5mm pre-tax losses each week" and that Celsius ran "a real risk of not returning to profitability quickly enough."  During 2022, MASHINSKY repeatedly discussed with other Celsius executives that Celsius needed a strategy to get back to profitability or "break even."  In early May 2022, an internal presentation to Celsius's Board of Directors referenced that Celsius had suffered a pre-tax loss of approximately $800 million in 2021.  Despite regular discussions about the fact that Celsius was not profitable in 2022 and was not earning sufficient yield to support its high rewards rates, MASHINSKY nevertheless continued to publicly claim that Celsius was in a strong financial position and earned the purported "yield" that it distributed to customers through its rewards.  For example, in an AMA on or about March 4, 2022, MASHINSKY falsely stated: "Celsius is trying to do something very simple. Okay?  How about we charge borrowers 9 percent and pay users 7 percent?  Right?  So most of the yield goes to the community or to the coin owners."  Other Celsius executives scrubbed the statement from the recording of the AMA that was later posted to Celsius's website.

*MASHINSKY's Misrepresentations Regarding Celsius's Purportedly Market-Neutral Strategy*

31.     In his public statements, ALEXANDER MASHINSKY, the defendant, repeatedly and falsely claimed that Celsius earned yield by deploying customers' crypto assets in a safe and secure manner.  MASHINSKY regularly downplayed the risks that Celsius's customers were exposed to by investing their crypto assets with Celsius by assuring them that Celsius was not making so-called "directional bets"—that is, gambling on the future value of cryptocurrencies by taking long or short positions in various crypto assets—but instead was earning yield with Celsius customer funds through a market-neutral strategy that did not depend on the prices of particular crypto assets rising or falling.  In fact, as MASHINSKY well knew, Celsius was not market-neutral

and was regularly using customer coins to take risky bets on the future value of various crypto assets, often at MASHINSKY's express direction.  Certain of these bets resulted in significant losses of Celsius customers' assets.

32.    For example, in or about the spring of 2019, Celsius took a short position in Bitcoin at the direction of ALEXANDER MASHINSKY, the defendant, based on MASHINSKY's personal view that the price of Bitcoin would decrease.  In or about 2021, once Celsius opened accounts on another cryptocurrency exchange, Celsius specifically created subaccounts called "Directional1" and "Directional2," which were for the purpose of taking directional risk.  On another occasion in or about July 2021, MASHINSKY told a Celsius trader "[w]anted your team to try and use momentum trading to get rid of more [Grayscale Bitcoin Trust] and ETHE" and added that "[i]f markets are crashing or running up and you can sell the security and then use the price gaps to buy cheaper then go ahead and do it."  The trader responded to MASHINSKY, "What's the biggest loss you accept?  No matter how we structure those momentum trades we would take a directional bet."  An internal Celsius presentation from in or about February 2022 noted, "Directional trading was a widespread practice before September 2021 and was known and accepted by senior management, including risk.  It was presented and discussed in ExCo [Executive Committee], ALCO [Assets and Liabilities Committee), and RC [Risk Committee] and there is extensive supporting evidence."

33.    In or about 2022, ALEXANDER MASHINSKY, the defendant, continued to order Celsius to engage in directional trading.  In or about January 2022, MASHINSKY knew that Celsius's trading desk had taken directional bets that exceeded its own risk limits.  That month, MASHINSKY himself took control of Celsius's trading at one point and directed that Celsius's traders take a large directional bet in Bitcoin, overruling concerns raised by others at Celsius,

including Celsius's risk department.  Internal WhatsApp messages between Celsius employees during this period show that employees were concerned about this trading, with one asking, "seems like Alex is unilaterally trading large positions of our book? . . . So at what point do we seek outside intervention to get the thing under control."  The trading that MASHINSKY directed in late January 2022 ultimately caused a large loss to Celsius of tens of millions of dollars.

34.    Even after the events of late January 2022, ALEXANDER MASHINSKY, the defendant, continued to falsely state that Celsius did not engage in directional trading.  For example, as late as in or about April 2022, even after years of undisclosed directional trading within Celsius, much at MASHINSKY's own direction, MASHINSKY stated during a CNBC interview, "We are what you call a delta-neutral strategy. . . . Celsius doesn't bet on the market going up or down."

*MASHINSKY's Misrepresentations Regarding Uncollateralized Loans*

35.    In his public statements, ALEXANDER MASHINSKY, the defendant, also repeatedly misrepresented other core aspects of Celsius's business in an effort to falsely assure customers that their crypto assets would be deployed in a safe and secure manner.  MASHINSKY repeatedly publicly claimed that one of the primary ways that Celsius earned yield using customers' assets was by offering loans using customers' assets to large, credible institutional counterparties, as well as by offering retail loans.  MASHINSKY repeatedly and falsely claimed that all of the loans extended by Celsius were either fully or partially collateralized and that Celsius did not offer uncollateralized loans to counterparties, which MASHINSKY touted as evidence that Celsius earned yield using Celsius customers' assets in a conservative, safe, and secure fashion that did not place customers' assets at undue risk of loss.

18

36.    But in reality, as ALEXANDER MASHINSKY, the defendant, knew, at the very same time MASHINSKY made these statements, uncollateralized loans made up a substantial and growing percentage of Celsius's institutional loan portfolio.    MASHINSKY was regularly presented with granular information regarding Celsius's uncollateralized loans in meetings with other Celsius executives, including, at regular meetings of Celsius's Risk Committee. MASHINSKY also knew that Celsius's uncollateralized loans represented a substantial portion of its institutional lending business.  For example, a November 28, 2021 Risk Committee presentation reflected that Celsius had a total of approximately $1.8 billion in unsecured loans across 21 separate clients, which represented approximately 39 percent of Celsius's institutional loan portfolio.

