UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                           :

UNITED STATES OF AMERICA       :

                           :

        - v. -            :                23 Cr. 347 (JGK)

                           :

ALEXANDER MASHINSKY,       :

                           :

           Defendant.     :

                           :

------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

JAY CLAYTON
United States Attorney
Southern District of New York

Peter J. Davis
Adam S. Hobson
Allison Nichols
Assistant United States Attorneys

- Of Counsel –

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

PROCEDURAL BACKGROUND ............................................................................ 3

CELSIUS NETWORK ............................................................................................. 7

THE OFFENSE CONDUCT .................................................................................. 13

   I.    The Misrepresentation Scheme ................................................................... 15

      A.   Mashinsky's Lies Regarding the Success of Celsius's Fundraising through the ICO .. 15

      B.   Mashinsky's Lies Regarding the Risks Celsius Took with Customer Funds .............. 18

      C.   Mashinsky's Lies Regarding Whether Celsius Was Sufficiently Successful to Sustain the Returns, or Yield, it Was Paying Investors ................................................ 27

      D.   Mashinsky's Lies Regarding Liquidity and the Lead-Up to the 'Pause' ..................... 31

      E.   Celsius Employees' Unsuccessful Efforts to Rein in Mashinsky's False Statements .. 37

   II.   The Scheme to Manipulate the Price of CEL ................................................ 44

      A.   Mashinsky Directed His Employees to Focus on Raising the Price of CEL ............... 46

      B.   June 2020: Secret Excess Purchase Begin ................................................................. 48

      C.   Use of Customer Bitcoin to Support CEL:  The Hole in the Balance Sheet ............... 53

      D.   April 2021 to December 2021: Celsius Resumes Excess Purchases ........................... 55

      E.   Early 2022: Celsius Reduces CEL Purchases but Mashinsky Continues to Manipulate CEL Price Around Key Events ................................................................. 60

   III.  Mashinsky's Self-Dealing ............................................................................ 61

RESOLUTION OF THE DEFENSE OBJECTIONS ............................................... 64

   I.    Applicable Law ........................................................................................... 65

   II.   The Disputed Facts Warrant Resolution ...................................................... 65

   III.  Mashinsky's 'Version of Events' Has No Basis in Fact ................................. 67

      A.   Mashinsky Made Numerous Misrepresentations, Which Were Part of a Yearslong Scheme to Defraud Investors ..................................................................................... 69

      B.   Mashinsky Led and Directed Celsius's Efforts to Manipulate the Price of CEL ......... 80

A SENTENCE OF AT LEAST 20 YEARS' IMPRISONMENT IS NECESSARY ..................... 82

   I.    The Nature, Circumstances, and Seriousness of the Offense Warrant a Significant Sentence ..................................................................................................... 83

   II.   General Deterrence Requires a Significant Sentence ..................................... 90

   III.  Specific Deterrence and the Defendant's Failure to Fully Accept Responsibility Require a Serious Sentence ......................................................................................... 92

i

IV.   A Sentence of at Least 20 Years is Necessary to Avoid Sentencing Disparities.............. 94

CONCLUSION.................................................................................................................. 97

The Government respectfully submits this memorandum in advance of the sentencing of the defendant Alexander Mashinsky, scheduled for May 8, 2025, and in response to the defendant's sentencing memorandum dated April 17, 2025 ("Def. Mem.").

## PRELIMINARY STATEMENT

The Court should sentence Alexander Mashinsky to twenty years' imprisonment as just punishment for his years-long campaign of lies and self-dealing that left in its wake billions in losses and thousands of victimized customers.

Over the course of several years, Mashinsky built Celsius Network into a marquee institution in the world of digital assets and decentralized finance. Mashinsky promoted Celsius as a type of blockchain bank, in which customer assets were safe and would bear interest for their owners. Hundreds of thousands of persons responded to that pitch by entrusting their money with Mashinsky. The economic scale quickly became immense: By 2021, Celsius managed more than $20 billion dollars in customer funds. As Celsius expanded, Mashinsky continued to tout the business and to assure his customers that their funds were safe and secure.

They were not. In 2022, Celsius declared bankruptcy and acknowledged that it could not return customers the funds they had deposited. The reasons why soon emerged: the safe and secure Celsius that Mashinsky had spent years describing did not exist. He had misrepresented how Celsius handled customer deposits, fabricated the company's profitability, and placed his customers' funds at the mercy of uncollateralized loans and undisclosed market bets even when he had told customers he would not do so. Mashinsky further compounded the risk to his customers by using their funds to manipulate the price of Celsius's native token, CEL, giving onlookers the false impression of genuine demand for CEL and giving Mashinsky a mechanism to enrich himself by selling his private stash of CEL tokens at artificial prices. Mashinsky's conduct made him rich

at the expense of Celsius's customers. When Celsius collapsed into bankruptcy, it wiped out the savings of ordinary retail investors who entrusted their cryptocurrency to the company based on Mashinsky's lies.

Mashinsky now comes before the Court to be sentenced. He has pled guilty to two counts of the Indictment, one charging him with misrepresenting the safety and liquidity of customer deposits with Celsius and the other with manipulating the price of CEL to artificially prop up its price and enrich himself personally. As part of his plea, Mashinsky has admitted that he was the leader of the criminal activity at Celsius, that his crimes caused staggering losses—in excess of $550 million—and that he personally benefited to the tune of more than $48 million. As the facts before the Court, including Mashinsky's guilty plea, make clear, his crimes were not the product of negligence, naivete, or bad luck. They were the result of deliberate, calculated decisions to lie, deceive, and steal in pursuit of personal fortune.

Nevertheless, even today, faced with overwhelming evidence of guilt, and having pled guilty to the offenses for which he will be sentenced, Mashinsky refuses to accept responsibility. He has engaged in elaborate linguistic acrobatics to avoid taking responsibility for the two fraudulent schemes while insisting he "stands by" the plea agreement. Def. Mem. 1. He has objected extensively to the Presentence Investigation Report ("PSR"), and offered an alternative "Version of Events." He has abandoned all pretense of acknowledging his sustained wrongdoing, and he does not even feint at contrition. Instead, he claims he was motivated by a selfless devotion to service, his only mistakes excessive enthusiasm for Celsius and trusting the wrong executives. Def. Mem. 31, 46. He also blames market conditions, regulatory uncertainty, and even his own victims, portraying himself as a casualty of forces beyond his control. This profound lack of remorse underscores the continuing danger he poses.

For his calculated criminal conduct and unrepentant posture, a severe sentence is warranted—one of at least 20 years. A sentence of substantial imprisonment is necessary to account for the seriousness of Mashinsky's crimes, promote respect for the law, provide just punishment, and deters others who might otherwise be tempted to pursue personal wealth through fraud. It is also consistent with the sentences the Court has imposed in similar fraud prosecutions in recent years. Mashinsky's victims have written deeply moving personal stories about how these losses have affected them and their families, recounting the hardships of retirements deferred, marriages dissolved, mental health diminished, and lives burdened. Mashinsky's crimes were willful, deliberate, continuous, and devastating. Justice requires a sentence commensurate with the conduct.

## PROCEDURAL BACKGROUND

### A.    Mashinsky's Guilty Plea

On December 3, 2024, Mashinsky pled guilty to Counts Two and Five of the Indictment pursuant to a written plea agreement dated December 2, 2024 (the "Plea Agreement," attached as Ex. 1). The Plea Agreement provided that in consideration of the defendant's guilty plea on Counts Two and Five, he would not be further prosecuted for (i) the scheme to defraud investors and customers of Celsius from 2018 to June 2022, as charged in Counts One through Three of the Indictment and (ii) conspiring to execute and executing a fraudulent scheme to manipulate the market for CEL token, as charged in Counts Four through Seven of the Indictment. Plea Agmt. 1-2. Mashinsky also admitted to the forfeiture allegation with respect to Count Five of the Indictment, agreed that a sum of money equal to $48,393,446 represented proceeds traceable to the commission of Count Five, and consented to the entry of a preliminary forfeiture order. Plea Agmt. 2; *see also* Dkt. 112 ("CPOF")).

The Plea Agreement set forth the parties' agreement as to the applicable U.S. Sentencing Guidelines ("U.S.S.G." or the "Guidelines") Plea Agmt. 3-5.  As relevant here, the parties agreed that the loss exceeded $550,000,000 (the top Guidelines loss range); that the offense involved ten or more victims; that the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means; and the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.  Plea Agmt. 4.  The Plea Agreement further provided that the sentencing range would be life imprisonment, but because the statutorily authorized sentences are less than the minimum of the applicable Guideline range, the Stipulated Guidelines Sentence is 30 years' imprisonment, or the statutory maximum.

Mashinsky acknowledged that he "has accepted this Agreement and decided to plead guilty because [he] is in fact guilty."  Plea Agmt. 6.

At the outset of the plea hearing, the Court placed Mashinsky under oath and confirmed that he understood that any false or untrue answers could be later used against him in a prosecution for perjury or making a false statement.  Plea Tr. 3.  The Court described the allegations and elements of Counts Two and Five, and Mashinsky confirmed he understood.  Plea Tr. 10-16.  When asked to explain his conduct with respect to Counts Two and Five, Mashinsky stated:

> Your Honor, as to Count Two, in December 2021, in connection with the Celsius Earn Program, part of which included electronic sales of the commodity Bitcoin in exchange for the CEL tokens that were used to pay customer rewards, I gave an interview in which I suggested that Celsius had received approval from regulators even though I knew that was not true.
>
> I understand at the time that customers would likely find false comfort in that misrepresentation, and that it would be material to their decision to invest in the Earn Program.
>
> As to Count Five, in September of 2019, I intentionally failed to disclose that I was selling my CEL token holdings even though I

4

> represented to the public, using electronic communications and wires, that I was not selling. I understand at the time that customers would likely find false comfort in that misrepresentation, and that it would be material to their decision to purchase or sell CEL token as an investment contract.
>
> I was working in the Southern District of New York as a CEO of Celsius at these times. I know what I did was wrong, and I want to try to do whatever I can to make it right. I accept full responsibility for my actions.

Plea Tr. 25. When pressed by the Court, Mashinsky acknowledged that he knew at the time that his actions were wrong and illegal. Plea Tr. 26-27. Mashinsky acknowledged that he was pleading guilty because he was in fact guilty and that he was pleading guilty voluntarily and of his own free will. Plea Tr. 28. The Court accepted Mashinsky's plea. Plea Tr. 29.

**B.    The Parties' Submissions to the Probation Office and the Probation Office's Resolution of Defense Objections**

On December 17, 2024, in connection with the standing order pertaining to the preparation of Presentence Investigation Reports, the Government submitted a factual summary of the offense conduct, along with other materials, to the Probation Office. The factual summary included information directly related to Counts Two and Five, as well as information constituting relevant conduct as defined in U.S.S.G. § 1B1.3 for the Court's consideration at sentencing.

The Government understands that Mashinsky was interviewed by the U.S. Probation Officer in the presence of his counsel on December 20, 2024. PSR ¶ 164. Through counsel, Mashinsky submitted an alternative written factual summary of the offense conduct, currently set forth in the PSR as "Defense Version of Events" at paragraphs 122 through 141. Mashinsky's skewed version of events denied much of his participation in the two schemes and limited his criminal acts to only the two misstatements that he had identified in his allocution.

On January 27, 2025, the Probation Office provided its initial PSR to the parties. On February 18, 2025, Mashinsky submitted a 92-page letter (the "Defense Letter") with 112 exhibits,

objecting to the factual recitations in the initial PSR.  Mashinsky's core argument to the Probation Office was that the offense conduct should not refer to anything beyond the two misstatements Mashinsky identified in his guilty plea allocution.  Mashinsky also objected to the factual bases set forth in the PSR supporting many of the Guidelines calculations.

Also on February 18, 2025, the Government sent the Probation Office its objections to the "Defense Version of Events," noting that the Government did not object to including that version within the "Acceptance of Responsibility" section of the PSR but that the factual assertions therein did not accurately reflect the offense conduct, as they were in some instances false and in others misleadingly minimized Mashinsky's actions.  On February 27, 2025, the Government sent the Probation Office a letter responding to the objections set forth in the Defense Letter.

On March 5, 2025, the Probation Office issued the final PSR.  The Probation Office's resolution of the specific defense objections is set forth at pages 78 to 84 of the PSR.  The Probation Office accepted the concessions and revisions that the Government had made in the Government Letter to Paragraphs 53, 60, 97, 105, 105(f), and 108(a), PSR p. 79, and removed certain adjectives in other paragraphs, PSR pp. 78-79.  Otherwise, the Probation Office determined that the scope of the offense conduct was "accurate and appropriate" and need not be limited to the two misstatements in the defendant's plea allocution.  PSR p. 78.

The Probation Office rejected the defendant's objections to the loss amount calculations, the number of victims, the sophisticated means enhancement, and the organizer/leader enhancement. PSR pp. 79-82.  In a sealed, 70-page submission attached as Exhibit B to his sentencing memorandum, the defendant raises objections to approximately 103 paragraphs of the final PSR.  Def. Mem. Ex. B.  As further discussed below, these objections can be overruled based on the documentary exhibits and other materials before the Court.

6

## CELSIUS NETWORK

Celsius Network LLC and its related entities (collectively, "Celsius"), was a crypto asset platform that, among other things, allowed its customers to earn returns on their crypto assets in the form of weekly "rewards" payments, to take loans secured by their crypto assets, and to custody their crypto assets. Celsius billed itself as the "safest place for your crypto" and urged potential customers to "unbank" themselves by moving their crypto assets to Celsius. Celsius also launched its own native crypto token, CEL, through an initial coin offering ("ICO") in 2018.  PSR ¶ 16.

Mashinsky was the founder and Chief Executive Officer ("CEO") of Celsius, which was founded in February 2018 when Mashinsky incorporated Celsius Network Inc. in Delaware and Celsius Network Limited in the United Kingdom ("U.K."). Celsius was initially headquartered in the U.K. but moved its headquarters to Hoboken, New Jersey, in 2021. Celsius also had an office in Manhattan, where many of its senior officers worked. In March 2018, Celsius launched its platform and began accepting crypto assets from customers. Beginning during the COVID-19 pandemic, Celsius employees predominantly worked from their homes. Mashinsky predominantly worked from his Manhattan apartment and sometimes held meetings with Celsius executives there. PSR ¶ 17.

Celsius's primary public offering was its "Earn" program, through which Celsius offered a platform for customers to provide their cryptocurrency assets to Celsius to invest. In exchange for providing their crypto assets, including Bitcoin, to Celsius, customers were told that they would earn returns through Celsius's investment of those assets. Celsius marketed the Earn program to the public as a profit-making opportunity. Celsius advertised that these deployment strategies would generate yield, and Celsius would then pay customers weekly interest, or "rewards" based on the purported yield that Celsius was earning. The core marketing pitch to Earn program

investors, which Mashinsky repeated in multiple forums, was that Celsius could generate yield for its customers by safely lending their crypto assets to institutions, but unlike banks, which kept most of the profits from investing customer deposits for themselves, Celsius would return the majority of the profits back to its customers.  PSR ¶ 19.

A core feature of Celsius's business was its native cryptocurrency token, CEL, which Celsius described as "the backbone of the Celsius Network." After the CEL token's creation in 2018 and throughout his tenure as CEO of Celsius, Mashinsky frequently discussed CEL in public and equated the value of CEL with the strength of Celsius's overall business. Mashinsky encouraged the public to purchase CEL and "HODL," an acronym for "hold on for dear life." As the price of CEL began to rise, Mashinsky touted the rise in CEL's price as evidence that Celsius was a strong and growing business. In public statements, Mashinsky encouraged customers of Celsius's Earn program to elect to receive their rewards in CEL rather than receiving rewards in the form of other crypto assets. At Mashinsky's direction, Celsius incentivized Celsius Earn customers to receive their weekly rewards in CEL by, at times, offering higher reward rates to customers who chose to receive rewards in CEL rather than in other crypto assets. PSR ¶ 75.

Over time, CEL became crucial to Celsius's overall illusion of financial health, particularly after Celsius, at the urging of Mashinsky, made the decision to add the CEL held in the company's treasury to Celsius's balance sheet. While Mashinsky touted CEL as an investment opportunity to the public and frequently cited CEL's rising price, in reality, and unbeknownst to market participants and to Celsius's customers, Mashinsky, along with other Celsius employees and executives, orchestrated a scheme to manipulate the price of CEL by causing Celsius to conduct massive purchases of CEL, without disclosing its identity as the purchaser, in the open market to artificially support and artificially inflate the price of the CEL. A portion of this CEL purchasing

was carried out using customer assets and resulted in further strain on Celsius's already weak financial situation, but Mashinsky nonetheless persisted in his plan to divert Celsius's assets into inflating the price of CEL. Traders at Celsius were directed to time their purchases of CEL in a way that would maximize their positive impact on the market price, including by concentrating CEL purchases rather than spreading them out, timing the purchases around certain events, targeting large sellers in off-exchange transactions, and placing resting orders to protect the price of CEL in the event of selling pressure. PSR ¶ 76.

Mashinsky and his co-conspirators artificially inflated the price of CEL to achieve multiple objectives:

*First*, because Mashinsky frequently equated the price of CEL with the strength of Celsius's business, artificially inflating the price of CEL allowed Mashinsky to publicly tout Celsius's future prospects to the public. For example, in a July 2020 AMA, Mashinsky described the price of CEL as the "thermometer" for the health of Celsius, described the price of CEL as being "correlate[ed]" with the health of Celsius, and said that, "When you see Celsius go up five, six, seven times in value in a matter of six months, that is because the community is excited. The community loves what we're doing."

*Second*, artificially inflating the price of CEL allowed Mashinsky and other Celsius executives to sell their own personal CEL holdings for a substantial profit, with Mashinsky reaping over $48 million in proceeds from his sales of CEL.

*Third*, artificially inflating the price of CEL allowed Celsius—which held hundreds of millions of CEL in its treasury—to present a stronger balance sheet.

*Fourth*, inflating the price of CEL made it more likely that lenders would accept CEL as collateral from Celsius.  PSR ¶ 77.

Mashinsky promoted Celsius through media interviews, his own Twitter account, and Celsius's website. Mashinsky's most common method of public communication was his weekly "Ask Mashinsky Anything" sessions, or "AMAs," in which he would speak in a live broadcast directly to the Celsius community and take questions about Celsius from customers and prospective customers. Celsius posted recordings of these AMAs to Celsius's website and YouTube channel, where they continued to be publicly available.

Mashinsky made false and misleading statements in the AMAs and in other public statements, concerning, among other things:

- The amount of money Celsius earned through its initial coin offering, or ICO, which offered CEL to the public for the first time, in 2018;

- The amount of risk Celsius customers were exposed to, including false assurances that (i) Celsius had a market-neutral investment strategy and was not exposed to directional market risk; (ii) Celsius did not accept uncollateralized institutional loans; (iii) none of Celsius's loan counterparties had ever defaulted on a loan; and (iv) regulators had blessed Celsius's business model;

- Celsius's business model was profitable and sustainable, and the "rewards" Celsius returned to its Earn program customers were based on a percentage of the revenue Celsius was able to earn through its lending and investment activity;

- Celsius always maintained sufficient liquidity to return customer cryptocurrency on demand, and, as such, a "run on the bank" scenario was not possible at Celsius;

- At various times, including as Celsius faced a liquidity crisis that led to it halting investor withdrawals permanently in June 2022, that Mashinsky was not withdrawing

his cryptocurrency from the platform or was not selling his CEL token when he was; and

- That the market for CEL was governed by supply and demand when in fact Celsius was making undisclosed and timed market purchases in order to prop up the price of CEL.

Because of the widespread and repeated nature of these misstatements, Celsius employees from multiple departments began to review the AMAs after they had aired to flag false and misleading statements by Mashinsky, and, at times, edit Mashinsky's misrepresentations out of the recorded versions of the AMAs posted to the internet. Despite warnings from other Celsius employees, including the General Counsel, Mashinsky continued to misrepresent the nature of Celsius's core business activities on live broadcasts. Neither Mashinsky nor Celsius ever issued corrections to notify the public and those who had watched the live recorded versions of the AMAs that certain of Mashinsky's statements were untrue or misleading.  PSR ¶ 23.

By mid-2022, Celsius was in a dire financial situation. Celsius was in such a weakened position that it could not withstand the drop in crypto asset prices that occurred beginning in May 2022, including, specifically, the drop in the price of CEL, and the resulting surge in Celsius customer withdrawals. Mashinsky continued to publicly tout the safety of Celsius and encourage customers to continue to deposit crypto on the Celsius platform, even as Mashinsky himself withdrew almost all his non-CEL personal crypto deposits, worth millions of dollars, from the Celsius platform. On June 12, 2022, Celsius announced that it was halting all customer withdrawals from the Celsius platform. At that time, hundreds of thousands of Celsius customers, many of whom were retail investors, still had approximately $4.7 billion worth of crypto assets on the Celsius platform, none of which they could access. On July 13, 2022, Celsius filed for Chapter 11 bankruptcy.  PSR ¶ 21.

