Message

| | |
|---|---|
| **From:** | yarden.noy@celsius.network [yarden.noy@celsius.network] |
| **Sent:** | 9/5/2021 1:52:33 PM |
| **To:** | 'Yaron Shalem' [yaron.shalem@celsius.network]; 'Roni Pavon' [roni@celsius.network] |
| **CC:** | yarden.noy@celsius.network |
| **Subject:** | Trading Snapshot - Working Draft for DD |
| **Attachments:** | Celsius Trading Snapshot_Working Draft.docx |

@Roni Pavon (roni@celsius.network) – how do you feel about sharing this with Signature as a working draft as part of the DD for bank account?

Thanks
YN

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
SUBJECT TO JANUARY 13, 2023 STIPULATION

CELSIUSNETWORK_02440721

**Trading Guidelines**
**(for the purposes of these guidelines, "Celsius" includes any affiliated entities):**

1. **Celsius selling CEL**:
   a. **Securities offering requirements**: make sales in accordance with U.S. requirements on securities offerings and in compliance with exemptions from registration. For example, the Reg S exemption would be utilized for sales that are made outside the US, and Section 4(a)2 would be utilized with respect to sales within the US (limited to accredited investors, no general solicitation, etc.).
      i. The same requirements apply to both selling on an exchange and through privately-negotiated sales.
   b. **Timing**: do not make sales on exchanges at the same time as Celsius is making purchases in the market.
      i. Generally, simultaneously trading on both sides of the market is problematic (and can be viewed as "wash trades" or "spoofing") and should be avoided.
   c. **Disclosures**: provide the market with a consistent level of information (e.g., volume of sales, token price, etc.) and on a regular periodic basis.
      i. The Company should disclose as much as it deems reasonable, so long as those disclosures remain consistent over time.
   d. **Use of exchanges**: avoid using decentralized exchanges and centralized exchanges that serve U.S. persons for sales, as it may not be possible to identify the accredited investor status or jurisdiction of the counterparty.
      i. It is permissible, though, to use centralized exchanges that appear to have strong procedures to restrict access by Americans.
   e. **Privately negotiated trades (referred to by the Company as OTC)**: engage in occasional block sales on a negotiated basis (including managing potential information disparities through disclosures pursuant to NDAs and "Big Boy Letters").
      ii. The Company may quote freely, i.e., it is not required to quote the market.
   f. **MNPI**: the Company should restrict selling when it is in possession of MNPI:
      i. The same rules and restrictions regarding not trading when in possession of MNPI should equally apply to the trading of any derivatives of CEL as well.
      ii. The Company should continually understand that any MNPI that it may have derived from an external third-party source to whom it owes a duty of confidentiality would prohibit the Company from trading CEL.
      iii. The Company can engage in privately negotiated transactions with the use of "Big Boy Letters" when in possession of MNPI (subject to rarer cases where trading would not be reasonable due to the Company being in the possession of MNPI relating to major upcoming events). While Big Boy Letters may be effective in reducing risk with respect to claims by sophisticated or professional counterparties who initiate transactions with the Company, they do not obviate all risks as the regulators might not view them as effective in avoiding enforcement actions.
      iv. In order to permit continued trading, the Company could implement information barriers between the traders and the rest of the Company. However, this would only be workable if the traders had complete discretion within certain parameters. Thus, using "blind" traders only works if their decision-making—both directly (explicit instructions from management) and indirectly (general strategic guidance from management)—is independent from those in possession of MNPI.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
SUBJECT TO JANUARY 13, 2023 STIPULATION

CELSIUSNETWORK_02440722

2. **Celsius buying CEL**
    a. **Guidelines to follow before hardwiring becomes automated (Phase I):** until the hardwired purchases begin, as described below, the Company should establish a predetermined formula for purchases and follow this formula on a regular schedule; effectively, a manual implementation of what the hardwired process will ultimately be. Similarly, a limited disclosure of this approach should be shared with the public as would be done with the official hardwired process.
        i. **Timing**: It is best to spread these purchases over time in a way that would limit market disruptions.
        ii. **Exchanges**: Purchases should be made on only one exchange per day, but the Company may make purchases on multiple exchanges over the course of multiple days (as long as the one exchange per day rule is observed).
        iii. **Disclosures**: Disclosures should occur on a consistent basis with the same level of information each time and in the manner described above in Section 1.c.
    b. **Automated/hardwired purchases (Phase II):** make "hardwired" purchases on the open market, such that the amount of CEL required by the Company's platform is automatically purchased regardless of market activity, and where the Company has disclosed with some specificity the nature of this relationship and mechanism.
        i. **Amount**: The amounts can be less than 100%, permitting a discretionary portion that can be taken from Treasury or otherwise negotiated, without suspending the program. Adjustments *should* be avoided more than once each year, though the program can always be suspended.
        ii. **Timing**: It is best to spread these purchases over time in a way that would limit market disruptions (e.g. purchasing small tranches at predetermined/variable but non-discretionary times). However, the Company does have some latitude to set up the automatic purchase parameters as it sees fit.
        iii. **Exchanges**: Purchases should be made on only one exchange per day, but the Company may make purchases on multiple exchanges over the course of multiple days (as long as the one exchange per day rule is still observed).
    c. **Privately negotiated trades (referred to by the Company as OTC)**: engage in occasional block repurchases on a negotiated basis (including managing potential information disparities through disclosures pursuant to NDAs and "Big Boy Letters").
        i. The Company may quote freely, i.e., it is not required to quote the market.
    d. **Buy-back programs**: make purchases in accordance with similar practices for U.S. public companies engaging in stock buy-backs, including:
        i. disclosing upcoming purchases (approximate amount and period), as well as how purchases will be effected (OTC vs on an exchange); privately negotiated transactions need not be disclosed in advance, but should be taken into account when reporting the Company's overall numbers;
        ii. ensure that total purchases—cumulative for *all* Company purchases of CEL (i.e., including from privately negotiated transactions and Insider Employees (as defined below))—in any given week are below 10% of the total outstanding CEL;
        iii. ensure that purchases and sales are made for legitimate business purposes and are not made for the purpose of causing an artificial price or manipulating the market; and
        iv. Transactions not at market price are ok, and their respective prices do not need to be disclosed.

