P58KMASS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                              23 CR 347 (JGK)

5   ALEXANDER MASHINSKY,

6                                            Sentencing
                 Defendant.
7   ------------------------------x

8
                                            New York, N.Y.
9                                           May 8, 2025
                                            11:15 a.m.
10

11  Before:

12                  HON. JOHN G. KOELTL,

13                                          District Judge

14                          APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    ALLISON C. NICHOLS
17  ADAM SLOAN HOBSON
    PETER J. DAVIS
18       Assistant United States Attorneys

19  MUKASEY YOUNG LLP
         Attorneys for Defendant
20  BY:  MARC L. MUKASEY
         TORREY K. YOUNG
21       MICHAEL F. WESTFAL
         SAL H. CHAN
22
    Also Present:
23
    Brandon Racz, FBI
24

25

P58KMASS

1          (Case called)

2          MS. NICHOLS:  Allison Nichols, Adam Hobson, and Peter

3    Davis, for the government, together with Special Agent Gurdeep

4    Singh, of the FBI, and two paralegals from the U.S. Attorney's

5    Office, Emily Cho and Anna Gamboa.

6          Good morning, your Honor.

7          THE COURT:  Good morning.

8          MR. MUKASEY:  Good morning, Judge.  Marc Mukasey, from

9    the firm Mukasey Young, for the defendant, Alex Mashinsky.  To

10   my left is my colleague, Mike Westfal; to his left is Torrey

11   Young; to her left is the defendant, Mr. Mashinsky; and all the

12   way at the end is our paralegal analyst, Sal Chan.

13         THE COURT:  Okay.  Good afternoon, all.

14         There is an agreed-upon forfeiture in this case.  I

15   signed a preliminary order of forfeiture, correct?  Yes?

16         MR. HOBSON:  That's correct, your Honor.

17         THE COURT:  Is it necessary for me to sign the final

18   order of forfeiture today?

19         MR. HOBSON:  Not today, your Honor.  We'll be

20   submitting that in the future.  We're, as you know, negotiating

21   some aspects of it.

22         THE COURT:  Okay.

23         Defense agrees with that?

24         MR. MUKASEY:  Yes, Judge.

25         THE COURT:  All right.

P58KMASS

1          I have received the presentence report, prepared

2     January 27, 2025, revised March 5, 2025.

3          I've reviewed the defense submissions, dated April 17,

4     2025, including the 41 letters of support, and the reply

5     submission, dated May 2, 2025, and the letter, dated May 6,

6     2025.

7          I've also reviewed the 101 objections to the

8     presentence report filed by the defendant, marked Exhibit B,

9     which were filed along with his original submission.

10          I've also reviewed over 200 victim statements filed by

11     the government, including the recent submissions on May 2,

12     May 7, and May 8, 2025.

13          I've also reviewed submissions by the government on

14     April 23 and April 30, 2025, containing letters on behalf of

15     the litigation administrator of the Celsius bankruptcy and a

16     member of the litigation oversight committee for the Celsius

17     Bankruptcy Estates.

18          Before listening to defense counsel, the defendant,

19     and the government, as well as any victims, all of whom can

20     address particularly the 3553(a) factors set out in the

21     statute, it's useful, at the outset, to set out the Court's

22     findings with respect to the submissions that have been made

23     and the applicable sentencing guidelines so that the parties

24     can then address the 3553(a) factors.

25          There is no question that the total offense level in

P58KMASS

1    this case is 43 and the criminal history category is I.  That

2    is the agreed-upon guidelines calculation in the plea

3    agreement, and the parties have agreed to that.

4           Under the guidelines, the guideline sentencing range

5    would be life.  However, the guideline sentencing range is

6    capped by the maximum penalties for the two crimes to which the

7    defendant pleaded, a total maximum sentence of 360 months.

8    Therefore, the guideline sentencing range is 360 months'

9    imprisonment — 30 years.

10          The parties also agreed in the plea agreement to

11   various enhancements to the basic guideline sentencing range.

12   These included:  An increase of 30 levels because the actual

13   loss from the offense exceeded $550 million.  Indeed, in its

14   submission, the defense concedes that it subscribes to a

15   "reasonable loss estimate of $590 million based on the

16   statement Mashinsky submitted in the bankruptcy."  Exhibit B to

17   defense submission, at 67.

18          The parties also agreed to an enhancement of two

19   levels because the offense involved ten or more victims.

20          The parties also agreed to a two-level enhancement

21   because the offense involved sophisticated means.

22          The parties agreed to a four-level enhancement because

23   the defendant was an organizer or leader of a criminal activity

24   that involved five or more participants.

25          The parties also agreed to a two-level enhancement

P58KMASS

1  pursuant to Section 3B1.3 of the guidelines because the

2  defendant abused a position of public or private trust, or used

3  a special skill in a manner that significantly facilitated the

4  commission of the offense.

5          The Court notes that the presentence report mistakenly

6  refers to this guideline in the plea agreement as "3B1.2,"

7  while the correct reference, which is correct in the plea

8  agreement, is to 3B1.3.  And the Court will correct the

9  presentence report at page 6.

10         The parties also agreed that the defendant will

11  forfeit in excess of $48 million, as well as nine specific

12  assets traceable to the commission of the securities fraud

13  alleged in Count Five.

14         The Court reviews some of these salient points in the

15  plea agreement, not because the Court is bound by the plea

16  agreement, but because the Court is actually not bound by the

17  plea agreement, and the Court has to make an independent

18  determination of the appropriate guidelines in the case.  But

19  because none of the parties argue that the guidelines are

20  incorrect or that there is any reason to depart from the

21  guidelines, the guidelines are, plainly, significant.

22         The parties have the right to argue for a sentence

23  different from that provided in the guidelines pursuant to the

24  relevant sentencing factors provided in 18 U.S.C.

25  Section 3553(a), but the guideline calculation was agreed to by

P58KMASS

| 1 | the parties, and the Court independently finds that the |
| 2 | guideline calculation is correct. |

3         I go through all of this because many of the
4    defendant's arguments are inconsistent with the parties'
5    agreement as to the guidelines and the evidence submitted in
6    connection with sentencing.

7         The defendant, seemingly, at various points, seeks to
8    limit his criminal conduct to the two false statements to which
9    the defendant pleaded guilty specifically, namely, his
10   statement in December 2021, in violation of the commodities
11   fraud statutes, as alleged in Count Two, that, "Celsius had
12   received approval from regulators," even though he knew that
13   was not true.  Plea transcript, at 25.

14        The second false statement was a statement in
15   violation of the securities fraud statutes charged in
16   Count Five in September 2019 that he failed to disclose that he
17   was selling his CEL token holdings even though he represented
18   to the public, using electronic communications and wires, that
19   he was not selling.  *Id.*  And, indeed, in his letter to the
20   Court, he only explicitly regrets the two false statements at
21   the plea allocution without reference to the millions of
22   dollars of loss from his frauds.  Defendant Exhibit T,
23   ECF No. 149-1.

24        The defendant does not explain how there could be an
25   agreed-upon actual loss of $590 million solely from the two

P58KMASS

```
1   specific statements that he admitted to making, in violation of

2   Counts Two and Five, at the plea allocution and to which the

3   defendant pleaded guilty, without including relevant conduct,

4   which is detailed at length in the presentence report.

5           The defendant also fails to explain how the

6   agreed-upon amount of forfeiture for his gain from the

7   securities offense in Count Five could be in excess of

8   $48 million plus the specific properties, when the actual gain

9   from the actual sale that he falsely denied was only $53,000.

10  Government April 28, 2025 memo, at 64.

11          The Court has carefully considered the defendant's

12  objections to the presentence report and overrules them, except

13  that the Court will strike paragraphs 41 and 43(d) as

14  insufficiently supported.  The Court will also correct

15  paragraph 56(a) of the presentence report, in lines 5 and 6, to

16  note that the email is from Mashinsky to Cohen-Pavon and not

17  from Cohen-Pavon to Mashinsky.

18          The Court notes that the objections to the presentence

19  report in Exhibit B do not change the guideline calculations,

20  and will not change the sentence.

21          The Court also notes that the Court has carefully

22  reviewed the submissions of the parties, and neither party has

23  sought a *Fatico* hearing with respect to the objections.

24  Indeed, the defense argues, "A *Fatico* hearing is unnecessary.

25  There is no dispute between the parties about the statutory
```

P58KMASS

maximum, the application of the guidelines, or the stipulated

guidelines range in the plea agreement.  The objections, many

of which are made for completeness and accuracy, can be

resolved under Section 3553(a) based on the submissions and/or

should not affect the sentence."

Of course, the Court will listen to the parties, after

the Court is finished this introduction, with respect to all

arguments concerning the appropriate application of the 3553(a)

factors, but some additional comments are appropriate, given

the number of objections raised by the defense.

To the extent that the objections are based on alleged

completeness, it is unnecessary to amend the presentence

report.  The Court has considered the objections, and they do

not make the statements in the presentence report false or

misleading.

Examples abound as to how suggested changes by the

defense do not change the substance of the presentence report

and how the presentence report supports the guideline

calculation agreed to by the parties.

The defense suggests rewording paragraph 22 to read,

"Mashinsky misrepresented, among other things, the regulatory

approval status of Celsius and his sale of CEL token holdings,"

thereby conceding that his misrepresentations were not limited

to the two specific statements in Counts Two and Five.

In paragraph 23, the defense suggested deleting the

P58KMASS

penultimate sentence, but would leave the rest of the

paragraph, including the statement "Mashinsky made false and

misleading statements in the Ask Mashinsky Anything (AMAs), and

Celsius' employees from multiple defendants began to review the

AMAs after they had aired false and misleading statements by

Mashinsky and, at times, edited Mashinsky's misrepresentation

out of the recorded version of the AMAs posted to the

internet."  Again, this concedes that the defendant made false

representations in addition to the two false statements in the

plea allocution.  The alleged objection also leaves the final

sentence:  "Neither Mashinsky, nor Celsius issued corrections

to notify the public and those who had watched the live

recorded versions of the AMAs that certain of Mashinsky's

statements were untrue or misleading."

        The defense objected to portions of paragraphs 26 and

29 through 34 concerning false statements by the defendant in

connection with the alleged $50 million raised in the initial

coin offering, or ICO, but did not object to paragraphs 27 and

28, which include the statement, "Contemporaneous with and

after the ICO, Mashinsky falsely and publicly stated that

Celsius had raised the full $50 million, meaning that Celsius

had sold all the CEL tokens it had made available for sale to

the public through the ICO."  The surrounding paragraphs

explain why this was untrue — because a significant amount of

the tokens were sold to an entity controlled by the defendant

P58KMASS

1  and not to the public.

2          The defendant objected to portions of paragraph 50

3  that explained that the defendant "falsely and repeatedly"

4  claimed that Celsius earned yield by deploying customers'

5  crypto assets in a safe and secure manner, but did not object

6  to that portion of paragraph 50 that asserted that "Mashinsky

7  downplayed the risks to which Celsius customers were exposed

8  through investing their crypto assets with Celsius by assuring

9  them that Celsius was not making 'directional bets,' that is,

10  gambling on the future in various crypto assets, but, instead,

11  was earning yield with Celsius customer funds through a

12  market-neutral strategy that did not depend on the prices of

13  particular crypto assets rising or falling."

14          The defendant also did not object to certain

15  paragraphs in the presentence report that showed that the

16  defendant was aware of directional trading despite the

17  statements to the contrary — see paragraphs 50(a) and

18  (b) — referring to 2019 trades of which the defendant was

19  aware, paragraphs 50(c), 50(d), and 50(e), other incidents to

20  which there is no objection.

21          "And there is no objection to paragraph 52."  After

22  the events of late January 2022, including an internal

23  investigation and presentation, Mashinsky continued to falsely

24  state that Celsius did not engage in directional trading.  As

25  late as April 2022, Mashinsky stated, during a CNBC interview,

we are not what we call a data-neutral -- "We are what we call
a data-neutral strategy.  Celsius doesn't bet on the market
going up or down."

In paragraph 53 of the presentence report, the
probation department reported that, "Mashinsky repeatedly and
falsely claimed that all of the loans extended by Celsius were
either fully or partially collateralized, and that Celsius did
not offer uncollateralized loans to counterparties, which
Mashinsky touted as evidence that Celsius earned yield using
Celsius customers' assets in a conservative, safe, and secure
fashion."

Mashinsky only objected to the word "falsely," and
attempted to justify the claim by the assertion that others
made similar statements.  But the evidence indicates that
Celsius did make uncollateralized loans, and the statements to
the contrary were false.  And the fact that others made similar
statements does not make the statements true.  Indeed,
Mashinsky does not dispute the portion of paragraph 54 of the
presentence report that shows the statements were false.

In paragraph 56 of the presentence report, the
probation department reported that "Mashinsky repeatedly and
falsely claimed that Celsius had never had an institutional
borrower default on a loan.  As Mashinsky knew, multiple
institutional borrowers had defaulted on their loans from
Celsius by the time that Mashinsky was publicly stating

P58KMASS

1    otherwise."

2           While the defense objects to the terms "repeatedly"

3    and "falsely," the defense does not object to the rest of the

4    statement, and there is evidence that the defendant's

5    statements were false.

6           In support of the allegation of falsity, the probation

7    department refers to an email at paragraph 56(a), lines 5 to 6.

8    The email was incorrectly attributed to Cohen-Pavon to

9    Mashinsky, while it should be from Mashinsky to Cohen-Pavon,

10   but it supports the paragraph, and the Court will direct that

11   the paragraph in the presentence report be corrected.

12          The defendant did not object to paragraph 66 of the

13   presentence report that states, "In the lead-up to the June 12,

14   2022 pause, Mashinsky sought to allay Celsius' customers

15   concerns about the solvency of the platform by publicly stating

16   that he, like Celsius' customers, held an amount of his own

17   wealth on the Celsius platform and was keeping his assets with

18   Celsius.  Mashinsky was secretly withdrawing his own assets."

19          The defendant does not deny or object to the statement

20   in the PSR, but contends that the PSR, the presentence report,

21   should contain a statement that the defendant was withdrawing

22   funds to pay income taxes.  But the defendant's reason for the

23   withdrawal does not change the substance of the statement in

24   the presentence report.

25          In paragraphs 86, 87, and 88, the defendant objected

P58KMASS

1    to certain characterizations of Celsius' purchases of CEL

2    tokens, but did not object to the statement that between

3    July 2020 and the end of 2020, the defendant made public

4    statements that Celsius was purchasing CEL in the market

5    primarily to fulfill rewards obligations, and not revealing

6    that Celsius was actually buying CEL well in excess of the

7    amounts needed for weekly rewards to artificially support the

8    price.

9         While the defendant objected to part of paragraph 89,

10   he did not object to the portion of paragraph 89 that stated,

11   "In addition to causing Celsius to purchase volumes of CEL for

12   the purpose of artificially supporting and inflating CEL's

13   price, at times Mashinsky personally purchased CEL using his

14   own accounts and wallets."

15        The defense did not object to the statement in

16   paragraph 98 of the presentence report that stated that,

17   "During an AMA in March 19, 2021, Mashinsky misrepresented the

18   nature and extent of Celsius' market activity and artificial

19   control over CEL price."

20        The PSR, in paragraph 110, states, "Mashinsky

21   repeatedly made false and misleading public statements

22   regarding his own personal CEL trading activity, including, in

23   certain instances, claiming that he had not been selling CEL,

24   when he had been selling large volumes of his CEL prior to and

25   immediately following these statements."  The defendant did not

P58KMASS

1   dispute the statement except to object to the words "large

2   volumes."

