

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Building*
*26 Federal Plaza*
*New York, New York 10278*

May 4, 2026

**BY ECF**
The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:    **United States** v. **Roni Cohen-Pavon**, 23 Cr. 347 (JGK)

Dear Judge Koeltl:

In connection with the sentencing of Roni Cohen-Pavon, the Government respectfully submits this letter, pursuant to Section 5K1.1 of the United States Sentencing Guidelines, to advise the Court that Cohen-Pavon has provided substantial assistance to the Government. Cohen-Pavon provided valuable information about his former boss and co-conspirator, Alex Mashinsky, and was prepared to testify against Mashinsky at trial. Cohen-Pavon's cooperation appears to have been a significant factor in Mashinsky's decision to plead guilty, resulting in a forfeiture order of approximately $48 million, and Cohen-Pavon's information was used to resolve several disputed issues at sentencing. Accordingly, the Government respectfully moves the Court to sentence the defendant in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

### Cohen-Pavon's History and Background

Cohen-Pavon, age 39, is an Israeli citizen who lives outside Tel Aviv with his wife and two young daughters. He studied law at Tel Aviv University and graduated in 2008. After graduating university, he joined the Israeli Defense Force ("IDF") where he was assigned to the international law department. In 2014, at the end of his term of service, he elected not to renew and left the IDF at the rank of Captain. He then joined a major Israeli law firm, Herzog, Fox & Ne'eman ("HFN").

At HFN, Cohen-Pavon first worked in the gaming department where he advised online gambling companies about regulations. After about six months he became interested in legal issues surrounding cryptocurrency but received resistance from the firm; he did, however, expand his practice into Fintech, banking, and payment processing. In 2017, several new crypto companies began to hold initial coin offerings, and Cohen-Pavon then expanded his practice into crypto regulation, now with the support of HFN. It was around this time that another partner at HFN introduced Cohen-Pavon to Daniel Leon, who, along with Alex Mashinsky, was in the process of founding a crypto "bank" called Celsius.

## Cohen-Pavon's Role at Celsius

Cohen-Pavon was initially engaged as Celsius's outside counsel and provided advice on how and where to form the company, which markets to enter, and how to market the company's proprietary "CEL" token. Cohen-Pavon also helped Celsius engage Latham & Watkins to advise on crypto issues in the United States and the United Kingdom. In 2018, Cohen-Pavon advised Celsius on its own initial coin offering for CEL. Over time, Cohen-Pavon was spending more and more of his time advising Celsius, and Celsius became one of his biggest clients. He also became more involved in non-legal aspects of Celsius's business, such as mediating a fight between Mashinsky and his then-CFO, Young Cho, when the two were mutually blaming one another over a $13 million loss from directional trading at the end of 2019.

In early 2020, Cohen-Pavon decided to leave HFN. At first Cohen-Pavon considered starting his own advisory service, but then Celsius offered him the role of Chief Revenue Officer. Cohen-Pavon felt he could offer more on the business side than the legal side and therefore agreed to join on a temporary, one-year basis. At the time, Mashinsky said he wanted Cohen-Pavon to help prepare Celsius for a potential IPO or Series B capital raise and to focus on corporate partnerships. Cohen-Pavon reported directly to Mashinsky. As part of this agreement, in May 2020, Celsius gave Cohen-Pavon an initial grant of CEL tokens. In approximately September 2020, Cohen-Pavon's role became permanent.

Mashinsky was known to be a very difficult manager. Cohen-Pavon became one of the few individuals at Celsius who could push back on Mashinsky and to whom Mashinsky would listen. Other employees frequently asked Cohen-Pavon to speak with Mashinsky about problems with Mashinsky's decisions rather than confronting Mashinsky themselves. Cohen-Pavon spearheaded some of the company's most important strategic initiatives, including negotiating an approximately $600 million capital raise, which at the time was one of the largest capital raises in crypto history. Cohen-Pavon was also the person Mashinsky turned to when he felt his priorities were not being managed correctly—including, as discussed below, the price of CEL token.