37.    ALEXANDER MASHINSKY, the defendant, had been warned by other Celsius employees not to make false statements regarding the fact that Celsius did not offer uncollateralized loans.  For example, in or about November 2021, a Celsius executive who specifically dealt with regulatory issues wrote to MASHINSKY regarding the upcoming publication of an interview with MASHINSKY in a magazine.  In a draft of the article, MASHINSKY was quoted as saying, "[o]ne way the company protects funds is by always requiring its borrowers to put up more than 100 percent of the value of their loan in collateral in another asset."  With respect to this statement, the Celsius executive emailed MASHINSKY, in bold, "**this is not true, and we can not say that**."  Nevertheless, despite this and other admonitions, MASHINSKY continued to claim that Celsius was not offering uncollateralized loans.  For example, during an April 2022 interview with CNBC, MASHINSKY was specifically asked if Celsius was offering uncollateralized loans, and MASHINSKY falsely responded that

Celsius's institutional business had "under collateralized, but we don't offer any non-collateralized loans."

<em>MASHINSKY's Misrepresentations Regarding Counterparty Defaults</em>

38.    ALEXANDER MASHINSKY, the defendant, in an attempt to portray Celsius's lending practices and due diligence process as conservative and sound, repeatedly and falsely claimed that Celsius had never had an institutional borrower default on a loan. In reality, and as MASHINSKY knew, multiple institutional borrowers had defaulted on their loans from Celsius by the time that MASHINSKY was publicly stating otherwise.

39.    From at least in or about early 2021, ALEXANDER MASHINSKY, the defendant, became aware of an institutional borrower defaulting on its loan from Celsius. MASHINSKY was involved in numerous conversations and meetings where this default was referenced. Also in or about early 2021, MASHINSKY learned that a second counterparty defaulted on its loan from Celsius, which resulted in Celsius sending a demand letter to the counterparty notifying it of the default. Nevertheless, MASHINSKY publicly stated on numerous occasions after he had full knowledge of these institutional defaults that Celsius had never had any such defaults. Indeed, MASHINSKY touted the fact that Celsius had had no institutional counterparties default as evidence of Celsius's superior lending practices. By way of example, in an AMA on or about July 9, 2021, MASHINSKY stated, "We manage risk appropriately and again, I say that every week, this week is a great time to say it, we did not have any institutional defaults."

<em>MASHINSKY's Misrepresentations Regarding Regulatory Clarity</em>

40.    In his effort to induce retail crypto asset users to deposit their crypto assets with Celsius, ALEXANDER MASHINSKY, the defendant, also repeatedly and falsely assured the public that Celsius had clarity and guidance from government regulators, when in fact, Celsius did

not have any such clarity and was under substantial regulatory scrutiny in multiple jurisdictions both in the United States and abroad.

41.     For example, ALEXANDER MASHINSKY, the defendant, is quoted in a published interview in or about December 2021 as falsely stating, "The regulators looked into us and said these guys know what they're doing." Similarly, in or about April 2022, MASHINSKY falsely stated during an AMA that "there's not—no legal issues at least with the services that Celsius provides or so," which statement was subsequently edited out of the recorded version of the AMA posted by Celsius online. In truth and in fact, MASHINSKY knew that Celsius faced substantial regulatory issues and did not have regulatory approval of its business. By late 2021, after the United States Securities and Exchange Commission (the "SEC") commenced an investigation of Celsius, MASHINSKY was expressly discussing with RONI COHEN-PAVON, the defendant, that Celsius should reach a settlement with the SEC. Similarly, MASHINSKY was present for a meeting with foreign regulators in or about June 2021 during which the regulators informed Celsius that Celsius's business model did not comply with local law.

*MASHINSKY's Misrepresentations Regarding Liquidity*

42.     ALEXANDER MASHINSKY, the defendant, repeatedly falsely represented that Celsius's customers were assured that Celsius would always have enough assets on hand to meet customer's withdrawal demands. MASHINSKY contrasted Celsius from traditional banks in this regard, falsely claiming that Celsius could not be subject to a "run on the bank." For example, in or about April 2021, MASHINSKY stated in an AMA: "So a run on the bank—normally, because banks have fractional reserves, they lend 20, 30, 50 times more than the money they have, there is a run on the bank. A run on the bank cannot happen at Celsius because Celsius never lends more than what it has, right? We cannot do legally, we're not allowed to create money or do fractional

reserves, so at any moment we always have enough coins and enough collateral and so on to return all the assets to all of our users." MASHINSKY further falsely claimed during this same AMA that Celsius had a daily process by which it ensured that "we have more coins than what we owe the community" and that no traditional bank could make such an assurance "because they never have enough assets to return for you if there is a run on the bank."

43.    Even before Celsius's bankruptcy proved the falsity of the claims by ALEXANDER MASHINSKY, the defendant, it was clear from Celsius's internal financial analyses that Celsius did not have more assets than deposits such that it could satisfy a demand for all customer assets. For example, the company's audited financials from February 2020 showed that Celsius did not have enough tangible assets to cover all customer deposits, and that Celsius could only be said to have enough assets to cover deposits if it included "intangible assets" such as CEL, the value of which was speculative at best. MASHINSKY had access to the audited financials and was involved in the process relating to their preparation.