Roni Cohen-Pavon, an attorney who was previously a partner at a law firm, joined Celsius as the Chief Revenue Officer in 2020. Cohen-Pavon was part of Mashinsky's inner circle at Celsius and was one of the most senior executives at the company. Cohen-Pavon, like Mashinsky, was a significant holder of CEL.  Cohen-Pavon pled guilty on September 13, 2023 pursuant to a cooperation agreement with the Government to four federal crimes in connection with his participation, with Mashinsky and others, in a scheme to manipulate the price of CEL.  Ex. 3 (Cohen-Pavon Plea Transcript).  As part of his guilty plea, Cohen-Pavon said under oath:

> In October of 2021, I became responsible for overseeing and approving Celsius' market purchases of the CEL token. Beginning in 2019, Celsius publicly told CEL market participants that the company was purchasing a certain amount of CEL in the market to fund the interest payment that it owed to Celsius' clients. From October 2021 through December 31, 2021, I oversaw and at times directly ordered a pattern of CEL token purchases in excess of what the company needed to buy to meet its interest obligation. I knew and understood that the purpose of these excess purchases was at least in part to increase the price of the CEL token, prevent the price of CEL token from dropping, and all to create the appearance of a more liquid market in CEL token trading, all of which were intended to, at least in part, to induce additional CEL purchases by the public at prices that likely did not reflect the true market price. . . .
>
> I communicated with other Celsius employees by either email and telephone about these excess purchases including the purpose behind the purchases and at times agreed to order excess purchases based on agreement with or orders from these other individuals. Throughout this time period, I believe that the CEL token qualified as a security under the relevant laws and regulation.

Ex. 3 (Cohen-Pavon Plea Tr.) 38-40.

Celsius Network has likewise admitted wrongdoing in connection with years of material false statements and manipulation of CEL.  Following an internal investigation, Celsius entered into a non-prosecution agreement with the Government in which Celsius admitted that the company had, from in or about 2018 up to and including in or about May 2022, "participated in a

scheme to defraud investors in Celsius by (1) making false and misleading statements about the degree of risk to which those investors' funds were exposed through Celsius's yield-generating activities, and (2) manipulating the market price and volume of CEL to give investors the impression that CEL was more valuable and liquid than it actually was. The scheme was carried out under the supervision and at the direction of Celsius's founder and Chief Executive Officer, Alex Mashinsky."  Ex. 2 (NPA) at 6, ¶ 3-4.

### THE OFFENSE CONDUCT

Celsius claimed to be the "bank" of crypto—a place where investors could "deposit" their crypto and earn "yield" generated by Celsius lending the assets to low-risk borrowers. Mashinsky marketed Celsius's "Earn Program" as being even better than a bank, because he claimed banks unfairly withheld most of the yield from customers, whereas Celsius would distribute 80 percent of the yield to customers and keep only 20 percent for itself. Celsius's motto was "Unbank Yourself," and Mashinsky described Celsius in utopian and altruistic terms as the bank of the future. The problem was that the business model Mashinsky advertised to investors was not how Celsius actually operated, and the only one who got rich from Celsius was Mashinsky himself. Specifically, over at least a four-year period Mashinsky:

- Misrepresented the safety and liquidity of customer deposits, falsely assuring investors that Celsius was safer than a bank while secretly engaging in risky investments and concealed losses.

- Misled customers about the company's financial health and its ability to meet customer obligations.

- Manipulated the price of CEL to artificially inflate its value and enrich himself personally.

13

- Spent hundreds of millions of dollars, including customer deposits, propping up the price of CEL.

- Privately sold millions of dollars' worth of CEL while publicly promoting the token to Celsius's customers, profiting at their expense.

As Celsius admitted as part of its non-prosecution agreement with the Government, and as supported by the company's internal investigation following the shuttering of Celsius's business, "[f]rom its inception in 2018, Mashinsky marketed Celsius by making false and misleading statements about core aspects of Celsius's business. Mashinsky made repeated false and misleading statements as to the safety of Celsius's yield-generating activities, the long-term sustainability of the high reward rates that Celsius paid to its customers, and the risks associated with depositing crypto assets with Celsius." Ex. 2 (NPA) at 6 ¶ 6. Mashinsky's false and misleading statements induced investors to deposit their crypto assets on Celsius's platform, *id.*, and also concealed that Celsius's investment activity was insufficient "to sustain the yields that Celsius was paying to investors, requiring the firm to raid customer deposits to deliver the earnings it promised investors." *Id.* at 7 ¶ 9. This was not Celsius's only misuse of customer funds. "At times, Celsius used its own customer deposits to fund those excess market purchases of CEL token in order to prop up CEL's price, without disclosing this fact to Celsius's customers and contrary to the express representations that Mashinsky and the firm made publicly that CEL buybacks were funded by the profits of Celsius's lending." *Id.* at 7-8 ¶ 10. Through years of mismanagement "[b]y 2022, Celsius was in a dire financial situation" and could not weather the drop in crypto prices in early summer 2022. *Id.* at 8 ¶ 13.

This section will address Mashinsky's criminal conduct as CEO of Celsius, including his participation in a yearslong scheme to mislead Celsius investors, his leadership of a scheme to

manipulate the price of CEL token that involved five or more participants and was otherwise extensive, and the self-dealing arrangements that allowed Mashinsky to pay himself more than $48 million.  The section will also address Mashinsky's blame-shifting argument that his employees and executives authorized his false statements or should have more effectively corrected him.

## I.    The Misrepresentation Scheme

Mashinsky directly marketed Celsius to retail customers located in the United States and abroad.  Throughout his tenure as CEO of Celsius, Mashinsky repeatedly made public misrepresentations regarding core aspects of Celsius's business and financial condition to induce retail customers to provide their crypto assets to Celsius and continue to use Celsius's services. PSR ¶ 22.  Those misrepresentations were, generally, that customer assets were not exposed to undue risk because of the safety of Celsius's yield-generating activities, that Celsius was profitable and able to sustain Celsius's high rewards rates or "yield" it was paying out to customers, and that Celsius maintained sufficient liquidity to return coins to customers as needed.  PSR ¶ 22.  As discussed further below, Mashinsky also lied about the amount Celsius had made through its CEL coin offering and about his own trading and withdrawal activity.

### A.    Mashinsky's Lies Regarding the Success of Celsius's Fundraising through the ICO

In approximately March 2018, at Mashinsky's direction, Celsius began offering its own crypto asset, the CEL token.  As is customary in the crypto industry, the features of the CEL token were described in a "whitepaper" released by Celsius.  PSR ¶¶ 25, 27.  The CEL token whitepaper said, among other things, that Celsius was creating 650 million CEL tokens and selling 325 million CEL tokens in the "Initial Coin Offering," or "ICO." The whitepaper stated that any of the 325 million CEL tokens made available for sale during the ICO that were not sold would be "burned," or destroyed, thus reducing the total float.  The whitepaper also described the purposes to which

money raised during the ICO would be put, including funding Celsius's operations and other initiatives. The whitepaper set forth pricing details and established a "hardcap," or maximum raise, of $50 million for the ICO. PSR ¶ 27.

During the initial offering for the CEL token and in the months that followed, Mashinsky and Celsius publicly stated that Celsius raised approximately $50 million in its initial CEL token offering, the maximum or "hardcap," that Celsius had set for the ICO. PSR ¶ 28. This was good news for the young company. The size of the capital raise was relevant to Celsius's customers both because it increased the amount of cash on hand and because it signaled the market's and public's belief in the financial health and long-term viability of Celsius's business model. PSR ¶ 25. It was not, however, true. Celsius had raised only $32 million through the ICO. PSR ¶ 29; Ex. 2 at 7, ¶ 20.

When it became clear that Celsius had failed to raise the full $50 million, Mashinsky, through an entity that he controlled, AM Venture Holdings or AMV, entered a token sale agreement with Celsius to purchase "up to $18,000" worth of CEL. PSR ¶ 29; Ex. 8. This agreement postdated the end of the ICO sale period and allowed Mashinsky, through AMV, to purchase the tokens that had gone unsold during the public offering. Ex. 8 at 1, 2. The agreement further gave Mashinsky 90 days to pay for the tokens. Ex. 8 at 2. But, as is undisputed, Mashinsky never paid. Nor, as is also undisputed, did he stop claiming that the ICO raised $50 million.

When Mashinsky failed to pay, Celsius employees had little meaningful ability to enforce the token sale agreement against their CEO.[1] At the same time, they recognized that admitting

---

[1] An internal chat between one of Celsius's co-founders, Daniel Leon, and another Celsius employee reflected an agreement not to even mention that Mashinsky owed the money, but rather to refer to AMV the entity, presumably either to make the conversation less confrontational and soothe Mashinsky's ego or because Mashinsky insisted on hiding behind the corporate form to distance himself from the self-dealing transaction. Ex. 9 at 3.

months or years after the fact that Celsius had only sold about 60 percent of what it had initially claimed would be a PR nightmare.  As one employee put it in a Slack message, "The public believes that the ICO was fully funded and all tokens purchased.  If they find out now that there were unsold they will be upset," Ex. 7 at 1, or, as Celsius co-founder Nuke Goldstein put it in the same Slack conversation, "that's going to open a bag of manure."  *Id*.

Instead of enforcing the token sale contract against Mashinsky, Celsius converted the sale agreement into a "loan agreement" whereby Celsius gave AMV a loan against the 117 million unsold CEL tokens (which he had never purchased).  Under the terms of the loan agreement, even though AMV did not own the tokens, the 117 million CEL tokens were held by Celsius as collateral against the loan, and AMV would be allowed to sell the tokens on the secondary market and transfer proceeds to Celsius as partial repayment of the loan.  Some Celsius employees had strong concerns about this first loan agreement, including that allowing the borrower (Mashinsky) to post collateral (the unpurchased CEL token) that he did not own was "circular" and that the agreement incentivized Mashinsky to do nothing unless that price of CEL rose sufficiently to make it a more valuable proposition for him. PSR ¶ 30; Ex. 12.  Celsius's CFO at the time raised these concerns directly to Mashinsky and ultimately resigned in part because he objected to this self-dealing transaction.

The second AMV loan agreement, signed in January 2020, superseded the first and required Mashinsky to repay the loan in full within 48 months.  PSR ¶ 30; Ex. 13 at 7. Nonetheless, merely three months later, Celsius's three-person board, with Mashinsky abstaining,[2] voted to absorb the 117 million CEL tokens into Celsius's Treasury, which effectively nullified both loan

---

[2] The Government does not dispute that Mashinsky abstained from this vote and does not object to the defense request that the fact be added to PSR ¶ 31.

agreements.  In April 2020, the board elected to keep the 117 million tokens in a segregated account within Treasury that would only be used in times of great financial need and with approval of the board.  In December 2020, the board agreed to remove those restrictions on the use of the 117 million tokens.  Mashinsky did not have to satisfy the loan and did not lose any of his collateral, as is undisputed.  PSR ¶¶ 31-33.

Mashinsky's lies concerning how much money Celsius raised in its ICO are relevant and significant for the Court to consider at sentencing for a few reasons.  *First*, the episode demonstrates that Mashinsky was willing to lie when the truth contradicted a narrative he wanted to be able to tell.  Mashinsky wanted to show that Celsius had momentum and a groundswell of support from "the community."  He wanted to be able to say that Celsius had raised the maximum amount offered through the ICO.  So he did, even though he knew and admitted privately that Celsius had only raised $32 million.  *Second*, it is an example of Celsius's true financial picture being less stable that Mashinsky publicly portrayed.  The amount that Celsius was able to raise in the ICO was relevant not just for optics and good press but also for Celsius's ability to meet its operations needs and growth goals.  The fact that it had only 64 percent of the capital it said it had was relevant and material.  *Third*, the misrepresentation presaged Mashinsky's attitude toward CEL that ultimately led him to undertake the manipulation scheme.  Mashinsky treated CEL and investor interest in CEL as an indicator of Celsius's overall wellbeing, much like equity in a publicly traded company.  *Finally*, the ICO misrepresentations reflect Celsius employees' inability to force their CEO to make good on his promises, tell the truth, or stop lying even when confronted.

### B.    Mashinsky's Lies Regarding the Risks Celsius Took with Customer Funds

As Celsius has already acknowledged, "Mashinsky made repeated false and misleading statements" concerning "the risks associated with depositing crypto assets with Celsius."  Ex. 2 at 6 ¶ 6.  Mashinsky "lied to Celsius's existing and prospective customers about the riskiness of

Celsius's deployment strategies.  Mashinsky regularly downplayed the risks to which Celsius's customers were in fact exposing themselves, including significant losses of assets."  Ex. 2 at 7 ¶ 9.  These lies are accurately summarized in paragraphs 50 through 60 of the PSR.  They include, for example, that "Celsius does not trade or take long or short positions with customer coins." PSR ¶ 51(c); "Celsius is very, very strict at who we lend to. . . . We do not do unsecured lending." PSR ¶ 55(e); "None of our institutional customers have defaulted on us or didn't return their assets or anything like that.  We don't have any bad loans." PSR ¶ 57(a); and "The regulators looked into us and said these guys know what they're doing."  PSR ¶ 60.

These specific instances of Celsius taking greater risk with customer funds than was disclosed to investors, and Mashinsky's lies about the risk that customers were exposing themselves to by trusting Celsius, go to the heart of Mashinsky's fraudulent scheme.  Investors who had never before dabbled in crypto believed Mashinsky's promise that Celsius was the "safest place for your crypto," safer even, he promised, than a traditional brick-and-mortar bank.  Investors eagerly watched Mashinsky's AMA videos, believing that doing so would educate them about Celsius and help them make sound investment decisions.  They believed the lie that Mashinsky perpetuates in his sentencing submission—that Mashinsky was committed to radical transparency.  Def. Mem. 20.  Investors relied on Mashinsky's false representations about how Celsius would use their money, making their choice to invest in Celsius far riskier than they anticipated or agreed to.  And Celsius's mismanagement of customer funds is to blame for customer losses, not, as Mashinsky self-servingly claims, external market forces.

1. <u>Purportedly Market-Neutral Trading Strategy</u>

Mashinsky downplayed the risk that Celsius's customers were incurring by assuring them that Celsius was not making directional bets by taking long or short positions on particular crypto

assets, but instead was hedging its positions so that it was overall market neutral and therefore not susceptible to large swings in the cryptocurrency markets. In fact, Celsius was not market neutral and was regularly using customer coins to take long or short positions in Bitcoin and other assets, often at Mashinsky's express direction. Some of these trades resulted in significant losses for the company and led to much internal discussion about why the company was placing directional bets at the same time it was claiming to be market neutral. PSR ¶¶ 50-52.

Celsius was placing directional trades at least as early as the spring of 2019, at Mashinsky's direction, as detailed in the PSR at paragraphs 50(a) to 50(i). For example, in the spring of 2019, Mashinsky took a short position in Bitcoin, using customer assets, based on his own view that the price of Bitcoin would go down. PSR ¶ 50(a). Mashinsky bet wrong, and his trade resulted in a $13 million loss to Celsius, at a time when Celsius had only $100 million assets under management. PSR ¶ 50(a). After that incident, Mashinsky agreed to his employees on the Investment Committee that he would stop personally trading in Celsius's account, but Mashinsky violated that company policy as well and continued trading as he saw fit. PSR ¶¶ 50(c), (h). Mashinsky also directed other Celsius employees to engage in directional trading. PSR ¶¶ 50(b), (d), (e), (f).

Following losses in January 2022 to the tune of tens of millions of dollars from directional positions that exceeded Celsius's own risk limits, and based in part on Mashinsky's personal trading, Celsius conducted an internal investigation into the practice. PSR ¶¶ 50(h)-(i), 52. This investigation concluded that "directional trading was a widespread practice before September 2021 and was known and accepted by senior management, including risk. It was presented and discussed in [Executive Committee meetings], [Assets and Liabilities Committee meetings], and

[Risk Committee meetings] and there is extensive supporting evidence." Ex. 103 at 2.  Mashinsky routinely attended these meetings where directional trading was presented and discussed.

Most brazenly of all Mashinsky's misstatements, even after the internal investigation determined that directional trading was a "widespread practice" condoned by senior management and discussed in executive-level meetings, and even after he was aware that the January 2022 directional trading had resulted in staggering losses of tens of millions of dollars in a few days, Mashinsky claimed in an interview in April 2022 that: "We are what you call a delta-neutral strategy. . . . Celsius doesn't bet on the market going up or down."  PSR ¶ 52.  This lie was designed to and did give investors false reassurance about Celsius's internal controls and the risks to which their cryptocurrency would be exposed.[3]

### 2.  Uncollateralized and Undercollateralized Loans

Another common talking point Mashinsky used to reassure investors and potential investors that Celsius was managing risk appropriately was to claim that all the loans Celsius extended were either collateralized or partially collateralized and that Celsius did not offer uncollateralized loans.  PSR ¶ 53.  The defense does not dispute that Mashinsky made this claim regularly.  PSR ¶¶ 53-55; Def. Mem. Ex. B at 26-29.  Mashinsky stated categorically on numerous occasions that Celsius does not offer non-collateralized loans, and his explanations provided reasoning that investors were likely to find, and did find, reassuring.  For example, Mashinsky said in July 2020 that Celsius does not offer uncollateralized loans "because that would be taking too

---

[3] *See* Exhibit 6, Declaration of Celsius customer Rebecca Gallagher, at ¶ 19 ("On April 8, 2022, I travelled to a Celsius meet-up at the Bitcoin Miami conference. There were hundreds of Celsius account holders at the meet-up. During the event, Mr. Mashinsky repeated the talking points that I heard him make many times previously on AMAs and elsewhere. While there, I had the opportunity to meet Mr. Mashinsky briefly. I looked him in the eyes and told him that I had entrusted my entire life's savings to Celsius. Mr. Mashinsky assured me that my funds were safe.").

much risk on your behalf." PSR ¶ 55(d). Mashinsky also credited Celsius's collateralization policy as the reason why Celsius had never suffered an institutional default (which, as discussed below, also proved untrue) and claimed that none of Celsius's competitors could make similar claims and also turn a profit. Vouching for himself and his trustworthiness, Mashinsky went on to say "this will be fraud to say that. It will be fraud for me I'll probably go to jail if I said that and it was untrue okay? So this is not just something you say. Again, I live in New York state, New York City, these are the toughest regulators in the world, you cannot say these things unless you're sincere." PSR ¶ 55(c).

However, overwhelming proof shows that Celsius did accept uncollateralized loans and that Mashinsky knew this at the time he made public statements to the contrary. For example, Mashinsky and the Risk Committee were briefed each biweekly meeting on the percentage of the company's loans that were not collateralized, and the materials even included a chart—updated weekly—to show the current breakdown. The below chart from November 2021 is illustrative of the updates Mashinsky received on a biweekly basis:



This chart shows that unsecured lending had fluctuated over time but had ranged from approximately 15% to approximately 70% of Celsius's institutional lending.

### 3. Counterparty Defaults

Similar to his misrepresentations about Celsius not making uncollateralized loans, Mashinsky also misled customers about the risk of investing with Celsius by telling them that none of Celsius's institutional borrowers had defaulted on their loans. Mashinsky touted the fact that Celsius had never had a counterparty default as evidence that Celsius had strong risk controls and conducted fulsome due diligence of its lending counterparties, and as evidence that Celsius earned yield using Celsius customers' assets in a conservative, safe, and secure fashion. PSR ¶¶ 56-58. As is undisputed, these representations were material to Celsius investors. PSR ¶ 58; Def. Mem. Ex. B 30-32. Nor does Mashinsky dispute his numerous public claims that Celsius had never had a counterparty debt. Def. Mem. Ex. B 30-32.

As Mashinsky told customers on at least four occasions in 2021: "We say that on every AMA, so let's say it again: We're profitable. We have not had any hacks. And none of our institutional customers have defaulted on us or didn't return their assets or anything like that. We don't have any bad loans." PSR ¶ 57(a); "[T]he outcome with Celsius is directly dependent on our ability to maintain the security of the service -- make sure that our counterparties pay us and again and again we've proven that through all these flash crashes we we've done a pretty good job at selecting counterparties that paid us both the principle and the interest and we have zero defaults to date." PSR ¶ 57(b); "Like I state every week, we did not have any liquidations, we did not have any counterparties go out of business or default on any of our loans." PSR ¶ 57(c); "What we do is we want to make sure that they're a credit worthy client and so we make them post collateral. And you know we talk about it every week, in four years we have not had a single institutional

default, either not pay the interest or not return the collateral or the coins that we lend to them. And obviously we expect it to happen at some point but it hasn't happened yet." PSR ¶ 57(d). These statements were strong, unequivocal, and reassuring to investors. They were not, however, true.

Mashinsky was aware of counterparties defaulting on loans with Celsius at the time he made these false statements. Celsius's Financial Risk Officer sent Mashinsky and other executives an email on November 21, 2020, well prior to any of the misstatements quoted in the PSR, stating: "Yesterday morning, [a Celsius employee] sent notice that we are closing on the BTC 250 loan to [Counterparty-1]. However, they have not yet responded, **which now puts them in default of the loan**. If they are defaulting on this loan, I believe that they will also default on their BTC 200 loan." Ex. 42 at 2 (emphasis added). The email went on to discuss efforts to reach someone at Counterparty-1, as well as raised concerns about unrelated credit risks to Celsius. Celsius's internal rating system by the Risk Committee, of which Mashinsky was a member, assessed Counterparty-1 a "C" for "default on debt is likely" and indicated that Counterparty-1 should be given "no further loans." Ex. 47 at  9, 7, 1. Furthermore, as Exhibit 61 demonstrates, the attributions in PSR ¶ 56(a) are inverted: in fact, it was Mashinsky who told Cohen-Pavon on February 5, 2021 that the Counterparty-1 default "used to be a $3m problem now it is a $17m problem. . . . We were supposed to get 200 BTC back. Never happened." Ex. 61. These attributions should be corrected in the PSR.