|US-DOCS\123824532.12||

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
SUBJECT TO JANUARY 13, 2023 STIPULATION

CELSIUSNETWORK_02440723

   e. **Use of exchanges**: decentralized exchanges may be used for purchases, as there is no need to confirm that the counterparty is an accredited investor if executed in the U.S.
   f. **MNPI**: the Company should restrict purchasing when it is in possession of MNPI, unless the purchase is hardwired as described above (subject to cases in which MNPI relates to particular events such that even hardwired trading would not be reasonable in the circumstances—which we would expect would occur in limited scenarios as compared to non-hardwired activity). Purchases should follow the same guidance regarding sales above in Section 1.f.
   g. **Other purchases or sales by the Company**: Any other ad-hoc transactions *must* conform to the guidance above.

       i.

3. **Employees, Insider Employees and Affiliated Entities trading CEL tokens**:
   a. **Direct repurchase**: permit Celsius to repurchase directly from Employees, Insider Employees and Affiliated Entities, assuming there is no informational/MNPI asymmetry with the relevant persons.
       i. "Big Boy Letters" can be utilized to address these asymmetries and help reduce risk. However, as noted above, there remains some regulatory enforcement risk with respect to the use of these approached by agencies such as the SEC or CFTC, as they might not regard them as effective.
   b. **"Insider Employees":** Includes founders, directors, controlling shareholders and senior executives (being those officers intimately involved in senior managerial decisions, which should include at least the CEO, COO, CTO, CFO, Chief Revenue Officer, and Chief Investment Officer). Such persons should be specifically designated by Celsius and subjected to training in these procedures.
       i. The actions of Insider Employees could be considered the same as actions taken by Celsius. Thus, they should abide by the following guidelines:
           1. <u>Securities offering requirements</u>: make sales in accordance with U.S. requirements on securities offerings and in compliance with exemptions from registration. For example, the Reg S exemption would be utilized for sales that are made outside of the U.S., and Section 4(a)(2) would be utilized with respect to sales within the U.S. (limited to accredited investors, no general solicitation, etc.). The same requirements apply to both selling on an exchange and through privately-negotiated sales.
           2. Do not trade on both sides of the market at once i.e., engage in wash trades, which could be or be perceived as "spoofing."
           3. Occasional block repurchases are permitted on a negotiated basis (including managing potential information disparities through "Big Boy Letters"). Insiders may quote freely, i.e., they are not required to quote the market.
           4. Avoid using decentralized exchanges and centralized exchanges that serve U.S. persons for sales. Using those for purchasing CEL, though, is ok.
       ii. Each Insider Employee should limit open market (on-exchange) sales to no more than 1% of the total outstanding CEL per quarter. Sales in privately negotiated transactions (such as in the U.S. with an accredited investor counterparty) would not be included in this calculation.

|US-DOCS\123824532.12||

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
SUBJECT TO JANUARY 13, 2023 STIPULATION

CELSIUSNETWORK_02440724

    c. **Other employees**: Employees who have not been designated as Insider Employees would be exempt from the above trading restrictions. However, all such persons should be aware of the general prohibitions on insider trading, fraud, and market manipulation, and they should be alert for any such occurrence over the course of their employment.
        i. Non-Insider Employees may sell CEL on DeFi.
    d. **MNPI:** as noted above, all individuals should receive training to the effect that if they trade CEL on MNPI, they could expose themselves to liability for insider trading.
        i. The same rules and restrictions regarding not trading when in possession of MNPI should equally apply to the trading of any derivatives of CEL as well.
        ii. If the MNPI is derived from an external third party source to whom a duty of confidentiality is owed by the Company and/or the individuals, Celsius and the individuals would not be able to transact at all on such MNPI.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
SUBJECT TO JANUARY 13, 2023 STIPULATION

CELSIUSNETWORK_02440725