3           The Court reviews these statements and objections to

4   indicate that the conduct supporting the guideline calculations

5   was more than sufficient to support the guideline calculations

6   of an offense level of 43, a Criminal History Category I, and a

7   guideline sentencing range of life.

8           The defendant has suggested a sentence of imprisonment

9   of a year and a day.  The probation department has suggested a

10  sentence of 180 months' imprisonment.  And the government has

11  suggested a sentence of at least 240 months' imprisonment.

12          The appropriate sentence requires a careful

13  consideration of the factors set out in Title 18, United States

14  Code, Section 3553(a).  Indeed, the sentencing statute commands

15  that, "The Court shall impose a sentence that is sufficient,

16  but no greater than necessary, to comply with the purposes set

17  forth in Section 3553(a)(2)."

18          The Court will now listen to defense counsel, the

19  defendant, and the government, and the victims, for anything

20  that they would like to say in connection with sentence.

21          As I said at the outset, I'll call on each of the

22  defense counsel, the defendant, and the government if there are

23  any other objections to the presentence report that must be

24  resolved and for any statement that the parties would like to

25  make in connection with sentence, anything that the parties

P58KMASS

1    would like to tell me.

2            In connection with calling on the government, I assume

3    that the government knows if there are any victims who wish to

4    be called?

5            MS. NICHOLS:  Yes, your Honor.  Four victims have

6    indicated that they would like to speak today.

7            THE COURT:  Okay.

8            So I'll start with defense counsel.

9            MR. MUKASEY:  Thank you, your Honor.

10           THE COURT:  Mr. Mukasey.

11           MR. MUKASEY:  Thank you, Judge.

12           If it please the Court, my colleagues and I are going

13   to sort of split up pieces of the 3553(a) arguments.  We won't

14   be repetitive.  We'll try to be as efficient as possible.

15           I want to preface my remarks — and I am going to pass

16   the baton in a moment --

17           THE COURT:  I always ask if there are any objections

18   to the presentence report that have to be resolved and have not

19   been resolved.

20           MR. MUKASEY:  I think your Honor has resolved the

21   material objections.

22           THE COURT:  Okay.  Go ahead.

23           MR. MUKASEY:  I'm going to start out to talk a little

24   bit about 3553(a).  I'm then going to pass the baton to two of

25   my colleagues, and I'm going to finish up, and we'll try to be

P58KMASS

1   as efficient as possible.

2          Judge, I want to preface these remarks today, by all

3   of us, by saying that I don't want anything that any of us say

4   today to be taken as disrespect for any of the people that were

5   harmed by the collapse of Celsius.  We've read the victim

6   impact statements.  They are rather brutal.  We've listened to

7   the victims, on video and otherwise, and we hear the intensity

8   of their pain.  That includes Mr. Mashinsky.  We understand

9   that people have suffered financially and suffered emotionally

10  in ways that we can't even pretend to know, so our sympathies

11  are with everyone as we proceed here.

12         I also want to say it's not our intention to repeat

13  what's in our papers, but just to add some color to them, and

14  maybe address some of the concerns that you mentioned in your

15  introduction, so I hope the Court will indulge us for a few

16  minutes.

17         Judge --

18         THE COURT:  Whatever time, whatever time you want.

19         MR. MUKASEY:  Thank you, thank you.

20         I've heard you say, Judge, in a panel — I think it was

21  a panel about multidistrict litigations years ago — that when

22  you have individual cases as opposed to a large class action

23  case, you feel it.  And I think sentencing for me, and for many

24  defense lawyers, is the most daunting and humbling and

25  formidable part of the job, and I can say that we feel it.

P58KMASS

1    I can also say that with the exception of the days

2    that Mr. Mashinsky's children were born, today is the most

3    consequential and impactful and important day of his life, and

4    I assure you, he feels it.

5    Alex's wife is here, his friends are here, supporters

6    are here, but I want to point out one person who is not here,

7    and that's Alex's son, who's graduating from college today in

8    the Midwest.

9    Obviously, Alex wanted to be at that graduation — it's

10   a moment of tremendous accomplishment for his son and his

11   family — but Alex thought that in the interest of the greater

12   good, and the larger Celsius community, that it was more

13   important to be here today to proceed with sentencing and bring

14   some closure to this matter for people who have been impacted.

15   I know I've heard your Honor also say that the

16   Sentencing Reform Act of 1984, which you referred to earlier,

17   is one of the most thoughtful and farsighted statutes that

18   Congress has passed, and that, of course, requires, as your

19   Honor noted, a sentence sufficient, but no greater than

20   necessary, to accomplish the purposes of sentencing.

21   And I think 3553(a)'s thoughtful and farsightedness

22   goes actually well beyond that directive into other areas that

23   we're going to get into.  But to start off, I respectfully

24   submit that the presentence report's recommendation of 15 years

25   is a sentence that is greater than necessary.  It's too severe

P58KMASS

```
 1    for the conduct at issue in the case, and it's too severe for
 2    the man at issue in the case.  The crimes here are serious, to
 3    be sure, but a 15-year sentence for a 60-year-old combat
 4    veteran, first-time nonviolent offender, who pleaded guilty,
 5    accepts responsibility, has expressed remorse, and who has no
 6    history of drinking or drugs or wrongdoing of any kind, small
 7    or large, in a case where, one way or another, a good measure
 8    of the economic damage will likely be remediated, in that kind
 9    of case, a 15-year sentence, which is really a slow death in
10    prison sentence, is unnecessary.  And if it pleases the Court,
11    my colleagues are going to start out with some points about the
12    nature and seriousness of the offense, and then I'm going to
13    come back and discuss some remaining 3553 factors.
14         MS. YOUNG:  Your Honor, it's impossible to assess
15    Alex's conduct without first zooming out and considering it in
16    the context of Celsius, the company.
17         First and foremost, Celsius was neither created, nor
18    operated as an instrument to fleece people.  It was, and after
19    successfully emerging from bankruptcy, is, still today, a real
20    company.  Alex cofounded Celsius with a colleague from one of
21    his prior companies, and they set out to create a lending
22    platform that could enable fair distribution of yield to people
23    who are pushed away from society by traditional banks.  In
24    other words, Alex set out to create a company to help others,
25    and he joined alongside those people as the largest individual
```

P58KMASS

1    customer.

2          For years, Celsius provided that service.  It made

3    real investments, real institutional loans, real retail loans,

4    had thousand of real employees with remote operations in four

5    continents, it paid customers approximately a billion and a

6    half dollars in real rewards over several years.  And billions

7    were both invested and successfully withdrawn from that

8    platform.

9          Now, to be clear, there's not a single customer who

10   wired their life savings from their bank to Celsius or

11   transmitted their 401(k) directly there because before becoming

12   a Celsius community member, every individual would have to take

13   their U.S. dollars and purchase cryptocurrency elsewhere before

14   investing with Celsius, because Celsius did not accept U.S.

15   dollars on its platform.

16         Now, the company began as a startup, but it quickly

17   propelled.  Over the years, it developed a phone application,

18   with detailed terms and conditions, a massive cybersecurity

19   apparatus to keep customer coins safe from hackers and other

20   cyber incidents.  It housed detailed data rooms that were

21   reviewed by institutional investors and had a comprehensive

22   plan for weekly hours-long YouTube videos, and a massive risk

23   management team with about 25 employees who reviewed and

24   approved all of Celsius' institutional loans.

25         Technology and resources were poured into the company.

P58KMASS

1    It was not a shell.  It was not a sham.  And Alex did not

2    clutch onto control or surround himself with dupes or lackies

3    or pawns.  For years, he surrounded himself with outside

4    lawyers from the most prestigious of firms — Davis Polk,

5    Morrison Foerster, Latham & Watkins, Akin Gump, and I could go

6    on.

7            And Alex also culled comments from the executive

8    team --

9            THE COURT:  There is no allegation of an

10    advice-of-counsel defense to any of the charges, right?

11            MS. YOUNG:  Correct, your Honor.

12            THE COURT:  Okay.  Go ahead.

13            MS. YOUNG:  Alex also culled an executive team with

14    the most stellar of backgrounds — a chief investment officer

15    from TIAA-CREF, a chief operating officer from Citigroup, head

16    of corporate from Bank of America, chief risk officer from

17    Morgan Stanley, and a chief financial officer from RBC.  And

18    these were not trophy advisory board members, like in other

19    startup fraud cases, such as their names or big names are used

20    to give the veneer of substance to the company.  These were the

21    day-to-day executives working at Celsius with Alex.

22            So, when my colleague, Mr. Westfal, discusses Alex's

23    conduct in a few minutes, please keep in mind the caliber of

24    people who came and stayed at Celsius.  You might have seen

25    them seated next to him on a marketing video, or supplied him

P58KMASS

1    with information before he spoke, or agreed with a business

2    model for purchasing CEL rewards by the company.

3            In the words of Celsius' head of compliance, who I

4    believe remains in a different capacity at the company still to

5    this day, Alex and the team put being in compliance as a top

6    priority.  And even the government's cooperator, when he was

7    serving as outside counsel before deciding to join Celsius,

8    publicly said that Celsius was building something good, that

9    he, Cohen-Pavon, was going to be proud of.

10           So, there was no original sin in forming Celsius.

11   Celsius is not a house built on sand.  It was not designed as a

12   Madoff Ponzi company with backroom employees and a board of

13   family members.  Alex put all the pieces in place for Celsius

14   to do good and then do well.

15           Now, crypto, even as we stand here today, exists in a

16   changing and challenging regulatory environment.  And as the

17   legal landscape for crypto changed, Celsius didn't duck into a

18   back, dark alley and operate in the shadows.  Celsius subjected

19   itself to scrutiny.  It registered in the United Kingdom and

20   made public filings available.  It didn't do its ICO in the

21   Caymans or the British Virgin Islands.  And out of an abundance

22   of caution, Celsius complied with the SEC's Reg D accreditation

23   requirements.  It registered as a money services business.

24   Unlike BitMEX, it complied with the Bank Secrecy Act and

25   FinCEN's AML requirements.  And Celsius submitted audited

P58KMASS

financials using GAAP accounting principles, none of which were alleged here to be doctored, fabricated, or false.

So, in stark contrast to Celsius, you have one point which was a sham from the getgo. According to the government, at one point, Greenwood lied to investors about the utility of tokens, claiming that they could be used to secure positions in mining pools. And these pools were depicted in promotional materials as being mined with computer hardware. But there were no mining pools, and there were no computers.

This question of whether the company built was real and whether they were real products also seemed to be a difference-maker at sentencing *United States v. Milton*, which was a securities and wire fraud case involving statements on social media by the founder of a public truck company. And after trial, at sentencing, Judge Ramos asked, you know, were the trucks ever built, were they sold, and there, the answer was yes. And, similarly, here, the products are real.

Mr. Milton received a sentence of four years with a wire fraud conviction and a finding by the court of a $660 million loss and thousands of victims.

So, in thinking about Celsius as compared to other cases, it's nothing like FTX and Alameda. Those companies ceased to exist after bankruptcy. Five executives were convicted, with three receiving significant periods of incarceration. And as to Sam Bankman-Fried, who was sentenced

P58KMASS

to 25 years after trial, the court, at sentencing, made

findings of an $11 billion loss, fraudulent actions during

bankruptcy, attempted witness tampering, multiple instances of

perjury, and campaign finance violations, none of which are

present here.

The government also stretches to draw parallels to

*Wong* and *Ilori*, but 3553(a) makes clear that the need to avoid

unwarranted sentence disparities among defendants with similar

records who have been found guilty of similar conduct.  And in

*Wong*, he was a recidivist, even according to the government's

sentencing papers.  And in *Ilori*, he committed PPP fraud using

stolen identities and falsified tax documents, while facing

separate charges involving identity theft and money laundering.

The Court should have no concern with unwarranted

sentencing disparities with respect to those cases.

As the Court assesses Alex and his conduct, I

respectfully urge you to think of Celsius in the greater

context.  There is a parable about blindfolded men and an

elephant.  And the men who cannot see an approaching elephant,

none of them have come across an elephant before, so they

imagine what it is by touching a part of the elephant and

thinking about what they know.  And one touches only the leg

and thinks it's a pillar, and one touches only the tail and

thinks, nope, it's a rope, and the story goes on.  But the

point is that there are limits to perception, and there is

P58KMASS

1      importance in having the complete context.

2              The view of Alex's criminal conduct should not only be

3      a clipped public statement here or a Slack chat about a boss

4      there, otherwise there's a flawed understanding of reality.

5      There's a need to see the whole elephant and the big picture,

6      and to see things like Alex's statements being made within a

7      real and complex company, that a $590 million loss was less

8      than 2 percent of Celsius' assets at its peak, and that Celsius

9      in many ways operated conservatively in the crypto space.

10             And with that, I'll turn it over to Mr. Westfal, who

11     will address the nature of Alex's conduct.

12             THE COURT:  All right.  Thank you.

13             MR. WESTFAL:  Good afternoon, your Honor.

14             THE COURT:  Good afternoon.

15             MR. WESTFAL:  I'd like to start by saying --

16             THE COURT:  It's actually still morning.

17             MR. WESTFAL:  It's still morning?  I just scratched

18     out morning and wrote afternoon.

19             I do want to start by saying that it is one of the

20     great privileges of my career to speak to you today about Alex

21     Mashinsky.  I want to say it's been one of the great joys of my

22     life to get to know Alex and his remarkable wife, Krissy, who's

23     here today, these past few years.  I'll be addressing the

24     nature and circumstances of Alex's offense and what, we submit,

25     was in his heart and in his mind over the five years of

P58KMASS

1    Celsius' existence.

2              Your Honor received many letters from Alex's friends

3    and family, including those stating, with complete certainty,

4    that Alex would never maliciously harm anyone, and that there

5    is not a malicious bone in his body.  This is the real Alex

6    Mashinsky.

7              Against this background, we submit it is useful to

8    evaluate Alex's conduct against the culpability spectrum that

9    the Second Circuit has talked about in *Adelson* and that

10   Judge Gleeson talked about in *United States v. Ovid*.  And on

11   one end of the spectrum are cases involving vicious predatory

12   conduct that targeted the weak, that took advantage of the

13   elderly, that intentionally inflicted harm on victims.  And we

14   respectfully submit that we are worlds away from that here.

15             On the other end of that spectrum is conduct that was

16   described as follows by the former chief of the criminal

17   division in this district.  He said:  White collar offenders

18   often become involved in illegal conduct as a result of their

19   position within a legitimate enterprise or in the context of a

20   legitimate financial relationship with others.  And according

21   to the former chief, lengthy prison sentences are not required

22   to deter recidivism amongst offenders at this end of the

23   spectrum who did not target and seek out victims to harm, but,

24   rather, committed crimes while engaged in efforts that were

25   legitimate from the beginning.  Judge Gleeson said the same

P58KMASS

1    thing in *Ovid*.

2           Your Honor, the level of depravity described in the

3    government's memo, that level of cruelty, is nowhere in the

4    discovery that we saw.  It is nowhere in the mountains of

5    materials that we reviewed.  And it is nowhere in Alex's prior

6    history, which Mr. Mukasey will talk about shortly.  And the

7    reason we don't see it is because it's nowhere in Alex's heart.

8    The level of ice-cold dispassionate aiming or training your

9    sights on targets, we don't see in this case, because he's not

10   capable of it.  And I submit there is nothing in this case that

11   shows Alex wanted to personally inflict pain or hurt on anyone.