Cohen-Pavon, like others at Celsius, was critical of Mashinsky's decision-making and became increasingly concerned about Mashinsky's ability to lead the company. Mashinsky regularly dismissed criticisms of his decisions by saying that he "lived in the future" so he knew what the correct answer was. He blamed others for mistakes, and whenever employees put concerns in writing, he accused them of trying to create a record for an eventual "whistleblower" complaint. Mashinsky also became obsessively focused on two topics—(i) his "Ask Mashinsky Anything" sessions, or "AMAs," through which he claimed he was able to engage directly with the "Celsius community," and (ii) the price of CEL token. Both of these priorities were viewed by others at Celsius—including Cohen-Pavon—as being not only distractions from the very serious issues Celsius was facing, but also contributors to these issues, as they created legal risk, controversy, and waste of resources.

By May 2022, Cohen-Pavon had decided that Celsius needed new leadership. He reached out to Celsius's largest investors, Westcap and CDPQ, about replacing Mashinsky with the then-CFO, who had more experience in traditional finance. He also proposed bringing in a more established person from the crypto space to be the face of the company as a non-executive

chairman, and suggested Sam Bankman-Fried. Cohen-Pavon also obtained buy-in from Celsius's senior management (not including Mashinsky), and Citibank arranged at least one meeting between Cohen-Pavon, Westcap, and Bankman-Fried. These discussions were disrupted by Celsius's pause of withdrawals in June 2022 and its declaring bankruptcy one month later.

## Cohen-Pavon's Role in the Charged Scheme

Alex Mashinsky was charged with two separate but related fraud schemes that he carried out as the CEO of Celsius—the "misrepresentation scheme" and the "manipulation scheme." In the misrepresentation scheme, Mashinsky waged a widespread campaign through social media, media interviews, marketing materials, and weekly "AMA" videos to lure billions of dollars' worth of crypto onto the Celsius platform by lying to investors about how those funds would be used. In the manipulation scheme, Mashinsky then used that investor money to artificially inflate the value of CEL token by secretly purchasing more CEL on the open market than Celsius was telling investors. Cohen-Pavon, in contrast to Mashinsky, was charged only with participating in the manipulation scheme. With respect to the misrepresentation scheme, Cohen-Pavon flagged Mashinsky's false statements to Mashinsky on multiple occasions and tried to convince Mashinsky to stop lying in his AMAs, but was ultimately not fully successful. Cohen-Pavon proffered that one of the reasons he tried to recruit new leadership to replace Mashinsky prior to the pause was because the many misrepresentations in the AMAs were becoming too big a problem.

### *The CEL Manipulation Scheme*

Mashinsky began orchestrating his scheme to support the price of CEL in late 2019 and early 2020. His efforts took multiple forms, but the primary driver of the inflated CEL price was excess market purchases in 2020 and 2021. At Mashinsky's direction, these purchases were carried out primarily by the CFO at the time ("CFO-1") and a Germany-based independent contractor who was the head of Celsius's trading desk ("Trader-1"). Celsius spent millions of dollars purchasing excess CEL in the market, and the price of CEL rose from approximately $0.40 in late July 2020 to over $6.50 in early 2021. Cohen-Pavon was not involved in the market manipulation scheme during that time.

By September 2021, the price of CEL had dropped from its earlier highs, and Mashinsky put Cohen-Pavon in charge of raising the price up to its previous levels. There was particular pressure to increase the price by year-end because the CEL held in the company's Treasury had become important to its balance sheet, and if the price of CEL did not reach $5.50 or $6.00 by December 31, Celsius would report a loss in its financials. When Cohen-Pavon took over the CEL purchasing operation, he discovered—for the first time—that Celsius had been purchasing far more CEL every week than had been needed to pay rewards, and more than had been reported to the Executive Committee. Cohen-Pavon began looking into the trading for specific days to understand what had happened. Cohen-Pavon remembered that on May 21, 2021, the entire crypto market had gone down, but the price of CEL had stayed stable, much to his surprise; he looked at the trading data from that day and learned that the price had remained stable because Celsius purchased $40 million of CEL in the market. Cohen-Pavon asked Trader-1 about this excess trading, and Trader-1 confirmed that Celsius had bought excess CEL to support the price, and had put resting buy orders in place to prevent the price from falling.