*MASHINSKY's Misrepresentations Leading Up to the June 12, 2022 "Pause"*

44.    ALEXANDER MASHINSKY, the defendant, continued to misrepresent the financial health of the Celsius platform in the weeks leading up to the June 12, 2022 "Pause" on withdrawals. As a result of the volatility in the crypto markets in or about early May 2022 and the weeks that followed, Celsius customer withdrawals increased substantially. In his public statements, MASHINSKY continued to assure Celsius customers that Celsius was in a strong financial position and had sufficient liquidity to meet all customer withdrawal demands.

45.    In the lead up to the June 12, 2022 "Pause," ALEXANDER MASHINSKY, the defendant, also sought to allay Celsius customers' concerns about the solvency of the platform by publicly stating that he, like Celsius's customers, held a huge amount of his own wealth on the

22

Celsius platform and was keeping his assets with Celsius. During an AMA on or about May 27, 2022, for example, MASHINSKY stated, "we all have our money in the same platform. I have millions of dollars of my money on the platform as well. And obviously, we're in it together."

46.    What ALEXANDER MASHINSKY, the defendant, did not tell Celsius's customers was that, in fact, in the last days and weeks, he had withdrawn a significant portion of his non-CEL assets from Celsius's platform. On or about May 10, 2022, MASHINSKY held millions of dollars' worth of crypto assets on Celsius's platform excluding his CEL holdings. On or about May 15, 2022, MASHINSKY withdrew approximately $2.9 million worth of non-CEL crypto assets from his Celsius accounts. And on or about May 27, 2022, the same day that MASHINSKY said "we're in it together," MASHINSKY withdrew an additional approximately $5.1 million worth of non-CEL crypto assets from his Celsius accounts. By on or about May 27, 2022, MASHINSKY had removed almost all of his non-CEL crypto assets from the Celsius platform, leaving MASHINSKY with only approximately $1 million worth of non-CEL assets on Celsius's platform by the end of May 27, 2022.

47.    Indeed, ALEXANDER MASHINSKY, the defendant, was internally discussing with other Celsius executives that Celsius was in trouble. For example, a June 2, 2022 slide deck entitled "Business Outlook—Restructuring, Capital and Liquidity Update" stated: "Celsius has been consistently losing money and is facing an erosion in the capital position as well as liquidity constraints. The current business model is not sustainable." Days later, on or about June 7, 2022, Celsius issued a blog post entitled "Damn the Torpedoes, Full Speed Ahead." The blog post falsely stated, among other things, that "Celsius has the reserves (and more than enough ETH) to meet obligations, as dictated by our comprehensive liquidity risk management framework."

**The CEL Manipulation Scheme**

48.     A core feature of Celsius's business was its native cryptocurrency token, CEL. Celsius's whitepaper—which laid out the basic concept for Celsius's business model and the CEL token—described CEL as "the backbone of the Celsius Network." After the CEL token's creation in or about 2018 and throughout his tenure as CEO of Celsius, ALEXANDER MASHINSKY, the defendant, frequently discussed CEL in public and equated the value of CEL with the strength of Celsius's overall business. MASHINSKY encouraged the public to purchase CEL and "HODL"— an acronym for "hold on for dear life." As the price of CEL began to rise, MASHINSKY touted the rise in CEL's price as evidence that Celsius was a strong and growing business. In his public statements, MASHINSKY also encouraged customers of Celsius's Earn program to elect to receive their rewards in CEL rather than receiving rewards in the form of other crypto assets. At MASHINSKY's direction, Celsius incentivized Celsius Earn customers to receive their weekly rewards in CEL by, at times, offering higher reward rates to customers who chose to receive rewards in CEL rather than in other crypto assets.

49.     Over time, CEL became crucial to Celsius's overall illusion of financial health, particularly after Celsius, at the urging of ALEXANDER MASHINSKY, the defendant, made the decision to add the CEL held in the company's treasury to Celsius's balance sheet. But while MASHINSKY touted CEL as an investment opportunity to the public and frequently cited CEL's rising price, in reality, and unbeknownst to market participants and to Celsius's customers, MASHINSKY, along with RONI COHEN-PAVON, the defendant, and certain other Celsius employees and executives, orchestrated a scheme to manipulate the price of CEL by causing Celsius to conduct massive purchases of CEL, without disclosing its identity as the purchaser, in the open market to artificially support and artificially inflate the price of the CEL. A portion of

this CEL purchasing was carried out using customer assets and resulted in further strain on Celsius's already weak financial situation, but MASHINSKY nonetheless persisted in his plan to divert Celsius's assets into inflating the price of CEL.

50.    ALEXANDER MASHINSKY, RONI COHEN-PAVON, the defendants, and their co-conspirators, artificially inflated the price of CEL to achieve multiple objectives. First, because MASHINSKY frequently equated the price of CEL with the strength of Celsius's business, artificially inflating the price of CEL allowed MASHINSKY to publicly tout Celsius's future prospects to the public. Second, artificially inflating the price of CEL allowed MASHINSKY, COHEN-PAVON, and other Celsius executives to sell their own personal CEL holdings for a substantial profit, with MASHINSKY reaping approximately $42 million in proceeds from his sales of CEL, and COHEN-PAVON reaping at least $3.6 million in proceeds from his sales of CEL. Third, artificially inflating the price of CEL allowed Celsius—which held hundreds of millions of CEL in its treasury—to present a stronger balance sheet. Fourth, inflating the price of CEL made it more likely that lenders would accept CEL as collateral from Celsius.