At approximately the same time as the Counterparty-1 default, another entity ("Counterparty-2") defaulted on a loan of approximately 4,000 Ethereum tokens. On February 9, 2021, Celsius sent Counterpart-2 a demand letter informing Counterparty-2 that it had breached its loan agreement by not repaying its principal and interest and that Counterparty-2 was therefore

in default. Ex. 132 at 2 ("Celsius further considers [Counterparty-2]'s violation of the Agreement as described above a material breach, and, therefore, an Event of Default."). Internal Celsius documents continued to refer to the Counterparty-2 loan as a "doubtful debt" and a default, as recently as June 2022. Ex. 131 (third line on chart, referring to "legacy default" under "status").

### 4. Regulatory Clarity

In order to make Celsius appear to be a safe, low-risk investment, Mashinsky falsely assured the public that Celsius had clarity and guidance from government regulators when Mashinsky knew that Celsius did not have clarity and was under substantial regulatory scrutiny. PSR ¶ 59. In a December 12, 2021 interview with Barron's Online, Mashinsky stated, "the regulators looked into us and said these guys know what they're doing." PSR ¶ 60. And, on an April 15, 2022 AMA, Mashinsky falsely said "there's no legal issues at least with what Celsius provides." PSR ¶ 60. Other Celsius executives reviewing the AMA for inaccuracies edited that statement out of the version that was later posted to Celsius's web site, but no correction, retraction, or clarification was made for those investors who listened to the live version of the AMA. PSR ¶ 60.

At the time he made these statements, Mashinsky knew they were untrue. With respect to U.K. regulators, Mashinsky had been present at (and secretly audio recorded) a meeting in June 2021 with the Financial Conduct Authority ("FCA") in which the FCA told Mashinsky and other Celsius executives that Celsius's business model did not comply with U.K. law, that the firm was "acting in breach" and that it was an "unauthorized business." PSR ¶ 59(a). As a result of this assessment by the U.K.'s leading regulatory body, Celsius withdrew its business from the U.K. *See* Def. Ex. B-61.

As for the United States regulators, Mashinsky was aware that in 2021 the SEC had opened an investigation of Celsius.  PSR ¶ 59(d).  In 2021, Celsius executives, including Cohen-Pavon, admonished Mashinsky not to use his AMAs to criticize the regulators or to characterize Celsius's interactions with them.  As Cohen-Pavon instructed by email in October 2021: "No saying anything about regulators, good or bad, except that we are collaborating with them and working together to find appropriate solution, but nothing further, and nothing about how they work for banks, etc." PSR ¶ 59(b).  The following month, another Celsius executive emailed Mashinsky a set of "recurring things" he should avoid with respect to AMAs, including "Distributing profits to the community—That's a major issue for regulator which we are strongly fighting to disclaim. Please avoid anything around that." PSR ¶ 59(c).  In late November 2021, Mashinsky and Cohen-Pavon discussed that Celsius should reach a settlement agreement with the SEC, which Mashinsky was in favor of doing.  PSR ¶ 59(c).

Against this evidence that he knew that regulators had looked into Celsius's business and found it to be acting in breach, unauthorized, and under current investigation, Mashinsky does not disclaim that his interview with Barron's Online included a materially false statement—in fact, it is one of only two misstatements that he admits.  As to the April 2022 false statement that there were "no legal issues at least with the services that Celsius provides," PSR ¶ 60, Mashinsky does not dispute that he said it or that it was false.  He does not appear to dispute that it was material. Def. Mem. Ex. B. 34.  Instead he tries to minimize or excuse the conduct by explaining that he had and Celsius had also provided a "detailed" and "careful[]" disclosure about changes the company was making to comply with U.S. regulations.  *Id.*  But providing other truthful or accurate information does not permit lying.  Both misstatements were willful and material and should be considered as part of Mashinsky's scheme to deceive investors.

### C.    Mashinsky's Lies Regarding Whether Celsius Was Sufficiently Successful to Sustain the Returns, or Yield, it Was Paying Investors

Mashinsky marketed Celsius as a safe place for customers to deposit cryptocurrency and earn a return in the form of "rewards." Mashinsky portrayed Celsius's business model as "doing good while doing well," *e.g.*, Ex. 136 at 2; Ex. 68, because, unlike banks, it shared the majority of profits generated from its deployment of customer deposits directly with customers, which in turn further expanded Celsius's customer base. Mashinsky's claims that Celsius was able to be profitable while returning high rewards to users were fundamentally untrue. These misrepresentations form the core of Mashinsky's deception to the public, which induced customers to deposit assets on Celsius's platform and to refrain from withdrawing their assets from Celsius's platform. *E.g.*, Ex. 6 (Gallagher Decl.) at ¶ 14 ("In making my investment decisions, I believed and relied on Mr. Mashinsky's promises that Celsius was safer than a bank, and that they would share 80% of their revenue with customers.").

Over a period of years, and despite significant internal evidence to the contrary and admonishments from senior Celsius employees to stop making these claims, Mashinsky told the public that Celsius was profitable, that its business model was sustainable, that it was able to earn sufficient yield to pay both high rewards and its own operating costs, and that rewards it paid customers were based on Celsius's true earnings rather than being "subsidized." PSR ¶ 45. Mashinsky falsely claimed that Celsius returned 80 percent of its revenues back to Celsius customers in the form of their weekly rewards payments or "yield," retaining the remaining 20 percent of its revenues to fund its operations and as profit. PSR ¶ 42. In fact, at Mashinsky's direction and against the advice of a chorus of senior employees, Celsius maintained artificially high rewards rates that were set primarily based on marketing concerns such as beating out

competitors' rates and attracting new customers, rather than being based on the actual yield that Celsius could generate deploying its customers' assets. PSR ¶ 43.

As Celsius's former chief products officer Oren Blonstein testified in a deposition in connection with the bankruptcy proceeding, Celsius treated customer coins "as fungible once they came into the platform." Ex. 5 (Excerpts from Blonstein Deposition Tr.) at 303. Blonstein further testified it was the reward rate, rather than the intrinsic utility of the coin, that determined what customers were paid. Ex. 5 at 304. As he explained, "those coins could have sat there and not been deployed at all and we may not have generated any yield" but Celsius would nonetheless have paid a "rewards rate" that had been previously set. Ex. 5 at 305. In other words, and contrary to Mashinsky's representations, "the activity of the coins was separate from the rewards that were paid out." Ex. 5 at 305; *see also* Ex. 133 at 13 (noting that "no coin is profitable at the current rewards level, expense base and balance sheet risk"). But by paying high rewards, and by telling the public that the rewards were a portion of revenue that had actually been generated, Mashinsky perpetuated the false belief that Celsius was profitable when it was not.

Because of Mashinsky's public statements about the company's profitability, and specifically his statements tying rewards numbers to Celsius's revenues or profits, customers incorrectly believed that the high reward rates they received were proof that Celsius's business model worked. In fact, Celsius's unsustainable business model was buoyed, for a time, by approximately $686 million from two equity raises and the overall peak in the crypto market in 2021. Privately, Mashinsky and other Celsius executives acknowledged that the rewards rates were "marketing statement[s]" that were not actually tailored to Celsius's revenue-generation. PSR ¶ 44(c). As Mashinsky stated on a private phone call, which he recorded, to U.K. regulators in June 2021:

> We pay out of our balance sheet if we cannot create yield. Let's say no one wants to borrow from us. We still have a balance sheet liability to all of these retain lenders to pay them the interest that was published. . . . Sometimes we didn't collect enough and we paid over 100 percent. Most of the bear market, 2019, we've paid more than 100 percent. We actually paid out of our balance sheet. So we have plenty of examples of where we tried to build our community and effectively take the loss.

PSR ¶ 44(c).

But this is not what customers were being told. Shortly before that private call, Mashinsky said on an AMA: "We say almost every week on our AMAs that we are profitable and that the yield that is generated is actual yield. It's not subsidized. It's not paid with either investors' money or some tokens that you printed or whatever. A lot of people don't understand that, how important that is." PSR ¶ 45(h). Shortly after the call with U.K. regulators, Mashinsky tweeted: "The other guys need to raise money every few months because they subsidize their already low rates and make al [sic] their income from fees. So Celsius is profitable and always act in its users best interest while Blockfi has hidden fees and charges you commissions on every move." PSR ¶ 45(i). And, a few months after that, Mashinsky emphasized in an interview that the rates were not set artificially by Celsius: "It's not just regulators who are baffled by these high rates. I mean, my own friends have said to me, Alex, 8.8 percent [rewards rates on customer investments] must be a scam. If you, if you were offering three to four percent, I might actually put some money with you but 8.8 percent, come on. You know, so again, we don't dictate the rates, the market dictates the rates." PSR ¶ 45(j). Based on these and similar statements, Celsius's customers believed that the rewards rates they received from Celsius were proof of the company's profitability and positive net revenue.

In fact, Celsius was largely unprofitable over its entire existence. Continuing to pay out high rewards to customers while operating at a loss and without regard to the level of rewards it

could truly afford made it inevitable that Celsius would eventually start paying customer rewards with other customer deposits, as Celsius employees internally recognized.  For example, on May 10, 2022, the CFO Rod Bolger and then-head of financial planning Chris Ferraro were discussing Celsius's losses and revenue, which was down $5 million from the prior week.  Ex. 114 at 2-3. The two discussed the need to message in upcoming meetings that Celsius needed to reduce rewards rates such that the "payout ratio" would be "below 100%."  Ex. 114 at 3.  Bolger remarked that there would be no point to further meetings if the company "drive[s] off a cliff," adding "stating the obvious."  Ex. 114 at 3.  Ferraro, referring to Mashinsky's habit of offering positive spin on negative news, replied, "you say driving off cliff – Alex [Mashinsky] say[s] flying down hill with wind at our backs." Ex. 114 at 3.  Bolger, appearing to agree that Mashinsky would not admit to the difficulty of Celsius's current situation and would oppose lowering rewards rates, said, "that aint happening without more of a hard hitting recommendation."  Ex. 114 at 3.  Ferraro wrote: "No other way to say you can't payout more than 100%? You are basically using user balances to pay user rewards."  Ex. 114 at 3.  As Ferraro, who later became Celsius's Chief Restructuring Officer, testified in connection with the bankruptcy:  Celsius "targeted a payout at 80 percent, but in reality, because the deployment didn't return the income that was expected, it was actually above 80 percent." Ex. 4 (Excerpts from Ferraro Deposition Tr.) at 366.

Indeed, in early 2021, Celsius employees had discovered that Celsius had been doing just that, when a reconciliation revealed that Celsius had a dramatic asset and liability mismatch exacerbated by Celsius's expensive efforts to prop up the price of CEL token by spending substantial sums purchasing CEL token in the market.  Even after this "hole" in the balance sheet was discovered and elevated to Mashinsky, he continued falsely telling the public that Celsius was

profitable, sustainable, and did not artificially "subsidize" customer rewards and that rewards did not come from other investors' money. This incident is discussed further in Section II.C., *infra*.

Celsius's financial difficulties were well known by Mashinsky. As early as December 2019, following the discovery that Mashinsky's 2019 directional trading had resulted in a $13 million against Celsius's approximately $100 million assets under management, PSR ¶ 46(a), Celsius's CFO begged Mashinsky to stop taking customer deposits because customers were not aware that they were putting money into an involvement company. PSR ¶ 38(c). When Mashinsky refused, the CFO resigned. *Id.* Shortly thereafter, Celsius formed a recovery committee, sometimes internally referred to as the "bankruptcy committee," tasked with evaluating whether Celsius could continue to be a going concern. PSR ¶ 38(d). Just a few months after a large institutional investor, Westcap, had made a large investment in Celsius, Westcap essentially accused Mashinsky of defrauding them, sending Mashinsky a presentation that said: "Actual performance and revenue and cost profile look nothing like what investors were sold only a few months ago." Ex. 121 at 6. Internal employee messages on May 24, 2022 noted that Celsius has "been straight up losing money for 3 years" and was "at 85% return on a user[']s $1 AFTER a 750mm investment." Ex. 124 at 2. And on May 25, 2022, Celsius's CFO cautioned Mashinsky that if the CEL token rewards rates are not lowered "we will continue to dig a deeper hole for many months – and the asset/liability gap is much more severe now with lower balances." Ex. 125. Mashinsky rebuffed the CFO, saying, "follow my lead on CEL" and "I don't need help in Marketing. I am going to bring a few billion in just like I brought the first 20B." Ex. 125. These messages show that Mashinsky believed that the way for Celsius to pay what it owed existing customers was just raise more money from new ones—exactly like in a Ponzi scheme.

## D.    Mashinsky's Lies Regarding Liquidity and the Lead-Up to the 'Pause'

Mashinsky's false assurances that Celsius had and would always have sufficient liquidity

to meet customer withdrawals was part of his pitch favorably contrasting Celsius to banks.  PSR ¶ 61.  Celsius, Mashinsky claimed, could not be subject to a run on the bank because of its superior risk controls.  PSR ¶¶ 61-62.  Mashinsky claimed in April 2021 that "at any moment we always have enough coins and enough collateral and so on to return all the assets to our users."  PSR ¶ 62.

This claim was not true in June 2022, when Celsius experienced a run that forced it to halt customer withdrawals, and it was not true in April 2021 when Mashinsky said it.[4]  The fact that Celsius could not survive a run on the bank in April 2021 is established by the very exhibits Mashinsky submitted.  Def. Mem. Ex. B 70, 71.  Explanation and analysis of this point is critical not because paragraph 62 of the PSR is itself of singular importance, but because the nature of Mashinsky's false statement and the distinction between what he said and the true state of Celsius's books is entirely consistent with the entire misrepresentation scheme discussed at length in the PSR.  Mashinsky reassured investors time and again that their investments were safe, that Celsius was employing strict rules around risk, and that these rules would protect them from harm.  Believing his lies, customers gave Mashinsky their savings.   But in actuality, Celsius was recklessly operating at extremely thin margins and in ways contrary to what was disclosed.

---

[4] Mashinsky made similar claims at other times.  For example, in a March 13, 2020 video posted to Celsius's YouTube channel titled "Crypto Market Commentary with Alex Mashinsky," Mashinsky stated, "So, we're always in the market, protecting our depositors, our job, job number one, job number two is to always return the assets that were given to us back to our depositors. And to do that, we make sure that we manage the risk of the counterparties." Ex. 138. On October 9, 2020, Mashinsky stated in an AMA, I state that every show, so I will state it right now, Celsius can return all the coins to all of our users and without using a penny from our treasury, right? So we have all the coins available."  PSR ¶ 55(d).  In an October 23, 2020 AMA, in response to the question would Celsius survive a run on everyone's holdings, Mashinsky stated, "Yes, so the answer is yes, and I do this every AMA, we have plenty more assets than all of our deposits put together, meaning tomorrow, if everybody came and said, 'Alex, enough with this bs, we want to withdraw all of our coins,' we can give all the coins to all our depositors and we have plenty left over—like tens of millions of dollars leftover plus another 400 million dollars worth of CEL token that Celsius owns." Ex. 139.

| Assets | | Liabilities | |
|---|---|---|---|
| Undeployed Assets | $5,359,588,920.52 | user balances | $10,597,863,538.27 |
| Exchange Balances | $624,001,248.27 | User Collateral | $1,915,681,456.53 |
| Institutional Loans Out | $2,641,554,807.39 | Locked (CEL) | $161,877,176.51 |
| Institutional Posted Collateral | $3,427,734,677.49 | Institutional collateral (Liability) | $1,517,933,397.61 |
| Defi Current Balance | $3,017,447,754.89 | Institutional Borrows (Liability) | $1,801,319,439.86 |
| Grayscale | $1,045,908,389.99 | | |
| Keyfi receivable | $439,399,860.05 | Other | $26,245,555.56 |
| Other | $446,691,929.36 | defi | $215,697,591.95 |
| Retail Loans | $406,169,273.08 | | |
| Undeployable (Primetrust) | $262,559,702.30 | | |
| mining | | | |
| Total | $17,671,056,563.34 | Total | -$16,236,618,156.30 |
| | Net | $1,434,438,407.04 | |



Assets: Undeployed Assets, Exchange Balances, Institutional Loans Out

Liabilities: user balances, User Collateral, Locked (CEL)

The defense claims that the mere fact that Celsius's assets (barely) exceeded liabilities in April 2021 is sufficient to conclude that Celsius had sufficient assets to return customer coins in the event of a run on the bank. The truth is that a more detailed analysis shows how truly vulnerable Celsius was to any adverse event, whether a run on assets or a loan default. As the above chart from Def. Ex. B-70 shows, a significant portion of Celsius's assets (more than one-third) were loans and posted collateral. These are illiquid assets that Celsius would not be able to wind down in the event of a run on the bank without incurring significant penalty, if at all. Further, as Defense Exhibit 71 makes clear, the "undeployed assets," which make up another approximately one-third of Celsius's assets at this time, includes the CEL Celsius was holding in its Treasury, which Celsius then valued at $1.5 billion. There is no basis for Mashinsky to include the value of this CEL in the calculation of whether Celsius would be able to return coins to customers in the event of a run

on the bank, as the valuation of CEL was based on Mashinsky's manipulation.  As discussed below, Celsius internally recognized that CEL was thinly traded and had no utility.  If customers had suddenly come to Celsius looking for their coins back, there is no reason to think they would have accepted CEL instead of the particular type of cryptocurrency they had deposited.  And, if Celsius tried to sell or trade large quantities of CEL for the particular coins it owed its customers, this huge influx of supply would have caused the price of CEL to plummet, making the value far less than how Celsius valued the CEL in its Treasury.[5]  CEL's value was "fake."  Ex. 87 at 1. Removing it from the asset column alone would have caused Celsius's liabilities to eclipse assets at this point in time.

Moreover, the numbers in Defense Exhibit 70 show the huge risk to which Celsius was exposed in the event of any default on its institutional loans.  The institutional loans in the assets column reflect the return Celsius anticipates on funds it has loaned out, secured by the institutional collateral it is holding in the liabilities column, which Celsius would return to the borrower in the event that the loans were fully repaid.  Unlike the claims Mashinsky repeatedly made, the institutional book was not fully collateralized.  If all the loans in this asset column were not repaid, and all Celsius had was the posted collateral, then its liabilities would eclipse its assets.

The "Summary – By Coin" tab of Defense Exhibit 70 shows an even more dire picture if the question is whether Celsius could return all customer coins in the event of a run.  Celsius's coin-by-coin positions show severe asset-liability mismatches in a number of different coins, which proves that Celsius would not have been in a position to return all coins to customers if they had demanded them in the summer of 2021, even if the coins had not been tied up in illiquid

---

[5] In an email dated May 18, 2022, Celsius's coin deployment specialist told Celsius's head of Treasury to "assume CEL is $0 since we cannot liquidate our current CEL position." Ex. 122 at 1.

investments or staked as collateral. Excluding the value of CEL—which was at best highly volatile and at worst "fake"—Celsius's liabilities outstripped its assets by $327 million.

It is against this backdrop—Celsius operating for years in an insolvent or barely solvent state and without the risk controls Mashinsky routinely promised—that we should understand the weeks leading up to the Pause when Celsius froze customer withdrawals. During those weeks, Mashinsky quietly withdrew almost all of his non-CEL cryptocurrency from the platform while assuring customers "all user funds are safe" and "we all have our money in the same platform. I have millions of dollars of my money on the platform as well. And obviously we're in it together." PSR ¶ 66.

On May 10, 2022, Mashinsky held on the Celsius platform 85 BTC; 1,640 ETH; 2,938,131 USDC; 60 MCDAI; 48,275 MATIC, 5,066 LINK, 4 WBTC, and 2,612 SOL. On May 15, 2022, he withdrew approximately $2.9 million in BTC, ETH, and USDC. The same day Mashinsky told investors "we're all in this together," Mashinsky withdrew an additional approximately $5.1 million in BTC, ETH, and USDC. By May 27, 2022, he had removed 95% of his BTC, 81% of his ETH, and 100% of his USDC, MCDAI, MATIC, LINK, WBTC, and SOL, leaving him with approximately $1 million in assets other than CEL left on the platform. PSR ¶ 66(e); Ex. 134. The only crypto token he did not withdraw en masse was his CEL token.

When Mashinsky made these decisions to withdraw his own holdings, he had significantly greater access to information about Celsius's true financial picture than he or Celsius were giving to investors. For example, in a presentation to Celsius's board dated May 2, 2022, before the Terra Luna collapse began,[6] Celsius's CFO presented financials showing that, contrary to what had been

---

[6] *See generally* CoinDesk, *The Fall of Terra: A Timeline of the Meteoric Rise and Crash of UST and Luna* (Apr. 14, 2024), available at https://www.coindesk.com/learn/the-fall-of-terra-a-

represented to Celsius's Series B investors, Celsius had a pre-tax loss of $811 million for 2021.[7]
The board presentation also noted that the non-mining negative net revenue was driven by a
rewards payout ratio of 123 percent (rather than the 80 percent from Mashinsky's marketing
pitches).  Def. Ex. B-22 at 85.

After receiving the information presented to the board, on May 16, 2022, Westcap emailed
Mashinsky a presentation called "Board Follow Up."  The first takeaway in the presentation read:
"Celsius does not have a sustainable business model today.  Celsius has wiped out all of its last
equity raise two times over in a few months and piled up ~$975M of losses over the past 5 quarters.
Celsius operational losses continue to accrue at an unsustainable rate.  Priority for '22 must be to
build a sustainable economic model in order to be a going concern."  Ex. 121 at 3.