12          So here's what we'd like you to take away, Judge,

13   about the nature and circumstances of the offense:

14          The portrayal of Alex as some sort of financial serial

15   killer who set out to harm people is a hoax.  Yes, there were

16   convictions, and, yes, his conduct was very serious, but there

17   was nothing predatory about it.  He didn't act out of evil,

18   selfishness, or spite.  Alex is not heartless.  He didn't act

19   with malice in his heart.  He is not capable of that, even

20   though he recognizes that his customers, quite clearly, have

21   suffered deep, deep harm.

22          We submit that one of the key distinctions between

23   Alex's case and other fraud cases is that Alex did not

24   misappropriate or steal his customers' assets.  But the

25   government now belatedly, we submit, accuses him of

P58KMASS

1   misappropriating or stealing his customers' assets.

2           THE COURT:  There is an agreement of forfeiture of

3   proceeds from the offense personally received of $49 million

4   plus specific properties.  That's personal gain.  There are

5   also the allegations that the company was marketed toward

6   people who could be described, in some circumstances, as less

7   sophisticated investors into a company that was portrayed as

8   good as a bank, only with greater rewards.  So, I just raise

9   that with you, in particular, when you say that there is no

10  allegation of personal aggrandizement, if you will.

11          Go ahead.

12          MR. WESTFAL:  The distinction we're trying to draw,

13  your Honor, is between the fraud defendants — I think like one

14  coin, as Ms. Young mentioned — who create the illusion of a

15  real investment when there's nothing there, or the defendants

16  who say we will take your money or crypto and invest them in

17  all of these things that don't exist, and, instead, they take

18  them for themselves.

19          What Mr. Mashinsky has agreed to do in his forfeiture

20  is, based on his sales of his own money — not customer funds.

21  There's not an allegation or evidence we're aware of that he

22  ever touched a single token of his customers or stole a single

23  penny from Celsius.  We think that distinction is important,

24  your Honor.

25          I would also say that we agree with the government

P58KMASS

that Celsius was marketed towards retail customers.  We

disagree that Alex targeted them to inflict hurt upon them.

What was in his heart and those of his employees was to help

customers, not hurt them.

Alex told customers that Celsius would pool their

assets, invest them in a variety of yield-generating

activities, and that's what Celsius did.  And then, according

to the government and the PSR, Celsius paid too much of its

revenue back to those customers in the form of "unsustainably

high weekly reward rates."

Celsius' weekly reward rates averaged 4-1/2 to

5 percent over the life of the company.  For these reasons,

your Honor, we respectfully submit that the nature and

circumstances of the conduct should be viewed toward the lower

end of the culpability spectrum.

In its sentencing submission, the government alleges

that Alex engaged in the predatory conduct that I just

described.  The government posits that Alex, "lured retail

investors to place their life savings onto the Celsius platform

where they trusted the defendant to keep it safe."  But is that

really what Alex said and did?  We submitted a sample of AMA

clips to the Court.  Was it really in Alex's heart to look his

customers in the eye and lure them into turning over their life

savings?  What Alex said in the clips that we submitted

include:  Again, I'm not asking you to take a hundred percent

P58KMASS

1  of your spend and put it all in savings, but you should be able

2  to spend 10 to 20 percent of your income and generate returns

3  on it which will eventually be enough to pay all of your bills.

4  That's financial independence.

5      Alex told his customers:  If you made the mistake of

6  putting 100 percent of your net worth in the CEL token — and it

7  is a mistake — take some off the table.  Why?  Because you

8  shouldn't have 100 percent of your net worth in anything,

9  definitely not in something volatile.

10      Alex told his customers:  If you already have a

11  retirement plan that is either in stocks, bonds, or other

12  assets, real estate, then you can take more risk on Bitcoin or

13  Ethereum — meaning, because you should keep your retirement

14  plan in place — and he continued:  If you don't have a

15  retirement plan, then you probably should not take as much

16  risk.  These are very volatile assets.

17      What was really in Alex's heart and mind, your Honor,

18  was to educate Celsius customers about the crypto world and to

19  help them achieve financial independence.  Many victims have

20  written letters of support for Alex, saying this is what his

21  weekly AMAs meant to them.  That was why he spoke directly to

22  his customers every Friday afternoon for an hour and a half for

23  more than three years — to help them.

24      It is trite, I submit, to say that Celsius was Alex's

25  baby.  It was not his baby.  It was his life.  It was his heart

1    and his soul, and he gave everything he had to it for more than

2    five years.

3        I'd like to say, your Honor, a few words about the

4    government's allegations of market manipulation.

5        Your Honor, this is the first case I have seen where

6    an entire company decided to commit market manipulation by

7    memorializing their efforts to support the price of a security

8    in written policies and procedures, where those price support

9    efforts were discussed candidly and with approval from the

10   company's general counsel, chief risk officer, chief financial

11   officer, and the entire executive committee, where the price

12   support was executed through crypto wallets that were posted

13   publicly on the company's website, updated regularly, and they

14   are still there to this day, and where the only person who

15   admitted guilt told a potential equity investor in the fall of

16   2021 that the company was supporting the price of its CEL

17   token.

18       If you believe the government's theory of market

19   manipulation, then you would also have to believe that Roni

20   Cohen-Pavon was disclosing rampant criminality at Celsius in

21   order to attract an investment from a sophisticated private

22   equity firm, represented by a leading global law firm, and a

23   Big Four accounting firm.

24       We have also shown, your Honor, that when Alex was

25   discussing potential public statements with one of Celsius'

P58KMASS

1    traders, he advised the trader that he, Alex, would not make

2    statements that could be deemed market manipulation.  That was

3    in the middle of an alleged market manipulation scheme.

4            I would also note, your Honor, that the government

5    has, in our view, not attempted to show your Honor whether

6    Celsius' supposedly manipulative purchases were 1 percent of

7    the market, 99 percent of the market, or somewhere in between.

8    That evidence was not submitted from what we've seen.

9            But against that backdrop, the government says, your

10   Honor, that Mashinsky wanted something for nothing, so he

11   created an utterly useless CEL token, manipulated the market

12   until it appeared to have value, lied about what he was doing,

13   and then he sold and traded CEL for currency that had value,

14   and he used that currency to maintain a luxurious lifestyle.

15   He has three homes.  His children have trust funds.  That is

16   not what happened here.

17           The government makes no mention of the fact that

18   Alex's two family homes were purchased before Celsius, with

19   savings from a 30-year career in business, and that the main

20   trust fund that the government seems to be focused on was

21   created more than 15 years before Celsius ever existed.

22           The last thing I would say on the manipulation

23   allegations, your Honor, is this:  We are sitting here at

24   sentencing, and we still don't know who the alleged

25   coconspirators are.  The likely culprits have all denied market

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P58KMASS

manipulation in federal court filings and videotaped FBI

interviews.  Even the government's cooperator has denied

manipulation outside of a narrow three-month period, and told

the government shortly before his plea that he understood the

price of CEL token reflected Celsius' success as a company.

            THE COURT:  I'm sorry, weren't there pleas of guilty

in this case to both Counts Two and Five?

            MR. WESTFAL:  From Mr. Mashinsky?

            THE COURT:  Yes.

            MR. WESTFAL:  So, yes, the answer is yes.

            THE COURT:  Okay.  Go ahead.

            MR. WESTFAL:  On that point, your Honor, we would

state this:  Under 10b-5, there are three distinct aspects or

ways to commit securities fraud — false and misleading

statements, course of business/course of conduct, or a scheme,

three separate predicates that could get you to securities

fraud.  The government submitted requests to charge to the

Court that would have proposed to tell the jury that they would

only have to find one of those predicates, and that the scheme

of manipulation was in addition to allegations about false

statements.

            If your Honor finds there were other coconspirators,

whether one or two or dozens, we ask that you take into

consideration that none of those individuals, other than the

government's cooperating witness, has been charged or faces any

P58KMASS

1    prison time, let alone a death in prison.

2            The government's failure to even charge these

3    individuals weighs heavily in favor of leniency for Alex, even

4    if the Court were to find what we submit is a far-fetched

5    manipulation theory.  On this score, I would point your Honor

6    to Judge Gardephe's decision in *United States v. Michael*

7    *Avenatti*.  The government elected in that case not to charge a

8    criminal defense attorney, who it named as a coconspirator of

9    Avenatti, in his indictment, and who stood to benefit from the

10   purported scheme.  That defense attorney suffered no

11   consequences at all.

12           Judge Gardephe said that it would not be justice for

13   Avenatti to be sentenced to a lengthy term of imprisonment — in

14   that case, 9 to 11 years — when the other lawyer referenced in

15   the indictment as a coconspirator wasn't even charged.

16   Judge Gardephe sentenced Avenatti to 30 months, instead.

17           I'd like to end, your Honor, with two points about the

18   government's fraud allegations.

19           In our objections, we intended to set forth what we

20   believe were Alex's good-faith bases for his statements,

21   otherwise mitigating circumstances, and relevant context around

22   each of the allegations.  Context matters, in our view, your

23   Honor, and we believe that the context can be seen in the AMA

24   videos themselves, which we provided to you.

25           The context can also be evaluated based on the

P58KMASS

information that Alex saw and heard at the time.  I think this is probably the most important question about what was going through Alex's mind, what was he seeing and hearing, what was happening at Celsius at the time, not now.  And I'd like to focus on two points in that regard:  First, Celsius' financial condition in the lead-up to the pause; second, Alex's actions after the June 12, 2022 pause on withdrawals.

Your Honor, the government has said that there were "clear signals" that Celsius was headed for insolvency in the months leading up to the pause, relying heavily on Alex withdrawing assets from Celsius so he could pay taxes.  We reject the government's hindsight, your Honor.  We submit this is the government's attempt to end-run an absence of evidence of predatory conduct.

So I'd like to talk about some of the so-called clear signals of insolvency, and I know that we have these in your papers, your Honor, but I think it's important to say them out loud.

Your Honor, we submitted a recording of a December 28, 2021 executive committee meeting, where Roni Cohen-Pavon presented Celsius' preliminary financial results for the year. He predicted that Celsius would have a P&L loss of $80 million, and then said that this doesn't mean anything about Celsius' financial strength, it is important to say, noting that the results did not account for Celsius' mining company that had

P58KMASS

just been valued at $3.4 billion and another subsidiary that
had just been valued at $500 million.

Cohen-Pavon described these financial results as,
quote, an accounting methodology and an accounting thing based
on the drop in the price of CEL token.  And he concluded his
remarks by telling the executive committee, "Obviously, this
cannot be shared outside of ExCo."

The government says it was Alex's fraud that covered
up Celsius' financial condition.

On April 19, 2022, Cohen-Pavon predicted to the
Celsius executive committee that, "In a bull market, we are
going to print money."

That was less than two months before the pause.  We're
still not hearing an expectation of imminent insolvency in
these statements.

In May of 2022, Celsius' chief financial officer, who
joined from the Royal Bank of Canada, told customers publicly
that Celsius was going to be around for the next 150 years.

In June, he told customers that the company's "strong
liquidity framework established practices around liquidity data
and modeling were elements that I was happy to find similar to
other large institutions, and that puts us in a strong position
to weather the recent market turbulence and ensure that clients
who needed access to their digital assets could get them free
and clear."

P58KMASS

1            That was the chief financial officer in June of 2022.

2            The chief financial officer also told the government

3    that by June 9th, or three days before the pause, there were

4    still no discussions inside Celsius about pausing withdrawals.

5    Cohen-Pavon told the bankruptcy examiner that he was unaware of

6    internal concerns about Celsius' inability to meet its

7    liabilities.  And he said that "The consensus was that because

8    Celsius had so much undeployed Bitcoin, a run on the bank would

9    be fine."

10            I will end with a few excerpts of how, again, the

11   chief financial officer described Celsius for potential

12   investors on June 6th, less than a week before the pause.  He

13   said:  "Celsius is a strong, well-known player in crypto,

14   strong funding, and client base.  Bitcoin at 30,000, not likely

15   to last.  In growth mode.  We are well positioned to win in

16   this marketplace.  No run on the bank.  Even with Luna and

17   Tether downturn, we have plenty of liquidity.  Strong capital

18   management, liquidity management, risk management, compliance,

19   KYC, AML looking to be regulated.  Everything is fine," he

20   said.  "We have a diversified revenue model and new revenue

21   streams."

22            The government, we submit, refuses to acknowledge the

23   possibility that Alex viewed his company the same way that his

24   chief financial officer did.

25            But this is exactly what Alex told an employee the day

P58KMASS

before the pause.  He said:  As long as people can withdraw,
they will not listen to social media commentators, they will
come back when the storm is over, and so will CEL.

It's also why, when Alex heard about a customer
struggling with a potential loan liquidation, on May 25, 2022,
he instructed his team to "Send all of these cases to the head
of retail lending, we will try to help as many as we can."

Your Honor, when Celsius paused withdrawals on
June 12th, Alex was Celsius' largest customer, by far.  He
held, at rock bottom prices, more than $20 million worth of
crypto on the platform, at the pause.  His wallets are still
posted on Celsius' website to this day.

Alex believed in Celsius, and he believed in CEL token
until literally the very end.  It was not his baby.  It was his
life.  And despite all of this, the government would have the
Court believe that Alex knew Celsius was bankrupt for months,
or years, or who knows how long, and that Celsius was a sham, a
house of cards, he definitely read Ponzi Scheme in their
papers, and that it all collapsed because of one man.

I'd like to conclude, your Honor, by touching on
Alex's actions after the pause, in which we will introduce
Mr. Mukasey's discussion of Alex's personal history and
characteristics.

Your Honor, Alex knows that his victims want their
money back, and they should get back every last coin.

P58KMASS

1          From the moment Celsius paused, Alex fought to make

2     that happen.  The first thing I'd like to say, your Honor, is

3     that Celsius did not pause because it ran out of coins.  It

4     wasn't missing $4.7 billion in customer coins.  The company

5     made the difficult, conservative, prophylactic decision to

6     pause withdrawals in order to protect customers.  Celsius

7     paused because there was a substantial amount of customer coins

8     in illiquid investments, like Celsius' Bitcoin mining company,

9     not undisclosed or risky investments — Bitcoin mining — and

10    that's an investment that can't just be withdrawn in a matter

11    of hours or days, it takes time.

12         From the time Celsius paused, Alex did everything he

13    could to maximize recovery for customers, including clear

14    actions that the government and one of its letter-writers now

15    outright deny.  When Celsius' independent directors and outside

16    counsel were planning a fire sale of customer assets into U.S.

17    dollars, Alex said no, and he replaced them using his own

18    money, because he knew that customers wanted coins, not

19    dollars.

20         Alex then put together the first iteration of Celsius'

21    plan to return coins to customers.  We could only give your

22    Honor a redacted excerpt of that plan, but it was 20 pages

23    long.  And Alex presented it to 36 individuals at the

24    bankruptcy advisors and law firms for Celsius and the UCC,

25    including White & Case, the firm that told you this never

P58KMASS

1    happened.

2              In the words of Celsius' former independent director,

3    David Barse, who worked closely with Kirkland & Ellis and

4    Celsius' current management for years, he said, until Alex

5    resigned from the company, it was clear to me that he was

6    focused entirely on preserving value for Celsius' customers.

7    The last thing Alex cared about was the recovery of a

8    substantial amount of personal wealth he created.  Even after

9    he resigned from the company, until the conclusion of the

10   bankruptcy, Alex continued to postulate proposals to protect

11   the customers.  Through the postbankruptcy time period --

12   excuse me.  Through the postbankruptcy time frame, my

13   observations and experience were that Alex operated with the

14   highest moral character in attempting to right the wrongs of

15   which he is accused.