When Cohen-Pavon learned about the excess CEL purchases, he stopped the excess purchases and instructed Trader-1 to trade only with Cohen-Pavon's direct approval. As a result, the price went down. At first, Cohen-Pavon did not know if Mashinsky knew about the excess buying, but when he told Mashinsky, Mashinsky did not express surprise, and Cohen-Pavon realized that he already knew. Mashinsky even admitted that he had told the CFO to use proceeds from selling CEL on the over-the-counter ("OTC") desk to then purchase CEL in the market, unconnected to rewards. Mashinsky was also angry at Cohen-Pavon for stopping the excess purchases and allowing the price to drop. He told Cohen-Pavon that Cohen-Pavon was too worried about pleasing the investors and that if he just spent money to increase the price of CEL, everyone would be happy. Cohen-Pavon told Mashinsky that they should instead increase the price of CEL by focusing on increasing its utility, to which Mashinsky responded, "Fuck utility." Mashinsky also told him to do the "simple thing" that got the price to where it was before, which Cohen-Pavon understood to mean market purchases.

Mashinsky instructed Cohen-Pavon to keep supporting the price by purchasing excess CEL, even if at a smaller scale than had been done earlier in the year. Under pressure from Mashinsky, Cohen-Pavon agreed to continue buying in excess of rewards through the end of the year. Mashinsky instructed him to spend $15 million on excess buys, though Cohen-Pavon believes he actually spent a little less. Also at Mashinsky's direction, Cohen-Pavon negotiated an over-the-counter purchase of the CEL of a large seller to stop that seller from dumping its CEL on the market.

Although Cohen-Pavon agreed with Mashinsky to continue to manipulate the price of CEL through the end of 2021, he also began to take steps to stop the excess purchases in 2022. One of those steps was to replace Trader-1 with a new trader who answered directly to Cohen-Pavon ("Trader-2"). Cohen-Pavon, Trader-2, and a third employee developed a weekly calculation that determined exactly how much CEL was needed to cover rewards, divided that number by 28, and then purchased the resulting number at regular intervals, four times a day, seven days a week, without any consideration of the CEL price. Cohen-Pavon also tried to insulate Trader-2 from Mashinsky's pressure by stationing Trader-2's desk near Cohen-Pavon's. There were still some instances of excess buying in 2022, despite Cohen-Pavon's efforts to stop it. For example, at one point in January, when the new purchasing system was still being implemented, he discovered that an unknown resting order was still in place. And in May 2022, when the Terra Luna collapse triggered a downturn in CEL and other crypto tokens, Mashinsky directed Trader-2 to move $5 million from Treasury and use it to purchase CEL to support the price. When Mashinsky had first proposed the purchase to Cohen-Pavon, Cohen-Pavon told him it was a bad idea, but then Mashinsky gave the trading direction to Trader-2 while Cohen-Pavon was unreachable during a flight from Barcelona to New York.

Cohen-Pavon financially benefited from the manipulation scheme, even if he expressed some reluctance about making excess purchases in late 2021. During the same time period that he was directing these excess purchases, Cohen-Pavon made approximately $1 million through sales of his own personal CEL token. According to Cohen-Pavon, he did not sell this CEL token himself; it was sold from Cohen-Pavon's Celsius wallet, which was controlled by Daniel Leon, and Leon was making the sales (this description is consistent with trading records).