*MASHINSKY Causes Celsius to Increase CEL Purchases to Artificially Inflate the Price*

51.    One of the core features of CEL was that Celsius would purchase in the market a portion of the CEL it owed customers in weekly rewards, rather than simply distributing the CEL that Celsius had in its treasury to users as rewards. But in or about 2018 and through much of 2019, Celsius conducted relatively limited market purchases of CEL. CEL's price remained low during this period, and by the end of October 2019, CEL was trading at approximately $0.05 per token.

52.    Beginning in or about November 2019, however, ALEXANDER MASHINSKY, the defendant, and others at Celsius began discussing internally how to execute Celsius's market

purchases of CEL to maximize the price impact on CEL. In or about May 2020, MASHINSKY explained in an internal email to certain others at Celsius, "Our job is to protect CEL," and further stated, "[i]t's a win win scenario, the only we loose [sic] is if CEL price drops a lot and people get nervous and keep selling. We can protect against this scenario."

53.    While for a period of time up until mid-2020 Celsius left open how much CEL it would buy in the market to fulfill weekly rewards versus pay from its treasury, on or about June 19, 2020, ALEXANDER MASHINSKY, the defendant, publicly committed that Celsius would "stop using the treasury to pay interest to our community" and would start "buying almost everything, almost 100 percent . . . . almost 100 percent from the markets." But while MASHINSKY had publicly committed that Celsius would purchase in the market the amount of CEL necessary to pay customers their weekly CEL rewards, beginning in or about July 2020, Celsius, at MASHINSKY's direction and with MASHINSKY's knowledge, began to conduct market purchases of CEL well in excess of the amount of CEL it needed to pay customers their weekly rewards, thereby misleading the public and market participants as to how active Celsius was in the market for CEL. The purpose of this undisclosed excess buying was to artificially support and inflate the price of CEL.

54.    At times ALEXANDER MASHINSKY, the defendant, personally gave directives that Celsius should conduct market purchases of CEL in excess of the CEL necessary to pay customers their weekly CEL rewards in order to support the price. For example, in or about July 2020, MASHINSKY directed that Celsius should be prepared to conduct large market purchases of CEL to support CEL's price in light of an anticipated negative news article about Celsius that was expected to be published imminently. On the date that MASHINSKY expected the article to be published, MASHINSKY, using WhatsApp, directed another Celsius executive with trading

authority to purchase CEL in excess of what was necessary to fulfill Celsius's weekly rewards obligations if the CEL price "drops a lot." On the date that the article was ultimately published, Celsius—consistent with MASHINSKY's directive—conducted large purchases of CEL and the price of CEL remained relatively stable as a result.

55. Between in or about late July 2020 and the end of 2020, Celsius purchased more CEL in the market than was necessary to pay weekly CEL rewards, every single week. During this period, Celsius was a net purchaser in the market of approximately 22 million CEL tokens in excess of the amount of CEL necessary to fulfill its weekly rewards obligations, representing approximately three times more CEL than Celsius needed to pay customers their weekly CEL rewards. These excess purchases—which bore no relation to Celsius's distribution of weekly rewards of CEL—were designed to artificially support and inflate the price of CEL. The strategy orchestrated by ALEXANDER MASHINSKY, the defendant, and his co-conspirators was effective, and the price of CEL rose dramatically from approximately $0.40 in late July 2020 to approximately $5.50 by the end of 2020.

56. During the period between in or about July 2020 and the end of 2020, ALEXANDER MASHINSKY, the defendant, repeatedly made false and misleading public statements regarding the nature and extent of Celsius's CEL market activity, falsely representing that Celsius was purchasing CEL in the market primarily to fulfill its weekly CEL rewards obligations, and not revealing that Celsius was actually buying CEL well in excess of the amounts needed for weekly rewards to artificially support the price. For example:

   a.    During an AMA on or about September 11, 2020, ALEXANDER MASHINSKY, the defendant, touted the fact that CEL's price was increasing, stating: "CEL token is just rocketing and it's all organic demand. There's no market making or manipulation or wash

trading or anything." MASHINSKY further stated during this same AMA that CEL had one of the highest trading volumes of any crypto token, which MASHINSKY said "tells you that the community is much larger, much more stable and is a HODLer community." While MASHINSKY claimed that the dramatic price increase in CEL was due to "organic" demand, in reality, and as MASHINSKY knew, the price increase was due to Celsius's own massive market purchases.

        b.     Similarly, on or about November 26, 2020, MASHINSKY sent a tweet from his Twitter account that falsely equated the amount of CEL that Celsius would purchase in the market with how much CEL Celsius users were going to receive in weekly CEL rewards, stating in relevant part: "I bought #CEL token at $2.05 if you were waiting for the price of @CelsiusNetwork token to tank it just did. We just published our total assets, do the math how much $CEL we will need to buy next week all time record users, deposits and Celsians earning in CEL."

*MASHINSKY Personally Purchases CEL to Manipulate the Price of CEL*

57.     In addition to causing Celsius to purchase huge volumes of CEL for the purpose of artificially supporting and inflating CEL's price, at times ALEXANDER MASHINSKY, the defendant, personally purchased CEL using his own accounts and wallets in order to manipulate CEL's price.

58.     For example, on or about October 21, 2020, ALEXANDER MASHINSKY, the defendant, communicated with a trader working for Celsius regarding a large market selloff that was occurring in the CEL market. When MASHINSKY learned that Celsius did not have a substantial amount of funds available in its accounts with centralized exchanges to purchase enough CEL to artificially support the CEL price during the selloff, MASHINSKY proposed

personally buying CEL to artificially support the price. MASHINSKY asked the trader to provide him with trading instructions, including asking "what size swap orders for ETH will have the most impact." After advising that he had swapped 100 ETH for CEL, MASHINSKY told the trader, "[l]et's see if we need more." Later that day, the Celsius trader advised MASHINSKY, "CEL $1.30 . . . you saved the day Alex." Another Celsius executive thanked MASHINSKY for supporting the price of CEL during the selloff, and MASHINSKY advised this executive, "I bought 300 ETH in three orders. [The trader] gave me the instructions [smiley emoji]." In total, on or about October 21, 2020, MASHINSKY net purchased approximately 149,000 CEL, which represented the second largest amount of CEL that MASHINSKY ever purchased in the market.