Despite these clear signals that Celsius was headed for insolvency, if not already there,
after Mashinsky protected his own assets by pulling them off the platform, Mashinsky continued
to push his employees to market Celsius products to customers.  On June 1, 2022, Mashinsky
instructed the CFO to "push retail loans as it is the most profitable business and helps lock coins
on our platform.  All we do when we don't issue loans is ask people to withdraw and go to the
competition."  Mashinsky then complained about and countermanded his own Finance team:
"Finance told Tal not to push loans.  Tal reports to Roni.  Please have them direct all their ideas to
Roni not Tal." Ex. 128 at 1.  However, in the coming days, Celsius would be forced to embark on
a large-scale effort to close loans in order to bring back liquidity.  Ex. 130 at 2.  And, for any

---

timeline-of-the-meteoric-rise-and-crash-of-ust-and-luna (indicating the stablecoin price started to
"wobble" on May 7 and had lost all value by a week later).

[7] Series B investor Westcap had believed that Celsius had a $350 million gross profit run rate for
2021. *See* Ex. 121 at 6.

customers who had loans with Celsius as of the time of the Pause, Celsius continued to lock up their collateral pending resolution in bankruptcy.

Also on June 1, 2022, Mashinsky promised investors that their funds were safe and that "anyone who wanted to withdraw partially or fully, there were no problems . . . you can withdraw at any time. . . . We have billions of dollars of liquidity." While it was true that Celsius had approximately $4 billion in liquid coins at the time Mashinsky made that statement, Celsius was also supposed to be holding on behalf of its customers $8 billion in coins, which means that Celsius clearly did not have sufficient liquid assets to return coins to all investors who might wish to withdraw. *See* Def. Ex. B-78 at 13. Mashinsky's statement reassuring investors to the contrary was knowingly false. It was intended to and did give Celsius's customers false reassurance that Celsius had sufficient liquidity to weather a run on the bank scenario, and some customers who heard these and similar false statements chose not to withdraw assets. *See* Gallagher Decl. ¶ 21.

### E.    Celsius Employees' Unsuccessful Efforts to Rein in Mashinsky's False Statements

Mashinsky did not need anyone at Celsius to tell him that the things he was telling the public were wrong or misleading—as discussed throughout the PSR and in this sentencing submission, he had direct knowledge of why his statements were materially false. But Mashinsky's misrepresentations were so egregious and so frequent that concerns were raised throughout the company. Ex. 2 (NPA) at 7, ¶ 8 (noting that "[b]eginning no later than 2020, Celsius employees repeatedly raised concerns about the accuracy of Mashinsky's various misrepresentations on these AMAs. These concerns became so widespread that by 2021 employees from multiple departments began to review the AMAs after they had aired, identify Mashinsky's false statements, and, at times, edit Mashinsky's misrepresentations out of the recorded versions of the AMAs posted to the internet."); PSR ¶ 72. Mashinsky claims in his sentencing submission and his objections to the

PSR that he was open to "feedback" on the accuracy of his statements in the AMAs, Def. Mem. 30; Def. Mem. Ex. B. at 41-43, but the evidence reflects Celsius employees' years of frustration that Mashinsky continued to make material false statements even after correction.[8]  Mashinsky's suggestion that his employees' failure to better police his statements or provide him adequate "feedback" excuses his misconduct does not warrant serious consideration.

The documents show that Celsius executives spoke among themselves about the AMA problem. For example, on one occasion, in response to an employee flagging a statement Mashinsky made about not offering unsecured loans and asking "why does he publish so dangerous statements," Celsius's CFO said, "I said this numerous times" and "I just don't know what goes through Alex mind when he talks about things that go against regulatory things. . . . [T]alking about something that is not compliant we could get sanctioned. I just sometimes feel like throwing up." Ex. 41 at -490. After watching another AMA, that same CFO wrote, "this AMA has a problem written all over the place … I think I have to, sometime over the weekend, with a glass of some kind of upper medicine, have to watch the whole AMA. . . . I know each of what he raised today is not the biggest thing but he doesn't [sic] this kind of thing time and time again." Ex. 23 at -133. After watching an AMA in February 2022, Celsius's head of compliance wrote to another executive, "He just can't stop. An honest person in my shoes would have resigned today. If my job is to protect the company from the sec, and I'm barred from talking to the CEO about this, and

---

[8] To the extent that the Court wishes to hear further on this subject, multiple former Celsius employees could credibly testify about their efforts to stop Mashinsky from making false statements on the AMAs, and his hostility to correction.  However, ultimately the question is not whether someone told Mashinsky after the fact that he had just made a material misrepresentation but whether he knew at the time that he spoke the truth that what he was doing was wrong and illegal.  The discussion of the AMA process, and Celsius executives' failure to derail Mashinsky's pattern of misconduct, are relevant for the Court to consider but likely can be resolved based on the documents and communications.

this continues to happen, I can't do my job." Ex. 105 at -568.

By July 2021, Mashinsky had earned enough of a reputation for making false statements in AMAs, and was perceived as a significant enough risk to the company, that Celsius's risk group—whose mandate was to focus on the financial risks of Celsius's investments, but who shifted here to monitor the legal and reputational risks from Mashinsky's statements—began to watch every AMA, identify misstatements, and edit out the misstatements before Celsius posted the AMA to its website. *See, e.g.*, Ex. 79 (September 17, 2021); Ex. 80 (September 25, 2021); Ex. 83 (October 17, 2021); Ex. 84 (October 18, 2021); Ex. 86 (October 29, 2021); Ex. 89 November 12, 2021; Ex. 97 (December 21, 2021); Ex. 104 (February 11, 2022); Ex. 111 (April 22, 2022); Ex. 120 (May 13, 2022); Ex. 123 (May 22, 2022); Ex 126 (May 27, 2022); Ex. 129 (June 2, 2022). Of course the editing process only partially addressed the problem, not only because the editing process did not catch every misstatement Mashinsky made, but also because most viewers watched the AMAs live, and Celsius never issued any corrections. And even with the review process in place, Mashinsky continued making misstatements. In March 2022, a member of the risk department compiled "a selection of recent misrepresentations made by Alex and other Celsius reps on Twitter Spaces AMAs," concluded that the misrepresentations were actionable under the securities laws, and stated that the "[i]ssues are material misstatements on AMA, Twitter Spaces, potentially interviews. Twitter Spaces re recorded and posted to the YouTube by third parties, we cannot edit these. I believe that regulatory has underestimate the risk of these forums to Celsius." Ex. 107. At one point the head of compliance wrote to Mashinsky's co-founder, "I couldn't sleep thinking about a risk we've been taking (I refer to it in the Risk Committee as 'communication risk') which impacts you and Alex personally because you are Directors, and, of course, impacts the firm. . . . I think what my team does [referring to AMA editing process] will no longer be nearly

enough to protect you, Alex and the firm. I think we need to reassess completely: - the AMA, - Twitter Spaces, - public interviews." Ex. 101 at 664-666.

Employees also raised their concerns directly with Mashinsky. *See, e.g.*, Ex. 41 at -488 ("I will talk to him. I said this numerous times."); Ex. 70 (email from head of risk to Mashinsky saying that Mashinsky's CNBC interview should not be posted online because Mashinsky falsely stated that "Celsius has no leverage"); Ex. 71 at -705 (email from head of compliance to Mashinsky about edits to an interview and writing, "Generally, not an interview we are too happy to share ('wallet', 'deposit', 'give our profit back to users', 'manage assets', sensitive regulatory issues…')"); Ex. 72 at -160 (email from head of compliance to Mashinsky that before a Mashinsky interview could be posted they "[n]eed to clean that from 80%, sharing profits with the users, and references (including insinuations) to future CEL prices"); Ex. 88 at -283 (email from head of compliance to Mashinsky saying, "Following our reviews of AMAs from recent weeks, there are a couple of recurring things we want to bring to your attention."); Ex. 90 at -074 (head of risks asks general counsel, "is anybody discussing the recurring issues with Alex in the [AMA] prep sessions," to which general counsel responds, "Yes, we mention it every week and ask to refrain from any comments.");[9] Ex. 91 at -277-278 (email from head of compliance to Mashinsky with a "few notes based on recent weeks' AMAs and other communications," including list of things he cannot say, including "'no bad debt', 'no collection', 'we only do asset backed lending'—please stop saying that…"); Ex. 90 at -240 ("Every so often, I ask AM not to say certain things (e.g. Banks have 50 to 1 leverage. Celsius has no leverage; Celsius never had an institutional default)."); Ex. 94 at -272 (email from head of compliance to Mashinsky saying, "This article says everything we cannot

---

[9] The general counsel proffered to the Government that the AMA "prep" process was focused primarily on the cameras and lighting, without Mashinsky even being present. The compliance team, which was based in Israel, was often unable even to attend due to time differences.

say in 3 pages. From 'returning profits to customers', to 'deposits' and 'savers', to 'all loans are fully collateralized'."); Ex. 108 at-412 ("I have at times mentioned to him in our one on one's about avoiding certain statements e.g. don't say we take no leverage, whereas banks are leveraged 50 times").

As Mashinsky's most trusted adviser, Cohen-Pavon in particular tried to stop Mashinsky from making misrepresentations, but without success. In September 2021, Cohen-Pavon wrote to the head of risk that despite talking to Mashinsky "endless times," Mashinsky "refuses to listen and insists on putting the company at risk, plus the individual risk on himself. . . . Alex bears personal liability on what he says, internally and externally. . . .And he also exposes the company." Ex. 78 at -296. Communications from the same time period show Cohen-Pavon repeatedly speaking to Mashinsky about his public statements. *See, e.g.*, Ex. 81 at -280 ("No talking about CEL price or what this would do to it. . . . No saying anything about regulators, good or bad, except that we are collaborating with them and working together to find appropriate solution, but nothing further, and nothing about how they work for banks etc."). After Zach Wildes, the young man whom Mashinsky used to moderate his AMAs, made certain problematic statements on an AMA, Cohen-Pavon told Mashinsky, "I can't keep getting on calls with regulators and explain why a 20 year old is putting the entire company at risk simply because we have no control on what he says (and I, personally, can't keep on policing these people and waste hours of my day to listen to videos and then ask people to edit them, simply because no one listens). And for the day someone may come and take all of our emails and WhatsApp, such things must be on record." Ex. 82 at -275.[10]

---

[10] Mashinsky's sentencing submission quotes a letter from Wildes saying that he never observed Mashinsky "act in bad faith" on the AMAs they did together. Def. Mem. 30. That the only Celsius person who would attest to Mashinsky's good faith is a person who himself put the company at risk by making false and misleading statements on AMAs is even more evidence that Mashinsky was not acting in good faith, and is still trying to make excuses. Moreover, Wildes was not an

On another occasion, Cohen-Pavon told Mashinsky that regulators were looking into the company, that "they also mentioned the AMA," that they had collected enough statements "to issue cease and desist," and that "[t]hey said it's the last time they warn us before taking a very aggressive action." Ex. 85 at -558.

After Mashinsky gave an April 2022 interview with CNBC in which he repeated almost all of the misstatements identified above in a short span of time, Cohen-Pavon asked the head of compliance to create a chart of Mashinsky's recent misstatements so that Cohen-Pavon could share it with Mashinsky. PSR ¶ 74. Multiple iterations of the chart were created over the next few days. *See, e.g.*, Ex. 109; Ex. 110.[11] The chart had columns that included "What he said," "What's the problem," and "What he could/should have said instead," and included most of the categories discussed above. Ex. 110. Cohen-Pavon told Mashinsky that he would quit if Mashinsky did not stop putting the company at jeopardy by making public misstatements.

Mashinsky ignored the warnings about his public statements. His general counsel recalled that Mashinsky often complained that his recorded AMA videos and interviews were reviewed for accuracy before they could be posted on the Celsius website, and that at one point Mashinsky told his marketing team to "fuck legal" and not listen to them; the head of compliance threatened to resign as a result of the incident. When a negative news article was about to be released with an accurate reporting of Celsius's financial difficulties, Mashinsky tried to take legal action against a

---

employee at Celsius, was approximately 30 years' Mashinsky's junior, and had only Mashinsky to rely upon to know whether their statements were true or not.

[11] Mashinsky does not deny that Cohen-Pavon showed him the chart, but questions whether it was shown during an in-person meeting because at the time the final version of the chart was emailed to Cohen-Pavon, Mashinsky was on a flight. Def. Mem. Ex. B at 43. But the first version of the chart was emailed to Cohen-Pavon days before, Ex. 109, and other iterations of the chart were saved on Celsius's system prior to Mashinsky's flight. Nor is it material whether Mashinsky was shown the chart in person or online, or when he was shown the chart.

former employee whom Mashinsky suspected as the source. *See* Ex. 28 at -235. And when the head of compliance emailed Mashinsky about certain misstatements, Mashinsky complained to Cohen-Pavon. Ex. 88 at -282; Ex. 91 at -277. Mashinsky told Cohen-Pavon that "you can not ask employees to work on promoting CEL and then send them these terrifying emails." Ex. 91 at -277. He also complained that because of the head of compliance's comments on the AMAs, "Marketing is so scared they are going to jail they don't do anything." Ex. 92 at 316.

Even Celsius's outside investors at Westcap complained to Mashinsky about his public statements. A few weeks before the Pause, as Celsius was struggling to maintain liquidity, the head of Westcap wrote to Mashinsky, "The PR firms think that you have become the problem and you are not listening to advice. The crisis manager who walked away from Celsius called us and said you were uncoachable and the part of the problem. You are not being the partner we thought you were going to be. We did not sign up for a one man show." Ex. 127 at -599. Mashinsky tried to make excuses, but Westcap pushed back: "This wasn't bad luck. You have to listen and it's not about you always being right on every trade. Look at where we are? The company should address this and all Pr not you, too much baggage and too late for that … At what point do you actually listen to anyone other than yourself?" *Id.* at 599-600.

The fact that Celsius's senior executives were so concerned about Mashinsky's misrepresentations that they formed teams dedicated to reviewing his statements, created charts cataloguing his lies, and talked openly about the CEO of the company committing securities fraud, is testament to how problematic and widespread Mashinsky's lies were. When a company's head of compliance has to create a chart of the CEO's misrepresentations, it is evidence that the CEO's misconduct went far beyond two simple misstatements.

## II.    The Scheme to Manipulate the Price of CEL

Even as Celsius struggled to generate the revenues needed to sustain its high yield rates, Mashinsky directed others at Celsius to spend Celsius's scarce resources to boost the price of CEL. Mashinsky and his team did this by secretly purchasing far more CEL in the market than it was disclosing to investors, and by timing and designing these purchases to maximize their impact on the price. Even worse, Mashinsky inflated the price of CEL so that he could then sell his own tokens at an artificially high price—sometimes even selling his CEL *to Celsius*, which was using *customer funds* to buy Mashinsky's CEL at these inflated prices. And he did not disclose any of this to the public, instead insisting that the price of CEL was entirely the result of "organic demand" and that it was so valuable that he was not selling.

As forecast by Mashinsky's lies in connection with Celsius's ICO, Mashinsky viewed CEL as a proxy for Celsius itself. And, as the previous section has established, while Mashinsky may have wanted Celsius to do well, what he wanted above all—above truth, above facts, above appropriate risk management, and above concern for his customers—was for Celsius to *appear* to be doing well. PSR ¶¶ 75-76. When the public did not take to CEL as warmly as Mashinsky had hoped, and Celsius's marketing of the new token did not spark sufficient demand for CEL, particularly in light of its lack of utility, Mashinsky decided to play the invisible hand and move the CEL market where he wanted it to go: Up.

Celsius publicly committed to purchasing in the market a portion of the CEL it owed customers in weekly rewards payments, rather than simply distributing CEL from its treasury, which would have increased the supply of CEL in circulation and, presumably, driven prices down. The idea was that Celsius's market purchases would have a positive impact on price, thus further incentivizing customers to take their rewards in CEL rather than in other cryptocurrencies.

Mashinsky and others at Celsius referred to this general principle as the "Flywheel." The Flywheel alone, however, did not drive up customer demand for CEL. PSR ¶ 78. Celsius's manipulation of CEL took different forms, but primarily involved excessive and timed market purchases of the CEL needed to pay customers' weekly CEL rewards. For most weeks and contrary to explicit disclosures, Celsius purchased far more CEL than necessary to pay rewards—often multiple times more. These excess purchases, often timed to maximize market impact, were designed to inflate the price of CEL and keep it from dropping. PSR ¶¶ 76, 86-87, 101-102, 105.

As the single largest holder of CEL other than Celsius itself, Mashinsky benefited whenever the price of CEL increased. PSR ¶ 109, So even as Celsius was struggling financially, Mashinsky directed Celsius employees to make these excess purchases—including using investor money—to prop up the price of CEL. Mashinsky then sold large quantities of his CEL at these inflated prices, even as he told the market that he was buying, not selling. Mashinsky ultimately profited over $48 million from selling his CEL token at artificially high prices, which he stipulated in his Plea Agreement were proceeds of the market manipulation scheme charged in Count Five. *See* Ex. 1 (Plea Agmt.) at 2. Meanwhile the company's purchasing of CEL to support the high price was one of its largest cash drains.

The scheme was an obvious way for Mashinsky to profit at the expense of Celsius's investors, and Celsius employees flagged the obvious conflict of interest at the time. For example:

- One of Celsius's CFOs expressed "queas[iness]" about spending so much money on CEL purchases and wrote, "For a company that could lose, at this pace, 6 million before the end of year, I can't possibly justify this." Ex. 31 at -267.

- The same CFO wrote to Mashinsky's co-founder to complain that Mashinsky was "using our money to do purchase of CELs every week and paying rewards to everyone

including key personnel every week," noting that "[i]f someone says that a company is losing more than half a million/month, just raisin[g] money and take 200k/week to buy its own shares (or tokens) 14% of which comes back right into the CEO's pocket (28k) it doesn't sound very good right?" *See* Ex. 14 at -710.

- Another senior executive wrote to Cohen-Pavon, "it's a bit funny we are working hard to raise the price so that Alex can sell higher, instead of just stopping buying for now." *See* Ex. 140.  Cohen-Pavon replied, "Exactly what I wanted to write. The ones who benefit are the Market Makers and Alex."  *Id.*

- Yet another senior executive described the whole process as essentially a Ponzi scheme at investors' expense, writing, "I mean us buying CEL in general is stupid since we are using customer stable coins (we borrow but are growing short in customer coins) which is very ponzi like so yeah agreed we should be buying back nothing until we start making money. every $$$ we spend on CEL is a $$$ we won't be able to return to the community." Ex. 113 at -750.

The scheme is detailed in PSR paragraphs 75 through 111. Mashinsky did not even address the CEL manipulation scheme in his sentencing submission, but his objections to the PSR include a broad objection to the assertion that Mashinsky "participated in a criminal conspiracy to artificially inflate the price of CEL." Def. Ex. B at 46. The discussion and evidence that follows shows that there is no merit to Mashinsky's objections.

### A.  Mashinsky Directed His Employees to Focus on Raising the Price of CEL

In 2018, CEL was sold in the ICO at a price of $0.20 per token, and Celsius conducted very little market buying of CEL in 2018 and 2019. By October 2019, the CEL price had dropped to about $0.05 per token.  PSR ¶ 78. At that point, Mashinsky began directing his staff to focus on CEL. PSR ¶ 79. In a November 2019 email to staff, Mashinsky said that Celsius "need[ed] to buy

twice as much CEL each week at these lower prices" and complained that "CEL is still an orphan in the trading desk so this needs to change." Ex. 10 at -410. In response to Mashinsky's push to rescue CEL through market purchases rather than increasing its basic utility, some executives pushed back, with one writing: "Buying tokens doesn't make the token valuable. It only changes the last traded price for the asset in the market. . . . We have to make the CEL token valuable . . . Anybody who exists outside our ecosystem will properly value CEL at $0.00." Ex. 11 at -100. But instead of focusing on utility, Mashinsky instead focused on supporting the price of CEL through market purchases. In January 2020, Celsius began increasing its weekly CEL rewards purchases up to 100% of what was needed to pay rewards, though not yet over 100%. PSR ¶¶ 81-83.

In the spring of 2020, Mashinsky and the team he had put in charge of CEL began to focus more on how Celsius's market purchases could drive up the price. PSR ¶ 81. In May 2020, Mashinsky emailed that, "Our job is to protect CEL not replenish it. . . . It's a win win scenario, the only way we loose t[is] if CEL price drops and people get nervous and keep selling. We can protect against this scenario." Ex. 16 at -921. His employees answered the directive. A few days after this email, Johannes Treutler, the trader responsible at the time for Celsius's CEL purchases, wrote the company's CFO and asked to approve additional funds for him to "support CEL in a way that wasn't possible [for] weeks" by "buying a bit more the next 2-3 weeks," which would help CEL reach "the territory about $0.2 for the first time ever." Ex. 17 at -083. The CFO agreed, but warned about whether such purchasing was "sustainable" or would "end up causing a pump and dump." *Id.*; *see also* Ex. 18 at -087 (confirming that this well-timed purchase was made during an AMA and that "the CEL price started to climb due to" it); Ex. 19 (discussing additional large purchases to be timed during the AMAs). Treutler reported the success of his efforts to Mashinsky,

telling him that "It is important to understand that the $CEL price increase went 1:1 parallel with the increase of $ we spend repurchasing CEL," that it was the "[t]actical CEL purchases" that caused a 55% rise in CEL price within 12 hours, and that the trading "proves the tight connection between CEL repurchases & $CEL performance." Ex. 20 at -133, -135. Mashinsky approved, telling Treutler that he "did a great job lighting up the fire in the community that CEL is going up." *Id.* at -133.