16             Alex has been seeking forgiveness from his customers

17   ever since.  One of his former employees directed a letter to

18   the Court that Alex "worked unimaginably hard to bring value to

19   his customers.  He was an incredible leader, and everyone knew

20   his heart was in the right place.  Alex placed his customers

21   first.  He was not perfect, he is not perfect, but he never

22   intended harm on anybody because he is not capable of such

23   depravity."

24             With that, I'll turn back to Mr. Mukasey.  Thank you,

25   your Honor.

P58KMASS

1           THE COURT:  Thank you.

2           Mr. Mukasey.

3           MR. MUKASEY:  Thank you, Judge.

4           So, Judge, that leaves Alex's personal history and

5    characteristics.  And for people who don't know Alex, it's got

6    to be hard, as Mr. Westfal said, to see him as anything other

7    than one-dimensional, a conman, a crook, a liar, a fraud.  It's

8    very, very easy to slot people in these kinds of cases into a

9    one size fits all kind of story about an arrogant swindler who

10   fleeces people of their life savings and laughs all the way to

11   his private island.  If you punctuate that at a bankruptcy,

12   that makes it look all the worse.  You have a terrible man, who

13   should probably die in prison.  But that's just not the

14   reality.  That's rhetoric of people who, I think, only see

15   things in cartoonish simplicity.  It's dehumanizing, it's

16   crude, and it's degrading.  It's a caricature.

17           And I think the truth is a lot closer in a case like

18   this to what Justice Sotomayor said in her book, which is that

19   good people can do bad things, they can make bad decisions.  It

20   doesn't make them bad people.  And I would add to that that

21   human beings are complex, and they have their heroic moments

22   and they have their antiheroic moments and they have their

23   brave moments and they have their weak moments, and they're a

24   blend of good and bad.  I imagine that's why the Supreme Court

25   said in a death penalty case called *Woodson v. North Carolina*

P58KMASS

that sentencing has to be done with an understanding of the diverse frailties of humankind.  Nobody's one thing or the other.

And I think it's because everybody's complicated, that we shouldn't be defined by the worst things we've ever done.  And I think that's where the government has Alex wrong.  Both of my colleagues said Alex is, by no means, perfect.  He comes before the Court today as a felon and with a lot of damage in his wake, but he's most certainly not the greedy, corrupt, power hungry outlaw that the government would have.

In Russia, as a boy, and in Israel, Alex saw a lot of nasty things, but he never let it make him become nasty.  He saw a lot of bitterness in those places, but he never let it make him bitter.  And he saw a lot of hatred, but he never let it make him hate.

Instead, he's led a rather extraordinary life.  He built a 30-year career on things that have absolutely nothing to do with the issues in this case.  Way before anyone ever heard of cryptocurrency or the blockchain, and a token was a thing you used to get on the subway, Alex was on the cutting edge of telecommunications, then ridesharing, then wireless communications in the subways.  He's consistently pushed himself to explore new frontiers and take on new challenges.  And there's not a person that we've come across who truly knows Alex who says he did any of these things because he was greedy

P58KMASS

1  or covetous or materialistic or ostentatious.  He wasn't raised

2  by his parents, and he hasn't lived on his own, to be about

3  money or pride or status, power.  He was raised to be a man of

4  service, and he's lived to be a man for others.

5          In over 30 years, he's helped countless others.  He's

6  created thousands of jobs across his companies, he's given

7  opportunity to innumerable people, and he's filled many of his

8  businesses with the needy, the disadvantaged, the

9  underprivileged, immigrants.  I'll give you one anecdote, which

10  is when Alex's office was in Midtown Manhattan, he saw a woman

11  every day that he went to the office standing outside the

12  building, and she looked like she'd fallen on hard times, and

13  he struck up a conversation with her after seeing her day after

14  day, and it turned out she had been homeless, and she had a

15  daughter, and she needed a job.  And Alex talked to her and

16  said, can you be here every day, and can you follow the

17  schedule, and can you be committed to this job?  And she said,

18  yes.  And he hired her.  And this woman followed him to a bunch

19  of different companies, worked for him for a while.  Alex's

20  sisters letter actually refers to this, which is ECF 136,

21  page 12, Exhibit 30.  And, by the way, I'm told that's not the

22  only time that he has hired an unhoused person literally right

23  off the street.

24          And more of these episodes and vignettes are recounted

25  in, I think, the remarkable letters you got from his family and

P58KMASS

1    his friends and discuss his personal integrity, his humility,

2    his work ethic, his charity, his kindness.  This is a man with

3    prodigious talent and creative imagination and gifts that he's

4    used in a way for others, not for his own reward.

5            He's humble.  He doesn't exalt himself.  He's not mean

6    or nasty or spiteful.

7            I'll give you a couple of other anecdotes.

8            For years, Alex worked with a Jewish cultural

9    organization called Aish, where he lectured young people from

10   around the country, who were needy and disadvantaged, about his

11   own journey from the Soviet Union, to Israel, to the United

12   States.  And in 2012, he gave, apparently, a pretty impactful

13   lecture that focused on the significance of hard work, ethics,

14   tenacity, and the Aish staff wrote him a note, which I can

15   include in the record later, that talked about how Alex had

16   directly and positively impacted not one, but close to 30 young

17   people with lessons that would resonate for years to come.

18   That's the staff's words.  That's living for others, I submit.

19           When Alex found and ran GroundLink, the precursor to

20   Uber that we talked about in our papers, he made sure to

21   dedicate a certain number of free rides on the service to

22   passengers who needed transportation to medical facilities, I

23   think particularly cancer treatment, that they couldn't afford.

24   That's living for others.

25           These kinds of acts, in addition to just the charity

P58KMASS

that we listed, obviously undertaken without fanfare, without

publicity, obviously predate his involvement in this case, and

they can't be attributed to some desire to create a record for

sentencing.  I think the points on Alex's generosity is this:

He's never looked down on anybody unless it was to help them

up.  In the military, in his prior businesses, in the

community, he's always been a person for others.  He's always

been a person of service.

In the case of Celsius, he tried, and he failed, but

he sure as hell tried.

Now, if I may, I'd like to talk for a second about an

aspect of sentencing a little different from punishment that I

think is an important consideration, which is rehabilitation.

Rehabilitation, redemption, second chances, those are equally

important considerations under 3553.

And I think people have the power to change.  People

overcome, and it doesn't take a decade in prison.  I think

Judge Underhill in Connecticut wrote a very compelling article

about it a few years ago.  And if you want to talk about

rehabilitation, and you value rehabilitation, I guess you have

to ask yourself which is better, sending Alex Mashinsky to some

prison in Iowa until he dies without friends or family or the

opportunity to serve — I don't think that leads to any kind of

rehabilitation — or taking a person who's capable of so much

more service and getting more service from him.

P58KMASS

1          The government thinks he's driven by greed?  Sentence

2     him to donate his time to people who need it.  The government

3     thinks he's tried to hurt people?  Sentence him to help them.

4     He's capable of magnificent things.  He's brilliant.  He's

5     inventive and imaginative.  He's been a soldier and a salesman

6     for a telecommunication pioneer and a transit innovator, and

7     he's been successful every step of the way.

8          And in the 18 months since he's been sidelined, since

9     Celsius collapsed, he wrote a book about gravity that tackles

10    Newton and entropy and quantum space time theory and all sorts

11    of other stuff that I don't pretend to understand.

12         The point is it's kind of stunning what he's done

13    since Celsius went into bankruptcy.  What that says is it says

14    there's an opportunity for rehabilitation, regrowth, real

15    rebuilding.  There's an opportunity to allow someone who's

16    committed a crime to atone for his mistakes, to move past them,

17    to put in the work to heal the hurt that he's caused, to

18    restore.  That would be real rehabilitation.

19         And another, I think, sometimes overlooked aspect of

20    3553 is the concepts of humanity and compassion and mercy.

21    And, obviously, the justice system is founded on concepts of

22    punishment, but also on principles of humanity and compassion

23    and mercy.  And Jack Weinstein, the late Judge Weinstein, in a

24    case called *U.S. v. Blarek*, 7 F.Supp.2d 192, Judge Weinstein

25    said that mercy is seldom included on the list of traditional

P58KMASS

rationales for sentencing; it is, however, evinced by

Section 3553(a).  He said that the notion that undue harshness

should be avoided by those sitting in judgment has long been a

part of the human fabric and spirit.  Lenity is often the

desirable route.

So, the guidelines and the sentencing process

obviously don't require humanity, compassion, and mercy to be

left outside the courtroom door.  And I think humanity can be

seen in Alex's devotion and his service to his wife and his six

kids, in his care for his ex-wife, who is not well, and his

special attention to his youngest son, who we also wrote about

in our submission.

Compassion?  Well, obviously, compassion should be

demonstrated for the victims here, of course, but compassion is

not a limiting force.  Compassion for the victims should in no

way diminish some compassion for Alex's life and all the good

he's done.

And as to mercy?  Well, I submit that a 15-year

sentence, a death-in-prison sentence, would lack mercy.

I will quickly address, before I sum up, the

deterrence points the government raised.  I think the fear of

recidivism here is completely unfounded.  His lack of a prior

criminal history says he won't recidivate.  His age says he

won't recidivate.  The statistics say he won't recidivate.  His

perfect record on bail says he won't recidivate.

P58KMASS

1              And prison, by the way, is not the only punishment

2    that has the power to deter.  Losing your business, your

3    assets, your reputation, your community, and being a pariah,

4    who will be publicly shamed on the internet in perpetuity,

5    seems like more than enough specific deterrence.  So, I

6    respectfully submit, the prosecution has achieved that goal.

7              I'll simply say that general deterrence, more jail

8    time does not mean more deterrence.  Convictions need to be

9    tailored to -- sentencings need to be tailored to the

10   individual, but to the extent general deterrence applies, this

11   case has resonated, and will continue to resonate, with members

12   of the financial community, the compliance community, the cyber

13   community have taken note and will continue to take note.  I

14   don't believe there's a need to send Alex to prison for

15   15 years to send that message.

16             Alex understands that the road to redemption here is a

17   long one.  I think when he addresses the Court in a moment,

18   you'll discern the seeds of redemption rather than kind of a

19   brick wall of denial.  If anyone here thinks that a lenient

20   sentence means a happy ending for Alex Mashinsky, they haven't

21   been paying attention.  I don't think I have to explain to

22   anybody that prison is painful, it's harsh, it's traumatizing,

23   it's isolating, it's humiliating, it's dangerous, and the

24   studies say that in a few years, it will wear Alex down to

25   nothing.

P58KMASS

1           And even without prison, his future is pretty bleak.

2     He's looking at an impossibly punishing set of circumstances

3     outside of prison.  The conviction alone carries extensive,

4     permanent, unavoidable collateral consequences that will stay

5     with him for the rest of his life no matter what your Honor

6     decides today.

7           I'm sure your Honor has heard this before, but I came

8     across it.  I read an article that you wrote about

9     Judge Weinfeld.  You said that Judge Weinfeld had a policy that

10    he would generally sentence white collar defendants to a term

11    of imprisonment because it was necessary for deterrence.  But

12    there was one defendant that Judge Weinfeld had in a white

13    collar case who had led a life that was characterized by quiet

14    acts of charity, and charity was done long before it was in the

15    defendant's interest to do the charity.  And Judge Weinfeld

16    didn't sentence him to prison, and he said that the bread that

17    the defendant had spread on the waters had now returned to him.

18          Alex's track record of doing good for others and using

19    his talents to serve others presents a unique basis to consider

20    leniency in this case.

21          Your Honor, we ask that you sentence Alex Mashinsky

22    today with an open mind and with a gentle heart.

23          THE COURT:  Thank you.

24          Mr. Mashinsky, I'll listen to you.

25          THE DEFENDANT:  Can I use --

P58KMASS

1          THE COURT:  Yes, please.  Keep your voice up, use the

2     microphone.

3          First, as I've asked your counsel, are there any

4     objections that I haven't resolved in connection with the

5     presentence report that you want me to deal with?

6          THE DEFENDANT:  Yeah, I have a prepared remark -- I'm

7     sorry.

8          THE COURT:  You want to take a moment?

9          THE DEFENDANT:  I'm fine, your Honor.

10          THE COURT:  Okay.

11          THE DEFENDANT:  I have prepared remarks, but I would

12     like to say a few more things.

13          Thank you, your Honor --

14          THE COURT:  I'm going to listen to anything you would

15     like to tell me in connection with sentence, but I always ask

16     the first question as a matter of practice — whether there's

17     anything else that I haven't dealt with in the presentence

18     report that you want me to deal with, objections that I haven't

19     already dealt with?  Your lawyer says no, but I wanted to ask

20     you.

21          THE DEFENDANT:  I would like to comment that the

22     $590 million in loss, in my view, are uncollected funds.  These

23     were things unavailable, and like Marc and others, my lawyers,

24     have said, they were -- we had billions of dollars available on

25     the platform; otherwise, we couldn't return billions of

P58KMASS

1   dollars.  And the only way after -- we had a balance of

2   $25 billion, and we allowed everybody to withdraw down to

3   5 billion.  We decided to protect all those remaining

4   customers.

5          So, I...

6          THE COURT:  Okay.

7          THE DEFENDANT:  So not be left with my most loyal

8   customers having to wait for the rest of their life for the

9   rest of the coins, so we took the action with everybody on the

10  board and everybody in my executive team — overnight, the

11  decision was made in five minutes — to pause withdrawals and

12  allow everybody equal opportunity at recovery.

13         MR. MUKASEY:  I think your Honor can consider that

14  under 3553 as part of his statement.

15         THE COURT:  Okay.  I've taken that into account.  I

16  will take it into account.  It doesn't change anything in the

17  presentence report.

18         Go ahead.

19         THE DEFENDANT:  The reason I forfeited the 48 million

20  and all my claims and everything else possible is because, as I

21  said to your Honor before, I wanted to be part of the solution,

22  not part of the problem.  My entry of the plea is my effort to

23  be part of the solution and not part of the problem.

24         I would like to finish my -- I don't have any other

25  comments.  I think we did -- I spent three years collecting all

P58KMASS

1    the evidence possible to show your Honor that all my actions

2    were always meant to be to protect my community and...

3          And I failed.

4          THE COURT:  Why don't I take five minutes.

5          THE DEFENDANT:  I don't think it's going to help, your

6    Honor.

7          THE COURT:  Well --

8          THE DEFENDANT:  I would like to read my statement.

9          THE COURT:  Okay.  Are you sure?  I'm happy to take

10   five minutes.  You can talk to your lawyers.

11         THE DEFENDANT:  Thank you, your Honor, and --

12         THE COURT:  Okay.

13         THE DEFENDANT:  I want to thank the Court for your

14   very careful attention to my case.  I truly appreciate it.

15         Judge, every year in Yom Kippur, the Jewish judgment

16   day, I ask myself whether, on the whole, my work and my life

17   made the world a better place.  For most of my life, I was

18   pretty sure the answer was yes, but I could not say that about

19   the last three years.

20         During that time, I failed my community, and I'm here

21   to take responsibility for that.  My false statements were

22   inexcusable, and I made a lot of decisions that caused people's

23   coin to become unavailable.  I never wanted to hurt anyone.  I

24   never targeted anyone.  But I know many of the victims that are

25   here today or who are standing by to see me punished for what

P58KMASS

1    happened.  I understand that.  I've read their letters, and I

2    am responsible.