*The Misrepresentation Scheme*

In contrast the market manipulation scheme, Cohen-Pavon did not participate in Mashinsky's scheme to misrepresent the financial strength of Celsius through repeated false statements. To the contrary, Cohen-Pavon tried multiple times to stop Mashinsky from making these representations. Over and over again, Cohen-Pavon pointed out factual errors in Mashinsky's public statements, explained to him why they were false, got Mashinsky to agree they were false, and extracted promises from Mashinsky that he would not say them again. Mashinsky nonetheless continued to make the same misstatements. These included statements that the ICO had raised $50 million, that Celsius had no uncollateralized loans, that Celsius had never had a default, that Celsius had not experienced losses, that Celsius's rewards were based on its revenues or profitability, that Celsius did not engage in directional trading, and that Celsius did not have leverage.

Because Cohen-Pavon had a close relationship with Mashinsky, other employees flagged Mashinsky's misstatements to Cohen-Pavon and looked to Cohen-Pavon to raise the issues with Mashinsky. Cohen-Pavon did so on a consistent basis. He also asked Mashinsky to stop holding AMAs, or at least to pre-record or script them, but Mashinsky refused. In March 2022, Mashinsky gave an interview to CNBC that contained multiple egregious misrepresentations, all of which Cohen-Pavon had previously told Mashinsky he could not say. Cohen-Pavon threatened to quit over the interview. He had the head of compliance create a chart of some of Mashinsky's repeated misstatements and showed the chart to Mashinsky, making Mashinsky promise to stop making misstatements. Mashinsky promised, but did not stop.

**Procedural History**

During the course of the Government's investigation, Cohen-Pavon accepted service of a grand jury subpoena while he was outside the territory of the United States, and he produced documents in response to that subpoena. In approximately May 2023, the Government informed counsel for Cohen-Pavon that after reviewing records and speaking to current and former employees of Celsius, the Government was nearing the end of its investigation and that Cohen-Pavon appeared to have criminal exposure as a co-conspirator in the market manipulation scheme. Soon after that call, counsel for Cohen-Pavon conducted an attorney proffer for the Government in which they set out much of what Cohen-Pavon knew about wrongdoing at Celsius, but argued that Cohen-Pavon was less culpable than others at Celsius, and that in their view a non-prosecution agreement was more appropriate than a cooperation agreement. When the Government informed counsel that a non-prosecution agreement was not acceptable, Cohen-Pavon declined to proffer with the Government.

In July 2023, the grand jury returned the Indictment, charging Mashinsky in all seven counts and Cohen-Pavon in the four counts related to the manipulation scheme. On July 13, 2023, the Indictment was unsealed and Mashinsky was arrested; Cohen-Pavon was in Israel and therefore was not arrested. Prior to initiating extradition procedures, the Government again spoke to Cohen-Pavon's counsel about the possibility of cooperation. Cohen-Pavon thereafter agreed to waive extradition and travel to New York with an expectation of proffering with the Government in the

hope of pleading guilty pursuant to a cooperation agreement prior to his return to Israel. On September 5, 2023, Cohen-Pavon arrived in New York, was presented and arraigned, and began proffering with the Government. He proffered for three consecutive days. In these proffers, Cohen-Pavon admitted to his role in the scheme to manipulate CEL and provided valuable information about Mashinsky's involvement in both the scheme to manipulate CEL and the scheme to misrepresent the financial condition of Celsius. On September 13, 2023, Cohen-Pavon pled guilty pursuant to the cooperation agreement before returning to Israel.

### Cohen-Pavon's Cooperation

Almost immediately after being charged, and prior to the initiation of extradition proceedings, Cohen-Pavon expressed an interest in cooperating with the Government. He waived extradition and voluntarily flew to New York, where he was arrested and arraigned before beginning to proffer for multiple days.

In his proffers, Cohen-Pavon provided credible evidence that was supported by emails, chats, trading records, and proffers from other witnesses. He provided detailed information about both the CEL manipulation scheme (in which he participated) and the misrepresentation scheme (in which he did not participate but tried to intervene). Because Cohen-Pavon was Mashinsky's most trusted adviser and de facto lieutenant, he was particularly well placed to provide an inside view into the schemes and the overall financial condition of Celsius. And because other Celsius employees frequently deputized Cohen-Pavon as their representative in raising concerns to Mashinsky, Cohen-Pavon's information was able to bridge an important evidentiary gap when he confirmed that he did, in fact, have these discussions with Mashinsky, and that Mashinsky understood that his public statements were false. Indeed, Cohen-Pavon's unique relationship with Mashinsky meant that Mashinsky had spoken frankly to Cohen-Pavon about his schemes and admitted his knowledge of wrongdoing on multiple occasions.