59.     ALEXANDER MASHINSKY, the defendant, purchased CEL in the market on other occasions in or about 2020 and 2021 for the purpose of artificially manipulating the price of CEL, particularly during periods when large selloffs of CEL were occurring.

*MASHINSKY's False Public Statements in Early 2021*

60.     By early 2021, the price of CEL had increased dramatically to approximately over $6.50 per token. ALEXANDER MASHINSKY, the defendant, understood that this dramatic price increase was the result of Celsius's own market purchases that had artificially inflated the price. The rising price of CEL meant that Celsius would have to spend more money every week purchasing CEL to fulfill weekly rewards. This caused MASHINSKY to instruct another Celsius executive and a Celsius trader to temporarily cease purchasing CEL in the market to fulfill weekly rewards until the price dropped by at least 30 percent. Even though MASHINSKY had publicly committed that Celsius would purchase all the CEL it needed to fulfill weekly rewards in the market, on or about January 3, 2021, he instructed a Celsius trader "we will be paying all CEL

from treasury until further notice. Please stop buying any CEL for the weekly interest unless it drops 30% or more from the $6.70 levels."

61.    In fact, despite giving this directive to cease purchasing CEL in the market, ALEXANDER MASHINSKY, the defendant, continued to publicly state that Celsius was buying all the CEL it needed to fulfill weekly rewards in the market. For example, MASHINSKY falsely stated in an AMA on or about January 8, 2021, that "we all know more users, more deposits, means we're earning more interest, which means we have to be buying more CEL tokens." On or about February 19, 2021, MASHINSKY again falsely stated that Celsius's market purchases were driven by how much Celsius customers were earning in CEL, stating, "when they earn more in CEL what does it mean? We have to go and buy more CEL in the markets."

62.    During an AMA on or about March 19, 2021, ALEXANDER MASHINSKY, the defendant, again misrepresented the nature and extent of Celsius's market activity and artificial control over the CEL price, stating: "We obviously want CEL token to go higher in price, but we don't control it. It's not like we are the invisible hand that controls the pricing here or anything like that." MASHINSKY further falsely stated during this AMA: "I think 56.5% of [Celsius users] are earning in CEL. Those are the drivers. That's what's driving adoption and demand—creates demand for the CEL token. Those are the biggest drivers compared to buyers and sellers." In truth, MASHINSKY knew that Celsius's own purchasing—including purchases well in excess of what was necessary to fulfill its weekly CEL rewards obligations—was the primary driver of the inflated price of CEL.

63.    After ALEXANDER MASHINSKY, the defendant, and other Celsius executives discovered the "hole" in Celsius's balance sheet in or about March 2021—which had been, in part, precipitated by Celsius's large market purchases of CEL using customer assets—Celsius

temporarily stopped buying CEL in the market altogether between in or about late March 2021 through mid-April 2021. MASHINSKY did not disclose the discovery of the "hole," nor did he disclose that Celsius had discovered it was using customers' assets to purchase CEL in the market. Moreover, MASHINSKY did not disclose that Celsius had temporarily stopped buying CEL, which rendered false his prior representations that Celsius would purchase every week in the market the CEL it required to pay customers their weekly CEL rewards.

*MASHINSKY, COHEN-PAVON, and Others Continue the CEL Token Manipulation Scheme*

64.    Beginning in or about mid-April 2021 and continuing through the end of 2021, Celsius resumed buying huge quantities of CEL token in the market well in excess of what Celsius required to fulfill its customers weekly CEL rewards in order to artificially support and inflate the price of CEL. In total for 2021, Celsius was a net purchaser in the market of approximately 82 million CEL tokens, while Celsius only distributed approximately 26.5 million CEL in rewards to its customers in 2021. In other words, Celsius purchased over triple the volume of CEL that it required to fulfill weekly rewards. Celsius spent approximately $416 million in 2021 alone purchasing CEL in the market, whereas Celsius's CEL rewards obligations were only approximately $144 million worth of CEL.

65.    During this time period, ALEXANDER MASHINSKY, the defendant, continued to make false and misleading public statements in which he linked Celsius's purchases of CEL in the market with the amount of CEL that Celsius needed to distribute to its customers as rewards. In reality, the amount of CEL that Celsius purchased in the market was far in excess of the amount needed to pay weekly rewards and was simply driven by the objective of MASHINSKY, RONI COHEN-PAVON, the defendant, and their co-conspirators to artificially support the CEL price. For example:

      a.     MASHINSKY falsely stated during an AMA on or about December 10, 2021, "So we continue to buy CEL tokens for the community every week based on how much you want to earn. So again, the more you earn in CEL, the more we have to buy." While MASHINSKY acknowledged during this same AMA that, at times, Celsius purchased more CEL than was necessary to pay Celsius users their weekly CEL rewards, he falsely claimed that most of Celsius's purchases in the market were "to pay the community, to pay the people who earn in CEL" and that Celsius only "once in a while" conducted CEL purchases above and beyond what was needed for CEL rewards. In reality, Celsius's purchases in excess of the amount required for weekly CEL rewards was the majority of Celsius's purchases in 2021. Such excess purchasing did not merely occur "once in a while."

      b.     On or about January 7, 2022, MASHINSKY again falsely claimed that the amount of CEL Celsius purchased in the market was based on and determined by how much CEL users were earning in CEL, stating, "[t]he piece of how much we buy CEL has nothing to do with Celsius — Celsius doesn't decide how many CEL tokens to buy and then how many of them to burn." MASHINSKY added, "[t]he more you earn in CEL the more of you can direct how much we buy and how much we burn."