### B. June 2020: Secret Excess Purchase Begin

After proving that Celsius could drive up the price of CEL through the size and timing of its market purchases, Celsius began purchasing much more CEL than was needed to pay out the weekly rewards that it was disclosing to the market. PSR ¶ 83. Between June 2020 and the Pause in 2022, there was almost never a week in which Celsius's purchases of CEL did not far exceed what it needed to pay rewards. The below chart tracks Celsius's net weekly purchases of CEL against its weekly reported rewards:



Source: CELSIUSNETWORK_00064677.xlsx, FTX_SDNY_00000096[A-F]

As this chart illustrates, Celsius frequently made purchases orders of magnitude higher than it actually needed to pay customer rewards, not occasionally, but over a period of years.  While Celsius's excess purchases began in early 2020 and extended into 2022, the core period of the manipulation scheme occurred between July of 2020 and December 2021. During that period, Celsius owed its customers weekly CEL rewards totaling approximately 39 million CEL.  But during the same period, Celsius's net purchases in the open market, which occurred at Mashinsky's direction, totaled approximately 116 million CEL.  Celsius's excess purchases – which were explicitly aimed at supporting and increasing the price of CEL – had their desired effect, and the price of CEL token rose precipitously during this period.[12]

### 1.   The Purchases Were Designed to Support the Price

In 2020 and early 2021, the excess CEL purchases were carried out primarily by Treutler, Urata-Thompson, and Connor Nolan. PSR ¶ 87. Their internal communications show that they were following Mashinsky's directive to use market purchases to support the price of CEL. They did this not only by purchasing far more CEL than needed to pay rewards, but also by timing their purchases to maximize market impact. *See, e.g.*, Ex. 21 (targeting buys for market impact); Ex. 22

---

[12] The chart shows "net" purchases, meaning that it deducts any CEL that Celsius sold over its over-the-counter, or "OTC," desk. Celsius often sold CEL to capitalize on the high prices and bring cash into the company, but when it did so, it conducted those *sales* through the OTC desk, even as it focused its *buys* on the crypto exchanges. *See* PSR ¶¶ 93-94. In fact, Celsius sometimes bought on the exchanges for the express purpose of driving up the price so it could make more money from OTC sales on the very same day. *See* Ex. 52 at -572 ("[A]s you know we have currently a shit ton of [OTC sales] deals pending … We risk to lose $2-3M OTC sales if we are not willing to spend $100-200k to stop the price drop at this level."). As Mashinsky recognized at the time, transactions on the OTC desk did not have the immediate market impact as transactions on exchanges, and by conducting its sales OTC reduced their downward market impact.  *See* Ex. 35 at -118 ("Selling OTC does not push CEL up. I rather have them buy in the open market."); Ex. 49 at -401 (Treutler advising Urata-Thompson that "[e]asiest way for us to sell a shot [sic] ton of CEL without stopping the rally is to sell OTC .. We can sell any size without adding pressure on markets.").

at -917 (discussing "need to be a bit more aggressive the next two weeks to support the closed raise and the talk about this on the AMAs each Friday"); Ex. 24 at -923 (need a large purchase to "make a big impact" during the AMA); Ex. 25 at -941 (discussing need for "a stronger buyback today as we need to take care for CEL"); Ex. 34 at -223 (describing how they bought "aggressive for one day and add support for next days"); Ex. 33 at -985, -986 (Nolan asks Treutler "you think we pushed [the market] too far?" and Treutler replies, "Honestly there is no too far. The higher we push CEL for an acceptable cost the more people notice it and add their own buy orders below the current price"); Ex. 36 at -277 (noting that there is "panic about the dropping price" of CEL and that "[t]o prevent this we need to add orders at 10..20..30..40..50% below the current price .. The token will never drop that hard but these orders are 1.) visual support for people to see there are still buyers & 2.) a protection from a flash crash"); Ex. 46 at -352 ("we helped employees sell off without a market impact and defended CEL in a large sell off attack on Friday"); Ex. 53 at -153 (implementing buy orders because "CEL needs to fly a bit today"); Ex. 57 at -574 ("We buy 50,000 CEL aggressively .. this can stop the massive underperformance as it attracts buyers who want to buy the retracement .. it's similar with us selling the tops to calm down the rally which we did a few weeks ago").

At times, Nolan in particular raised concerns about the purchases, suggesting they "chang[e] up our strategy so less expensive moving forward," and that they "should be spending the least possible to fulfill our obligations, not just supporting the price," but in response Treutler reminded Nolan that Mashinsky had approved them "sometimes be[ing] aggressive" with their "buying power" to support CEL. *See* Ex. 21 at -912; *see also* Ex. 45 at -121 ("Again—burning like 200 BTC [for CEL purchases] a week is not sustainable"). The team recognized that their purchases were not being disclosed to the market. For example, Treutler stated in an internal

message, "The last 3-4 months we bought always more CEL than what we pay as interest per week but we did not buy it for the interest payments, that was just what we told the community." Ex. 67 at -583. And Urata-Thompson once said, "It's like FBI. THe [sic] job we do is not to be noticed." Ex. 46 at -353.

### 2.  Mashinsky Directed the Trading Activity

The messages also confirm that Mashinsky knew that his team was using the market purchases to drive up the price of CEL, and the specific trading directives often came directly from Mashinsky. *See, e.g.*, Ex. 22 at -917 (Treutler "explained early this week already to Alex" a plan to "be a bit more aggressive in the next two weeks to support the closed raise and the talk about this on the AMAs each Friday"); Ex. 29 at -594 (Urata-Thompson confirming to Mashinsky that they had "firepower" to purchase extra CEL if negative news article came out); Ex. 30 at -569 ("I actually spoke to Alex [about a large CEL purchase] since he called me. He said we don't have to do much. However, if there is excess USD, put some of that into BTCs somehow"); Ex. 32 at -160 (Mashinsky discussing selling pressure with Treutler and instructing him, "We can buy for a few weeks ahead. As long as CEL goes up it is profitable for us."); Ex. 36 at -277 (Treutler messages Urata-Thompson about purchases to halt a drop in CEL price and reports "Alex calle[d] me 30 minutes ago and asked how he can help and started to buy some CEL on Uniswap to support and trying to reverse the down trend."); Ex. 37 at -365 (Mashinsky confirming to Urata-Thompson that he was "trying to support the morning sell off earlier today before [Urata-Thompson] was able to get Connor to move coins and work with Johannes."); Ex. 39 at -305 (Treutler reports to Urata-Thompson that Mashinsky asked him "to figure out how we can take care the CEL price goes back to $1.30+" before Celsius closes a large OTC sale transaction); Ex. 40 at -814 (ExCo presentation describing how CEL price dropped to $0.97 after Celsius "stopped buying back CEL" but then

"immediately recover[ed] to $1.30" because "Alex bought 150k CEL," because Celsius "added $1M in passive buy orders," and because Celsius "bought $600k worth of CEL during the next hours"); Ex. 44 at -120 ("Alex called me last night after the attack and was happy we solved it"); Ex. 46 at -353 ("But I definitely will bring this up at EXCO so everyone especially Aex gets it."); Ex. 58 at -575 ("I had a talk about what happened last week [i.e., resting buy order being triggered by a large seller] … He thought about it and says that's what he wanted—allowing market to go down and us buying back more CELs at lower price."); Ex. 59 at -440 (Mashinsky asking to "do a call to talk about price of CEL"); Ex. 60 at -576 (describing decision made on call with Mashinsky to "spend[] this week -$6M Cash to normalize markets" which "means we actively spend money to normalize markets"); Ex. 62 at -094 (Mashinsky talking about CEL price with Treutler and asking, "How much CEL will you buy this week?").

### 3. Timing to Combat Negative News Cycles

Sometimes Celsius timed its aggressive CEL purchases to prevent a drop in price around negative news events. For example, in July 2020, Celsius expected the influential crypto website Coindesk to release a negative article about Celsius. PSR ¶ 84. In response, Mashinsky told Urata-Thompson, "if CEL drops more than 20% due to Coindesk be ready to do some buys." Ex. 141. Urata-Thompson told him that they were already "concentrating [the CEL purchases] at the beginning of week this week," and clarified, "or are you asking me to do more but [buys] than our weekly purchase?" *Id.* Mashinsky replied, "Yes do more if it drops a lot." *Id.* Urata-Thompson confirmed, "Ok. Will find money from somewhere." *Id.*; *see also* Ex. 29 at -594 (Mashinsky tells Urata-Thompson, "Looks like article will go out tomorrow or Friday so let's talk to him after it is out and we see what damage we have. May be nothing with all the CEL you need to buy"). Urata-Thompson passed Mashinsky's directive on to the team. *See* Ex. 26 at -943 ("let's not take it for

'granted' but if the market really starts bleeding, you have my permission . . . to do more purchase."); Ex. 25 at -940 ( "spend most of the weeks estimated buy on the day of the bad news [because] if people want to know if Celsius is doing well they look at CEL and not at anything else"); Ex. 27 at -153 ("I am ready for the war" . . . "if needed, we will mobilize everything we've got, so let's all move fast"). The Coindesk article was released on July 28, 2020; between July 27 and August 2, Celsius purchased 2.7 million CEL, more than double what was needed to pay rewards.

On some occasions, when Celsius did not have enough money in its trading account to fend off a market drop, Mashinsky coordinated Treutler to use Mashinsky's personal account to support the price of CEL. PSR ¶¶ 90-92. For example, on October 21, 2020, as CEL price was falling, Mashinsky asked Treutler "how much dry powder you have left," and when Treutler indicated that there was not enough, Mashinsky said he would "jump in." Ex. 137 at -423. Mashinsky reported that he purchased 300 ETH worth of CEL "to support the morning sell off earlier today." Ex. 37 at -365. Treutler told Mashinsky he "saved the day." Knowing that Mashinsky's purchases were not an indication that Mashinsky believed in the long-term value of CEL but were instead meant to be short-term support of CEL's market price, Treutler offered to have Celsius's OTC desk buy back the tokens the next day. Ex. 137 at -423. Mashinsky responded, "Sure, not urgent." *Id.*

At the same time Mashinsky and his team were purchasing excess CEL and timing their purchases for maximum impact on the CEL price, Mashinsky was falsely telling the market that that the "rocketing" price of CEL was due to "all organic demand. There's no market making or manipulation or wash trading or anything." PSR ¶ 88(a).

## C. Use of Customer Bitcoin to Support CEL: The Hole in the Balance Sheet

The executives and traders carrying out Mashinsky's market manipulation scheme warned about the expense that Celsius was incurring to purchase CEL in the market—an expense that

increased as the price of CEL increased. *See* Ex. 53 at -154 ("It's getting super expensive and we still aren't sure of our numbers with covering the BTC and eth we use here."); Ex. 45 at -121 ("Again-burning like 200 BTC a week is not sustainable . . . right now we are losing money as mkt goes up."). The high cost of the purchases also meant that Celsius was using its investors' own crypto to fund the manipulation, with Mashinsky the primary beneficiary as the largest holder of CEL. *See* Ex. 17 at -080 ("[P]retty much everything we have on our balance sheet is customer deposits. . . . so we need to be very very careful what we do with 'our money'. it is all customer money"); Ex. 43 at -113 (Nolan warns "we need to start discussing repurchase of coins we use to buy because it has gotten crazy . . . we never run numbers on how much of these purchases we have actually covered in int [sic] or to verify we arent eating into customer coins"); Ex. 5 (Blonstein Dep.) at 303 (testifying that Celsius treated customer coins "as fungible once they came into the platform.").

By early 2021, the price of CEL had risen from approximately $0.40 to approximately $6.30 in just six months. At this point, even Mashinsky recognized that the high cost of the CEL purchases was not sustainable and directed his team to sell into the market highs to generate additional cash for the company.  PSR ¶ 95.   Mashinsky wrote to his team, "Having CEL go up so fast is not good for Celsius or the community. Please talk to Harumi about new guidelines for how we put more cash on the balance sheet. . . . You can not have record selling and record price something have to give." Ex. 48 at -291; *see also* Ex. 54 at -086 (Mashinsky wrote "CEL going up too fast is not good for us . . . CEL chart is parabolic since Dec 11. We can not support these price levels and I do not want to use our funds supporting these levels. You can use OTC but not your net proceeds and you can not start buying back until it is lower by 30% or you will not have enough funds to support anything."). Even when Mashinsky directed his team to reduce the size of their

CEL purchases, though, he still directed them to leave the "resting orders" in place so that Celsius would automatically purchase large amounts of CEL if the price dropped too far. *See* Ex. 55 at -435 (Mashinsky confirming Urata-Thompson "instruct[ed] [her] team not to buy any more and only place -20% buy orders").

In March 2021, Celsius discovered that it had used so much of its customers' crypto to purchase CEL that it no longer had enough of those coins to cover customers' deposits. PSR ¶ 101. Meanwhile, the price of some of those assets, including Bitcoin, had increased, meaning that Celsius had a large short exposure to those assets, when it was supposed to be market neutral. Internally, Celsius executives referred to this mismatch as a "hole in the balance sheet," and Celsius had to spend millions of dollars purchasing coins in the market to make up for the shortfall. *See* PSR ¶¶ 46(b), 47; Ex. 63; Ex. 64; Ex. 65; Ex. 66. Celsius never disclosed the hole in the balance sheet to its customers. PSR ¶ 100.

### D. April 2021 to December 2021: Celsius Resumes Excess Purchases

In April 2021, after spending a significant amount of money to fill the hole in the balance sheet, Celsius resumed making excess purchases of CEL. PSR ¶ 101. As the above chart of Celsius's net CEL purchases shows, the CEL purchases often exceeded rewards by a magnitude even higher than in the 2020 buying. PSR ¶ 101. For example, during the week of May 24, 2021, Celsius net purchased 1,356% more CEL than it needed to pay rewards. This purchase in particular coincided with a large drop in the price of Bitcoin; Bitcoin and most other coins plummeted in value, but due to Celsius's market support, the price of CEL remained relatively stable. And as in 2020, the traders executing on Mashinsky's strategy to support CEL continued updating him about their success. *See, e.g.*, Ex. Ex. 142 (Mashinsky asks Treutler "how are you holding up in this sell off?," Treutler responds "Talking CEL: we bought a few more CEL than we should usually buy between $4.50-5."); Ex. 69 at 153-154 (Treutler tells Mashinsky that CEL was down 17% due to

negative market news but he planned to "focus the next hour on the token price" and make purchases to "keep the price stable"); Ex. 73 at -948 (Treutler tells Mashinsky and others that because of CEL price dropping "from $6.30 to $5.50 within minutes..we bought them <$5.75 to prevent further damage..*nothing you can tell our community but just so you're aware*") (emphasis added). In June 2021, CEL hit its all-time high of $8.02.

In the summer of 2021, after Treutler experienced health issues, Mashinsky placed Roni Cohen-Pavon in charge of CEL purchases. PSR ¶ 105. During his guilty plea, Cohen-Pavon told the Court, under oath, that, "[f]rom October 2021 through December 31, 2021, I oversaw and at times directly ordered a pattern of CEL token purchases in excess of what the company needed to buy to meet its interest obligation. I knew and understood that the purpose of these excess purchase was at least in part to increase the price of the CEL token, prevent the price of CEL token from dropping, and all to create the appearance of a more liquid market in CEL token trading, all of which were intended to, at least in part, to induce additional CEL purchases by the public at prices that likely did not reflect the true market price." Ex. 3 (Cohen-Pavon Plea Tr.) at 38-39.

By September, the price of CEL had dropped from its summer high down to approximately $6.00. Cohen-Pavon told Mashinsky that "talking with [Treutler] and several clients, it seems like we're closer to $3 than to $6." Ex. 76 at -195. Cohen-Pavon described this to another executive as a "CEL crisis," because there were "No buyers, only sellers." Ex. 77 at -562. Cohen-Pavon told a different executive, "[w]e must raise the price." Ex. 143. Cohen-Pavon proposed a public "burn" program, in which Celsius would announce that it was purchasing extra CEL in the market for the express purpose of destroying those coins and thus creating deflationary pressure. Ex. 77. Celsius announced the burn in October, but CEL price continued to drop to around $4.00.

By the end of October, Mashinsky increased the pressure on Cohen-Pavon to increase the price of CEL. PSR ¶ 105.  He told Cohen-Pavon that "[t]he price will not take care of itself if everyone will just get scared and sell." Ex. 87 at -424. Cohen-Pavon replied, "We're not just sitting and watching the price," but that "The issue is that people are selling and no one is buying except for us. *The main problem was that the value was fake and was based on us spending millions (~$8M a week and even more until February 2020 [sic]) just to keep it where it is*." *Id.* (emphasis added). In this conversation, Cohen-Pavon was explicit to Mashinsky about the fact that Celsius was supporting the price by spending more in the market than was needed to pay rewards: "This week we spent 'only' $4M (on top of the rewards) and the price is till going down. . . . We should be patient or decide we're spending the same level as we spent in the last few weeks (summed at around $45M)." *Id.* Mashinsky did not deny Cohen-Pavon's point that CEL lacked value, but responded, "Does doge coin value real? How about $5B for Solana. Everyone knows what these tokens are and want to buy them because they think price is going up." *Id.* at -426.  Mashinsky told Cohen-Pavon to "[a]sk [Treutler] what he did in Sep 2020 to get CEL awareness," to which Cohen-Pavon told him, "[Treutler] said he spent money, and we intend on spending money (we're building a plan to buy in $30M in a few weeks)," and that Treutler "doesn't know what to do but to spend money." *Id.* Cohen-Pavon also told Mashinsky that "[t]he only buyers in the market in the past week were us." *Id.* at -427.  This exchange makes clear that Mashinsky understood that Celsius's buying activity was responsible for the artificially inflated CEL price, that the CEL's price was not explained by organic demand or the utility of the token, and that Mashinsky approved of Celsius continuing to use scarce corporate funds to support the price.

Cohen-Pavon confirmed during his guilty plea allocution that the October 30, 2021 discussion described in the preceding paragraph was him "and Mr. Mashinsky discuss[ing] by

electronic message a plan to artificially manipulate the price of CEL," Ex. 3 (Cohen-Pavon Transcript) at 40, and confirmed that the message was "in furtherance of the conspiracy" to manipulate the price of CEL. *Id.*

The October 30 communication that Cohen-Pavon highlighted in his guilty plea was not Mashinsky and Cohen-Pavon's only written communication about manipulating the CEL price. For example, on December 10, 2021, Cohen-Pavon sent Mashinsky a chart showing how much excess CEL had been purchased so far in 2021, and told Mashinsky: "we bought 23M extra tokens." Ex. 95 at -676. The chart showed that even taking account for the CEL sold on the OTC desk, Celsius had spent almost $200 million purchasing 47,864,090 CEL tokens, even though it paid just half that amount (24,799,156) in rewards:

|  | BUY | SELL | NET |
|---|---|---|---|
| FTX CEL | 25,530,514.40 | -1,105,008.50 | 24,425,505.90 |
| FTX CNC | 39,807,249.60 | -7,274,300.10 | 32,532,949.50 |
| FTX Kairon 2 | 5,988,414.70 | -56,744.30 | 5,931,670.40 |
| FTX Kairon | 189,809.80 | -21,513.70 | 168,296.10 |
| OTC Desk | 19,455,365.84 | -53,650,463.59 | -34,195,097.75 |
| OTC Employees | 6,651,550.62 | -45,154.00 | 6,606,396.62 |
| Liquid | 12,421,869.28 | -27,500.00 | 12,394,369 |
| Total | 110,044,774.24 | -62,180,684.19 | 47,864,090.05 |
| 4.03 | 443,480,440.20 | -250,588,157.29 | 192,892,282.91 |

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

044aac91-9372-4061-b1dc-62131df7e988.jpg

| | |
|---|---|
| CEL on CEL total interest | 11,932,760.49 |
| CEL on others total interest | 12,866,396.39 |
| Total CEL interest | 24,799,156.88 |

*Id.*[13] Mashinsky and Cohn-Pavon continued to discuss Celsius's CEL purchases in the days that followed, as Celsius continued excess purchases of CEL through the end of the year. *See, e.g.*, Ex. 96 at -203 ("As of now, no one is buying in the market except for us. We spent $20M in the last 36 hours (16M to buy out Intership and 4M to support in the market)."); Ex. 98 at -330 ("If we want to get to something reasonable, CEL should get to 5.5-6"); Ex. 99 at -805 (Mashinsky asks "Do we need CEL above 5 or we ok," and Cohen-Pavon replies, "It was not simple to get it where it is"); Ex. 100 at -700 (Mashinsky asks, "Should we buy back more [CEL] before the US accredited launch?" and Cohen-Pavon replies, "We started recently."). These communications show that Mashinsky and Cohen-Pavon recognized that it was their purchases of CEL that was responsible for the current price.[14]

Also in the fall of 2021, at the same time that Mashinsky and Cohen-Pavon were making large, targeted purchases of CEL in order to support its price, Celsius's chief of compliance had drafted a formal policy for Celsius's CEL transactions that expressly forbid this very activity. *See* Ex. 74. That policy provided that Celsius should purchase CEL pursuant to "a predetermined formula for purchases and follow this formula on a regular schedule," *id.* at -723, and not the ad hoc purchasing that Mashinsky directed Cohen-Pavon to carry out for the purpose of increasing

---

[13] Cohen-Pavon calculated the $200 million cost by attributing a $4.03 price to the CEL purchases based on the then market price. In reality, because the price of CEL had been much higher for much of the year, rising as high as $8.02, Celsius had spent substantially more.