3            As someone who came from nothing, I recognize how hard

4    people work to earn, save, and invest in crypto.  I worked very

5    hard, along with many others, to try to recover all those coins

6    and more, and I'm glad to see that many customers already got

7    back more than their bankruptcy claims.

8            It's not an excuse.  I just hope this will ease some

9    of the pain and suffering for many of the victims.

10            I respectfully ask the victims for forgiveness and

11    apologize for all -- to all of them for my mistakes.  I'm truly

12    sorry.  I wanted to be of service to people.  I wanted Celsius

13    to be a service to help people.  I destroyed that, and I'm

14    sorry.

15            This country -- I would like to tell a short story,

16    your Honor.

17            THE COURT:  Go ahead.

18            THE DEFENDANT:  My father, my grandfather, they're all

19    refuseniks in Russia.  The only reason we were allowed to leave

20    was because the United States of America donated 300,000 metric

21    tons to free 300,000 Jews, and my parents, and later my

22    grandparents, were allowed to leave Russia.  When people used

23    to ask me why did I come to the United States, I used to joke

24    and say that four metric tons of wheat that were paid for my

25    family to leave Russia.

P58KMASS

1              This country has given me everything.  It allowed me

2     to fulfill my dreams, live a life that I would never imagine,

3     and I would never, never try to hurt anybody here after

4     everything that the United States has done for me.

5              This country gave me an opportunity to rebuild my life

6     and build a family and serve others.  I hope the Court will

7     give me one more opportunity to rebuild my life, serve others,

8     and get a little more time in the future with my family.

9              Thank you, your Honor.

10             THE COURT:  All right.  Thank you, Mr. Mashinsky.

11             I'll listen to the government.

12             Let me ask the government initially, are there any

13    objections to the presentence report that I haven't dealt with?

14             MS. NICHOLS:  No, your Honor.

15             THE COURT:  No other objections?

16             MS. NICHOLS:  No, your Honor.

17             THE COURT:  I'll listen to you.  Whether you wish to

18    call the four victims first or after you speak, it's up to you.

19             MS. NICHOLS:  I'd like to call them after, your Honor.

20             THE COURT:  Okay, fine.

21             MS. NICHOLS:  I'd like to speak about the 3553(a)

22    factors here today, and I'm going to focus --

23             THE COURT:  Do you want to use the podium?  You can

24    speak from there.  That's fine.

25             MS. NICHOLS:  Can you hear me, your Honor?

P58KMASS

1          THE COURT:  Just speak up, use the mic.

2          MS. NICHOLS:  Yes, your Honor.

3          I plan to focus most of my remarks on the

4    characteristics of the offense and the characteristics of the

5    defendant, which are, as they often are, intertwined here.  But

6    before I turn to Mr. Mashinsky and his words and his actions,

7    which are why we are here today, I'd like to give a moment of

8    time to additional victims who could not be here.  And I know

9    the Court has read the submissions, but I would just like to

10   highlight a few.

11          Joseph Forucci wrote that he invested in Celsius

12   because he hoped to change the trajectory of his and his

13   daughter's life.

14          Geoffrey Cirkel wrote:  What hurts the most is not

15   just the money, it's what the money represented — the security

16   of my family, the education of my children, the belief that the

17   financial system, even in the crypto space, had some basic

18   level of transparency and ethics.  I am now forced to start

19   over financially as a parent, as a provider, as a human being,

20   who once had faith in innovation and progress.  I am trying to

21   rebuild not only my financial life, but also my ability to

22   trust.

23          Daniel Frishberg wrote that Mashinsky's lack of an

24   apology or anything resembling remorse added insult to injury.

25          And this was a theme in the victim letters, your

P58KMASS

1    Honor.

2            Rien VanMarcke wrote that he had convinced his aging

3    mother and other close friends to invest their savings based on

4    Mashinsky's promises of security and fairness.  He writes:

5    When Celsius collapsed, I had to tell them that it was all a

6    lie.  The guilt of failing those who trusted me still haunts

7    me.  He goes on to say:  Mashinsky's cruelty didn't end with

8    the collapse.  His family mocked the victims with unbankrupt

9    yourself merchandise funded by stolen savings while flaunting

10   luxury lifestyles online for his wife and children.

11           And those T-shirts, unbankrupt yourself, sold by the

12   defendant's wife, was also a theme in the victim letters.

13           Finally, Rejoy Varghese writes:  I worked tirelessly

14   to save for my four children's education, dreaming of giving

15   them opportunities that I never had.  Those four Bitcoins

16   represented years of sacrifice, long hours, and unwavering

17   commitment to my family's future.  They were not just numbers

18   on a screen.  They were my hope, my promise to my children that

19   they could pursue their dreams without the burdens that I

20   faced.  When I entrusted my savings to Celsius, I did so with

21   trust and optimism, believing in the vision Alexander Mashinsky

22   presented, but that trust was betrayed.  Greed corrupted his

23   vision, and he unjustly enriched himself at the expense of

24   hard-working people like me.

25           Mr. Varghese is the "every man" of Celsius' victims,

P58KMASS

1  of Mashinsky's victims.  Mr. Mashinsky is, in the words of his

2  own counsel, a predator.  He preyed on hope.

3          And in some of the submissions that we have seen in

4  advance of sentencing today, there was minimization of

5  Mr. Mashinsky's actions.  There was a suggestion that these

6  victims, who believed in what Mashinsky was selling, should

7  have known better, they should have sifted better between the

8  truths that he was selling some days and the lies that he was

9  telling others.

10         Mr. Mashinsky knew exactly what he was doing when he

11  was getting on those AMAs every week and selling these people

12  hope.  He knew, but they did not, that it was a false hope.

13         And despite the efforts in the bankruptcy, which I am

14  going to come to a bit later, your Honor, those victims are not

15  going to be made whole despite the large numbers that we are

16  talking about in terms of the criminal forfeiture and the

17  recovery efforts in the bankruptcy.

18         I'd like to talk about the defendant's actions at

19  Celsius, and I'd like to do it in a chronological order, your

20  Honor, because what we have heard today from counsel and in the

21  written submissions is not true.  It is not true that for years

22  Celsius provided the service that it claimed to provide.  It is

23  not true that the products were real.  It is not true that an

24  unexpected dip in the crypto market is the cause of Celsius'

25  collapse.  Alex Mashinsky's fraudulent schemes are the cause of

P58KMASS

1    Celsius' collapse.

2            Celsius was probably a good idea.  It was innovative.

3    But it did not operate the way that the defendant said.  And it

4    was his lies that induced these customers to turn over their

5    savings to the platform.

6            In the beginning, there was the ICO, and as the Court

7    has already found, Mr. Mashinsky lied about the amount of money

8    that the ICO raised, and this is right out the gate.  Those

9    lies were important and material because they gave Celsius a

10   sense of momentum, a sense of proof of concept.  So many people

11   believed in this business model was essentially the claim, and

12   it wasn't true.

13           In 2019, directional trading, explicitly,

14   specifically, personally done by Mashinsky, caused a

15   $13 million loss.  And at that time, the company's assets under

16   management were only about $100 million.  So this loss was,

17   frankly, catastrophic.  And the CFO at the time came to

18   Mashinsky at the end of 2019 and told him, you have to stop

19   taking customer coins because the customers do not know that

20   they are putting their money into an insolvent company.  This

21   was a face-to-face conversation with Mashinsky, and he did not

22   take that advice.  That CFO resigned.

23           At the beginning of 2020, uncollateralized loans made

24   up more than 70 percent of Celsius' institutional book, fully

25   uncollateralized.  And as the chart in the government's

P58KMASS

submission at page 20 shows, fully unsecured loans continued to

make up about 20 percent of Celsius' book for the remainder of

2020.  Much of the remainder of those were only partially

collateralized, with about 10 percent fully collateralized, and

as the PSR sets forth, and as the Court has found, Mashinsky

repeatedly claimed that Celsius only took fully collateralized

loans.  This was not true.

In early 2020, a recovery committee was formed,

sometimes also known as the bankruptcy committee.  This was a

committee whose task was to see whether Celsius had to go under

or could continue to be a going concern.  It was disbanded in

the late summer of 2020.  But before it was disbanded, the CEL

manipulation began.

Celsius began making, in June 2020, excess purchases

of CEL on the market in order to support the price.  These

purchases were directed by Mashinsky, as set forth in the PSR

and as the Court has found.

Counsel refers to this as a government theory and as

allegations, but it is neither.  It is the offense of

conviction, and it is offense conduct that has been now found

by the Court, and it is set forth in the PSR.

Defense counsel says that it is somehow not believable

that an entire company could have decided to commit market

manipulation, but that is what happened, as directed by the

company's CEO.  And Celsius, the entity, has entered into a

P58KMASS

nonprosecution agreement with the government in which it

admitted facts that were based on its own internal

investigation, including that the rise in the CEL token was not

the product of market forces, but was, instead, attributable to

the fact that Celsius executives, including Mashinsky, had

orchestrated a scheme to manipulate the CEL token by taking

steps to artificially support the price of CEL.  That's in the

NPA, which is the government's Exhibit 2, at paragraph 11.

At the beginning, your Honor, of 2020, when the

recovery committee was first formed, one of the things that it

did was lock up CEL rewards for company insiders as a

cost-saving measure, so insiders, like Mr. Mashinsky and other

executives, would no longer be earning the rewards that

noninsider customers were entitled to based on their own

deposits on the platform.

Mr. Mashinsky, as the largest holder of the CEL token,

other than Celsius itself, was entitled to a great number of

these rewards.  But in the summer of 2020, these rewards were

then unlocked.  And Government Exhibit 31 is a conversation

between the CFO at the time, Harumi Urata-Thompson, and a

trader, Johannes Treutler, on August 5, 2020.  Defense counsel

has commented in their reply submission that the government has

submitted conversations that Mr. Mashinsky is not on to support

the conduct here, and I think this conversation, among many

others, is important, in part, because it refers to

P58KMASS

1    conversations that the participants were having in realtime

2    with Mashinsky himself.

3          Ms. Urata-Thompson mentions two conversations with

4    Mashinsky about the topic of his CEL rewards.  She had

5    challenged him on whether the company could afford to pay him

6    the rewards which he was ostensibly owed based on his CEL token

7    holdings, which, again, he had gotten for free.  Celsius was

8    paying Mashinsky at this time $28,000 a week in CEL rewards,

9    even as it had spent over $2 million during a four-month period

10   bolstering the price of CEL in the market, and even as it had a

11   deficit of half a million dollars for that month.

12         Mashinsky has said, and his counsel has said, that he

13   was not motivated by greed.  But this conversation proves that

14   lie.  He was pushing back to ensure that he could continue to

15   get what he wanted — wealth for himself, wealth for his

16   family — even while the company was headed for a $6 million

17   operating loss that year.

18         The excess purchases that the company engaged in in

19   the year 2020, again, at Mashinsky's direction, were effective.

20   The price of CEL went up from a low of 5 cents in October 2019

21   to 5.50 at the end of 2020.

22         Mashinsky at times personally participated in this

23   manipulative trading.  For example, on October 21st, 2020, as

24   set forth in Exhibit 137 to the government's submission,

25   Mr. Mashinsky checked in with Johannes Treutler, the trader, to

P58KMASS

ask how much dry powder do you have left.  And when Treutler

indicated he did not have enough, Mashinsky said that he would

jump in.

He then purchased 300 ETHE worth of CEL "to support

the morning sellouts earlier today."  Treutler told Mashinsky

that he had saved the day.

Mashinsky did not want those coins, your Honor.  And

Treutler knew that.  He was not building a position in CEL.

Treutler offered that Celsius' OTC desk, over-the-counter desk,

would cover Mashinsky's purchases in order that he be made

whole after his buying supported the price.

To be clear, as set forth in the PSR, these purchases

of CEL in the market, excess purchases compared to what the

company said that it was doing, were not part of any sort of

sanctioned sell/buyback program, they were not blessed by

attorneys, and they were not written or approved.  The company

said that it was doing one thing by buying certain amounts to

cover customer CEL rewards, and then, undisclosed, it was

buying far more than that.  It was also buying to combat

negative news articles, including at Mashinsky's direction in

July 2020.

So, by the end of 2020, your Honor, Celsius

experienced its first institutional default.  And as the Court

has already discussed, Mashinsky was copied on an email that

said that that counterparty was in default on their loan and

P58KMASS

1    would likely default on a second loan.

2            Over a year later, in November 2021, Mashinsky said

3    that Celsius had never had an institutional default.  And this

4    is not the only such statement, they're set forth in the PSR,

5    but I want to talk about this one, because Mashinsky added:

6    And, obviously, we expect it to happen at some point, referring

7    to institutional defaults, but it hasn't happened yet.

8            And I call this to the Court's attention because the

9    AMAs here are peppered with similar indicia of various

10   similitudes.  Mashinsky is not just lying; he is saying it in

11   the sort of folksy way that purports to be transparent — hey,

12   things happen, any company could suffer an institutional

13   default, when it happens, I'll let you know, but we have never

14   had one.  And it was this affect that induced so many of his

15   customers to trust him.

16           Mashinsky is not a buffoon who cannot remember

17   information that he is given and emails that he has received.

18   He has calculated a persona for maximum effectiveness with this

19   kind of phony transparency.

20           In 2021, early 2021, the price of CEL hit 650.  And,

21   at that point, it was so high, that even Mashinsky agreed that

22   the company could ill-afford to support the price at those

23   levels, so he directed the team to cut back on the market

24   purchases to pay rewards.  This directive, among others, shows

25   his understanding that the market buys that he was directing

P58KMASS

were driving CEL's price.  And around the same time, the

company discovered that it had been selling customer Bitcoin to

pay on these purchases of CEL, which was, at this point, much

more expensive than it had been before, and the company

realized that it was short Bitcoin and had to conduct extra

purchases to make up the price.

Mashinsky does not deny that he was made aware of

this, but he has repeatedly said — including today, and

including to the bankruptcy examiner — that Celsius never used

customer coins to pay for its CEL purchases.  That is not true.

Towards the end of 2021, Roni Cohen-Pavon took over

for Treutler as the key person orchestrating Celsius' criminal

market manipulation of CEL.  There are a number of

conversations between Cohen-Pavon and Mashinsky over the last

months of 2021 that show that Mashinsky knows exactly what's

happening.  Mashinsky tells Cohen-Pavon in October '21, the

price will not take care of itself.

Cohen-Pavon replies:  We're not just sitting and

watching the price.  The issue is that people are selling, and

no one is buying except for us.  The main problem was that the

value was fake and was based on us spending millions just to

keep it where it is.

He goes on:  This week, we spent "only" $4 million on

top of rewards, and the price is still going down.

In this conversation, Mashinsky acknowledged that CEL

P58KMASS

lacked value, but denied that this was an issue as long as the
price continued to go up, artificially buoyed by Celsius' buys.
He said, "Everyone wants to buy these tokens because they think
the price is going up."

Who benefits from that speculative frenzy?  Alex
Mashinsky.  In the same year, in 2021, Mashinsky is, not once,
but several times, selling crossed with the company's excess
buying, and his sales separately violate the company's CEL
trading policy.  In early 2021, the CFO at the time brought
this to Mashinsky's attention and told him to stop violating
the policy, and told him that his selling into the company's
buy orders was making it very difficult for the company to
continue to keep CEL's price where it was.  He does not stop.

Other employees discuss this pattern of Mashinsky
selling into the company's buy orders, and, again, he notes in
his reply submission that as to some of those, he is not on the
communications.  But it cannot be — and it is not true — that
Mashinsky was the only person at the company who did not
understand that this was happening.