As soon as he pled guilty, Cohen-Pavon's cooperation was public and known to Mashinsky. Cohen-Pavon's cooperation was likely a significant factor in Mashinsky's decision to plead guilty a few months prior to his January 2025 trial date. Mashinsky's plea agreement required him to take responsibility for both the misrepresentation scheme and the manipulation scheme and to agree to forfeiture of over $48 million of ill-gotten gains. Prior to Mashinsky's guilty plea, Cohen-Pavon was prepared to testify at Mashinsky's trial, and the Government had been engaging with Cohen-Pavon's counsel to plan an extensive schedule of witness preparation.

In advance of sentencing, Mashinsky raised extensive objections to the presentence report and appeared to be walking away from taking responsibility for his crimes. Cohen-Pavon's information was a significant part of the Government's response to Mashinsky's objections. Cohen-Pavon was also prepared once again to testify in the event the Court ordered a *Fatico* hearing. A hearing was not ultimately required, though, and the Court resolved almost all the objections in the Government's favor, likely based in part on Cohen-Pavon's information.

## Section 5K1.1 Factors

Section 5K1.1 of the Guidelines sets forth five non-exclusive factors that sentencing courts are encouraged to consider in determining the appropriate sentencing reduction for a defendant who has rendered substantial assistance. *See* U.S.S.G. §5K1.1(a). The application of each of those factors to Cohen-Pavon's cooperation is set forth below.

### 1. "[S]ignificance and usefulness of the defendant's assistance" (§5K1.1(a)(1))

Cohen-Pavon's cooperation was extremely significant and useful. No one at Celsius was closer to Mashinsky than Cohen-Pavon, and no witness with whom the Government met had more information about Mashinsky's personal knowledge of and involvement in the two schemes.

With respect to the manipulation scheme, Cohen-Pavon was able to provide information from the perspective of someone who personally participated in the scheme while knowing the impact of his actions and knowing that they were wrong. He was also able to provide information about communications he had with Mashinsky in which he raised concerns about the manipulation but Mashinsky rejected them. Other participants in the manipulation scheme had also provided information about Mashinsky's knowledge of the excess CEL purchase and his direction to make the purchase, but those witnesses' discussions with Mashinsky did not involve the same degree of depth and candor as Cohen-Pavon's conversations with Mashinsky. In addition, those witnesses were not involved in the scheme after the summer of 2021, which is when Cohen-Pavon became involved. Cohen-Pavon's information was therefore necessary to complete the full story of Mashinsky's manipulation of CEL up to the pause.

With respect to the misrepresentation scheme, Cohen-Pavon was able to fill an important gap in the evidence—namely, that Mashinsky himself was told, repeatedly, that his statements were false, and that Mashinsky acknowledged that his statements were false, but Mashinsky kept making them anyway. The record already contained a large number of emails in which Celsius employees *other than Mashinsky* identify misrepresentations in Mashinsky's public statements, and multiple witnesses stated that processes were in place to monitor Mashinsky's statements for misrepresentations, but it was Cohen-Pavon who was tasked with discussing these misrepresentations directly with Mashinsky. Absent Cohen-Pavon, Mashinsky was likely to claim that he did not realize his statements were false, and that these concerns were never actually raised with him directly. Indeed, Mashinsky objected to a number of facts in the presentence report on this basis. Cohen-Pavon's confirmation that he spoke directly to Mashinsky about the misrepresentations filled this evidentiary gap and left Mashinsky very little room to challenge his culpability on the misrepresentation claims. Cohen-Pavon also identified additional misstatements that he spoke to Mashinsky about that were not evident from the email record, including statements that the company had never been hacked.