66.     While ALEXANDER MASHINSKY, the defendant, was externally messaging that Celsius's purchasing in the market was simply a function of how much CEL it needed to distribute to its users, behind the scenes MASHINSKY was frequently discussing the need to purchase CEL to artificially support CEL's price. Beginning in or about September 2021, MASHINSKY placed RONI COHEN-PAVON, the defendant, in charge of managing and directing Celsius's weekly purchases of CEL in the market. COHEN-PAVON directed Celsius to purchase CEL in excess of its weekly rewards obligations in order to artificially support the price of CEL, and frequently

communicated with MASHINSKY about Celsius's efforts to artificially manipulate the price of
CEL.  For example:

      a.    On or about October 30, 2021, as the price of CEL was dropping,
MASHINSKY and COHEN-PAVON discussed in a WhatsApp communication their efforts to
support the price of CEL.  MASHINSKY complained to COHEN-PAVON that "every day we
have all time record new users joining Celsius yet CEL [p]rice is going down" and further noted
"[t]he price will not take care of itself if everyone will just get scared and sell."  COHEN-PAVON
responded:

> We're not just sitting and watching the price. We're on it all week
> and even now [another Celsius executive] and I are live with the
> market maker. The issue is that people are selling and no one is
> buying except for us. The main problem was that the value was fake
> and was based on us spending millions (~8M a week and even more
> until February 2020) just to keep it where it is. This week we spent
> 'only' $4M (on top of the rewards) and the price is still going down.

MASHINSKY later stated in this same WhatsApp conversation to COHEN-PAVON, "Does doge
coin value real? How about the $5B for Solana. Everyone knows what these tokens are and want
to buy them because they think price is going up."   COHEN-PAVON further advised
MASHINSKY that COHEN-PAVON and certain other Celsius executives "bought [CEL] from
our personal money to support the price."

      b.    On or about December 10, 2021, MASHINSKY requested in a WhatsApp
communication that COHEN-PAVON provide him with data on how much CEL Celsius had
purchased in 2021.  COHEN-PAVON later provided MASHINSKY a chart summarizing Celsius's
market activity for the year, which, according to COHEN-PAVON, showed that Celsius "bought
23M [million] extra tokens."  The chart that COHEN-PAVON provided showed that Celsius's
total weekly rewards obligations in CEL for the year to date had been approximately 24.7 million

CEL tokens, and that Celsius had been a net purchaser of approximately 47.8 million CEL tokens that year, even when accounting for the activities of Celsius's over-the-counter ("OTC") desk. COHEN-PAVON thus provided MASHINSKY with a clear summary showing how Celsius had purchased CEL in massive volumes far in excess of the amounts Celsius required to fulfill its weekly CEL rewards to customers. Indeed, according to the summary chart COHEN-PAVON provided to MASHINSKY, Celsius had been a net purchaser of essentially double the CEL tokens that it required to distribute weekly CEL rewards to customers, even when accounting for Celsius's OTC desk, which itself had sold large amounts of CEL.

        c.     On or about December 11, 2021, COHEN-PAVON advised MASHINSKY in a WhatsApp communication that "[a]s of now, no one is buying in the market except for us." COHEN-PAVON further told MASHINSKY in this same WhatsApp communication, "[w]e spent $20M in the last 36 hours (16M to buy out [a known large CEL token holder] and 4M to support in the market). And this is after we're going up and the entire market is going down, people are still selling."

        d.     On or about January 1, 2022, MASHINSKY asked COHEN-PAVON in a WhatsApp communication, "do we need CEL above 5 or we ok?" COHEN-PAVON responded "it was not simple to get it where it is."

*Efforts to Manipulate CEL in 2022*

        67.     In or about 2022, Celsius's market purchases of CEL were substantially lower than they were in 2021, with Celsius only purchasing modestly more CEL than it required to fulfill weekly CEL rewards. Once Celsius's market purchases began to decrease, the price of CEL began to drop. Consistent with an overall drop in crypto prices in early- to mid-May 2022, the price of CEL continued to decrease. ALEXANDER MASHINSKY, the defendant, sought to artificially

support the price of CEL as the selling of CEL in the market increased. On or about May 12, 2022, MASHINSKY wrote to RONI COHEN-PAVON, the defendant, "let's defend CEL here so we don't loose [sic] all our users." On or about May 12, 2022, MASHINSKY gave a directive to a Celsius trader that Celsius could purchase up to $5 million worth of CEL to support the price of CEL, and during that week Celsius purchased approximately three times more CEL than it required to distribute weekly CEL rewards to its customers.

68.    In the immediate lead-up to the June 12, 2022 "Pause," ALEXANDER MASHINSKY, the defendant, also considered, but ultimately did not pursue, a plan to further manipulate the price and availability of the CEL token through a "short squeeze" in CEL.

*MASHINSKY's False and Misleading Statements Regarding His CEL Sales*

69.    As ALEXANDER MASHINSKY, the defendant, was causing Celsius to artificially inflate the price of CEL, he was personally selling large volumes of his own holdings in CEL. MASHINSKY reaped approximately $42 million in proceeds from these sales.