[14] Mashinsky and Cohen-Pavon also debated whether to announce another public buyback. On December 27, Mashinsky suggested that CEL would get to $5.50 or $6.00 "if we announced the buyback but it has to happen tomorrow." Cohen-Pavon replied that they "need to find a way it won't look as a desperate move. We will say—we ought so much, the price still went down. And now we're buying more even though we hold (together with founders and employees) – over 60 percent of CEL." Ex. 98 at -330). Cohen-Pavon's response recognized that the public would not likely react positively to news that the company was spending even more money to support a coin held primarily by Mashinsky and other Celsius insiders. Ultimately the purchases were not disclosed.

the price. The policy provided that it was "best to spread these purchases over time in a way that would limit market disruptions," *id.*, whereas Mashinsky and Cohen-Pavon were concentrating their purchases to maximize market impact. The policy provided that "[d]isclosures should occur on a consistent basis with the same level of information each time," whereas Mashinsky was either not disclosing the market purchases, or disclosing them in a misleading way. The policy also provided that any buyback program should "ensure that purchase and sales are made for legitimate business purposes and are not made for the purpose of causing an artificial price or manipulating the market," *id.* – exactly the opposite of what Mashinsky was instructing Cohen-Pavon to do.

### E. Early 2022: Celsius Reduces CEL Purchases but Mashinsky Continues to Manipulate CEL Price Around Key Events

Cohen-Pavon raised concerns about the amount of money Celsius was spending to support the price of CEL. PSR ¶ 106; *see also* Ex. 95 at -676 (flagging the high costs of the CEL purchases). In response, Mashinsky became angry and told Cohen-Pavon that he was too worried about pleasing Celsius's institutional investors, and that if he just spent the money to increase the price of CEL, everyone would be happy. PSR ¶ 106. When Cohen-Pavon suggested that they focus on utility, Mashinsky responded, "Fuck utility." *Id.* Mashinsky told him to instead do the "simple thing" that Treutler had done, which Cohen-Pavon understood to mean market purchases. *Id.*; *see also* Ex. 112 at -257, -258 (Cohen-Pavon explaining to the then-CFO that "[w]e need to build utility for CEL," and that while Mashinsky is "starting to understand it," "he's also pushing for the quick and dirty").

After the large purchases of CEL in December 2021, Cohen-Pavon reduced the amount of CEL that Celsius was purchasing in the market, tying it more closely to rewards and spreading the purchases out over the week at regular intervals. PSR ¶ 107. As a result, the price of CEL dropped to below $3.00, even before the larger crypto market disruption from the Terra Luna crash. *Id.*

On May 12, 2022, the entire crypto market, including the price of CEL, dropped following the Terra Luna collapse. PSR ¶ 108(a). In the wake of the falling price, Mashinsky wrote to Cohen-Pavon, "let's defend CEL here so we don't loose [sic] all our users." Ex. 119 at -470; *see also* Ex. 116 at -632 (Mashinsky's co-founder complains that "if CEL keeps falling I'll start getting liquidated," and Mashinsky replies, "I am trying to stop it."). Mashinsky proposed to spend $5 million to purchase CEL in the market and support the price, but Cohen-Pavon told him it was a bad idea. PSR ¶ 108(a). Mashinsky then reached out directly to the junior trader in charge of CEL purchases and ordered him to purchase $5 million worth of CEL, but the CFO partially countermanded this order when he learned of it. *Id.*; *see also* Ex. 115 at -176 (CFO telling Mashinsky, "We need to stop buying CEL"). Chats between the CFO and the trader show that they both disagreed with Mashinsky's directive to spend $5 million to support the price of CEL. *See* Ex. 117 at -005, -006 ("Alex told me to buy CEL as you already know. . . . He told to buy up to 5mm USD but I don't have enough USD," to which the CFO said, "We can't prop up CEL at this point"); Ex. 118 at -259 (traders tell CFO that Celsius is "still buying CEL" even though Mashinsky had agreed to stop, which were "clear violations of CFO org orders"). That week, Celsius purchased approximately three times more CEL than it distributed in weekly rewards to customers. PSR ¶ 108(a).

A month later, on June 13, 2022, Celsius paused all withdrawals. The price of CEL that day was $0.28, far from its $8.03 high of the prior summer.

## III.  Mashinsky's Self-Dealing

Mashinsky claims throughout his sentencing submission that he was not motivated by greed, that he did not misappropriate customer money, and that he did not benefit from his fraud. This is not true.

As Mashinsky admitted in his plea agreement and consent preliminary order of forfeiture, his cash proceeds from the manipulation scheme totaled more than $48 million. PSR ¶ 109. That is a staggering windfall over a four-year period. Mashinsky was the largest holder of CEL, outside of Celsius itself. As Mashinsky was causing Celsius to artificially inflate the price of CEL, he was personally selling large volumes of his own holdings in CEL. Mashinsky reaped approximately $46,010,000 in proceeds from these sales, which he then transferred to his personal bank accounts and family trust accounts, and which he used on personal luxuries, including the purchase of a third home in Texas and the upkeep of his Manhattan penthouse and vacation home in the Hamptons. PSR ¶ 109. Mashinsky accrued for himself an additional nearly $2.5 million in bonuses as a direct result of his manipulation of the price of the token, because, under the terms of the CEL whitepaper, Mashinsky and other executives were entitled to bonus payments when the CEL price hit certain thresholds, which it did as a result of the manipulation scheme. PSR ¶ 109. After misleading retail crypto investors into investing all their crypto with Celsius, Mashinsky thus used those funds to drive up the price of CEL and enrich himself.

This is classic fraud. Mashinsky wanted something for nothing, so he created an utterly useless CEL token, manipulated the market until it appeared to have value, lied about what he was doing, and then sold and traded CEL for currency that had value. He used that currency to maintain a luxurious lifestyle. He has three homes. His children have trust funds. He has secreted money away in LLCs that he disclaims control over to this day.

Mashinsky was so self-interested, in fact, that his sales of CEL token regularly violated Celsius's trading policy, which Mashinsky signed in July 2020. That policy restricted sales of CEL token by executive officers and directors of Celsius and specifically prohibited, among other things, selling in an amount of CEL more than $20,000 per day or $50,000 per week. PSR ¶ 111.

Other Celsius executives were aware that Mashinsky was violating the policy through his large sales, and on at least one occasion reminded Mashinsky in writing to comply with the policy. In early 2021, Mashinsky had conducted large sales via the decentralized exchange Uniswap, which had caused Celsius, which had resting buy orders in place, to enter into what amounted to a cross trade with Mashinsky with Celsius buying the CEL token that Mashinsky had sold. After the incident, the CFO emailed Mashinsky, copying other Celsius executives, to advise him of this cross-trading. She added, "we could have taken out our resting orders altogether, but that would have tanked the CEL market in one shot. . . .So I need you to reconsider your selling CELs in the open market. One to preserve the value of our CELs and the other to actually keep us compliant. We all signed the CEL Trading Policy. Thank you for your consideration." Ex. 56. Despite these admonishments, Mashinsky continued selling massive quantities of CEL in the open market in 2021 and 2022, in violation of the CEL Trading Policy he had signed.

Mashinsky's employees often complained that at the very same time they were using customer funds to inflate the price of CEL, Mashinsky was selling his personal tokens, which meant both that customer coins were going directly into Mashinsky's pocket, and also that Celsius was having to spend more and more money to offset Mashinsky's sales. *See, e.g.*, Ex. 50 at -082 (Treutler complains that Mashinsky sold $90,000 worth of CEL into one of Celsius's buy orders); Ex. 51 at -411-413 (complaining about Mashinsky cross-trading with Celsius's buy orders). One of Celsius's CFOs tried multiple times to get Mashinsky to stop selling his CEL into Celsius's buy orders without permission, and she was so concerned about the cross-selling that she told other employees, "We are talking about becoming a regulated entity and we are doing something possibly illegal and definitely not compliant." Ex. 144 at -567.

Mashinsky now denies being part of a scheme to manipulate the price of CEL. He

acknowledges only that he made one misstatement on one occasion in which he Tweeted that he was not selling CEL when he was. The overwhelming evidence that Mashinsky was the leader of the scheme to manipulate CEL is set above. But Mashinsky's denial of participation in the CEL manipulation scheme is wrong for the additional reason that it does not square with the forfeiture amount or common sense. Mashinsky offers no explanation for how the one lie he admits, which concerned sales of approximately 674,000 CEL, worth at the time approximately $53,000 could have caused him to accrue $48 million in crime proceeds, as he agreed he did in the plea agreement. PSR ¶ 110(a); Ex. 1 (Plea Agmt.) at 2.

## RESOLUTION OF THE DEFENSE OBJECTIONS

Mashinsky submitted 70 pages of factual objections to the final PSR. These objections cover a number of facts relevant to the charged schemes, but reduce primarily to the following fundamental issues: (1) did Mashinsky knowingly make misrepresentations about Celsius other than the two misrepresentations he mentioned in his allocution, and (2) did Mashinsky work with others at Celsius to manipulate the price of CEL. Despite raising extensive objections to nearly every paragraph of the PSR, Mashinsky asks the Court not to conduct a *Fatico* hearing because "[t]here is no dispute between the parties about the statutory maximum, the application of the Guidelines, or the stipulated Guidelines range in the plea agreement," and because "'relevant conduct' under U.S.S.G. § 1B1.3 [is not] implicated here." Def. Mem. at 2 n.1. To the extent Mashinsky suggests the Court can proceed to sentencing without resolving the factual disputes, he is incorrect. However, the Court need not hold a full evidentiary hearing given the extensive documentary record. The exhibits attached to this submission, along with the exhibits attached to the defense submission, provide sufficient evidence to establish the facts in the presentence investigation report. To the extent that further evidence or witness testimony would be helpful to

the Court in resolving any of the disputed facts, the Government stands ready to supplement the documentary record or to call witnesses at an evidentiary hearing.

## I.    Applicable Law

Courts must resolve material factual disputes before sentencing a defendant. *See United States v. Berndt*, 127 F.3d 251, 257 (2d Cir. 1997). "[T]he Guidelines make clear that '[w]hen any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor.'" *Berndt*, 127 F.3d at 257 (quoting Guidelines § 6A1.3(a). But courts also have wide discretion in how to resolve such disputes, which do not require evidentiary hearings with live testimony. *United States v. Ghailani*, 733 F.3d 29, 54 (2dCir. 2013). The "sentencing court is afforded broad discretion in resolving disputed factual issues, including the discretion to decide whether a hearing is necessary and how such a hearing should be conducted." *United States v. Ambrosio*, 129 F.3d 114 (2d Cir. 1997) (summary order) (citing *United States v. Ibanez,* 924 F.2d 427, 430 (2d Cir. 1991)).  Indeed, the sentencing court "is entitled to rely on any type of information known to it," in resolving sentencing disputes.  *United States v. Tracy*, 12 F.3d 1186, 1203 (2d Cir. 1993) (citing *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989)). A district court may find facts relevant to sentencing by a preponderance of the evidence.  *See United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005); *United States v. Garcia*, 413 F. 3d 201, 220 n.15 (2d Cir. 2005); *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005).

## II.    The Disputed Facts Warrant Resolution

The disputed facts, which encompass nearly all of the PSR, are "Relevant Conduct" under the Sentencing Guidelines. The Guidelines include a broad definition of Relevant Conduct, which includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced,

procured, or willfully caused by the defendant," and, in the case of jointly undertaken activity, acts and omissions of others that were "within the scope of the jointly undertaken criminal activity," that were "in furtherance of that criminal activity," and that were "reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3. The Guidelines specify that relevant conduct, whether committed by the defendant or within the scope of jointly undertaken criminal activity, consists of "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). 2006). Offenses are part of the same course of conduct "if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3 cmt. 5(B)(ii).

Furthermore, the Court's resolution of factual disputes is not limited to disputes about Relevant Conduct. "The material which can appear in a PSR is extremely broad." *United States v. Brickhouse*, 75 Fed. App'x 39, 40 (2d Cir. 2003); *see also* 18 USC 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."). "A district court may consider as part of its sentencing determination uncharged conduct proven by a preponderance of the evidence as long as that conduct does not increase either the statutory minimum or maximum available punishment." *United States v. Ulbricht*, 858 F.3d 71, 128 (2d Cir. 2017); *see also United States v. Green*, 2024 WL 4488577, at *4 n.1 (2d Cir. Oct. 15, 2024) (same); *United States v. Pocinoc*, 833 Fed. App'x 847, 848-49 (2d Cir. 2020) (holding that district court did not err in declining to strike uncharged conduct from PSR because such conduct was "clearly relevant from a history and characteristics perspective under 18 U.S.C. 3553(a)" and "their inclusion in the PSR is consistent with the broad

scope of materials permitted in the PSR."); *United States v. Reese*, 33 F.3d 166, 174 (2d Cir. 1994) ("[A] sentencing court is free to consider . . . evidence of uncharged crimes."); *United States v. Najera*, 2022 WL 2802703 (S.D.N.Y. July 15, 2022) (Gardephe, J.) ("[I]n sentencing a defendant, a district court may consider conduct to which a defendant did not plead guilty, as long as doing so does not increase either the statutory minimum or maximum available punishment.").

Despite some glancing argument to the contrary, Mashinsky himself obviously considers the factual disputes to be material.  He has urged the Court to credit his "Version of Events" and to find that his "two statements were not part of a broad, multi-year scheme to defraud Celsius's customers" but were instead "discrete lapses in judgment and singular occurrences," Def. Mem. at 31, and to sentence him accordingly.  In other words, the scope and nature of Mashinsky's crimes is the core dispute between the parties, and must be resolved prior to sentencing.

## III.    Mashinsky's 'Version of Events' Has No Basis in Fact

To the extent that Mashinsky engages with the facts at all in his primary sentencing submission, he advances two main theories: that he made only two misstatements in all of his yearslong representations about Celsius's business and operations, which were not overly misleading because of additional "context," Def. Mem. 31, and that Celsius went under in June 2022 because of market events beyond anyone's control.  He does not even mention market manipulation, although he objects extensively to the section of the PSR discussion his participation in a scheme to manipulate CEL token.  Def. Mem. Ex. B at 44-66.

Mashinsky's positions are contradicted by the evidence and are impossible to reconcile with the Guidelines stipulations to which Mashinsky agreed in the Plea Agreement.  The evidence summarized and cited in the Offense Conduct section of this submission provides the Court with information to conclude that there is an independent factual basis to find the Guidelines

enhancements previously agreed between the parties. Moreover, the Court should consider that the agreed-upon Guidelines provisions are logically inconsistent with Mashinsky's narrow view of his offense conduct. *See United States v. Granik*, 386 F.3d 404, 413 (2d Cir. 2004) ("Binding a defendant to factual stipulations regarding a crime requires only an understanding of the obvious: facts admitted in a plea agreement can, and usually will, be accepted by the sentencing court as true."). For example, Mashinsky stipulated that the loss from his crimes was more than $550 million, but he does not reconcile that loss amount with his position that the full extent of his crime was making only two misstatements, one about regulatory clarity and one about his own purchases of CEL token, both of which he now claims no one would have relied upon. The position defies logic and is best interpreted, along with his arguments that market downturns caused most of investors' losses, as a tacit invitation to the Court to set aside the agreed-upon Guidelines loss amount. In contrast, it is the sort of years-long, far-reaching scheme described in the PSR—including repeated misrepresentations about Celsius's profitability, sustainability, low-risk investment strategies, and general safety as an investment—that would have foreseeably induced investors to deposit more than $550 million on the Celsius platform. And it is the sort of extended market manipulation scheme described in the offense conduct, with the regular expenditure of millions of dollars to secretly purchase more CEL than Celsius told the market, that could inflate the price of CEL to a level that Mashinsky was able to personally profit more than $48 million, which he stipulated to be the amount of proceeds he earned from that scheme. Similarly, Mashinsky has stipulated that he was an "organizer or leader of a *criminal activity* that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a) (emphasis added). This stipulation cannot be reconciled with Mashinsky's position that he did not even participate in—let alone lead—the conspiracy to manipulate the price of CEL.

A. **Mashinsky Made Numerous Misrepresentations, Which Were Part of a Yearslong Scheme to Defraud Investors**

Mashinsky broadly objects to the PSR's description of the scope of his misrepresentation scheme. Def. Mem. Ex. B. 1. However, a closer look at Mashinsky's specific objections reveals that, while he objects to characterizations of his misstatements as "false" or "repeated," he does not dispute the gravamen of the conduct and the documents he submits do not call into question the facts as set forth in the PSR.

1. The ICO

As previously discussed in the Offense Conduct Section, Mashinsky does not dispute either that the ICO raised only $32 million, nor that he claimed that it raised $50 million on numerous occasions. PSR ¶¶ 25-35; Def. Mem. Ex. B at 3-6. He raises some objections around the margins of these paragraphs in the PSR, including attempting to justify his actions and objecting to some of the characterizations of documents and events. These objections should be overruled.

Mashinsky submitted exhibits that he claims show that he had reason to believe, at least at certain times, that the ICO had in fact raised the full $50 million. As the foregoing facts in the Offense Conduct section demonstrate, Mashinsky did not and could not have believed that. He signed the AMV token sale agreement on March 29, 2018, *after* the Celsius ICO sales period had lapsed, and committing to purchase up to $18 million worth of CEL—the very amount that had gone unsold during the ICO sales period. Ex. 8. That amount is no coincidence. The AMV token sale agreement alone reflects Mashinsky's desire to put public relations spin above substance. Had Mashinsky paid for the tokens, as he was contractually obligated under the token sale agreement, and continued claiming publicly that Celsius had raised $50 million "from the community" without disclosing that an entity wholly owned and controlled by him was responsible for more than one-

third of the ICO raise, this would have been itself a material misrepresentation. But Mashinsky's lies went even further, because Mashinsky did not care to put his money where his mouth was.

Mashinsky failed to provide any consideration for the purchase, leaving Celsius about $18 million short. Mashinsky knew at all times that he had not paid the money. The exhibits he submits do not show otherwise. Defense Exhibit B-3 is a photograph purporting to show Mashinsky taking a photo of the Celsius web site on March 20, 2018, where it showed a $50 million raise from the ICO. If this is an authentic photograph of the web site on that date, it is evidence of the fraud. Mashinsky and Celsius's marketing materials concerning the ICO raise were false, as it is uncontested that the ICO did not raise this amount of money. Defense Exhibits B-4 and B-5 are an email and attachment that Mashinsky claims "confirmed that Celsius had raised more than $54 million in the ICO," Def. Mem. Ex. B at 3—except that is not what these documents say. Rather, the attachment indicates that the *total value* of all CEL tokens is more than $54 million. It shows that approximately 225 million tokens were sold, approximately 1 million tokens were burned, 6 million were "unallocated" and the balance—at that time approximately 93 million or nearly 30 percent of all tokens for sale—were to be allocated to AM Ventures. (At a later time, when additional commitments from the public sale fell through, the amount allocated to AM Ventures increased to 117 million tokens.) As Mashinsky well knew, at the time he received this email and at every time thereafter, that AM Ventures had not paid for and never paid for these tokens, these exhibits do not establish that Mashinsky had any basis to include the AMV "purchase" in his public statements.

Mashinsky further objects to some of the characterizations of the loan agreements in paragraph 30 of the PSR and claims that the loan agreement required him to post as collateral his interest in Celsius. Def. Mem. Ex. B. at 4. As is correctly discussed in paragraph 30 of the PSR,

70

it was only the second iteration of the loan agreement that required Mashinsky to post his equity in Celsius as collateral securing the repayment of the "loan."  PSR ¶ 30; *compare* Ex. 12 *with* Ex. 13.  This is apparent from review of the documents themselves; nonetheless, if helpful to the Court in considering Mashinsky's objections, the Government is prepared to call at least one Celsius executive, the CFO at the time, who discussed his objections to the "self-dealing" and "circular" loan agreement with Mashinsky directly in late 2019 or early 2020.

Additionally, to the extent that there is any doubt about what Mashinsky knew and understood about the ICO raise, Cohen-Pavon has previously told the Government and would be expected to testify in sum and substance that Mashinsky continued to publicly state that Celsius's ICO raised $50 million even after Cohen-Pavon told him to stop making that claim.

2. <u>Celsius's Risk Management: Directional Strategy, Uncollateralized Loans, Counterparty Defaults, and Regulatory Clarity</u>

Mashinsky does not deny making statements regarding Celsius's market-neutral trading strategy, uncollateralized loans, counterparty defaults, or regulatory clarity; rather, he appears to suggest variously that the statements were true or that other Celsius employees made similar misstatements.  Def. Mem. Ex. B 22-34.  As the evidence previously summarized demonstrates, Mashinsky's statements were not true, and these misrepresentations were material to investors' decisions to invest and stay invested with Celsius.  Further, the fact that other employees, who reported to and worked for Mashinsky, at times made similar false statements compounds, rather than excuses, Mashinsky's fraudulent conduct.