Employees complained that they were spending so much
money to support the price for CEL, only to allow Mashinsky to
be able to sell higher.  He did know, and he was told in early
2021, but he could not be deterred.

Also in '21, his repeated lies during the AMAs begin
to come to a head.  His risk team begins reviewing them and

P58KMASS

putting in place an editing process to take out the
misrepresentations.

In early 2022, new executives come in with impressive
backgrounds in finance.  There is also a massive equity
investment that results in those equity investors getting board
seats and access to company management, including the new
executives.

These new professionals identify problems with the
company.  They're not new problems, but they are of renewed
focus at the highest levels of Celsius.

Mashinsky continues to ignore the problems.  He
continues to oppose lowering rewards rates, and he churns
through the entire equity investment in mere months.  He does
not listen to these new advisors.  We highlight some examples
of this in our submission.  I'll just flag a couple.

In May 2022, Celsius' CFO told Mashinsky that the CEL
token rewards rates need to be lowered because, otherwise, they
will continue to dig a deeper hole for many months.

Mashinsky ignored this advice and said:  Follow my
lead on CEL.  I don't need help in marketing.  I am going to
bring in a few billion, just like I brought in my first
20 billion.

These messages show that there was no amount of bad
news that Mashinsky could receive that would change his
attitude towards CEL and his belief that the way for Celsius to

P58KMASS

continue to appear to be solvent was simply to raise new money from new investors.

Chris Ferraro, who has served as the chief restructuring officer during the bankruptcy and joined the company in March 2022, shortly before it folded, testified in a deposition that Celsius had spent approximately $300 million purchasing cryptocurrencies for its accounts to cure directional positions and make them market neutral, as Mashinsky had promised.

Even after the huge losses in January of 2022, resulting from directional positions at Celsius, Mashinsky said, in an April interview, that the company was delta neutral. After that interview, a chart was made for him by senior executives at Celsius, setting out his false statements, and he was confronted with it and told to stop repeating these lies. And it was only at this point that Terra Luna imploded.

So it is not true that Celsius' collapse was caused by external forces beyond anyone's control.

After the price drop across the crypto industry that resulted from the Terra Luna implosion, Mashinsky did a few things in response. He engaged in more AMAs to try to reassure his customers. He tried to push retail loans to get more collateral from his customers. He engaged in more buying to prop up the price of CEL, including by going to a trader directly after the CFO told him that they could not spend more

P58KMASS

money on propping up the price of CEL.  And he took his own

money off the platform.

Mashinsky's knowledge that the company was in a dire

position is best illustrated by his actions.  He claims in his

reply submission, for the first time, that on April 8, 2022, he

made deposits to the platform.  We checked this.  There were

not deposits on that date.  There were other deposits in the

month of April in Bitcoin and ETHE.  Those were very nearly to

the dollar canceled out by withdrawals that his wife made from

her account, worth about $2.95 million, on April 10, 2022.

This offset the assets that Mashinsky was bringing onto the

platform.

And then, as set forth in the PSR, and as we have

already discussed, in May, he takes almost all of his ETHE and

Bitcoin off the platform.

That brings us to the bankruptcy, your Honor.

Mr. Mashinsky claims again today that he is being helpful.  He

claims that the last thing that he cared about was his own

wealth.  And that is not the case.  He has pointed to him

voluntarily sitting for an interview with the bankruptcy

examiner as evidence of his good faith.  Among other things, he

told the bankruptcy examiner, "People might say I'm a God, but

I'm not.  I'm only human.  I just went on a show once a week to

tell people what I feel."

He gave factual information that the bankruptcy

P58KMASS

examiner did not appear to credit, including denying that

Celsius manipulated the price of CEL or that it engaged in

directional bets.

He was forced out of the company in September of 2022.

So it is not true that he was the architect of the

restructuring plan that was eventually put into place during

Celsius' bankruptcy proceedings.  I understand that he met

once, in August, with the unsecured creditors committee, but

that meeting was not integral in any way to the plan that was

put into place, as led by Chris Ferraro and the other employees

of the company during the restructuring process.

I'd like to talk about the claims briefly in the

bankruptcy.  The plea agreement requires Mr. Mashinsky to

withdraw with prejudice the claims that he has asserted on

behalf of himself and the entities that he controls.  He has

not done this, as of today.  I have spoken, just this morning,

with Mr. Mukasey about this, and I think that we can get there,

your Honor, but for today's purposes, the agreement in the plea

agreement has not been fulfilled, and so --

THE COURT:  Excuse me.  Hold on.

Yes?

MR. MUKASEY:  Your Honor, I'm sorry for interrupting.

THE COURT:  I'm sorry, no, go ahead.

MR. MUKASEY:  I just want to clarify --

THE COURT:  I'm sorry?

P58KMASS

1          MR. MUKASEY:  I just want to clarify:  Last night, at

2     about, I don't know, 5:00 o'clock, I sent an email to the

3     government saying, are there any issues we need to discuss in

4     advance of sentencing?  I want to make sure the whole thing

5     goes as smoothly as possible.

6          The government said, you know, we don't really know

7     how it's going to go.  If you want to write us an email, we'd

8     be happy to listen to it.  I think it was in good faith.

9          No mention of this alleged noncompliance with the

10    bankruptcy undertakings in the plea agreement.  It hit us this

11    morning, you know, out of thin air, that the government thinks

12    Mr. Mashinsky has not done what he needs to do with respect to

13    withdrawing claims.  We are not his bankruptcy counsel.  We

14    are --

15          THE COURT:  Fine.  It won't affect the sentence,

16    whether the claims are withdrawn from the bankruptcy.

17          MR. MUKASEY:  I just want to put on the record that we

18    are going, we endeavor, to live up to the language of the plea

19    agreement, to make sure that Alex does whatever he can to do

20    that.

21          THE COURT:  Okay.  Thank you.

22          Government?

23          MS. NICHOLS:  Thank you, your Honor.

24          I appreciate what the Court said about it not

25    affecting the sentence.  I think it does affect the

P58KMASS

restitution, because in the plea agreement, the consideration

for him agreeing to withdraw with prejudice the claims that he

has asserted on behalf --

THE COURT:  In the plea agreement, the government does

not seek restitution because it says that it will seek

restitution for victims in the course of the bankruptcy

proceeding, and, therefore, it urges the Court not to impose

restitution as part of the sentence in this case — yes, I know

that.

If the government alleges now that there is something

different in the bankruptcy that should affect that provision,

the Court would not be in a position to formulate an order of

restitution today, obviously.  I appreciate that restitution is

something that could be determined in the future, after 90 days

or even a further extension, put the defense says it will

comply with the provisions of the plea agreement with respect

to withdrawing claims in the bankruptcy.

MS. NICHOLS:  Exactly so, your Honor.  And so all the

government is asking for today is that the Court order that

restitution to the victims does apply, and we can have a

conference in 90 days, but it sounds like it could very well be

resolved ahead of then.

THE COURT:  Mr. Mukasey, do you have anything?

MR. MUKASEY:  I just want a moment to look at the plea

agreement, Judge.

P58KMASS

1        THE COURT:  While you're doing that, I want to take a

2   break for the court reporter, in any event.  I was going to

3   wait until this portion of the government's presentation ended,

4   but since there is a break, I'll take a ten-minute break now.

5        (Recess)

6        THE COURT:  All right.  The government.

7        MS. NICHOLS:  Thank you, your Honor.

8        We had a chance to talk again with defense counsel

9   during the break.  And all the government is asking is that the

10  Court defer the question of restitution for 90 days.  I

11  understand that's acceptable to the defense.

12       THE COURT:  Okay.

13       MS. NICHOLS:  The Court has already said that this is

14  not going to affect the sentence, so I won't continue, but I

15  think the reason why the government thinks that it's

16  significant is that, despite Mashinsky's gestures at

17  prioritizing recovery for victims, he's, once again, not

18  putting his money where his mouth is, and he wants his family

19  and his children, and trusts for the benefit of his children,

20  and CEL token in his wife's name that he gifted her during the

21  fraud, to come before the recovery of the victims here.  I do

22  think that that is worth the Court's consideration at sentence.

23       In the final reconciliation of the numbers here,

24  Celsius' customers lost access to approximately $5 billion as

25  of the date of the pause.  As the litigation trustee has said

P58KMASS

1    in his letter to the Court, even under the most conservative

2    estimates, Celsius was missing at least 1.3 billion at that

3    time, and the true number is higher because some of the assets

4    that Celsius held on its books at the time of the bankruptcy

5    turned out to be worthless.

6            So, when we fast forward to the first distribution to

7    creditors in the bankruptcy in January 2024, crypto prices have

8    come up during that time period compared to what they were as

9    of the bankruptcy petition date.  Celsius was able to

10   distribute just shy of $3 billion, constituting 58 percent of

11   claims.  But that is obviously not making customers whole

12   because, first of all, it's not a hundred percent, and, more

13   saliently, Celsius benefited from the run-up in prices and

14   customers did not, because their claims were valued as of the

15   petition date, they were dollarized as of the petition date.

16           So if the customer assets that Celsius had held on the

17   bankruptcy petition date were valued at today's crypto prices,

18   those same assets would be worth approximately $12 billion.

19   And I think, your Honor, that is where some of the anger and

20   the hurt is coming from in the victim letters here, because it

21   wasn't crypto that was a bad bet, it was Mashinsky.  And they

22   realize that if they had held their Bitcoin somewhere else, it

23   would be worth far, far, far more than they will ever get back

24   for it.

25           As I've already said, as he agreed in his plea

P58KMASS

agreement, Mashinsky benefited tremendously from this fraud.
He made about $46 million selling CEL token into the
artificially inflated prices — CEL token that he got for
nothing because it was gifted to him during the ICO.  He got an
additional $2 million in bonuses for CEL hitting certain price
thresholds, again based on the artificial manipulation.

Where did that money go?  Some of it, the government
froze through a TRO in the summer of 2023 and expects a forfeit
of that property.

A lot was spent on Mashinsky's lifestyle.  There was
about $30 million in CEL proceeds in a particular Fidelity
account, and some of that was disbursed to other accounts, but
the rest was spent.  That $9 million penthouse in Manhattan was
renovated over the course of the fraud.  Mr. Mashinsky has two
other properties, real property.

According to the PSR, during the fraud, two new trusts
were formed to benefit Mashinsky's children, and one of the
older trusts routinely covered Mashinsky's living expenses with
the consent of the trustee, Mashinsky's sister.

At the end of this, Mr. Mashinsky will still be a
wealthy man, but his victims cannot say the same.

Your Honor, I have covered the nature and
circumstances of the offense.  I have covered the
characteristics of the defendant that are relevant here to the
conduct that he engaged in.

P58KMASS

1          I'd like to speak very briefly about specific
2     deterrence, general deterrence, and respect for the law.
3          Your Honor, the government's view is that you can, and
4     should, listen very carefully to what Mashinsky has said, what
5     his counsel has said, in considering whether he has truly made
6     himself accountable for these crimes.  He apologized today for
7     mistakes, but throughout this sentencing proceeding, he has
8     acknowledged with specificity very few mistakes.  And there is
9     a real concern that a significant sentence is needed to impress
10    upon him specifically that what happened here was not a fluke,
11    it was not a whoops-a-daisy, it was not the volatility of the
12    crypto market; it was him, it was his lies, it was his fraud.
13         The Court should also consider general deterrence and
14    respect for the law.  The government is asking for a big
15    sentence, your Honor.  We do not do that lightly.  We're asking
16    for a big sentence because deterrence is necessary given the
17    scope of the fraud here.
18         Deterrence and respect for the law is particularly
19    important in the crypto industry, which is new and
20    ever-changing.  A strong sentence is needed to send the signal
21    that fraud is not acceptable in any space, whether it's
22    traditional finance or the crypto industry or some as yet
23    unconceived innovation that may come in the future.
24         The government is asking for a significant sentence in
25    order that the Court show future fraudsters that crime does not

P58KMASS

1    pay.

2            So, with that, your Honor, unless the Court has other

3    questions for the government, there are a number of victims who

4    have asked to speak.  I think the number has increased to six

5    today, and I will start with --

6            THE COURT:  Could I stop you?

7            MS. NICHOLS:  Yes, your Honor.

8            THE COURT:  We have gone for almost three hours, and I

9    think it's fair to have a lunch break before I listen to the

10   victims — fair to the victims, as well as to the court

11   reporter.  I could go on without lunch, but in deference, I

12   think we should break until 2:30.  So, we'll break until 2:30.

13           (Luncheon recess)

14

15

16

17

18

19

20

21

22

23

24

25

P58KMASS

                        AFTERNOON SESSION

                             2:30 PM

1            THE COURT:  All right.  Government?

2            MS. NICHOLS:  Thank you, your Honor.

3       There are a few people who have indicated that they'd

4  like to speak, and in no particular order, I'll call Cam Cruz.

5            THE COURT:  Please state your name.

6            MR. CRUZ:  Good afternoon, your Honor.  My name is

7  Cameron Cruz.

8            THE COURT:  And could you keep your voice up.

9       Mr. Westfal, maybe raise the volume on the lectern

10 mic?  Thank you.

11      Go ahead, sir.

12           MR. CRUZ:  Yes, thank you.

13      My name is Cameron Cruz.  I am one of Mr. Mashinsky's

14 many victims, and I serve on the litigation oversight

15 committee, although I'm speaking in my only personal capacity

16 today.

17      And I think I'd just like to express the severe damage

18 and hurt that Mr. Mashinsky's actions have caused.  And just

19 hearing the defense and their expression of what occurred is

20 very different from the reality that thousands of Celsius

21 customers across the world have experienced.

22      Ms. Young brought up the idea of an elephant and how

23 metaphorically people are touching the elephant, they would get

P58KMASS

```
 1   different impressions of what occurred.  I would submit that
 2   the defense is at the opposite of the elephant from the victims
 3   of Celsius.  We are at the tusk end, and we have been gored.
 4   At the other end, we are hearing simply things that are not
 5   true.  There was something about expressing the damages
 6   2 percent of the total assets that Celsius managed.  This is a
 7   horrific minimization of what occurred.
 8        I've spoken to countless victims across the world, one
 9   of which, just as an example, doesn't want to be named, but he
10   is an Australian customer who lost all of his Ethereum loan
11   collateral, and because he had acquired it at low prices, he
12   now owes massive tax bills and is effectively wiped out.  His
13   wife and kids are destitute, and he used to have what he
14   thought was a fortune.  And he was induced into Celsius because
15   of what Mr. Mashinsky put forward as the Mashinsky method.  The
16   defense had mentioned that he is working on a new book about
17   gravity, but he seems not to understand the gravity of the
18   situation.
19        He is claiming that he is guilty, but everything that
20   he is saying through his defense is as if this is no big deal.
21   Like he even submitted a letter from one of his children that
22   said his dad had not done anything severe.  And this would have
23   been reviewed by, presumably, counsel and the parents, but this
24   is what they're teaching their kids — that this is not anything
25   severe.  People's lives have been ruined.
```

P58KMASS

1          In the span of the three years we've been waiting for

2     justice, the estate has published that they are aware of 231

3     creditors who have passed away while we are waiting for

4     justice.  They will not see justice; they did not survive.  And

5     the defense has put a focus on how painful it is to be behind

6     bars.  What about the pain of these people and their families

7     that have lost their family members waiting for justice?

8          Mr. Mashinsky seems to think that he can turn himself

9     in weeks later — he wants to attend a wedding.  I ask

10    Mr. Mashinsky how many funerals have you attended of your

11    victims?  Can you even remember the names?  You say you've read

12    our letters.  Can you remember -- how many names can you

13    remember?