Relatedly, Cohen-Pavon also provided inside information about several important events in Celsius's corporate history that were relevant to the misrepresentation scheme, because those events showed that Mashinsky's statements were untrue and that Mashinsky knew they were untrue.  In an effort to avoid responsibility, Mashinsky had tried to paint himself as a "delegator" who was not aware of the bad decisions made by more junior employees. Cohen-Pavon was able

to refute this characterization by showing that Mashinsky had direct knowledge of the many corporate events that rendered his statements false, including details concerning the company's ICO, its early formation of a "recovery committee" after it discovered a $13 million loss from directional trading (trading that was carried out by Mashinsky himself), multiple other losses from directional trading, defaulted loans, and the discovery of a "hole in the balance sheet" caused by the company using customer coins to purchase CEL. Cohen-Pavon discussed each of these significant corporate events with Mashinsky and was able to confirm Mashinsky's knowledge of the events and, in most cases, Mashinsky's personal responsibility for causing the events. This information was important in countering Mashinsky's narrative of himself as a hands-off manager who was not aware of his subordinates' mistakes.

2.  **"[T]ruthfulness, completeness, and reliability" of the defendant's information and testimony (§5K1.1(a)(2))**

The Government found Cohen-Pavon to be candid, remorseful, and credible. In his proffers, Cohen-Pavon made no attempt to minimize his own involvement in the scheme, including his own criminal intent and willfulness. Furthermore, the information Cohen-Pavon has provided has been complete, reliable, and corroborated by other evidence developed during the investigations, including emails, text messages, trading records, and proffers from other witnesses.

3.  **"[N]ature and extent of the defendant's assistance" (§5K1.1(a)(3))**

The Government did not have occasion to call Cohen-Pavon as a witness in court, although Cohen-Pavon was prepared to testify and was on the verge of doing so at least twice. Cohen-Pavon did everything that the Government asked of him: He met with the Government when asked, and provided complete and truthful information about his and others' criminal activity.

4.  **"[I]njury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance" (§5K1.1(a)(4))**

The Government is not aware of any danger or risk of physical injury to Cohen-Pavon or his family resulting from his cooperation, but certain consequences of Cohen-Pavon's cooperation of worth noting. First, Cohen-Pavon pleaded guilty and cooperated with the Government knowing that it would inflict future professional reputational damage to the detriment of him and his family. Second, Cohen-Pavon cooperated against Mashinsky, with whom he had previously had a close friendship. Finally, Cohen-Pavon admitted to complicity in a scheme that victimized thousands of crypto investors who had a strong and justifiably angry presence online and faces civil liability based on his role and his admissions. Such cooperation often carries the risk of social ostracization. Nonetheless, Cohen-Pavon cooperated with full knowledge of the risks involved and never wavered.

5.  **"[T]imeliness of the defendant's assistance" (§5K1.1(a)(5))**

Although Cohen-Pavon declined an invitation to cooperate with the Government prior to the Indictment's unsealing, Cohen-Pavon promptly began to cooperate once charged. As an Israeli citizen living in Israel, Cohen-Pavon could have fought extradition and put the Government

through a drawn-out process that might never have resulted in his seeing the inside of a United States courtroom. Instead, Cohen-Pavon immediately decided to waive extradition, travel to the United States, and subject himself to arrest. At the time, he had no assurances that the Government would extend him a cooperation agreement. Cohen-Pavon's cooperation was timely enough for the Government to use his information and the prospect of his testimony to secure a guilty plea from Mashinsky and to prevail on disputes at sentencing.

## Conclusion

In light of the facts set forth above, and assuming that the defendant continues to comply with the terms of his cooperation agreement, the Government intends to request at sentencing that the Court sentence the defendant in light of the factors set forth in Section 5K1.1 of the Guidelines.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: _____

Adam S. Hobson
Allison Nichols
Peter J. Davis
Assistant United States Attorneys
Telephone:  (212) 637-2366

cc:   Counsel of record (by ECF)
      Nicolo Dimaria, United States Probation Officer (by electronic mail)