70.    ALEXANDER MASHINSKY, the defendant, repeatedly made false and misleading public statements regarding his own personal CEL trading activity, including, in certain instances, claiming that he had not been selling CEL when, in truth and in fact, he had been selling large volumes of his CEL prior to and immediately following these statements. By way of example:

a.    On or about September 8, 2019, MASHINSKY stated on his Twitter account, "I did not sell any CEL. I buy more every week. Look at that balance of 77m CEL and remember what we told you when it is at $10 a CEL." In reality, MASHINSKY conducted no purchases of CEL during the period immediately preceding and after making this public statement. To the contrary, MASHINSKY was selling CEL during this period. On or about August 22

35

through August 23, 2019, MASHINSKY sold approximately 292,000 CEL, and from or about September 19 through or about September 23, he again sold another 382,000 CEL. MASHINSKY had, in fact, not purchased CEL in the market at all prior to his September 8, 2019 statement.

        b.     On or about November 13, 2020, MASHINSKY stated during an AMA, "CEL token should be at more than $2.00 right now" and "if you think you missed the party because CEL is up a few thousand percent, you know, again, this is not investment advice, I'm not telling you to buy CEL, but I am not selling." In reality, MASHINSKY was a net seller of approximately 280,000 CEL in the week leading up to and including on or about November 13, 2020, and he then went on to net sell approximately another 307,000 CEL in the days that followed the November 13, 2020 AMA.

        c.     On or about November 5, 2021, MASHINSKY addressed "rumors" during an AMA that he had been selling CEL, stating that he actually bought "something like 30,000 CEL token last few days. If you think I'm selling, I'm not selling, I'm buying." In fact, while MASHINSKY had net purchased approximately 29,000 CEL the day prior to the November 5, 2021 AMA, MASHINSKY had been a net seller of CEL in the thirty days leading up to the AMA, net selling approximately 247,000 CEL.

    71.    The large sales of CEL by ALEXANDER MASHINSKY, the defendant, violated Celsius's trading policy, which MASHINSKY had signed in or about July 2020. That policy forbade Celsius executives and directors from selling CEL in excess of $20,000 per day or $50,000 per week. Yet, on numerous occasions, MASHINSKY sold CEL in the market well in excess of these limits and in direct contravention of the trading policy he had signed. Furthermore, Celsius executives at various points warned MASHINSKY that he was in violation of Celsius's policies through his sales, yet he continued to sell large volumes of his personal CEL holdings nevertheless.

**Statutory Allegations**

**COUNT ONE**
**(Securities Fraud)**

The Grand Jury charges:

72.    The allegations contained in paragraphs 1 through 71 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

73.    From at least in or about 2018 through at least in or about June 2022, in the Southern District of New York and elsewhere, ALEXANDER MASHINSKY, the defendant, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, to induce investors to purchase an interest in Celsius's Earn Program and to acquire CEL token, MASHINSKY made false and misleading statements about Celsius's financial condition and operations.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

37

## COUNT TWO
### (Commodities Fraud)

The Grand Jury further charges:

74.     The allegations contained in paragraphs 1 through 71 of this Indictment are hereby

repeated, re-alleged, and incorporated by reference as if fully set forth herein.

75.     From at least in or about 2018 through at least in or about June 2022, in the Southern

District of New York and elsewhere, ALEXANDER MASHINSKY, the defendant, willfully and

knowingly, directly and indirectly, used and employed, and attempted to use and employ, in

connection with a swap, a contract of sale of a commodity in interstate commerce, and for future

delivery on and subject to the rules of a registered entity, a manipulative and deceptive device and

contrivance, in contravention of Title 17, Code of Federal Regulations, Section 180.1, by: (1) using

and employing, and attempting to use and employ, a manipulative device, scheme, and artifice to

defraud; (2) making, and attempting to make, an untrue and misleading statement of a material

fact and omitting to state a material fact necessary in order to make the statements not untrue and

misleading; and (3) engaging, and attempting to engage in an act, practice, and course of business

which operated and would operate as a fraud and deceit upon a person, to wit, MASHINSKY

engaged in a fraudulent scheme to induce investors to sell their Bitcoin to Celsius in exchange for

an interest in Celsius's Earn Program, by making false and misleading statements about Celsius's

financial condition and operations.

(Title 7, United States Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal
Regulations, Section 180.1; and Title 18, United States Code, Section 2.)

**COUNT THREE**
**(Wire Fraud)**

The Grand Jury further charges:

76.     The allegations contained in paragraphs 1 through 71 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

77.     From at least in or about 2018 through at least in or about June 2022, in the Southern District of New York and elsewhere, ALEXANDER MASHINSKY, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, MASHINSKY engaged in a fraudulent scheme to induce investors and borrowers to provide their assets to Celsius as part of Celsius's Earn and Borrow programs, to induce investors to receive their rewards payments from Celsius in CEL, and to induce investors to purchase CEL in the market, by making false and misleading statements about Celsius's financial condition and operations, including using interstate wires, some of which transited through the Southern District of New York.

(Title 18, United States code, Sections 1343 and 2.)

**COUNT FOUR**
**(Conspiracy to Manipulate the Price of CEL)**

The Grand Jury further charges:

78.     The allegations contained in paragraphs 1 through 71 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

79.    From at least in or about 2019 through at least in or about June 2022, in the Southern District of New York and elsewhere, ALEXANDER MASHINSKY and RONI COHEN-PAVON, the defendants, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5; market manipulation, in violation of Title 15, United States Code, Sections 78i(a)(2) and 78ff; and wire fraud, in violation of Title 18, United States Code, Section 1343.