*Directional Trading*

Mashinsky does not dispute the directional trading or the instructions related to the same described in the PSR in paragraph 50. Def. Mem. Ex. B 22-24.  Nor does Mashinsky dispute that he "falsely told investors repeatedly and over a period of years that Celsius was 'market-neutral'

and did not engage in directional trades."  PSR ¶ 51.  Mashinsky instead seeks to exclude from the PSR some of the incidents of directional trading as irrelevant and to blame certain of the directional bets on his employees.  As to the 2019 trading in paragraphs 50(a) and (b), Mashinsky objects to the Court's consideration of this trading, as it predates his statements that Celsius was market neutral.  Def. Ex. B 22.  This argument misses the point.  The fact that Mashinsky *first* personally took directional positions betting on certain cryptocurrencies going up or down and *then* proclaimed Celsius had a market-neutral strategy shows that he knew at the time he made the statement that it was false.

Mashinsky also claims that certain directional trading was "hidden" from him.  Def. Mem. Ex. B.  Even if it were true that directional trading at Celsius was of a greater magnitude than that which Mashinsky personally executed or ordered, this would not make Mashinsky's false representations somehow unwilful, as he clearly knew about his own activity and falsely stated that Celsius was market-neutral.  But in addition, Mashinsky's claims of ignorance are contradicted by the documentary evidence.

The defense appears to suggest that the internal investigation into directional trading practices at Celsius that concluded in February 2022 somehow exonerated Mashinsky or proved that rogue employees hid information from him because he was not specifically named in the resulting report. Def. Mem. Ex. B at 24; Def. Ex. B-46.  In actuality, the investigation found that directional trading was a "widespread practice" at Celsius that was regularly discussed at meetings Mashinsky attended.  Ex. 103 at 2.  As one example, the September 14, 2021 Executive Committee ("ExCo") presentation slides reflect "LONG1 bleeding" (referring to one of the directional accounts) and note a loss of $11 million in the last week due to swing trades. Ex. 75 at 19.

Several of Mashinsky's objections related to the trading in January 2022 suggest that, rather than causing Celsius a huge loss, Mashinsky was simply trying to unwind unacceptable directional positions. Def. Mem. Ex. B. at 24. This is inaccurate. At the time, as now, Mashinsky sought to blame the January 2022 losses on his Chief Investment Officer, who resigned. In fact, rather than exonerating Mashinsky, the internal investigation by Celsius's compliance officer obliquely refers to Mashinsky's attempt to lay the blame for the directional positions on the Chief Investment Officer, who had only started at Celsius in September 2021, by noting that "directional trading was a widespread practice *before September 2021* and was known and accepted by senior management." Ex. 103 at 2 (emphasis added). Furthermore, even after receiving the internal report that he now purports to champion, Mashinsky continued to urge Celsius employees to violate corporate policies when he perceived a chance to take additional risk that he believed would be worthwhile. *See* Ex. 102 at 1 ("Although Alex's mantra is that the firm is not to do proprietary trading what Alex has instructed the team to do the past 8 days and his continued requests for 'trading around the hedges' are proprietary trading."). Celsius's practice of directional trading had serious ramifications for its profitability. Chief Restructuring Officer Chris Ferraro, who joined the company in March 2022 shortly before it folded, testified in a deposition in connection with the bankruptcy that Celsius had spent approximately $300 million purchasing cryptocurrencies for its accounts to cure directional positions and make them market neutral. Ex. 4, (Ferraro Dep. Tr.) at 96.

Mashinsky's personal participation in and instructions regarding directional trading was so pervasive over Celsius's existence that the Government could call four or more witnesses to provide credible testimony concerning the Mashinsky-driven directional bets from 2019 to 2022 discussed in the PSR at paragraphs 50 to 52 and to establish that Mashinsky's objections around

the margins to these paragraphs are baseless. But, as the essence of the conduct—that Mashinsky claimed on multiple occasions that Celsius was market neutral when he knew it was not—is undisputed, that does not appear necessary.

*Uncollateralized Loans*

Mashinsky objects to the characterization that he "knew" that Celsius's uncollateralized loans represented a substantial portion of its institutional lending business, as set forth in PSR ¶ 54, but he does not meaningfully address the evidence summarized in the PSR. *See* Def. Mem. Ex. B at 26-29. For example, he states that he "learned about a small number of uncollateralized loans" in July 2020 and "disclosed them on his AMA." Def. Mem. Ex. B 26. Assuming *arguendo* that July 2020 was the first time Mashinsky was aware of uncollateralized loans, that simply affirms that each of the times after that date that Mashinsky claimed that Celsius did not make uncollateralized loans, he was knowingly lying. *See* PSR ¶ 55(c)-(i).

The remaining "context" that Mashinsky offers in this section is either already contained within the PSR, *e.g.*, Def. Mem. Ex. B. at 28 (asking Court to clarify that the relationship with EFH began with Celsius borrowing from EFH, which ¶ 54(c) already says), or is irrelevant, Def. Mem. Ex. B at 25 (claiming other Celsius executives made similar false statements). Moreover, the record shows that executives repeatedly told Mashinsky that his statements about uncollateralized lending were false. *See, e.g.*, Ex. 41 at 1 (CFO referring to an AMA where Mashinsky said Celsius did not give unsecured loans and saying "I just told him that the number [of unsecured loans] is increasing and overall ratio of collateral with institution is going down."); Ex. 91 at 2 (head of compliance flags to Mashinsky his statement that "we only do asset backed lending" and writes "please stop saying that"); Ex. 94 at 1(head of compliance emails Mashinsky saying, "This article says everything we **cannot** say in 3 pages. From 'returning profits to

74

customers', to 'deposits' and 'savers', to 'all loans are fully collateralized'.").

*Counterparty Defaults*

Mashinsky's objections regarding his false statements concerning counterparty defaults are particularly frivolous.  Mashinsky's objection that Counterparty-1 did not default on its loan until November 2021, Def. Mem. Ex. B 31, are disproven by the documents.  Ex. 42 at 2 (email dated November 21, 2020 to Mashinsky and others stating that Counterparty-1 is "**now**" "**in default of the loan**.  If they are defaulting on this loan, I believe that they will also default on their BTC 200 loan." (emphasis added).

Mashinsky also now denies, without citation, that this loan was uncollateralized, Def. Mem. Ex. B 31; however, a Risk Committee presentation dated December 11, 2020 shows that Celsius had extended Counterparty-1 loans worth $7,429,243 and been given no collateral for those loans.  Ex. 47 at 9.[15]  Mashinsky's claim that the Counterparty-1 default was not declared as a default until November 2021 is belied not only by the foregoing documentary exhibits, each of which were known to Mashinsky at the time he made his false statements, but also by the loan agreement itself, which defines an Event of Default in part as "the failure of the Borrower to return any Borrowed Amount when due" or "any material breach of this Agreement." Def. Ex. B-56 at 6.  The borrower's first missed payment in late 2020 thus constituted a default.

As to Mashinsky's claim that he was permitted to say that Celsius had no institutional defaults because that fact appeared on "talking points" that he "relied on" for his AMA presentations, Def. Mem. Ex. B at 30, the evidence shows that Mashinsky wrote those talking points himself on May 2, 2021, and distributed them to a public relations employee who would

---

[15] *See also* Ex. 131, an "Institutional Lending Credit Exposure Report" showing that as of June 14, 2022, Counterparty-1 had provided 0% collateral, but the value of Celsius's net exposure had ballooned to $9,947,700.

not have been in a position to verify their accuracy. Ex. 68. He wrote them several months after he was aware of the first institutional default, as indicated by, among other things, his own email summarized in the PSR that said, in part "We were supposed to get 200 BTC back.  Never happened." PSR ¶ 56(a); Ex. 61.

*Regulatory Clarity*

The defense requests additional information be added to the PSR suggesting that Mashinsky did not "challenge" regulatory interpretation and was "encouraging" of "collaborative conduct."  Def. Mem. Ex. B 32-34.  These additions, if true, are irrelevant to the misstatements or to Mashinsky's contemporaneous knowledge that his statements were false, and are therefore irrelevant.

3.  <u>Profitability and Revenue-Sharing</u>

Mashinsky objects nearly wholesale to the portion of the PSR discussing his claims regarding profitability, sustainability, and revenue-sharing.  Def. Mem. Ex. B at 7-20.  These objections can be grouped into three categories: (i) the claim that at various times Celsius either was profitable or Mashinsky had reason to believe that it was; (ii) at various times Mashinsky gave accurate information about Celsius's lack of profitability and how it calculated rewards rates, and (iii) there is no evidence that Celsius's lack of profitability caused it to pay out customer rewards using other customer coins.  For the reasons already set forth in the Offense Conduct section, and as briefly further addressed below, these objections have no merit.  To the extent the Court has additional questions about what Mashinsky understood about Celsius's poor financial performance during the times he was publicly vouching for the company's profitability and sustainability, the Government is prepared to call multiple witnesses who could testify about their discussions with Mashinsky, their attendance with Mashinsky at company meetings where these topics were

discussed, and appropriate context for the documentary exhibits attached to this submission.

Overwhelming evidence, as summarized in the Offense Conduct section, establishes that Celsius was not profitable during its existence.  Most saliently, institutional investor Westcap, which had been given financial data leading it to believe that Celsius had a $350 million profit for 2011, essentially accused Mashinsky of defrauding them, sending Mashinsky a presentation in May 2022 that said: "Actual performance and revenue and cost profile look nothing like what investors were sold only a few months ago."  Ex. 121 at 6.  The presentation further noted that "Celsius has wiped out all of its last equity raise two times over in a few months and piled up ~$975M of losses over the past 5 quarters.  Celsius operational losses continue to accrue at an unsustainable rate."  Ex. 121 at 3.

But the signs that Celsius was flailing existed well before 2022.  Mashinsky disputes the import of the financial statements summarized in the PSR noting operating losses year after year.  As to the U.K. audited financial statements, Mashinsky asserts that these financials—while showing Celsius repeatedly incurring losses year after year—show a positive net revenue when accounting for the value of customer coins Celsius was holding or an artificial value of CEL token.  This analysis fails to account for the fact that customers could choose to withdraw those coins; fails to account for the fact that CEL was worthless; and fails to account for the high volatility in the cryptocurrency market generally. Additionally, Mashinsky asks the Court to add a sentence about the impact on the 2021 financials once the mark-to-market ("MTM") value of Celsius's cryptocurrency was incorporated.  Def. Mem. Ex. B at 11. In the year 2021 Celsius benefited from favorable crypto prices (which, necessarily, impacted the entire crypto industry) "due to lower crypto prices vs. cost basis and net liability position." Def. Ex. B-22 at 85. When the value of Celsius's book was calculated using mark-to-market accounting, the net income before tax for

77

2021 changes from a loss of $811 million to a positive $2.6 billion.  By the same token, however, mark-to-market accounting would change Celsius's net income before tax for the first quarter of 2022 from a loss of $164.5 million to a loss of $1.302 billion.  Def. Ex. B-22 at 85-86.  To the extent that the Court grants the defense's additions regarding mark-to-market accounting to Paragraph 41 of the PSR, the additions should include the effect of this change on 2022 as well. In terms of understanding Celsius's profitability and financials more generally, Celsius's year-over-year losses are a more important benchmark than a valuation that includes the customer crypto, particularly given the volatility of crypto assets.

Mashinsky also asserts that the excerpts from the internal numbers presented at weekly meetings were not fairly representative, and submits additional presentation decks from different weeks with different weekly numbers.  The Government does not object to removal of the portions of the portion of PSR paragraph 43(d) that says that the reward payments were "similar" to reward payments in other weeks.  The core point is actually that the internal weekly numbers were all over the place, but—contrary to what investors were told—in weeks when Celsius earned less, or even had negative revenue, it did not return less in rewards to customers.

The fact that Mashinsky at times acknowledged this does not give him license to lie to investors at other times.  *See, e.g.*, *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990) ("A defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on [other] specific occasions."); *United States v. Boykoff*, 67 F. App'x 15, 20-21 (2d Cir. 2003) ("[E]vidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant.") (quotations and citations omitted); *Levine v. SEC*, 436 F.2d 88, 91 (2d Cir. 1971) (broker-dealer defendant was not entitled to offer testimony by certain of his clients that they had not been lied to, as such testimony would not negate the testimony of the customers who testified

that false and misleading statements had been made to them).

Finally, other than times when Celsius was flush with infusions of cash from its investors, *e.g.*, Ex. 121 at 3 ("Celsius has wiped out all of its last equity raise two times over in a few months and piled up ~$975M of losses over the past 5 quarters."), its "unsustainable" operating losses meant that it necessarily paid out investor rewards with other investor coins. This is simple math: "No other way to say you can't payout more than 100%? You are basically using user balances to pay user rewards." Ex. 114 at 3.

### 4. Liquidity and the Lead-Up to the Pause

Mashinsky's objections regarding his misstatements surrounding Celsius's liquidity are already discussed in the Offense Conduct section.

As to the defendant's conduct protecting his own crypto assets in the last month of Celsius's existence, Mashinsky wants the Court to understand that he only did that because of an expected tax liability. Def. Mem. Ex. B at 37. However, as Mashinsky does not deny that he withdrew his non-CEL assets from the platform as discussed in PSR ¶ 66, no changes to the PSR are warranted. If the Court has additional questions about this conduct, the Government is prepared to submit additional exhibits demonstrating that Mashinsky had been selling millions of dollars' worth of CEL for months prior to May 2022, that he had sufficient assets in other accounts to cover much of his tax liabilities at the time, and he did not even fully pay his taxes until October 2022, rendering his explanation less than compelling. But whether or not Mashinsky had good reason to need access to his non-CEL assets in May 2022 is not relevant to the fact is that he withdrew his assets while reassuring customers (who may have also wanted to use their crypto to pay a tax bill or for similar purposes) that their funds were safe and giving false comfort that "we're all in this together."

**B. Mashinsky Led and Directed Celsius's Efforts to Manipulate the Price of CEL**

With respect to the market manipulation scheme, Mashinsky does not object to the majority of the factual assertions in the PSR, but instead objects to the overarching conclusion that Mashinsky, "Cohen-Pavon and others participated in a criminal conspiracy to artificially inflate the price of CEL and objects to the characterization of causal connections." *See* Def. Mem. Ex. B at 46; *see generally* Defense Objections to ¶¶ 76, 77, 88, 89, 94, 95, 96, 97, 98, 101, 102, 103, 108, 109.  As set forth in exhaustive detail above, Mashinsky's objections are contradicted by Cohen-Pavon's guilty plea, in which he stated under oath that he and Mashinsky agreed together to manipulate the price of CEL, Ex. 3; they are contradicted by Celsius's stipulation of facts in its NPA, in which it admitted that the company had determined that "Celsius executives, including Mashinsky, had orchestrated a scheme to manipulate the CEL token by taking steps to artificially support the price of CEL," Ex. 2 at ¶ 11; and they are contradicted by the extensive contemporaneous communications discussed above and attached as exhibits.  These communications show that Celsius purchased far more CEL than it needed to pay rewards almost every week beginning in June 2020; that Celsius's traders intentionally timed their trades and selected their amounts to maximize the impact on CEL's market price; that these traders regularly communicated with Mashinsky about their efforts to support CEL's price; that Mashinsky directed them to take these steps to support CEL's price; and that Mashinsky's frequent statements that the demand for CEL was entirely "organic" were false.

Mashinsky's objections are also inconsistent with the factual stipulations in his Plea Agreement in which he admitted that he profited more than $48 million from the scheme charged in Count Five, Ex. 1 at 2, and that he was "an organizer or leader of a *criminal activity* that involved five or more participants or was otherwise extensive." Ex. 1 at 4 (emphasis added).  Mashinsky has thus already admitted that he was an "organizer or leader of a criminal activity," and his efforts

to now distance himself from his employees who were carrying out the manipulation scheme at his direction is inconsistent with his Plea Agreement.

Mashinsky objects to the assertion that Celsius purchased more CEL in the market than was necessary to pay weekly CEL rewards every week between July 2020 and the end of 2020. Def. Mem. Ex. B at 52 (objecting to PSR ¶ 86). He contends that Celsius was in fact a net *seller* during this period, because it sold CEL over its OTC desk. *Id.* But the chart of the market data set forth above in the market manipulation section already nets out the sales over the OTC desk, and thus shows that even taking account of OTC sales, Celsius was *still* a net purchaser.

Finally, Mashinsky also objects to the assertion that Celsius sometimes used customer assets to purchase CEL. Def. Mem. Ex. B. at 59 (objecting to PSR ¶ 99). But the Celsius employees who oversaw the CEL purchases openly discussed the fact that they were using customer coins to purchase CEL—including to purchase CEL from Mashinsky himself—and that doing so raised serious concerns. *See, e.g.*, Ex. 14, 31, 43, 45, 53, 113. Indeed, for a large period of time, the only assets Celsius had were customer assets, meaning it was by definition using customer coins to purchase CEL. *See, e.g.*, Ex. 17 ("[P]retty much everything we have on our balance sheet is customer deposits…so we need to be very very careful what we do with 'our money'. it is all customer money"). This is exactly the issue that led to the "hole in the balance sheet," when Celsius discovered that because it used customer coins to purchase CEL, it no longer had enough coins to cover deposits. *See, e.g.*, Ex. 63, 64, 65, 66.

* * *

For the reasons stated herein, the defense objections should be overruled and the facts in the PSR should be taken as the Court's findings of fact.

## A SENTENCE OF AT LEAST 20 YEARS' IMPRISONMENT IS NECESSARY

The stipulated Guidelines range is 30 years' imprisonment, and would be much higher but for the statutory cap that resulted from the Plea Agreement. In determining the appropriate sentence, the Court must consider not only the Guidelines range but also the seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7).

The defendant writes at great length about his childhood and purported social benevolence to suggest that the defendant could not have decided, "at age 52, for no apparent reason, to throw away his values and everything he had achieved in favor of becoming a financial fraudster of epic proportions." Def. Mem. at 12. But, of course, the defendant was convicted—after a sworn guilty plea—of doing just that. That the defendant was a fraudster of epic proportions is not, as the defense would have it, a Government "theory," it is just the simple truth.

As set forth in the PSR, the defendant lied over and over and over again. He also played games with the price of the CEL token to enrich himself. What followed was a disaster of harm that fell disproportionately on retail investors. People who put their life savings in Celsius. People who trusted the defendant was telling the truth when he said their investments were safe. In light of the § 3553(a) factors, including not only the nature of the offense but also the history and characteristics of this defendant, the need for general and specific deterrence, the need to promote

respect for the law, and the need to avoid unwarranted sentencing disparities, the Court should impose a term of imprisonment of no less than 20 years.

## I.    The Nature, Circumstances, and Seriousness of the Offense Warrant a Significant Sentence

The nature and circumstances of the defendant's crimes are extraordinarily serious.

*First,* the scope of Mashinsky's fraud is staggering. Tens of thousands of customers deposited billions of dollars based on false assurances of safety and soundness. When Celsius inevitably collapsed, Celsius's customers lost access to more than $5 billion dollars of their crypto, devastating the financial lives of countless victims. Even after the bankruptcy process, investors are short over $1 billion under even the most conservative calculation. Mashinsky's criminal conduct was aimed at and harmed retail investors at an unimaginable scale. Mashinsky's scheme focused on soliciting crypto from what he describes as "everyday people." Def. Mem. at 14. As a result, almost all the victims of his crime were retail crypto investors whose losses constituted a significant portion of their savings and had devastating consequences on their lives. This was not a financial crime in which a few well-heeled hedge funds and sophisticated institutional investors lost a small fraction of their assets. It was a crime in which Mashinsky deliberately targeted real, "everyday" people with misrepresentations, and caused irremediable harm on their lives. These retail investors were the kind of investors who relied on online videos for financial advice, and when they watched Mashinsky's AMAs they believed him when he said that Celsius was a low-risk and profitable place to deposit their crypto, and they believed him when he said that the CEL token price reflected supply and demand. Many of them lost their life savings as a result and are still putting their lives back together.

The more than 200 victim letters submitted in connection with sentencing are heartbreaking.  They reflect the devastating real-world impact that the defendant's fraud had on working people who trusted him to keep their savings safe. For example:

- He used my bitcoin to inflate the price of his printed CEL token and whilst insiders ran for the exits when the smoke alarm rang I stood firm inside believing the loans were secure when in reality Celsius operated as a hedge fund and crypto speculator . . . I was emotionally devasted into darkness followed by the shame of confronting all those I had convinced to invest in Celsius . . . My will to live remained only because I was a father to triplets and was responsible for their well-being.[16]

- I'm now 59 and lost my entire life savings (nearly 9 Bitcoin) in the Celsius bk case. Needless to say, at my age, it was absolutely devastating . . . I lost my apartment, I could no longer help my very sick mother, I had to liquidate everything else I owned just to scrape by. I literally had to 'camp' out of my vehicle for nearly a year until I could begin to get back on my feet. The suffering, depression, humiliation & despair was far beyond any jail term.  I implore the Court to impose the absolute maximum sentence permissible when sentencing Alex.  He still has no shame, no remorse nor any regret for robbing hundreds of thousands of victims out of billions of dollars.[17]

- [T]his man has robbed me of 40 years savings for our retirement.[18]

- The fallout from this fraudulent scheme has been utterly devastating. Financially, it has forced me to drastically alter my lifestyle.  Plans for retirement have been indefinitely postponed, my ability to provide for my children's education has been significantly compromised, and day-to-day financial decision are now fraught with anxiety . . . The betrayal I feel knowing that Mashinsky knowingly mislead investors like me—exploiting our trust for his own gain—is immeasurable.[19]

- The emotional toll has been overwhelming. . .  Celsius didn't just take my money; they stole my stability, my dreams, my family. . . It is crucial to understand that Mashinsky's actions didn't just affect our finances; they destroyed lives. He portrayed himself as someone we could trust, but his greed led us all to unimaginable suffering.[20]

---

[16] Stavropoulous, Dkt. 141-1 at 30.
[17] Butler, Dkt. 141-1 a 51.
[18] Penney, Dk. 141-1 at 61.
[19] Barett, Dkt. 141-1 at 41.
[20] Hernandez, Dkt. 141-1 at 57.