14          You said that you --

15          THE COURT:  Just address the Court.

16          MR. CRUZ:  Very well.

17          He has said that he has spoken to us.  In December of

18    2022, I publicly invited Mr. Mashinsky to a conversation.

19    Instead, he blocked me.  And he has blocked many of us on

20    Twitter.  The people he has spoken to are the people that still

21    believe that he is innocent, many of which have written letters

22    in his defense.

23          And he has maintained this posture that he is pleading

24    guilty, but he has said only two misstatements.  If you review

25    the corrections that his team has submitted, that I believe the

P58KMASS

1    prosecution has included in their exhibits, where they reviewed

2    his AMAs for misstatements, any one of these AMAs would include

3    much more than two misstatements.  So he is averaging over two

4    misstatements per hour, let alone two misstatements over five

5    years.  It's just, frankly, offensive to those of us that have

6    had to listen to these AMAs, and have had to listen to the lies

7    and the clear misstatements.

8         And the record will show that he knew about these

9    horrific losses, and he simply thought he could cover it up and

10   fix it, but it only made matters worse.  Rather than tell his

11   customers about these losses, he just carried on.

12        I came to Celsius in late 2021, after most of the

13   horrific incidents occurred.  And their promising yield or

14   interest, whatever you want to call it, between 5 and

15   8 percent, maybe 5 and 9 percent, depending on what assets you

16   hold, in reality, my return was negative 100 percent because

17   the life of my funds was less than six months on the platform,

18   and I got back maybe 40 percent of my original investment.

19        This is not uncommon.  Many people have been wiped

20   out.  I was lucky that I only put perhaps two years of my -- or

21   I got back about two years of my savings lost, but there's

22   others that have put their life savings in here.  And to go

23   back to the Mashinsky method, the idea of being able to live

24   off of the interest you have, that was an invitation to put

25   your life savings at risk, because you would need to generate

P58KMASS

1    that healthy return to fund your lifestyle.

2             So he was inviting people to deposit their life

3    savings.  The day before the pause, he encouraged a customer to

4    deposit or to open a retirement account on Celsius for a reward

5    of a thousand dollars.  If you're inviting people to have their

6    retirements on your platform, these are long-term savings that

7    need to be protected, the type of investment that should never

8    be engaging in or exposed to this type of horrific loss.

9             And when I discovered the losses that my funds were

10   subjected to, that occurred prior to my arrival, it made it

11   even more offensive to me because he had hidden these.  He had

12   actually also suppressed -- there were independent journalists

13   that had uncovered many of the Celsius loss events, including

14   they lost the keys to 35,000 of Ether, they had failed to get

15   back collateral on a loan to Equities First, and so this was a

16   half a billion dollar impairment, but did they tell their

17   customers?  Instead of telling their customers, they just

18   pretended like everything was okay.  They said we know that we

19   have borrowed, say, over a hundred billion dollars secured

20   against our collateral, which now is appreciating value, and

21   you don't have it anymore, but we'll pretend like the loans are

22   intact, we're just going to say you owe us an uncollateralized

23   loan.

24            So this was a huge problem they concealed while

25   Mr. Mashinsky went on AMAs saying they had no defaulted loans.

P58KMASS

1    It's just simply not reality.

2            The defense also mentioned there was no, what was the

3    term, original sin.  The ICO was a fraud.  They did not raise

4    $50 million; they raised $32 million.  The "I" in ICO stands

5    for "initial."  This is original sin literally in the term

6    itself.  Celsius was founded on fraud, and it compounded.  You

7    can't take shortcuts like Mr. Mashinsky did.  And he continued

8    to do that from the beginning to the end, until he ran out of

9    time.

10           He's presented here that he looked out for his

11   customers by pausing at the end to protect us.  The reality

12   was, they run out of Bitcoin to distribute.  They had no

13   choice.  The Bitcoin had all flown out the door.

14           They only paused because they had no options, and,

15   unfortunately, customers that have lost their money, many of us

16   have much more limited options in our own lives.  And I think

17   that is where the focus should be today — on the victims and

18   how much we have suffered, many of which are too overcome to

19   report on their victimhood because to lose your life savings

20   and get a small amount back poses an incredible toll, and it's

21   very difficult for people to not only lose their money, but

22   have to face the shame and humiliation of having believed in

23   somebody who asked for their trust and who returned so little.

24           The defense has said that Celsius was Mr. Mashinsky's

25   life.  So I ask the Court to judge him based on Celsius, then,

P58KMASS

1    rather than all these other elements that they're trying to

2    introduce.  This is really one of the worst crimes, and

3    needless, because he could have come forward at any point over

4    the five years and been honest.  But even here, today, he's not

5    being honest.  He's minimizing what he's done, and for that, I

6    ask you to impose a harsh sentence today.

7         Thank you, your Honor.

8         THE COURT:  All right.  Thank you.

9         MS. NICHOLS:  David Smith.

10        MR. SMITH:  Hello.  My name is David Smith, D-a-v-i-d,

11   S-m-i-t-h.

12        THE COURT:  Good afternoon.  Go ahead.

13        MR. SMITH:  Yes.

14        I didn't intend to speak here today, and I didn't even

15   know earlier this week if I was going to come.  I thought, as I

16   was asked to speak, you know, would that be helpful to other

17   people, because I've heard that term come up before.  Because I

18   also realize by putting myself on the public record, I'm, yet

19   again, exposing myself to potential problems, which have been

20   ongoing, you know, from being involved in Celsius.  It's not

21   over for me today — it continues.  People continue to try to

22   scam me.  Today, there's a hearing somewhere else, you know,

23   where I could be representing my interests in a different court

24   matter over there.  And, so, the victimization, you know,

25   continues to this very day, it's not even over, and it probably

P58KMASS

1    won't be over for years.

2            And I think in this society, the reason I'm speaking

3    here today is because crime cannot pay.  We need to have a

4    society where people do not commit crimes and so this doesn't

5    happen to more people.  It already happened to me and those of

6    us here and the people who have lost their lives during this

7    time, and I just hope that we have less and less, ideally none,

8    of that, which was one of the promises of this new technology

9    where you could have transparency and understand what was going

10   on.

11           And I think Ms. Young's words stuck out to me, as

12   well, when she talked about the elephant and talked about

13   focusing on small pieces.  And I think that's what's been tried

14   to happen here today — they try to focus on small pieces

15   instead of talking about the broad picture of what happened,

16   where this company and Mr. Mashinsky engaged in risky behavior

17   and self-enriching behavior, lies to cover that up.  And after

18   the fact, when everything went south, maybe he did try to

19   recover for everybody, because that was then in his and his

20   family's interests, because if I was made whole, I wouldn't

21   have any problem, I wouldn't be here today.  There wouldn't be

22   a court hearing somewhere else, you know, that I'm not at.

23           And so that elephant really stood out to me, where I

24   think they tried to focus on minutia instead of the very simple

25   broad picture.

P58KMASS

1            My understanding of this company was that they have

2      overcollateralized assets.  And, so, when they lend you a

3      Bitcoin, they've got maybe 1.6, maybe 2 Bitcoin, something like

4      that, behind.  So, then, following that model, it's very hard

5      to lose funds, you'd have to be hacked or have something go

6      awry.  I never imagined that the CEO of the company would lie

7      about what was going on and would engage in the risky behavior,

8      the trading, all these things, that have been talked about

9      here.

10            Talking about the company still existing, that was

11      pointed out as a benefit, I don't understand that at all.  I

12      wish that the company right now does not exist because I

13      continue to be victimized and continue to wonder when am I

14      going to get the value there.  I wish it would have been shut

15      down two and a half years ago and sold when this whole thing

16      went.  And so I don't know why that would be viewed as a

17      positive.

18            So I think viewing, again, the totality of what

19      happened, I think you can look at microscopic instances in this

20      man's 60 years of life, like the 30 people that he helped that

21      were cited, or helping somebody find a job, who it sounds like

22      they were not particularly qualified, but were given a chance,

23      and I think all the facts get twisted to find whatever fits the

24      narrative that he is a good person who was looking out for us.

25      But I think when you look at the totality, at one point, it's

P58KMASS

helping people who don't have a track record, it's helpful to
him, so that gets put out.  Another point is having people who
worked at TIAA-CREF is helpful, so that gets put out.  But the
only consistent thing that I've seen is that there's
minimizations, like Cam said, and protection of his own assets,
minimization of what he did, enriching his own family and lies,
and that seems to be really the common theme to me when you
look at the totality of that, and that there isn't remorse.

     For those reasons, I do think there needs to be a
harsh sentence so that this doesn't happen to tens of thousands
or hundreds of thousands more.  There are a huge amount of
victims in this case.

     Thank you.

     THE COURT:  Thank you.

     MS. NICHOLS:  Santos Caceres.

     MR. CACERES:  Good afternoon, Judge.  Thank you for
allowing me the time to speak today.

     THE COURT:  Would you spell your last name for the
reporter.

     MR. CACERES:  My first name is Santos; my last name is
Caceres, C-a-c-e-r-e-s.

     THE COURT:  All right.  Thank you.  Go ahead.

     MR. CACERES:  Judge, I'm here today to tell you a
little bit about my story and where I come from, and just for
you -- for the court and for you, your Honor, to have an idea

P58KMASS

1  of perhaps a different side of the story.  There's always two

2  sides of a coin.

3          And I just wanted to start off by saying that I grew

4  up in Argentina, and I became a natural citizen of the United

5  States about four years ago.  In the year 1999, I traveled from

6  Argentina to the State of Alabama to pursue an education.  I

7  graduated with a degree in business administration, which I'm

8  very proud of.  And since the year 2000, I've lived in the

9  United States, and I'm happy -- I'm proud to be a citizen of

10 the United States of America.

11         I wanted to tell you a little bit about my story

12 because I grew up in Argentina as a Catholic boy, and one of

13 the things that my father always taught me was to take

14 responsibility for my decisions.  Unfortunately, my father

15 passed away when I was 12 — he had lung cancer, and -- but that

16 was in 1994.  And, to this day, I remember very vividly, when

17 he told me one day you're going to be a man, and you're going

18 to have to learn how to take your own decisions and take your

19 own responsibility.

20         Having said so, I am a victim of Celsius.  I did lose

21 a good amount of money.  I was a CEL token holder — I got 100.

22 There's many, many difficult things that I've lived in the last

23 two years, for sure, not only myself, but also my wife.  She is

24 also a creditor of Celsius, and we have two little kids.  You

25 know, I feel -- I feel the pain of every single victim here.

P58KMASS

1    I've gone through it myself.

2            I also tried to remain optimistic, I tried to remain

3    positive of the future.  So far, what I believe -- I was always

4    scared for this to be a Chapter 7 liquidation, and really,

5    really be hurt deeply, but, fortunately, this bankruptcy and

6    the United States Code allows businesses to reorganize and go

7    through Chapter 11 reorganization, and, to my understanding, a

8    Chapter 11 reorganization is an opportunity to reorganize the

9    business, restructure the business in a way that, hopefully, we

10   would -- as creditors, will get close to being whole in our

11   losses.

12           Having said that, I remain optimistic, I remain

13   positive of the future that comes.  So far, I was distributed

14   about 60 percent in coin, liquid coin, as the effective date.

15   I was also given -- my wife and I were given shares of Ionic

16   Digital, which is the new Celsius mining company, about

17   14.9 percent.  That takes my wife and I out to 75 percent

18   recovery so far.

19           I believe the Celsius debtors have -- forgive me, I'm

20   not perfect with the numbers, but I believe they do have

21   $1.3 billion ready to be distributed.

22           I also believe the litigation oversight committee has

23   anywhere from 3 to 5 billion dollars, depending how you want to

24   value all these claims.

25           Ionic Digital is doing very well.  They do have 2,600

P58KMASS

1    Bitcoins in the treasury.  It's not yet a public company, but

2    it's aiming to become a public company.  And one of the reasons

3    why I was happy about receiving shares of Ionic Digital is that

4    it is my belief that the shares of this company will outperform

5    their underlying asset, which is Bitcoin.  If I run a

6    comparative analysis of all the public miners in the United

7    States, their market capitalization is close to -- let's just

8    say it's averaging between 2 and 4 billion dollars.  I did

9    receive shares of a company that was valued at 750 million, so

10   I do believe today, although they're not tradeable, the shares,

11   I do believe that the shares are valued more than the 20-dollar

12   effective date.

13          So, when I put that into consideration -- and,

14   obviously, the markets have gone up since the effective date,

15   and when I do put everything into calculation, my wife and I,

16   today, our holdings surpassed a hundred percent of the

17   recovery.  I do feel for the creditors that only have Bitcoin,

18   and they only have Bitcoins.  Those were the ones that suffered

19   the most losses.  But for creditors that did have stable coins,

20   alternative coins, coins that are not very famous or powerful

21   in the markets, and coins that have completely disappeared from

22   the markets, people that do have stable coins, they have been

23   able to benefit from the crypto prices going up.  So, for

24   example, a creditor that had only stable coins, today that

25   creditor, it's over a hundred percent easily of today.

P58KMASS

1          So the last thing I want to say is that there's always
2     two sides of a story.  I haven't been a creditor that can say,
3     oh, everything is fine.  I've felt it, it's been very
4     difficult, but, again, if I go back to my childhood beginnings,
5     where my father did tell me when you take a decision, you take
6     the responsibility, you don't need anybody to protect you, you
7     don't expect anybody to step in and try to solve your problems,
8     you become a man, and you take care of that, and I believe
9     that's what I'm doing today.

10          My wife and I, we're going to make it.  We'll remain
11     very, very optimistic about what's coming.  We believe in the
12     new Celsius Ionic Digital, and we believe that those 3, 4,
13     $5 billion in claims that the litigation oversight committee is
14     working really hard on — and they're doing a great job — I do
15     believe we're going to be getting recoveries for the next year,
16     two, three, four, five years to come.

17          Having said so, and just to finish, Judge, thank you
18     for your time, and I just want to say that, briefly, I know
19     Mr. Mashinsky, he's a human being, he's done mistakes, he's
20     caused a lot of pain to people, he's here willing to take
21     responsibilities for all the things he's done.  He's not shying
22     away.  And I think that today can be a very good day for all of
23     us involved — victims, the Court, defense counsel, Alex,
24     Krissy, the kids, and everybody else that is invested in this
25     case.

P58KMASS

1          So, thank you for your time, and have a nice day.

2          THE COURT:  Thank you.

3          MS. NICHOLS:  Hugh Mitton.

4          MR. MITTON:  Good afternoon, Judge.

5          THE COURT:  Good afternoon.

6          MR. MITTON:  Hugh Mitton, H-u-g-h M-i-t-t-o-n.

7          THE COURT:  I'm sorry, last name again is?

8          MR. MITTON:  Mitton.

9          THE COURT:  Okay.

10          MR. MITTON:  Forgive me, I'm a pretty nervous public

11  speaker.

12          So, I invested in Celsius because I saw a video of

13  Mr. Mashinsky saying that you deposit coins with them, and they

14  loan them out to institutional investors, and that these loans

15  are collateralized, meaning they're pretty safe, and then the

16  percentage of the money that they get from the borrowers,

17  they'll pay back to me at 5 or 6 percent, whatever it was.

18          So imagine my surprise when I learned, after the

19  pause, that they've been doing other things with my money, like

20  investing in this Bitcoin mining operation, which they never

21  mentioned once.  And on top of that, they invested in Luna

22  coin, which, in itself, was a fraud, and I would argue like

23  very obviously a fraud, paying 20 percent interest, and then

24  they -- I heard that they had a risk analysis done on this as

25  well, which is very surprising to me.