80.    It was a part and an object of the conspiracy that ALEXANDER MASHINSKY and RONI COHEN-PAVON, the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and a facility of a national securities exchange, would and did use and employ, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, to wit, MASHINSKY and COHEN-PAVON agreed to and did engage in a scheme to defraud investors in CEL token by artificially manipulating the market for CEL token and through making false and misleading statements about Celsius's purchases of CEL token and making false and misleading statements about MASHINSKY's own sales of CEL token.

40

81.    It was further apart and an object of the conspiracy that ALEXANDER MASHINSKY and RONI COHEN-PAVON, the defendants, and others known and unknown, willfully and knowingly would and did, directly and indirectly, by the use of the mails and a means and instrumentality of interstate commerce, and of a facility of a national securities exchange, and for a member of a national securities exchange, effected, alone and with one and more other persons, a series of transactions in a security registered on a national securities exchange, a security not so registered, and in connection with a security-based swap or security-based swap agreement with respect to such security creating actual or apparent active trading in such security, and raising and depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others, in violation of Title 15, United States Code, Sections 78i(a)(2) and 78ff, to wit, MASHINSKY and COHEN-PAVON agreed to and did engage in a series of transactions in CEL in order to artificially raise the price of CEL and induce others to purchase CEL.

82.    It was further apart and an object of the conspiracy that ALEXANDER MASHINSKY and RONI COHEN-PAVON, the defendants, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States code, Sections 1343, to wit, MASHINSKY and COHEN-PAVON agreed to and did engage in a scheme to defraud investors in CEL token by manipulating the market for CEL token, making false and misleading statements about Celsius's market activity in CEL, and making false and misleading statements about MASHINSKY's own sales of CEL token.

Overt Acts

83.     In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.      On or about July 14, 2020, ALEXANDER MASHINSKY, the defendant, instructed another co-conspirator not named herein by electronic message to cause Celsius to purchase CEL token in the market in order to artificially manipulate the price of CEL.

b.      On or about October 21, 2020, MASHINSKY personally purchased CEL in the market in order to artificially support the price of CEL.

c.      On or about October 30, 2021, MASHINSKY and RONI COHEN-PAVON, the defendant, discussed by electronic message a plan to artificially manipulate the price of CEL.

d.      On or about January 7, 2022, MASHINSKY made false and misleading public statements regarding Celsius's market purchases of CEL.

e.      On or about November 5, 2021, MASHINSKY made false and misleading public statements regarding his own sales of CEL.

(Title 18, United States Code, Section 371.)

**COUNT FIVE**
**(Fraudulent Scheme to Manipulate the Price of CEL)**

The Grand Jury further charges:

84.     The allegations contained in paragraphs 1 through 71, and 83 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

85.     From at least in or about 2019 through at least in or about June 2022, in the Southern District of New York and elsewhere, ALEXANDER MASHINSKY and RONI COHEN-PAVON, the defendants, willfully and knowingly, directly and indirectly, by use of a means and

instrumentality of interstate commerce and of the mails, and a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, MASHINSKY and COHEN-PAVON engaged in a scheme to defraud investors in CEL token by artificially manipulating the market for CEL token and through making false and misleading statements about Celsius's purchases of CEL token and making false and misleading statements about MASHINSKY's own sales of CEL token.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT SIX
### (Market Manipulation of CEL Token)

The Grand Jury further charges:

86.    The allegations contained in paragraphs 1 through 71, and 83 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

87.    From at least in or about 2019 through at least in or about June 2022, in the Southern District of New York and elsewhere, ALEXANDER MASHINSKY and RONI COHEN-PAVON, the defendants, willfully and knowingly would and did, directly and indirectly, by the use of the mails and a means or instrumentality of interstate commerce, and of a facility of a national securities exchange, and for a member of a national securities exchange, effected, alone and with one and more other persons, a series of transactions in a security registered on a national securities exchange, a security not so registered, and in connection with a security-based swap or security-

43

based swap agreement with respect to such security creating actual or apparent active trading in such security, and raising and depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others, to wit, MASHINSKY and COHEN-PAVON engaged in a series of transactions in CEL in order to artificially raise the price of CEL and induce others to purchase CEL.

(Title 15, United States Code, Sections 78i(a)(2) and 78ff; and Title 18, United State Code, Section 2.)

## COUNT SEVEN
### (Wire Fraud — CEL Token Manipulation)

The Grand Jury further charges:

88.     The allegations contained in paragraphs 1 through 71, and 83 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

89.     From at least in or about 2018 through at least in or about June 2022, in the Southern District of New York and elsewhere, ALEXANDER MASHINSKY and RONI COHEN-PAVON, the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, MASHINSKY and COHEN-PAVON engaged in a scheme to defraud investors in CEL token by artificially manipulating the market for CEL token and through making false and misleading statements about Celsius's purchases of CEL token and making false and misleading statements about MASHINSKY's own sales of CEL token, including using interstate wires, some of which transited through the Southern District of New York.

(Title 18, United States code, Sections 1343 and 2.)

44

## FORFEITURE ALLEGATIONS

90.     As a result of committing the offenses alleged in Counts One and Three through Seven of this Indictment as to ALEXANDER MASHINSKY, the defendant, and as a result of committing the offenses alleged in Counts Four through Seven as to RONI COHEN-PAVON, the defendant, the defendants shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

### Substitute Assets Provision

91.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third person;

c.     has been placed beyond the jurisdiction of the Court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be subdivided without difficulty;

45

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and

Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the

defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

_____
FOREPERSON

_____
DAMIAN WILLIAMS
United States Attorney