- Due to Alex's misrepresentation & blatant lies of how celsius was rehypothecating creditor's bitcoin, I lost my entire retirement savings, home, and am struggling to pay medical expenses.[21]

- Alex Mashinsky preyed upon the lowest hanging fruit—yearning people in need of financial success—which is why so many people were hurt by his actions. Myself included. . . Thousands of us are left scrounging and praying that we can get a tiny fraction of our previous claim returned.[22]

- I had placed all my cryptocurrency on Celsius Network because of statements made weekly by Mr. Mashinsky on his AMAs. I relied on what he said and he intentionally deceived me and misrepresented the facts. . . . I am a retired school teacher and I was counting on my cryptocurrency holdings to fund my retirement and to pass on to future generations. Mr. Mashinsky has changed my financial trajectory and that of my family. He will never understand the damage he has done to me and other victims.[23]

This is only a small sampling of the victim statements discussing the harm suffered by those who trusted Mashinsky.

Contrary to Mashinsky's claims, Mashinsky's victims were not made whole by the bankruptcy process. On its effective date, the restructuring plan in the bankruptcy showed that the total estimate for allowed claims, which entirely or almost entirely includes customer claims, was over $5 billion—meaning that customers lost access to over $5 billion worth of crypto assets when Celsius paused withdrawals. *See* Statement of Litigation Administrator, Dkt. 143-1 at 2-3. Even under the most conservative estimates, Celsius was missing at least $1.3 billion at that time—and turned out to be missing much more when some of Celsius's biggest outstanding loans turned out to be worthless. *Id.* at 3. The total liquid assets for distribution as of the plan effective date were valued at $2.873 billion, or 57.9% of claims, with another 21.3% coming from illiquid stock and recovery rights. *Id.* at 3-4. The shortfall from the total claims of Mashinsky's victims was more than $1 billion. *Id.* This distribution, which was far larger than what Celsius would have been able

---

[21] Dunn, Dkt. 141-2 at 54.
[22] Taras, Dkt. 141-1 at 109.
[23] Leonard, Dkt. 141-1 at 128.

to distribute as of the petition date, was made possible by both the efforts of the restructuring team to maximize value and because of the overall run-up in crypto prices over that time period—not by any efforts of Mashinsky.  But while Celsius's crypto assets continued to appreciate in value during the restructuring process, the claims of Celsius's customers had been converted into dollars as of the petition date. That means that Celsius got the benefit of the run-up in the crypto prices, but the customers' claims were locked in at the post-Pause lows.  If the customer assets that Celsius held on the bankruptcy petition date, then worth approximately $5 billion, were valued as of today's crypto prices, those same assets would be worth approximately $12 billion.  In real terms, therefore, Mashinsky's victims are out not just $1 billion—which would still make it one of the largest losses in the history of crypto—but the $7 billion they would have had but for Mashinsky's fraud.  *Id.* at 4.[24]

*Second*, Mashinsky's crimes were no accident, no momentary lapse, no isolated bad decision. They were a sustained, calculated campaign of deceit carried out over years, targeting ordinary people. From Celsius's inception, Mashinsky falsely presented the company as a safe and transparent alternative to traditional financial institutions, repeatedly assuring customers that their

---

[24] Contrary to the arguments made in his submission, Mashinsky did not play an instrumental role in formulating the restructuring plan. Celsius filed for bankruptcy in July 2022, and Mashinsky resigned two months later, in September.  Attorneys for Kirkland & Ellis, as representative of Celsius as the debtor in the bankruptcy proceeding, and for White & Case, representatives of first the Unsecured Creditors Committee ("UCC") and now the Litigation Trustee, confirm that Mashinsky had no involvement in developing or implementing the restructuring plan after he left in September 2022. Kirkland is also not aware of any truth to the suggestion that Mashinsky personally paid any of its fees, Def. Mem. Ex. B 36, and believes that would be very unusual. Moreover, while Mashinsky's victims had their assets tied up in the bankruptcy, Mashinksy and his wife mocked those very victims by marketing merchandise that said "Unbankrupt Yourself," a callous spin on Celsius's "Unbank Yourself" motto. Multiple victims describe their anger at seeing this merchandise. *See, e.g.*, Dkt. 141-1 at 23, 105; *see also* https://www.entrepreneur.com/business-news/celsius-ceos-wife-selling-unbankrupt-yourself-t-shirts/435508.

deposits were secure, liquid, and protected. Behind the scenes, he operated Celsius in precisely the opposite manner, engaging in reckless, high-risk investments, manipulating asset prices, concealing massive losses, and enriching himself personally at the direct expense of those who relied on his word. Worse still, Mashinsky's conduct reflects layer upon layer of calculated deceit. When internal data showed that Celsius was on the verge of insolvency, Mashinsky did not warn customers or change course. Instead, he doubled down on his lies: misrepresenting Celsius's balance sheet, concealing mounting losses, artificially inflating the price of CEL to prop up the company's image, and quietly liquidating millions of dollars of his personal holdings. Even in the final months before Celsius's bankruptcy, Mashinsky continued to extract wealth for himself, all while falsely assuring customers that their funds were safe.

*Third*, unlike defendants who commit fraud impulsively or under temporary financial pressure, Mashinsky had countless opportunities to stop, to disclose the truth, and to mitigate the harm. Each time, he chose instead to mislead the public, secure more deposits, and profit personally. His scheme did not collapse overnight; it was propped up by relentless, knowing deception, carried out month after month, year after year. This sustained, deliberate betrayal of trust makes Mashinsky's crime extraordinarily serious. Courts have long recognized that fraud offenses vary in severity depending on the defendant's motives, methods, and the degree of harm inflicted. Here, every factor cuts toward greater culpability: Mashinsky lied personally and persistently; he targeted vulnerable everyday customers; he plundered vast sums with no regard for the consequences; and he refused to take responsibility even after the devastating results of his fraud became plain.

Attempting to downplay the severity of his crimes, Mashinsky criticizes the Guidelines for their emphasis on loss amount. Loss amount is an important metric in ensuring just punishment

for white collar criminals. "One of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008). "[T]he sentencing guidelines sought to address the inequities of prior sentencing practices that tended to punish white collar economic crimes less severely than other comparable blue collar offenses." *United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009). In 2002, following major corporate fraud at Enron, WorldCom, and Adelphia, Congress instructed the Commission to amend the Guidelines for white-collar crime, this time as part of the Sarbanes-Oxley Act, and in response the Commission amended the modified loss-amount enhancement in Section 2B1.1 for high-loss cases — that is, cases involving loss amounts in excess of $200 million. *See* U.S. Sentencing Comm'n, Emergency Guidelines Amendments, 15 Fed. Sentencing Reporter 281, 283 (Apr. 1, 2003) ("[T]he amendment expands the loss table at §2B1.1(b)(1) to punish adequately offenses that cause catastrophic losses of magnitudes previously unforeseen, such as the serious corporate scandals that gave rise to several portions of the Act."), available at 2003 WL 22016909. Thus, to the extent Section 2B1.1 emphasizes loss amount to the degree it does, that was an intentional decision by the Commission based on years of consideration and guidance from Congress. *See United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006) ("Congress has directed that the Guidelines be a key component of sentence determination. . . . [T]he Guidelines reflect Congress's judgment as to the appropriate national policy for [white collar] crimes.").

Furthermore, in this case the loss amount is a particularly appropriate proxy for the severity of the crime. The losses did not result from a handful of rich victims making a large financial bet, nor from a single mistake by Mashinsky, but instead reflect hundreds of thousands of individual

investors who relied on misrepresentations that Mashinsky made over and over, for the course of years. The losses also resulted from Mashinsky misusing millions of dollars' worth of investor funds to manipulate the price of CEL through a manipulation scheme that involved thousands of market purchases over the span of years, and led unwitting investors to buy CEL at inflated prices while Mashinsky sold and made millions of ill-gotten gains. The losses here represent an amalgamation of harm to household after household, not an abstractly large number.

This Court should reject the defendant's attempts to shift blame for victim losses from his conduct to "market conditions" and his victims recovered through the bankruptcy process. Indeed, as the Litigation Administrator for the bankruptcy wrote the Court, much of what the defendant argues about the bankruptcy proceeding is false and self-serving. See also Offense Conduct, Section V, supra. The Litigation Administrator wrote:

> In conclusion, the financial toll of Mr. Mashinsky's illegal conduct is immense. It has caused hundreds of thousands of victims immeasurable emotional and financial hardship. Far from "indicat[ing] Alex's . . . commitment to [Celsius'] customers. . . ," Celsius' chapter 11 cases and Mr. Mashinsky's sentencing memorandum demonstrate his wanton and continued disregard for (1) the truth, (2) his responsibility to safeguard the hard-earned money entrusted to him, and (3) unwillingness to accept responsibility for his actions.

Statement of Litigation Administrator, Dkt. 143-1 at 4.

Nor can the defendant credibly argue that he had a "[l]ow-[l]evel of [c]ulpability." First, the defendant stipulated to the organizer and leadership enhancement in the plea agreement. That is for good reason—it was the defendant who was lying to the investors and it was the defendant who was leading and directing the manipulation of the CEL token. Second, the evidence contradicts the claim that the defendant was not predatory. The evidence showed over and over again that the defendant lied and manipulated CEL to his own personal benefit to the tune of tens of millions of dollars. He then used this money to fund his own lavish lifestyle. The defendant was not motivated by benevolence, but by greed.

As described above, Mashinsky's crimes consisted of a deliberate barrage of lies and manipulation that spanned months and hurt thousands of innocent victims. This was not a momentary lapse of judgment, nor could it be said to be a one-off unique act caused by market conditions. Instead, the consistent lying, the consistent manipulation, and the outright disregard for the impact on real people's lives, shows a callousness and seriousness that must be met with just punishment.

## II.    General Deterrence Requires a Significant Sentence

A significant term of imprisonment is also necessary to deter the defendant and others from committing similar crimes in the future.

Financial markets, whether traditional or digital, depend fundamentally on trust. Investors must be able to trust that when companies promise the safety of their funds, those promises are truthful. The cryptocurrency industry, in particular, remains a nascent and volatile market where public trust is fragile and where fraudsters have repeatedly sought to exploit both the lack of regulatory clarity and the enthusiasm of retail investors. There is often an unjustified sense that traditional laws do not apply in this new landscape. But while cryptocurrency involves new technology and new risks, and while the intricacies of the applicable regulatory regimes are still being developed, cryptocurrency does not carry a license to commit fraud. In such an environment, general deterrence is not merely important; it is essential.

Without meaningful deterrence, financial crime may be seen as a rational choice. The allure of enormous personal wealth secured quickly, often in untraceable digital assets, is powerful. Individuals operating in emerging financial spaces like cryptocurrency may believe they can deceive investors, extract personal profit, and escape meaningful accountability simply by claiming that innovation or market forces caused their collapse. Only a severe sentence can dispel this dangerous illusion. Only a severe sentence can make clear that lying, stealing, and

manipulating markets under the guise of financial innovation is still lying, stealing, and manipulating, and will be punished accordingly. A significant sentence for Mashinsky will serve as a critical warning to other entrepreneurs, executives, and promoters in the cryptocurrency industry and in any future industry as-yet unconceived: that fraud will be punished severely, regardless of the technology or industry in which it occurs.

Moreover, general deterrence is particularly vital in cases like this, where the fraud was deliberate, sophisticated, lucrative, and "difficult to detect and punish" since such "attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it." *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994); *see also United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (quotation marks and citation omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). Mashinsky did not make an isolated mistake. He knowingly and repeatedly chose to deceive thousands of customers, for years, while personally enriching himself. Allowing such a massive and brazen fraud to result in anything less than a substantial sentence would send exactly the wrong message: that if a fraud is clever enough, dressed up in the language of disruption or decentralization, it will be excused or minimized. The Court should reject that notion emphatically.

The need for general deterrence is also greater where, as here, the defendant targeted unsophisticated retail investors, rather than institutional funds or professional traders. Mashinsky did not defraud venture capital firms or hedge funds with teams of analysts and risk managers. He preyed on ordinary individuals who relied on his promises of safety and financial security. These victims placed their trust in Mashinsky because they believed his repeated assurances that Celsius

was fundamentally different from Wall Street. In fact, it was worse. When financial crimes devastate vulnerable retail investors, the damage ripples far beyond individual balance sheets; it undermines public confidence in markets as a whole. A substantial sentence is therefore necessary not only to punish Mashinsky, but to protect the integrity of the financial system and to make clear that those who exploit public trust for personal gain will face the most serious consequences.

### III.    Specific Deterrence and the Defendant's Failure to Fully Accept Responsibility Require a Serious Sentence

Specific deterrence also requires a significant sentence here, especially in light of Mashinsky's continuing refusal to accept responsibility for his crimes. Mashinsky appears to have carefully crafted his plea allocution so that he could satisfy the elements of the offenses with the narrowest possible admissions. He then submitted a preposterous counter-narrative to Probation that minimized his own conduct and blamed others, PSR ¶¶ 123-141, and he has continued to minimize his crimes through his objections to the PSR and his sentencing submission. In doing so, he has all but walked away from the factual stipulations in his Plea Agreement.

The Guidelines make clear that acceptance of responsibility is about more than pleading guilty. Note 1(A) of the commentary to § 3E1.1 provides that in considering acceptance of responsibility, an appropriate consideration includes "truthfully admitting the conduct comprising the offenses, *and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under 1B1.3. . . . A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility*, but the fact that a defendant's challenge is unsuccessful does not necessarily establish that it was either false or frivolous."  (emphasis added). Similarly, Note 3 provides: "Entry of a plea of guilty prior to the commencement of trial *combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely*

*denying any additional relevant conduct for which he is accountable under 1B1.3,* will constitute significant evidence of acceptance of responsibility for the purposes of subsection (a). However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right." (emphasis added). The Second Circuit has also held that where, as here, the defendant's "carefully worded plea allocution … muted the gravity of his complicity in the securities fraud offenses," and where the defendant "objected to the PSR on various grounds related to evidence tampering and fraudulent transactions during his tenure at [the company], but then withdrew those objections during the course of the *Fatico* hearing, implicitly acknowledging that his objections lacked merit." *United States v. Kumar*, 617 F.3d 612, 636 (2d Cir. 2010).

Mashinsky's failure to accept full responsibility for his crimes raises concerns about whether, absent a serious sentence, he will recognize the magnitude of his crimes and be deterred from returning to fraud if given the opportunity. Mashinsky's sentencing submission shows that he has not truly reckoned with what he did, and he has shown remorse only for the fact that his scheme unraveled and he was caught. If Mashinsky cannot admit the full scope of his crimes, there is no reasonable assurance that he will not commit them again.

Moreover, Mashinsky's statements during the course of the fraud show that he has no respect for the law and is not, like most citizens, deterred by the mere prospect of consequences for his illegal actions. Mashinsky was brazen enough to falsely state in an AMA that Celsius does not make uncollateralized loans, and then assure his investors that the statement was true because "this will be fraud to say that. It will be fraud for me I'll probably go to jail if I said that and it was untrue okay?" PSR ¶ 55(c). He knew he faced jail for his lies, but he lied anyway, because

of greed.  Mashinsky calculated that the risk of jail was outweighed by the money he could bring into Celsius, which he then used to make himself wealthy.  There is no reason to believe that, absent a serious sentence, his calculus will ever change.

Nor will the prospect of forfeiting his ill-gotten gains suffice to deter Mashinsky from future misconduct.  While he made over $48 million from his unlawful scheme, he spent most of that money on his lavish lifestyle, and it is unlikely his victims will ever be able to recover the full amount.  He has shielded most of his substitute assets by putting them into an elaborate system of trusts that—while purportedly organized for the benefit of his children—continue to cover Mashinsky's own living expenses with the consent of the trustee, Mashinsky's sister.  And even as Mashinsky claims to have agreed to forfeit the assets that the Government traced directly to the proceeds of his crimes, his wife has asserted that she has a superior claim to the property, which, if credited, will reduce what the Government seizes and returns to Mashinsky's victims.  Thus, even with the financial consequences of his guilty plea, Mashinsky will continue to be a very wealthy man, and could easily conclude that crime does pay, after all.

## IV.    A Sentence of at Least 20 Years is Necessary to Avoid Sentencing Disparities

A sentence of at least 20 years is also necessary to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  A 20-year sentence is consistent with other significant fraud prosecutions in this District and across the country. Defendants who, like Mashinsky, caused catastrophic financial harm through deliberate lies and self-enrichment have routinely received lengthy sentences. Bernard Madoff was sentenced to 150 years for his Ponzi scheme; Sam Bankman-Fried recently received a 25-year sentence for his multibillion-dollar fraud against customers and investors; and there are several other similarly situated defendants who received sentences of 20 years or more.

While each case is unique, the common thread is clear: defendants who steal billions of dollars through calculated deceit deserve decades, not years, in prison. In light of Mashinsky's personal enrichment, ongoing lack of remorse, and the devastation he caused to ordinary victims, a 20-year sentence is in line with sentences imposed in other similar cases. Indeed, Probation notes that from 2019 to 2023, there were 34 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 43 and a Criminal History Category of I. The average length of imprisonment imposed was 197 months and the median length of imprisonment imposed was 180 months.[25]

Mashinsky rightly recognizes that the most obvious comparator to his own case is the case of Bankman-Fried, another prominent crypto executive whose billion-dollar company was revealed to be a giant fraud after the crypto market dropped in 2022. Judge Kaplan imposed a sentence of 25 years on Bankman-Fried. Mashinsky is correct that there are differences between his case and Bankman-Fried's, but they do not support the conclusion that Mashinsky deserves substantially less punishment. Mashinsky is correct that he pled guilty whereas Bankman-Fried exercised his right to trial, but this seems to have been merely a difference in tactics, as Mashinsky can hardly be said to have recognized the error of his ways when he largely contests that he made any errors at all. In addition, while Bankman-Fried enriched himself by directly misappropriating investor funds while Mashinsky took the more indirect route of misappropriating investor funds to manipulate the price of CEL, and then enrich himself by selling his CEL into the market, both defendants treated investor funds as their own money and enriched themselves at investors' expense. There are also aggravating factors that weigh in favor of a *higher* sentence for Mashinsky,

---

[25] As defendant notes, for the years 2020 through 2024, the median length of prison imposed was 138 months and the average length of prison imposed was 158 months' imprisonment. https://jsin.ussc.gov/analytics/saw.dll?Dashboard.

including the fact that he personally enriched himself to a greater degree than Bankman-Fried, and did not even pretend to have altruistic motives for his unlawful behavior (as Bankman-Fried had claimed). And while Bankman-Fried was in his 20s and argued that his actions were attributable to youth and inexperience, Mashinsky, who is in his 60s, was indisputably old enough and experienced enough to better appreciate the crimes he was committing. The 25-year sentence for Bankman-Fried is therefore a meaningful data point for the Court to consider.

Defendant's reliance on the sentence imposed by Judge Ramos in *United States v. Milton* is misplaced. In *Milton*, the defendant's misstatements resulted in selling stock to investors at an inflated price. This stands in far contrast to the defendant's conduct, which lured retail investors to place their life's savings onto the Celsius's platform where they trusted the defendant to keep it safe. No investor came forward who had invested his or her entire life savings in Milton's company, whereas Mashinsky's scheme was designed for investors to do just that. Milton's case also involved hundreds of millions in losses, whereas the losses here are in the billions. A far more apt comparator is the 20-year sentence that Judge Ramos imposed in *United States v. Greenwood*. That case involved the co-founder of the cryptocurrency OneCoin. Misrepresentations by the defendant caused 3.5 million victims to input $4 billion worldwide into the fraudulent cryptocurrency. That sentence is an appropriate analogue given the similarities in scope and scale of the retail harm caused by the respective defendants.

Further, on April 23, 2025, Judge Castel imposed an 18-year sentence in *United States v. Austin*. The defendant in that case fraudulently offered services related to the cryptocurrency industry and caused more than $12 million in losses to more than two dozen victims. And outside the crypto context, Judge Vyskocil recently imposed a 25-year sentence in *United States v. Ilori*, in which the defendant defrauded the Government out of millions of dollars in a COVID-19 loan

fraud scheme. And in a market manipulation scheme pursued by billionaire investor Bill Hwang, Judge Hellerstein imposed a sentence of 18 years' imprisonment.

In sum, this case is on par with other white-collar crimes that have been met with sentences at and above 15 years. Given the number of aggravating factors here, the Government respectfully recommends a sentence of at least 20 years.

## **CONCLUSION**

Alexander Mashinsky committed a massive fraud: through calculated deception and exploitation, he inflicted catastrophic financial and emotional harm on thousands of victims. He enriched himself while destroying lives, and even today refuses to acknowledge what he did. For these reasons, the Government respectfully submits that the Court should impose a substantial term of imprisonment, in an amount of at least 20 years, to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford effective deterrence.


Dated: New York, New York
       April 28, 2025                              Respectfully submitted,

                                                   JAY CLAYTON
                                                   United States Attorney


                                           By: _____
                                                   Peter J. Davis
                                                   Adam S. Hobson
                                                   Allison Nichols
                                                   Assistant United States Attorneys

97