P58KMASS

1          So, there were just a number of things going on behind
2     the scenes, which were very different to the public image that
3     was the reason I bought into Celsius, and Mr. Mashinsky would
4     have had to sign off, presumably, on all of these, as the CEO
5     of the company.
6          In the time that's passed since the pause, I didn't
7     just lose my money, I've lost my sleep, I've lost my mental
8     health, and I've also lost my time trying to figure out what's
9     going to happen, if I will get anything back and if I need to
10    do anything in this.
11         I also noticed that the defense counsel said that his
12    son is attending university and he's missing the graduation,
13    but it doesn't make mention of all the people that can no
14    longer afford to send their children to university.
15         I think the worst part is that through all this,
16    Mr. Mashinsky hasn't apologized, he hasn't owned it.  We never
17    got a single email saying sorry or making himself accountable
18    for what happened.  All I did see was videos his wife posted on
19    social media of her dancing in their penthouse apartment.
20         Thank you for your time, your Honor.
21         THE COURT:  Thank you.
22         MS. NICHOLS:  Hollis Waite.
23         MR. WAITE:  Hollis Waite, that's W-a-i-t-e.
24         THE COURT:  Okay.  Go ahead.
25         MR. WAITE:  So, I didn't come here expecting to speak.

P58KMASS

1    I didn't even realize it was an option until about two hours

2    ago.  So forgive me if I'm a little scattered.

3              I am a 49-year-old father of two daughters, age six

4    and ten.  As a victim of Celsius, now I'm woefully unprepared

5    for the upcoming expenses of college and everything that the

6    kids are going to need.

7              So, my youngest daughter is struggling a little bit

8    with reading lately, and I would love to be able to spend more

9    time with her because I know that I could fix that.  But

10   because I also have to look to the future and these

11   expenditures coming up, I've been unable to sort of scale back

12   and take a job which is less demanding.  At the moment, I

13   currently work, you know, a minimum of 60-plus hours a week,

14   and, basically, I just have to make a judgment call here.

15             So, I used -- I do work in finance.  I used to be on

16   the central risk desk at a very well-known bank.  And,

17   essentially, the purpose of that job is to make sure that

18   traders don't take excessive risks with customer funds.  We run

19   it through some complex equations and make sure that, you know,

20   people aren't doing anything that's too likely to blow up.  The

21   reason for that is that people who are custodians of customer

22   funds are generally incentivized to risk as much as they can

23   because, you know, it's not their money.  If they make large

24   profits, they're going to get a cut of that as a commission,

25   whereas if it fails, well, they're not going to bear the full

P58KMASS

1   brunt of that.  So, in a way, it's sort of like an extension of

2   the concept privatized gain, socialized losses.

3           And you'd be surprised by how often people try to

4   figure out ways to get around the system and just increase the

5   amount of risk that they're taking.  But one thing that anyone

6   who's even remotely involved in finance would know — and I'm

7   assuming that this includes Mr. Mashinsky — is that taking

8   excessive risks with customer funds without their knowledge is

9   essentially stealing.  Whether you get away with it or not,

10  then you still, in a sense, have taken something from them.

11          And this is something that I feel -- I don't think

12  that Alex is uniquely dishonest in this regard.  I think that

13  there's people, probably millions of people, like in a similar

14  situation that would have done a similar thing — they say,

15  okay, well, maybe we can take a little bit more risk and I can

16  save my business, or maybe I can make a higher commission, or

17  maybe I can accomplish something else which benefits me

18  personally.  And I think that this situation is bigger than

19  Alex Mashinsky.  I think it's necessary that we send a message

20  to people that there is -- that taking excessive risks is

21  theft, and that people who do it will be punished, so that

22  others think twice about making these kinds of decisions.

23          So, although I don't think it's likely that Alex would

24  be a recidivist, I'm sure he's learned his lesson, and I agree

25  that he's -- regardless of the sentencing, he's going to face

P58KMASS

1    excessive -- he's going to face a lot of embarrassment,

2    personal embarrassment, and it's going to be hard to get a job

3    or whatever, but I think that we really do need to send a

4    message to all the other would-be white collar criminals.

5            So, that's all.  Thank you.

6            THE COURT:  Thank you.

7            MS. NICHOLS:  That's all that we're aware of, your

8    Honor.

9            THE COURT:  All right.

10           That concludes the presentations by the defense, the

11   defendant, and the government.

12           I will place the presentence report, the

13   recommendation, and the addendum in the record under seal.

14   I'll place all of the parties' submissions to me also in the

15   record under seal.

16           The parties can submit redacted copies for the record,

17   not under seal, after redacting such things as personal

18   identifying information, health information, and the like.

19           For the reasons that I explained at length at the

20   outset, I adopt the findings of fact in the presentence report,

21   except on page 6, paragraph 9, it should read 3B1.3, not 3B1.2;

22           Second, I've stricken paragraphs 41 and 43(d);

23           And, third, paragraph 56(a), lines 5 and 6, the email

24   should read from Mashinsky to Cohen-Pavon, and not from

25   Cohen-Pavon to Mashinsky.

P58KMASS

1          Therefore, I conclude that, under the current

2     guidelines, the total offense level is 43, the criminal history

3     category is I, and the guideline sentencing range is

4     360 months — 30 years.

5          I appreciate that the guidelines are only advisory,

6     and that the Court must consider the various sentencing factors

7     in 18, U.S.C., Section 3553(a) and impose a sentence that is

8     sufficient, but no greater than necessary, to comply with the

9     purposes set forth in Section 3553(a)(2).

10          The offense in this case is extremely serious.  The

11     defendant committed commodities fraud and securities fraud that

12     resulted in the loss of about $590 million.

13          The defendant personally profited from those crimes by

14     more than -- well, personally profited by more than $45 million

15     from the securities fraud.

16          The letters from the victims in this case were

17     extraordinarily moving.  They show that people lost their life

18     savings, or a substantial portion of them, and that many people

19     suffered severe psychological injuries from their financial

20     losses.

21          The letters also demonstrate that the fact that

22     victims have received some compensation from the bankruptcy

23     process cannot make up for the time that they have been

24     deprived of their savings, and cannot make up for the

25     psychological harm inflicted on them, and do not even make up

P58KMASS

1    for the complete monetary losses.

2          It is also true, however, that no matter what the

3    sentence, the sentence will not cure either the monetary or the

4    psychological harm that has been caused to the victims, but a

5    sufficient sentence is necessary, under the terms of the

6    statute, to reflect the seriousness of the offense and the need

7    for just punishment.

8          On the other hand, it is also necessary to weigh the

9    mitigating factors.

10          The defendant had a traumatic upbringing.  He was a

11    refugee from an early age, and he went on to found several tech

12    companies without any suggestion of any unlawful activity in

13    those companies.  Indeed, there is no suggestion that the

14    defendant had any prior unlawful activity.

15          The defendant had a distinguished military career in

16    the Israeli Army, including being wounded.

17          He has a large and supportive family.

18          There is reason to believe that the monetary

19    consequences of this conviction, together with the collateral

20    consequences, and together with a substantial prison sentence

21    for this 59 or 60-year-old defendant, will be sufficient for

22    deterrence.

23          On the other hand, a substantial sentence is still

24    necessary, given the seriousness of the offense and the need

25    for a just punishment measuring the actual offense.

P58KMASS

1          I've already set out before what each of the parties

2     seek in terms of a sentence.  They range from a year and a day,

3     by the defense, to 240 months, at least, from the government.

4          Where to draw the line?

5          On balance, given all of the appropriate factors to be

6     considered, a sentence sufficient, but no greater than

7     necessary, the Court determines a sentence of 120 months'

8     imprisonment on Count Two and 144 months' imprisonment on

9     Count Five, both to run concurrently.

10          I will obviously allow voluntary surrender.

11          The Court will impose a term of three years'

12     supervised release on Counts Two and Five, to run concurrently,

13     with the mandatory standard and special conditions of

14     supervised release listed on pages 88 to 90 of the presentence

15     report.

16          The defendant has a low risk of substance abuse, and

17     the Court will not order drug testing.

18          The Court will order forfeiture pursuant to Count Five

19     in the amount of $48,393,446, and the specific property listed

20     on pages 90 and 91 of the presentence report.

21          The Court will not order restitution at this time, but

22     defer an order of restitution, and the parties should report

23     back to the Court on an appropriate amount of restitution,

24     including victims, by no later than August 8th.

25          The Court will impose a $50,000 fine.  The Court finds

P58KMASS

 1    that the defendant has the ability to pay that fine in view of

 2    the presentence report.

 3              The Court will impose a $200 special assessment.

 4              The sentence is consistent with the factors in

 5    Section 3553(a) and is sufficient, but no greater than

 6    necessary, to comply with the purposes of Section 3553(a)(2).

 7              I have explained the reasons for the sentence.

 8              Before I actually impose the sentence, I'll recognize

 9    each of the parties for anything that they wish to tell me

10    before I actually impose the sentence.

11              Mr. Mukasey?

12              MR. MUKASEY:  Nothing yet, Judge.  We'll have a

13    request after you impose sentence.

14              THE COURT:  Okay.

15              Mr. Mashinsky, anything before I actually impose the

16    sentence?  I'll listen to you for anything you wish to say,

17    anything at all.

18              THE DEFENDANT:  I mean, your Honor, the evidence

19    submitted, I feel, shows that I took actions based on

20    information that was provided and based on information that was

21    available to me, and I feel that while I am here to take

22    responsibility, I'm taking responsibility for a thousand

23    employees who have not done -- not one of them has come forward

24    and admitted to anything they've done.

25              So, I am the CEO, and I'm here to take responsibility.

P58KMASS

1    So I'm not -- that's it, your Honor.

2                THE COURT:  All right.  Thank you.

3            I'll recognize the government for anything the

4    government wishes to tell me.

5                MS. NICHOLS:  I apologize, your Honor.  We just didn't

6    hear the fine amount.

7                THE COURT:  The fine was $50,000.

8                MS. NICHOLS:  Thank you, your Honor.

9                THE COURT:  I'll state the sentence now, and then I'll

10   allow the parties to make any legal objections.

11            Pursuant to the Sentencing Reform Act of 1984, it is

12   the judgment of this Court that the defendant, Alexander

13   Mashinsky, is hereby committed to the custody of the Bureau of

14   Prisons to be imprisoned for a term of 144 months, that is,

15   120 months on Count Two and 144 months on Count Five, both

16   sentences to run concurrently.

17            The defendant will voluntarily surrender to an

18   institution designated by the Bureau of Prisons by 2:00 p.m. on

19   September 12th of 2025.

20            I recommend to the Bureau of Prisons that the

21   defendant be incarcerated in the New York City area, but not at

22   the MDC.

23            Upon release from imprisonment, the defendant shall be

24   placed on supervised release for a term of three years on

25   Counts Two and Five, to run concurrently.

P58KMASS

1          Within 72 hours of release from the custody of the

2     Bureau of Prisons, the defendant shall report in person to the

3     probation office in the district to which the defendant is

4     released.

5          While on supervised release, the defendant shall

6     comply with the mandatory, standard, and special conditions of

7     supervised release listed on pages 88 to 90 of the presentence

8     report;

9          The defendant shall not commit another federal, state,

10    or local crime;

11         The defendant shall refrain from any unlawful use or

12    possession of a controlled substance;

13         The defendant must cooperate in the collection of DNA,

14    as directed by the probation officer;

15         The defendant must not incur new credit charges or

16    open additional lines of credit without the approval of the

17    probation officer unless the defendant is in compliance with

18    the installment payment schedule.  This special condition of

19    supervised release is necessary because there will be a fine

20    imposed of $50,000; there is a significant forfeiture

21    provision; and this condition will assist probation in

22    monitoring the defendant's compliance with his financial

23    penalties.  Plainly, the defendant's conduct involved unlawful

24    activity involving financial crimes.

25         I will impose a fine of $50,000.  The fine is payable

P58KMASS

1    within 90 days.

2                The defendant has the ability to pay a fine based on

3    the presentence report.

4                I will order forfeiture consistent with the

5    preliminary order of forfeiture, which includes a monetary term

6    of $48,393,446, and the specific property listed on pages 90

7    and 91 of the presentence report.

8                With respect to restitution, I will delay any order of

9    restitution until the parties report on the appropriate level

10   of restitution and the appropriate victims.  The parties should

11   make the report no later than August 8, 2025.

12               It is further ordered that the defendant shall pay to

13   the United States a special assessment of $200, which shall be

14   due immediately.

15               I've already explained the reasons for the sentence.

16               Does either counsel know of any legal reason why the

17   sentence should not be imposed as I so stated it?

18               MS. NICHOLS:  No, your Honor.

19               MR. MUKASEY:  No, Judge.

20               THE COURT:  Okay.

21               I'll order the sentence to be imposed as I've so

22   stated it.

23               There's a waiver of the right to appeal the sentence,

24   correct?

25               MS. NICHOLS:  Yes, your Honor.

P58KMASS

1          MR. MUKASEY:  Yes, in the plea agreement.

2          THE COURT:  Does either party know of any reason why

3     the waiver is not effective?

4          MS. NICHOLS:  No, your Honor.

5          MR. MUKASEY:  No, Judge.

6          THE COURT:  Mr. Mashinsky, the reason that I ask these

7     questions is that, generally, a defendant has the right to

8     appeal the sentence.  The notice of appeal must be filed within

9     14 days after the entry of the judgment of conviction.  The

10    judgment of conviction is entered promptly after the judge

11    announces the sentence.

12         If the defendant cannot pay the cost of appeal, the

13    defendant has the right to apply for leave to appeal

14    in forma pauperis.  If the defendant requests, the clerk will

15    prepare and file a notice of appeal on the defendant's behalf

16    immediately.

17         In this case, the parties advise that you have given

18    up, or waived, your right to appeal the sentence as part of the

19    plea agreement, and so it appears that you have waived your

20    right to appeal the sentence.  But I go over this with you now

21    because I want to make sure that you talk to your lawyers so

22    that you're fully informed of all of your rights.

23         Do you understand?

24         THE DEFENDANT:  I understand, your Honor.

25         THE COURT:  Does the government move to dismiss all

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P58KMASS

1    open counts?

2              MS. NICHOLS:  Yes, your Honor.

3              THE COURT:  And the defense agrees?

4              MR. MUKASEY:  No objection.

5              THE COURT:  All open counts dismissed on the motion of

6    the government.

7              Mr. Mukasey, you said that there was something else.

8    Did I cover it?

9              MR. MUKASEY:  You came pretty close, Judge.

10             I appreciate the voluntary surrender.  I appreciate

11   that you were going to recommend no service of time in MDC.

12             I know that beggars can't be choosers when it comes to

13   the Bureau of Prisons, but it you could recommend Otisville --

14             THE COURT:  Sure.

15             MR. MUKASEY:  -- potentially, if it's a possibility,

16   the camp.  I know it's of limited utility, but the

17   recommendation might help.

18             THE COURT:  FPC Otisville?

19             MR. MUKASEY:  Yes.

20             THE COURT:  Yes.  Okay, I will recommend to the Bureau

21   of Prisons that the defendant be imprisoned at FPC Otisville --

22             MR. MUKASEY:  Thank you.

23             THE COURT:  -- and not at the MDC.

24             Okay.  Good afternoon, all.

25             Anything further?

P58KMASS

1            MS. NICHOLS:  No.  Thank you, your Honor.

2            MR. MUKASEY:  No, your Honor.

3            THE COURT:  I thank the reporter.

4            (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25