FILED: NEW YORK COUNTY CLERK 11/22/2025 11:47 AM    INDEX NO. 450040/2023
NYSCEF DOC. NO. 64    RECEIVED NYSCEF: 11/22/2025

22-10964-mg    Doc 23    Filed 07/14/22    Entered 07/14/22 14:27:45    Main Document    Pg 47 of 64

## Top Unsecured Creditors

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim — if the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | Pharos USD Fund SP<br>Pharos Fund SP<br>Landmark Square, 1st Floor<br>64 Earth Close<br>PO Box 715<br>Grand Cayman KY-1107<br>Cayman Islands | Email - admin@lanternventures.com | Loan Party | Unliquidated | | | $ 81,081,803 |
| 2 | On File | On File | Customer | Unliquidated | | | $ 40,586,695 |
| 3 | On File | On File | Customer / Loan Party | Unliquidated | | | $ 38,359,717 |
| 4 | On File | On File | Customer | Unliquidated | | | $ 24,628,833 |
| 5 | On File | On File | Customer / Loan Party | Unliquidated | | | $ 20,998,387 |
| 6 | On File | On File | Customer | Unliquidated | | | $ 19,369,656 |
| 7 | On File | On File | Customer / Loan Party | Unliquidated | | | $ 15,812,046 |
| 8 | On File | On File | Customer / Loan Party | Unliquidated | | | $ 15,571,124 |
| 9 | On File | On File | Customer / Loan Party | Unliquidated | | | $ 15,133,797 |
| 10 | On File | On File | Customer | Unliquidated | | | $ 14,569,039 |
| 11 | ICB Solutions<br>W Royal Forest Blvd<br>Columbus, OH 43214 | Phone - 614-403-0997 | Customer | Unliquidated | | | $ 13,343,960 |
| 12 | The Caen Group LLC<br>Detwiler Road<br>Escondido, CA 92029 | Phone - 760-803-0712 | Customer | Unliquidated | | | $ 13,077,800 |
| 13 | Alameda Research LTD<br>Tortola Pier Park, Building 1 Second Floor Wickhams Cay I<br>Road Town, Tortola VG1110<br>British Virgin Islands | Email - sam@alameda-research.com<br>Phone - 774-270-0676 | Loan Party | Unliquidated | | | $ 12,770,047 |
| 14 | B2C2 LTD<br>86-90 Paul Street<br>London EC2A 4NE<br>United Kingdom | Email - middleoffice@B2C2.com<br>Phone - 44-203-973-4780 | Loan Party | Unliquidated | | | $ 11,814,949 |
| 15 | Covario AG<br>Landys+Gyr Strasse 1<br>Zug 6300<br>Switzerland | Email - brokerage@covar.io<br>Phone - 414-154-11382 | Customer | Unliquidated | | | $ 11,310,531 |
| 16 | On File | On File | Customer | Unliquidated | | | $ 11,168,614 |
| 17 | On File | On File | Customer | Unliquidated | | | $ 11,131,962 |
| 18 | On File | On File | Customer | Unliquidated | | | $ 11,089,080 |
| 19 | On File | On File | Customer | Unliquidated | | | $ 10,378,951 |
| 20 | On File | On File | Customer | Unliquidated | | | $ 10,328,557 |
| 21 | Invictus Capital Financial Technologies SPC<br>67 Fort Street<br>Grand Cayman, KY1-1102<br>Cayman Islands | Email - spc@invictuscapital.com | Customer | Unliquidated | | | $ 9,885,589 |
| 22 | On File | On File | Customer | Unliquidated | | | $ 9,790,947 |
| 23 | On File | On File | Customer | Unliquidated | | | $ 9,678,180 |
| 24 | On File | On File | Customer / Loan Party | Unliquidated | | | $ 9,331,765 |
| 25 | On File | On File | Customer / Loan Party | Unliquidated | | | $ 9,087,167 |
| 26 | On File | On File | Customer | Unliquidated | | | $ 8,499,705 |

7/14/2022

FILED: NEW YORK COUNTY CLERK 11/22/2025 11:47 AM    INDEX NO. 450040/2023
NYSCEF DOC. NO. 64    RECEIVED NYSCEF: 11/22/2025

22-10964-mg    Doc 23    Filed 07/14/22    Entered 07/14/22 14:27:45    Main Document
Pg 49 of 61

Top Unsecured Creditors

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim — if the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 27 | Strobilus LLC<br>159 Main St.<br>Nashua, NH 03060 | Phone - 617-640-3914 | Customer / Loan Party | Unliquidated | | | $ 7,850,694 |
| 28 | Crypto10 SP -Segregated Portfolio of Invictus Capital Financial Technologies SPC<br>67 Fort Street, 1st Floor, Artemis House<br>George Town, KY1-1102<br>Cayman Islands | Email - c10_spc@invictuscapital.com | Customer | Unliquidated | | | $ 7,829,667 |
| 29 | Altcointrader (Pty) Ltd<br>229 Ontdekkers Road, Horizon,<br>Roodepoort 1724<br>South Africa | Email - richard@altcointrader.co.za<br>Phone - 278-2411-0866 | Customer | Unliquidated | | | $ 7,593,905 |
| 30 | On File | On File | Customer / Loan Party | Unliquidated | | | $ 7,460,897 |
| 31 | On File | On File | Customer | Unliquidated | | | $ 7,280,505 |
| 32 | On File | On File | Customer | Unliquidated | | | $ 7,207,770 |
| 33 | On File | On File | Customer | Unliquidated | | | $ 6,754,458 |
| 34 | Deferred 1031 Exchange, LLC<br>Lakeland Ave.<br>Dover, DE 19901 | Phone - 425-766-7107 | Customer | Unliquidated | | | $ 6,684,659 |
| 35 | On File | On File | Customer | Unliquidated | | | $ 6,499,769 |
| 36 | On File | On File | Customer | Unliquidated | | | $ 6,370,197 |
| 37 | On File | On File | Customer / Loan Party | Unliquidated | | | $ 6,349,731 |
| 38 | On File | On File | Customer / Loan Party | Unliquidated | | | $ 6,268,520 |
| 39 | On File | On File | Customer / Loan Party | Unliquidated | | | $ 6,099,136 |
| 40 | On File | On File | Customer | Unliquidated | | | $ 5,909,689 |
| 41 | On File | On File | Customer | Unliquidated | | | $ 5,851,623 |
| 42 | On File | On File | Customer | Unliquidated | | | $ 5,807,454 |
| 43 | On File | On File | Customer / Loan Party | Unliquidated | | | $ 5,788,622 |
| 44 | On File | On File | Customer / Loan Party | Unliquidated | | | $ 5,783,350 |
| 45 | On File | On File | Customer | Unliquidated | | | $ 5,747,666 |
| 46 | On File | On File | Customer / Loan Party | Unliquidated | | | $ 5,746,814 |
| 47 | On File | On File | Customer | Unliquidated | | | $ 5,710,805 |
| 48 | On File | On File | Customer | Unliquidated | | | $ 5,710,207 |
| 49 | On File | On File | Customer | Unliquidated | | | $ 5,664,096 |
| 50 | On File | On File | Customer | Unliquidated | | | $ 5,588,694 |

## Exhibit D

### Consolidated List of the Holders of the Debtors' Largest Secured Claims

Pursuant to local Rule 1007-2(a)(5), to the best of the Debtors' knowledge there table below shows the secured claim against the Debtors prior to the Petition Date.

| | Name of Creditor | Creditor Name, and complete mailing address including zip code of employee, agents or department of creditor familiar with the claim who may be contacted | Amount of Claim | Description of Collateral | Indicate if claim is contingent, unliquidated, or disputed |
|---|---|---|---|---|---|
| 1 | Symbolic Capital Partners Ltd | 30 N. Gould St. Suite 2741 Sheridan, WY 82801 United States | $23,120,671.05 (value of our posted collateral in USD as of 7/12/22) | Ethereum pursuant to the Master Loan Agreement dated October 21, 2021 with Celsius Network Limited as the borrower and the Loan Term Sheets promulgated thereunder. | C / U |

## Exhibit E

### Summary of the Debtors' Assets and Liabilities

Pursuant to Local Rule 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities on a consolidated basis. The following financial data is the latest available information and reflects the Debtors' financial condition, as consolidated with their affiliated debtors and non-debtors as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

| Assets and Liabilities | Amount (Approximate) |
|---|---|
| Total Assets (Book Value as of July 13, 2022) | $ 4,319,507,506 |
| Total Liabilities (Book Value as of July 13, 2022) | $ 5,505,114,892 |

FILED: NEW YORK COUNTY CLERK 11/22/2025 11:47 AM    INDEX NO. 450040/2023
NYSCEF DOC. NO. 64                                      RECEIVED NYSCEF: 11/22/2025

## Exhibit F

### Summary of the Publicly Held Securities of the Debtors

Pursuant to Local Rule 1007-2(a)(7), the Debtors have no classes of shares of stock, debentures, or other securities of the Debtors that are publicly held.

22-10964-mg    Doc 23    Filed 07/14/22    Entered 07/14/22 14:27:45    Main Document
Pg 52 of 61

## Exhibit G

### Summary of the Debtors' Property Held by Third Parties

Pursuant to Local Rule 1007-2(a)(8), the following lists the Debtors' property, as of the Petition Date, that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

As further discussed in the First Day Declaration and the Cash Management Motion, the Debtors contract with certain third-party crypto custodians to allow their customers to trade various cryptocurrency and store digital currencies. Through these arrangements, the Debtors' ownership interest is not affected. The Debtors also have certain personal property in connection with the mining of cryptocurrencies, and such property is physically situated at hosting sites provided by third parties. Any additional information that the Debtors may have with respect to the aforementioned will be provided during these chapter 11 cases.

FILED: NEW YORK COUNTY CLERK 11/22/2025 11:47 AM    INDEX NO. 450040/2023
NYSCEF DOC. NO. 64                                                 RECEIVED NYSCEF: 11/22/2025

## Exhibit H

### Summary of the Debtors' Property From Which the Debtors Operates Their Business

Pursuant to Local Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the Debtors operates their business as of the Petition Date.

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Celsius Network Inc. | 1447 Peachtree St. NE, 7th Floor | Atlanta | GA | 30309 |
| Celsius Network Inc. | 401 East Jackson Street, Suite 3300 | Tampa | FL | 33602 |
| Celsius Network Limited | 8912 Spanish Ridge Ave, Suite 300 | Las Vegas | NV | 89148 |
| Celsius Network Limited | Anexartisias 34, 6th Floor, Nora Court | Limassol | Cyprus | 3040 |
| Celsius Network Limited | The Harley Building 77-79 New Cavendish St. | London | United Kingdom | W1W 6XB |
| Celsius Network Limited | 156 Menachem Begin Road, H Recital Building, 10th Floor | Tel Aviv | Israel | 6492108 |
| Celsius Network LLC | 121 River Street, Waterfront Corporate Center, Building II | Hoboken | NJ | 07030 |
| Celsius Network LLC | 232 Market Street | Flowood | MI | 39232 |

22-10964-mg    Doc 23    Filed 07/14/22    Entered 07/14/22 14:27:45    Main Document
Pg 54 of 61

## Exhibit I

### Location of Debtors' Assets, Books, and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

As of July 13, 2022, the Debtors had assets of approximately $ 4,319,507,506 as provided in Exhibit E, substantially all of which are held digitally and securely by cloud computing service providers, cryptocurrency investments that are either held with custodians, exchanges, or the DeFi protocol, crypto wallets securely held in cold storage, cash in banks, loan receivables, and mining equipment and rigs located in the United States.

### Books and Records

The Debtors' books and records are stored digitally and securely by cloud computing service providers.

### Debtors' Assets Outside the United States

The Debtors do not have significant assets located outside of the territorial limits of the United States.[1] In the ordinary course of business, on any given day, the Debtors may own title to goods and merchandise that is in transit to the United States from locations outside the territorial limits. Such goods only remain outside the United States for the duration of shipping and transport. Because of the constant movement of this property, providing a comprehensive list of such goods and merchandise would be impractical.

---

[1]    Certain Debtors are based or operate in the United Kingdom, Israel, Serbia, and Cyprus. Accordingly, the Debtors may have certain assets in such countries. However, the aggregate value of any such assets is not significant relative to the aggregate value of the Debtors' estates.

FILED: NEW YORK COUNTY CLERK 11/22/2025 11:47 AM    INDEX NO. 450040/2023
NYSCEF DOC. NO. 64    RECEIVED NYSCEF: 11/22/2025

## Exhibit J

### Summary of Legal Actions against the Debtors

Pursuant to Local Rule 1007-2(a)(11), there are no material actions and proceedings pending or threatened against the Company or its properties where a judgment against the Debtors or a seizure of their property may be imminent as of the Petition Date. This list reflects actions or proceedings considered material by the Debtors and, if necessary, will be supplemented in the corresponding schedules to be filed by the Debtors in these chapter 11 cases.

## Exhibit K

## The Debtors' Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following schedule provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition Date.[1]

| Name / Position | Relevant Experience / Responsibilities | Tenure |
|---|---|---|
| *Alex Mashinsky,* Chief Executive Officer & Director | Alex Mashinsky is a Chief Executive Officer and co-founder of Celsius Network. Alex is one of the inventors of VOIP (Voice Over Internet Protocol) and winner of numerous technology and entrepreneurship awards. Over 35 patents have been issued to Alex, relating to exchanges, VOIP protocols, messaging and communication. As a serial entrepreneur and founder of seven New York City-based startups, Alex has raised more than $1 billion and exited over $3 billion. Alex founded two of New York City's top 10 venture-backed exits since 2000: one of his first companies, Arbinet, IPO'd in 2004 with a market capitalization of over $750 million; and another venture, Transit Wireless, was valued at $1.2 billion at the time of exit. Alex has received numerous awards for innovation, including being nominated twice by E&Y as entrepreneur of the year in 2002 & 2011; Crain's 2010 Top Entrepreneur; the prestigious 2000 Albert Einstein Technology medal; and the Technology Foresight Award for Innovation (presented in Geneva at Telecom 99). As one of the pioneers of web-based exchanges, Alex authored patents that cover aspects of the Smart Grid, ad exchanges, Twitter, Skype, App Store, Netflix streaming concept and many other popular web companies. Additionally, Arbinet's fundraising story was featured as a case study in 2001 by Harvard Business School. | 2017 – Present |
| *Daniel Leon,* Chief Strategy Officer & Director | Daniel Leon is Chief Strategy Officer and co-founder of Celsius Network. He has a proven track record of growing early-stage companies and building them from the ground up. Daniel has co-founded and led multiple companies and not-for-profit organizations. Before Governing Dynamics, where he is a managing partner, he was CEO of Atlis Labs, a venture-backed local discovery platform powered by real-time customer referrals. Prior to that, Daniel served as CEO of Beyon3D and chairman of HereO. He was also general manager, of GroundLink, which raised more than $30 million in funding during his tenure. He | 2017 – Present |

---

[1]   Persons listed on this schedule hold such positions at both Celsius Network Limited (UK) and Celsius Network LLC, unless indicated otherwise.

FILED: NEW YORK COUNTY CLERK 11/22/2025 11:47 AM   INDEX NO. 450040/2023
NYSCEF DOC. NO. 64                                                    RECEIVED NYSCEF: 11/22/2025

| Name / Position | Relevant Experience / Responsibilities | Tenure |
|---|---|---|
| | started his career as vice president with the Gallup Organization. Daniel holds a degree in Economics from Brown University. He splits his time between New York and Tel Aviv. | |
| *Nuke Goldstein,* President of Labs & Co-founder | Nuke Goldstein is President of Labs and co-founder of Celsius Network. Nuke is an expert in Blockchain, AI and other technologies, having designed the technological and financial infrastructure of Celsius Network. Nuke leads all product initiatives at Celsius from inception to implementation. His career ranges from image processing and AI to IoT and blockchain. Prior to his work on the Celsius crypto assets lending and borrowing platform he designed P2P credit protocols using distributed storage and smart-contracts. Nuke was the CEO and founder of Sevenpop, a leading interactive music technology provider to hundreds of hotels and shopping centers across Israel. Nuke holds a B.Sc. in computer science from the Technion in Haifa (Israel's most elite Institute of Technology). He also has black belts in Kempo Karate and Combat Ju-Jitsu. In addition, he has been awarded a grant by the National Science Foundation. | 2017 – Present |
| *Chris Ferraro,* Chief Financial Officer | Chris Ferraro is the Chief Financial Officer. | 2022 – Present |
| *Aslihan Denizkurdu,* Chief Operating Officer | Aslihan Denizkurdu is Chief Operating Officer of Celsius Networks. Aslihan is responsible for continuously strengthening Celsius' infrastructure as well as governance and management practices. Prior to Celsius, Aslihan was the Chief Operating Officer and Head of Governance for Risk Management at Citigroup. | 2022 – Present |
| *Rodney Sunada-Wong,* Chief Risk Officer | Rodney is an experienced Risk Manager, expert in setting up governance to help achieve profitability objectives, optimize risk-taking, and regulatory expectations. Former Chief Risk Officer - U.S. Broker Dealer, U.S. and Mexico Derivatives Swap Dealers at Morgan Stanley. | 2021 – Present |

FILED: NEW YORK COUNTY CLERK 11/22/2025 11:47 AM    INDEX NO. 450040/2023
NYSCEF DOC. NO. 64    RECEIVED NYSCEF: 11/22/2025

| Name / Position | Relevant Experience / Responsibilities | Tenure |
|---|---|---|
| *Roni Cohen Pavon,* Chief Revenue Officer | Roni is responsible for all revenue generated from Celsius's products, technologies and services, with a special emphasis on new business lines, strategic initiatives and partnerships. | 2020 – Present |
| *Ron Deutsch,* General Counsel & Head of M&A | Ron Deutsch is General Counsel and Head of M&A of Celsius Network. Ron leads the legal, regulatory and corporate governance functions at Celsius Network. Ron also handles the negotiations, execution, and management of strategic transactions and investments for the company. Prior to joining Celsius, practiced at top AmLaw 100 firms focusing my practice on corporate transactions, representing private and public companies, and private investment funds and their portfolio companies, in complex deals, including mergers and acquisitions, strategic transactions, leveraged buyouts, joint ventures, divestitures, restructurings, growth equity investments, and governance matters. Specialties: Mergers and Acquisitions, Private Equity – LBOs/PIPEs, Blockchain, Investment Funds, Venture Capital/ Emerging Technology, Corporate Transactions, Corporate Governance, Restructuring. | 2021 – Present |
| *Oren Blonstein,* Chief Compliance Officer | Oren Blonstein is Chief Compliance Officer of Celsius Network. Oren is a proven product and compliance executive with over 20+ years of experience. Oren's role is to lead Celsius's compliance apparatus to ensure the safety of the funds in the network. Prior to Celsius, Oren was Chief Compliance Officer at Huobi US, Advisor at AVA labs and Managing Director at Tora. | 2021 – Present |
| *Trunshedda Ramos,* Chief Human Resource Officer | Trunshedda Ramos is Chief Human Resource Officer of Celsius Network. Trunshedda is an experienced Human Resources Leader. At Celsius, she is in charge of aligning the human capital strategy to business objectives while ensuring the Celsius culture can continue to scale. | 2020 – Present |
| *Shiran Kleiderman,* Chief Security Officer | Shiran Kleiderman is Chief Security Officer of Celsius Network. Shiran leads security initiatives and works to keep Celsius funds and internal systems secure. Under Shiran's leadership, our 24/7 security operations center (SOC) keeps our clients safe and secure. | 2020 – Present |
| *Guillermo Bodnar,* Chief Technology Officer | Guillermo Bodnar is Chief Technology Officer of Celsius Network. Guillermo is a veteran technology and solutions leader, driving Celsius to remain on the bleeding edge of innovation. Prior to Celsius, Guillermo was the Chief Solutions Officer at Globant, where he led the company's digital solutions strategy and built the infrastructure needed to support their IPO. | 2022 – Present |

FILED: NEW YORK COUNTY CLERK 11/22/2025 11:47 AM    INDEX NO. 450040/2023
NYSCEF DOC. NO. 64                                    RECEIVED NYSCEF: 11/22/2025

| Name / Position | Relevant Experience / Responsibilities | Tenure |
|---|---|---|
| *Amir Ayalon,* Chief Executive Officer of Celsius Mining | Amir Ayalon is the Chief Executive of Officer of Celsius Mining. | 2021 – Present |
| *Tal Bentov,* Vice President of Lending | Tal Bentov is the Vice President of Lending. | 2019 – Present |

FILED: NEW YORK COUNTY CLERK 11/22/2025 11:47 AM   INDEX NO. 450040/2023
NYSCEF DOC. NO. 64                                   RECEIVED NYSCEF: 11/22/2025

22-10964-mg   Doc 23   Filed 07/14/22   Entered 07/14/22 14:27:45   Main Document
Pg 60 of 61

## Exhibit L

**The Debtors' Payroll for the 30-Day Period
Following the Filing of the Debtors' Chapter 11 Petitions**

Pursuant to Local Rules 1007-2(b)(1)–(2)(A) and (C), the following provides, for the 30-day period following the Petition Date, the estimated amount of weekly payroll to the Debtors' employees (exclusive of officers, directors, and stockholders), the estimated amount paid and proposed to be paid to officers, stockholders, and directors, and the amount paid or proposed to be paid to financial and business consultants retained the Debtors.

| Payments | Payment Amount |
|---|---|
| Payments to employees (not including officers, directors, and stockholders) | $ 3,450,169 |
| Payments to officers, directors, and stockholders | $ 730,833 |
| Payments to financial and business consultants | $0 |

FILED: NEW YORK COUNTY CLERK 11/22/2025 11:47 AM   INDEX NO. 450040/2023
NYSCEF DOC. NO. 64                                   RECEIVED NYSCEF: 11/22/2025

FILED: NEW YORK COUNTY CLERK 11/22/2025 11:47 AM    INDEX NO. 450040/2023
NYSCEF DOC. NO. 64                                      RECEIVED NYSCEF: 11/22/2025

## Exhibit M

### The Debtors' Estimated Cash Receipts and Disbursements for the
### Thirty 30-Day Period Following the Filing of the Chapter 11 Petitions

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| Type | Amount |
| --- | --- |
| Cash Receipts | $17,128,000 |
| Cash Disbursements | $74,582,000 |
| Net Cash Gain | ($57,454,000) |
| Unpaid Obligations (excluding professional fees) | $3,205,000 |
| Unpaid Receivables (excluding professional fees) | $0[1] |

---

[1] Receivables accrued in connection with the Debtors' lending and staking programs are denominated in cryptocurrency, not cash.

EXHIBIT AB

EXHIBIT AC

Debtor's Name Celsius Network LLC                                       Case No.  22-10964

## Part 1: Summary of Post-confirmation Transfers

|  | Current Quarter | Total Since Effective Date |
|---|---|---|
| a. Total cash disbursements | $39,572,400 | $635,684,861 |
| b. Non-cash securities transferred | $0 | $658,770,760 |
| c. Other non-cash property transferred | $303,067,397 | $3,436,169,880 |
| d. Total transferred (a+b+c) | $342,639,797 | $4,730,625,501 |

## Part 2: Preconfirmation Professional Fees and Expenses

| | | | Approved Current | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|
| a. | Professional fees & expenses (bankruptcy) incurred by or on behalf of the debtor    Aggregate Total | | $0 | $164,969,616 | $0 | $164,606,060 |
| | *Itemized Breakdown by Firm* | | | | | |
| | Firm Name | Role | | | | |
| i | A.M. Saccullo Legal, LLC | Other | $0 | $230,725 | $0 | $230,725 |
| ii | Akin Gump Strauss Hauer & Fe | Co-Counsel | $0 | $16,098,697 | $0 | $16,098,697 |
| iii | Alvarez & Marsal | Financial Professional | $0 | $24,793,360 | $0 | $24,793,360 |
| iv | Centerview Partners | Financial Professional | $0 | $24,353,872 | $0 | $24,353,872 |
| v | KE Andrews | Other | $0 | $75,000 | $0 | $75,000 |
| vi | Kirkland & Ellis | Lead Counsel | $0 | $74,041,850 | $0 | $74,041,850 |
| vii | Latham & Watkins | Special Counsel | $0 | $10,506,738 | $0 | $10,506,738 |
| viii | RSM US LLP | Other | $0 | $1,279,378 | $0 | $918,322 |
| ix | Sontchi, LLC | Other | $0 | $73,822 | $0 | $73,822 |
| x | Stout | Other | $0 | $1,251,266 | $0 | $1,251,266 |
| xi | Stretto | Other | $0 | $12,264,908 | $0 | $12,262,409 |
| xii | | | | | | |
| xiii | | | | | | |
| xiv | | | | | | |
| xv | | | | | | |
| xvi | | | | | | |
| xvii | | | | | | |
| xviii | | | | | | |
| xix | | | | | | |
| xx | | | | | | |
| xxi | | | | | | |
| xxii | | | | | | |
| xxiii | | | | | | |
| xxiv | | | | | | |
| xxv | | | | | | |
| xxvi | | | | | | |
| xxvii | | | | | | |
| xxviii | | | | | | |
| xxix | | | | | | |

UST Form 11-PCR (12/01/2021)                    2

22-10964-mg   Doc 23   Filed 07/14/22   Entered 07/14/22 14:27:45   Main Document
Pg 7 of 61

of its outstanding DeFi (as defined herein) and other counterparty loans to bring its collateral back under its control.

16.    These chapter 11 cases will provide a "breathing spell" for the Debtors to negotiate and implement a plan that will maximize the value of its business and generate meaningful recoveries to our stakeholders as quickly as possible.

**Celsius Network Inc.**
Consolidated Assets & Liabilities, as of July 13, 2022

*(USD, MMs)*

| | |
|---|---:|
| **Liabilities** | |
| User Liabilities | $ (4,720) |
| CEL Liabilities | (210) |
| Custody Liabilities | (180) |
| Other | (390) |
| **Total Liabilities** | **$ (5,500)** |
| | |
| **Assets** | |
| Bank Cash | 170 |
| Crypto Assets | 1,750 |
| Loans | 930 |
| Allowance For Doubtful Accounts | (310) |
| Net Loans | 620 |
| Mining Assets | 720 |
| Custody Assets | 180 |
| CEL Token | 600 |
| Other | 270 |
| **Total Assets** | **$ 4,310** |
| **Surplus / (Deficit)** | **$ (1,190)** |

*(handwritten margin note: "— total claims by Celsius creditors")*

Note  These preliminary unaudited amounts are presented on a non-GAAP basis for illustrative purposes only and are rounded to the nearest $10 million USD. Amounts include non-Debtor subsidiaries.  Celsius generally does not produce mid-month balances sheets, and the intent here is to provide a snapshot and directional sense for various assets and liabilities as of the petition date. Amounts from subsequent filings reflecting a petition date balance sheet may be materially different as a result of further review and diligence by management.

INDEX NO. 450040/2023
NYSCEF DOC. NO. 64
RECEIVED NYSCEF: 11/22/2025

on an "over the counter" or "OTC" basis, and vary based on market conditions, internal deployment capabilities and needs, and risk policies. Depending on the creditworthiness of the counterparty, the Company may provide institutional borrowers with either secured or unsecured loans. Institutional loans are typically in the form of cryptocurrency coins, but can sometimes be loans of U.S. dollars or stablecoins.

57. As of July 11, 2022, CNL had approximately 47 institutional borrowers, with approximately $93 million of aggregate outstanding performing loans and the Company held collateral, with a market value of approximately $98.5 million in digital assets to cover such loans.

### iv.   Custody Service

58. In April 2022, the Company began providing a new type of service marketed to its users located in the U.S. called the Celsius Custody Service. For eligible users, "Custody Service" serves as the central hub of their digital asset account at Celsius, enabling the user to navigate from Celsius' "Custody Wallet" to various Celsius products (based on the availability of those products in the user's jurisdiction). For example, an eligible customer could elect to transfer their cryptocurrency from the "Custody Service" program to the Earn program to earn rewards. For clarity, crypto assets held solely in "Custody Service" do not earn rewards from the Earn program as crypto assets held in custody shall "at all times remain with the [user]" and "Celsius will not transfer, sell, loan or otherwise rehypothecate" digital assets in custody unless "specifically instructed by [users], except as required by valid court order, competent regulatory agency, government agency or applicable law."[10] Pursuant to the "Terms of Use," the Company is, however, entitled to set-off any obligations owed by a user to the Company against the user's

---

[10]   *See* paragraph 4.B., Celsius' "Terms of Use," as of April 14, 2022.

_EXHIBIT AD_

**PLEASE TAKE FURTHER NOTICE** that the Plan provides that the Litigation Administrators or the Plan Administrator may designate additional amounts for distribution on account of Illiquid Recovery Rights, including Litigation Proceeds.

**PLEASE TAKE FURTHER NOTICE** that the Litigation Administrators and the Plan Administrator previously designated $127.0 million for the second distribution (the "Second Distribution") and $220.6 million for the third distribution (the "Third Distribution," and together with the Initial Distribution and Second Distribution, the "Prior Distributions") for distribution to Holders of Claims entitled to receive a distribution on account of Litigation Proceeds and other estate assets on or around November 21, 2024, and August 19, 2025, respectively.

**PLEASE TAKE FURTHER NOTICE** that the Litigation Administrators and the Plan Administrator have designated an additional approximately $344.4 million in the aggregate for distribution to Holders of Claims entitled to receive Illiquid Recovery Rights under the Plan (the "Fourth Distribution"). The Fourth Distribution is the result of the ongoing work of the (i) Litigation Administrators to monetize the Debtors' illiquid assets and resolve Claims and (ii) Plan Administrator to administer the Debtors' Estates and distribute the Debtors' remaining assets, as further described herein.

**PLEASE TAKE FURTHER NOTICE** that the Post-Effective Date Debtors intend to commence the Fourth Distribution to Holders of eligible Claims in February 2026. The remainder of this Notice includes general information regarding such Fourth Distribution. You are encouraged to review this Notice, the Plan, and the Confirmation Order in their entirety.

## Litigation Administrators' Ongoing Efforts

As described further in the Litigation Administrators' quarterly reports,[3] since the Third Distribution, the Litigation Administrators have continued their efforts to, among other things, prosecute, settle, or otherwise resolve any remaining Disputed Claims, the Recovery Causes of Action, and the Contributed Claims and administer and monetize certain illiquid assets. As a result of these efforts, the Litigation Administrators have facilitated another distribution, including as a result of the Tether Adversary Proceeding[4] and the Litigation Administrators' other efforts to Holders of Claims entitled to Illiquid Recovery Rights under the Plan.

The Litigation Administrators designated and on December 19, 2025, transferred approximately $257.1 million, net of holdbacks for fees, costs, and expenses, from the Litigation Recovery Account to the Post-Effective Date Debtors to be distributed as part of the Fourth

---

[3] See, e.g., *Litigation Administrators' Quarterly Report for the July 1, 2025 to September 30, 2025 Period* [Docket No. 8256].

[4] On August 9, 2024, the Blockchain Recovery Investment Consortium, LLC, as the Complex Asset Recovery Manager, commenced litigation against Tether Limited and its affiliated entities (collectively, "Tether") alleging preference, fraudulent transfer, breach-of-contract, and related claims in connection with pre-petition transfers of collateral to Tether and Tether's liquidation of the same (the "Tether Adversary Proceeding"). On October 9, 2025, following extensive settlement negotiations, the Post-Effective Date Debtors and Tether executed a settlement agreement that fully resolved the litigation.

2

Debtor's Name Celsius Network LLC                                                    Case No.  22-10964

## Part 1: Summary of Post-confirmation Transfers

*→ distributed after 5.8.25*
*→ (Ionic Digital shares)*

|  | Current Quarter | Total Since Effective Date |
|---|---|---|
| a. Total cash disbursements | $39,572,400 | $635,684,861 |
| b. Non-cash securities transferred | $0 | $658,770,760 |
| c. Other non-cash property transferred | $303,067,397 | $3,436,169,880 |
| d. Total transferred (a+b+c) | $342,639,797 | $4,730,625,501 |

## Part 2: Preconfirmation Professional Fees and Expenses

| a. | | | | Approved Current | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|---|
| | Professional fees & expenses (bankruptcy) incurred by or on behalf of the debtor | | Aggregate Total | $0 | $164,969,616 | $0 | $164,606,060 |
| | *Itemized Breakdown by Firm* | | | | | | |
| | Firm Name | Role | | | | | |
| i | A.M. Saccullo Legal, LLC | Other | | $0 | $230,725 | $0 | $230,725 |
| ii | Akin Gump Strauss Hauer & Fe | Co-Counsel | | $0 | $16,098,697 | $0 | $16,098,697 |
| iii | Alvarez & Marsal | Financial Professional | | $0 | $24,793,360 | $0 | $24,793,360 |
| iv | Centerview Partners | Financial Professional | | $0 | $24,353,872 | $0 | $24,353,872 |
| v | KE Andrews | Other | | $0 | $75,000 | $0 | $75,000 |
| vi | Kirkland & Ellis | Lead Counsel | | $0 | $74,041,850 | $0 | $74,041,850 |
| vii | Latham & Watkins | Special Counsel | | $0 | $10,506,738 | $0 | $10,506,738 |
| viii | RSM US LLP | Other | | $0 | $1,279,378 | $0 | $918,322 |
| ix | Sontchi, LLC | Other | | $0 | $73,822 | $0 | $73,822 |
| x | Stout | Other | | $0 | $1,251,266 | $0 | $1,251,266 |
| xi | Stretto | Other | | $0 | $12,264,908 | $0 | $12,262,409 |
| xii | | | | | | | |
| xiii | | | | | | | |
| xiv | | | | | | | |
| xv | | | | | | | |
| xvi | | | | | | | |
| xvii | | | | | | | |
| xviii | | | | | | | |
| xix | | | | | | | |
| xx | | | | | | | |
| xxi | | | | | | | |
| xxii | | | | | | | |
| xxiii | | | | | | | |
| xxiv | | | | | | | |
| xxv | | | | | | | |
| xxvi | | | | | | | |
| xxvii | | | | | | | |
| xxviii | | | | | | | |
| xxix | | | | | | | |

UST Form 11-PCR (12/01/2021)                              2

Case 1:23-cr-00347-JGK   Document 189-5   Filed 05/26/26   Page 24 of 64

4/4/26, 9:18 PM          Ionic Digital Announces Confidential Submission of Draft Registration Statement for Proposed Public Listing



After most shares were distributed to creditors at $658m Valuation Ionic plans to go public at $1 - 2 B Valuation with upside all being shared with creditors.

Oct 29, 2025 8:05 AM Eastern Daylight Time

# Ionic Digital Announces Confidential Submission of Draft Registration Statement for Proposed Public Listing

**Share**  in  X  f  ✉  🔗  •••

AUSTIN, Texas--(BUSINESS WIRE)--Ionic Digital Inc. ("Ionic Digital") today announced that it has confidentially submitted a draft registration statement on Form S-1 with the U.S. Securities and Exchange Commission ("SEC") relating to the proposed public listing of its Class A common stock. The public listing is expected to take place after the SEC completes its review process, subject to market and other conditions.

This press release does not constitute an offer to sell or the solicitation of an offer to buy any securities. Any offers, solicitations of offers to buy, or any sales of securities will be made in accordance with the registration requirements of the Securities Act of 1933, as amended ("Securities Act"). This announcement is being

Cookies Settings

Accept All Cookies

By clicking "Accept All Cookies", you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts.  Cookie Policy

EXHIBIT AE

Distribution to Holders of Claims entitled to receive Illiquid Recovery Rights under the Plan, with a portion to be held back in certain reserves in accordance with the Plan.

### Plan Administrator's Ongoing Efforts

As described further in the Plan Administrator's quarterly reports,[5] the Plan Administrator has been working to administer the Debtors' Estates and distribute assets to creditors as contemplated by the Plan.

As part of this process, the Plan Administrator has reviewed amounts held in the Disputed and Contingent Claims Reserve to determine what amount, if any, can also be released for distribution to creditors. The Debtors initially sized the Disputed and Contingent Claims Reserve to allow for up to $500 million of potential future Allowed Claims that were then disputed, contingent, or unliquidated. As such Claims are resolved by the Litigation Administrators, the Plan Administrator makes distributions from the Disputed and Contingent Claims Reserve to satisfy newly Allowed Claims. However, not all unliquidated and/or Disputed Claims ultimately become Allowed Claims. As a result of the Litigation Administrators' work to resolve disputed, contingent, or unliquidated Claims, the initial reserve was reduced to allow for up to $450 million of disputed, contingent, or unliquidated Claims coinciding with the Second Distribution and $375 million of disputed, contingent, or unliquidated Claims coinciding with the Third Distribution. With the Fourth Distribution, because of the work of the Litigation Administrators to resolve disputed, contingent, or unliquidated Claims, the Plan Administrator has determined it can reduce the reserve further to allow for up to $300 million of disputed, contingent, or unliquidated Claims. As a result, the Plan Administrator has determined that assets associated with $75 million in claims, currently valued at $73.7 million,[6] should be released from the assets held in the Disputed and Contingent Claims Reserve for distribution to creditors in connection with the Fourth Distribution.

In addition, starting in early 2025, the Plan Administrator commenced the forfeiture procedures authorized by the Bankruptcy Court. *See Order (I) Setting Deadline for Forfeiture of Unclaimed Property, (II) Approving Related Procedures and Notice and (III) Granting Related Relief* [Docket No. 7983]. Approximately $22 million, representing the distributable value of Claims previously deemed forfeited by creditors who did not respond or take action by the March 31, 2025 deadline, were included in the Third Distribution. In the second quarter of 2025, approximately 22,000 creditors were notified that their Claims were subject to potential forfeiture. Of these creditors, approximately 12,000 creditors, representing approximately $9.4 million in distributable value,[7] failed to open a Celsius Distributions Support ticket or otherwise claim their distribution by the applicable deadline. The Plan Administrator determined, in an exercise of his

---

[5]  See, e.g., *Plan Administrator's Sixth Status Report on Distributions* [Docket No. 8277].

[6]  This value is based on a BTC pricing of $88,597.00 per BTC and an ETH pricing of $2,935.87 per ETH.

[7]  This value is based on Liquid Cryptocurrency pricing as of January 16, 2024, for those forfeited initial distributions, BTC at a pricing of $95,836.23 per BTC for those forfeited second distributions, and BTC at a pricing of $118,019.75 per BTC for those forfeited third distributions.

3

FILED: NEW YORK COUNTY CLERK 11/22/2025 11:47 AM    INDEX NO. 450040/2023
NYSCEF DOC. NO. 73                                   RECEIVED NYSCEF: 11/22/2025

P58KMASS

in his letter to the Court, even under the most conservative estimates, Celsius was missing at least 1.3 billion at that time, and the true number is higher because some of the assets that Celsius held on its books at the time of the bankruptcy turned out to be worthless.

So, when we fast forward to the first distribution to creditors in the bankruptcy in January 2024, crypto prices have come up during that time period compared to what they were as of the bankruptcy petition date.  Celsius was able to distribute just shy of $3 billion, constituting 58 percent of claims.  But that is obviously not making customers whole because, first of all, it's not a hundred percent, and, more saliently, Celsius benefited from the run-up in prices and customers did not, because their claims were valued as of the petition date, they were dollarized as of the petition date.

So if the customer assets that Celsius had held on the bankruptcy petition date were valued at today's crypto prices, those same assets would be worth approximately $12 billion. And I think, your Honor, that is where some of the anger and the hurt is coming from in the victim letters here, because it wasn't crypto that was a bad bet, it was Mashinsky.  And they realize that if they had held their Bitcoin somewhere else, it would be worth far, far, far more than they will ever get back for it.

As I've already said, as he agreed in his plea

# EXHIBIT AF

# Post-Effective Date Debtors' Assets (Jan 31st, 2026)

Case 1:23-cr-00347-JGK    Document 189-5    Filed 05/26/26    Page 29 of 64

| | Crypto [1] | Fiat | Lit Admin Assets [2] | Total |
|---|---|---|---|---|
| Post-Effective Date Debtors' Assets | $692 M | $143 M | $98 M | $ 933 M |
| Remaining Amount Owed in Current Distributions [3] | $678 M | $ 64 M | N/A | $742 M |
| Net Assets | $14 M | $79 M | $98 M | $191 M |

**Net Assets[4]** will be distributed to creditors over time, and all remaining Net Assets will be fully distributed to creditors once all claims are resolved and all other distributions have been completed

(1) Crypto Net Assets of $14 million include Forfeitures of $1 million and Crypto Reserve of $13 million.  Crypto value based on BTC and ETH prices as of Jan 31st, 2026.
(2) Lit Admin Assets of $98 million in proceeds from asset sales and litigation recoveries managed by the Litigation Administrators. This amount excludes value of remaining illiquid assets.
(3) Remaining Amount Owed in Current Distributions include Initial, Second, Third, Fourth and Corporate Supplemental Distributions.  For the avoidance of doubt, these amounts were included in the calculation of the recovery rate for the applicable distribution. The Post-Effective Date Debtors' assets decreased by $344 million during the fourth quarter primarily due to the Fourth Distribution.
(4) Net Assets as presented include cash for budgeted expenditures related to the Plan Administrator, Litigation Administrators and the general administration / wind down of the estate.

F

2

Total of $4.73B distributed

Excludes $191m in cash

300m ETH
150m Fireblocks
50m Badger Inswk
2,000M FTX

EXHIBIT AG

Case 1:23-cr-00347-JGK   Document 189-5   Filed 05/26/26   Page 31 of 64
Case 1:23-cr-00347-JGK   Document 165   Filed 07/07/25   Page 6 of 104

P58KMASS

the parties, and the Court independently finds that the guideline calculation is correct.

I go through all of this because many of the defendant's arguments are inconsistent with the parties' agreement as to the guidelines and the evidence submitted in connection with sentencing.

The defendant, seemingly, at various points, seeks to limit his criminal conduct to the two false statements to which the defendant pleaded guilty specifically, namely, his statement in December 2021, in violation of the commodities fraud statutes, as alleged in Count Two, that, "Celsius had received approval from regulators," even though he knew that was not true.  Plea transcript, at 25.

The second false statement was a statement in violation of the securities fraud statutes charged in Count Five in September 2019 that he failed to disclose that he was selling his CEL token holdings even though he represented to the public, using electronic communications and wires, that he was not selling.  *Id.*  And, indeed, in his letter to the Court, he only explicitly regrets the two false statements at the plea allocution without reference to the millions of dollars of loss from his frauds.  Defendant Exhibit T, ECF No. 149-1.

The defendant does not explain how there could be an agreed-upon actual loss of $590 million solely from the two

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FILED: NEW YORK COUNTY CLERK 11/22/2025 11:47 AM    INDEX NO. 450040/2023
NYSCEF DOC. NO. 73    Case 1:23-cr-00347-JGK    Document 165    Filed 07/07/25    Page 7 of 104    RECEIVED NYSCEF: 11/22/2025

P58KMASS

specific statements that he admitted to making, in violation of Counts Two and Five, at the plea allocution and to which the defendant pleaded guilty, without including relevant conduct, which is detailed at length in the presentence report.

The defendant also fails to explain how the agreed-upon amount of forfeiture for his gain from the securities offense in Count Five could be in excess of $48 million plus the specific properties, when the actual gain from the actual sale that he falsely denied was only $53,000. Government April 28, 2025 memo, at 64.

The Court has carefully considered the defendant's objections to the presentence report and overrules them, except that the Court will strike paragraphs 41 and 43(d) as insufficiently supported. The Court will also correct paragraph 56(a) of the presentence report, in lines 5 and 6, to note that the email is from Mashinsky to Cohen-Pavon and not from Cohen-Pavon to Mashinsky.

The Court notes that the objections to the presentence report in Exhibit B do not change the guideline calculations, and will not change the sentence.

The Court also notes that the Court has carefully reviewed the submissions of the parties, and neither party has sought a *Fatico* hearing with respect to the objections. Indeed, the defense argues, "A *Fatico* hearing is unnecessary. There is no dispute between the parties about the statutory

P58KMASS

dollars. And the only way after -- we had a balance of $25 billion, and we allowed everybody to withdraw down to 5 billion. We decided to protect all those remaining customers.

So, I...

THE COURT: Okay.

THE DEFENDANT: So not be left with my most loyal customers having to wait for the rest of their life for the rest of the coins, so we took the action with everybody on the board and everybody in my executive team — overnight, the decision was made in five minutes — to pause withdrawals and allow everybody equal opportunity at recovery.

MR. MUKASEY: I think your Honor can consider that under 3553 as part of his statement.

THE COURT: Okay. I've taken that into account. I will take it into account. It doesn't change anything in the presentence report.

Go ahead.

THE DEFENDANT: The reason I forfeited the 48 million and all my claims and everything else possible is because, as I said to your Honor before, I wanted to be part of the solution, not part of the problem. My entry of the plea is my effort to be part of the solution and not part of the problem.

I would like to finish my -- I don't have any other comments. I think we did -- I spent three years collecting all

# EXHIBIT AH



# Memo

| | | | |
|---|---|---|---|
| To | Ashley Harrell | From | Calvin Tan, Grace Chong |
| | | Date | 20 July 2020 |
| | | Our ref | CT/GSLC |
| Subject | Regulatory advice regarding CEL | Client | Celsius Network Ltd |

---

## 1.    OVERVIEW

1.1    We have been asked by Celsius Network Limited ("**CN**") to review the Celsius Degree token ("**CEL**") to assess whether (i) CEL falls within the scope of a "capital markets product" under the Securities and Futures Act ("**SFA**"); and/or (ii) whether CEL will be classified as e-money or a digital payment token ("**DPT**") under the Payment Services Act ("**PS Act**").

1.2    This advice is provided on the basis of the matters set out in section 2, and the assumptions set out in Appendix 1, having regard to the Singapore laws in force as at the date of this advice memorandum.

1.3    Based on our review:

- CEL is not likely to fall within the scope of a "capital markets product", as it is not likely to constitute a share, debenture, unit in a business trust, unit in a collective investment scheme, or derivatives contract.

- CEL is not likely to fall within the scope of "e-money" under the PS Act, as it is not denominated in any currency, and does not represent a claim on a centralised issuer.

- Rather, CEL would likely be characterised as a "digital payment token".

## 2.    INFORMATION REVIEWED

2.1    For the purposes of our analysis, we have reviewed the information set out in the following sources:

- The Whitepaper for Celsius dated March 2019[1];

- The Legal Opinion for Celsius dated 19 February 2018 by Latham & Watkins ("**Legal Opinion**"); and

- Information provided to us by or on behalf of CN.

2.2     Besides the above information, we have not specifically reviewed or commented on any other documentation, in providing this advice. We have also assumed the correctness of the factual matters provided to us, whether or not referred to in this advice, and have made no investigation or verification of any factual matter(s) contained herein. We assume that there are no other facts that are relevant other than those which are stated in this advice.

3.     **ASSUMPTIONS**

3.1     At this stage, we have provided guidance on how some of the key features of CEL are likely to be characterised, but these are subject to change if there are changes to the structure of CEL.

3.2     This memorandum of advice is subject to the assumptions listed in **Appendix 1**.

3.3     In particular, we have not been asked to provide any analysis of the application of the Singapore regulatory regime to the Platform itself, to any transactions which may be carried out on the Platform or any services performed on the Platform. We would be happy to provide further advice should CN wish to introduce the Platform in Singapore.

3.4     We understand and assume that the Platform does not presently provide services in relation to tokenised securities. If the business model of the Platform evolves to give entitlements to investments in future, the analysis would need to be refreshed to assess whether the CEL tokens may constitute asset backed tokens, which may fall within the scope of capital market products.

4.     **BACKGROUND**

**Celsius platform**

4.1     Celsius is a global financial platform allowing its users to earn interest for their crypto-asset holdings (which may be paid in either CEL or another crypto-asset). (the "**Platform**"). It will allow borrowers to get a dollar margin loan against their crypto-assets. The platform will also enable margin traders (hedge funds and crypto funds) to borrow crypto-assets for various purposes, including hedging and shorting. Celsius also allows Celsius holders to borrow US dollars using crypto as collateral.

4.2     Lenders of crypto-assets will earn fees on their assets in the form of CEL (or other forms of cryptocurrency – such as Bitcoin) when their crypto-assets are being lent to borrowers. CEL will be purchased and used to pay fees to lenders in relation to the borrowing of crypto-assets.

4.3     Celsius also has a feature called Celpay, which allows users to send cryptocurrencies

---

[1] We understand that the Whitepaper has been updated based on comments by Latham & Watkins in their legal opinion dated 19 February 2018.

to their contacts. The contacts can then redeem the coins by following the link and instructions to install the app to receive the funds.

**CEL token**

4.4    The CEL token currently has the following utilities:

- Getting higher interest rates when lending CEL or opting to receive interest in CEL;

- Paying lower interest rates when borrowing CEL or opting to pay interest in CEL; and

- Achieving seniority in the Platform which will provide better interest rates.

4.5    Other utilities specified in the Whitepaper have not yet been made available to clients.

5.    **APPLICATION OF SECURITIES LAWS AND REGULATIONS**

<u>Whether CEL is considered to be a "capital market product" in Singapore</u>

5.1    MAS has issued a Guide to Digital Token Offerings (last updated on 26 May 2020) (the "**Guide**") which clarified that offers or issues of digital tokens may be regulated by MAS if the digital tokens constitute "capital markets products" under the Securities and Futures Act ("**SFA**"). Capital markets products include any securities, units in a collective investment scheme, derivatives contracts and spot foreign exchange contracts for purposes of leveraged foreign exchange trading.

5.2    MAS stated that they will examine the structure and characteristics of, including the rights attached to, a digital token in determining if the digital token is a type of "capital markets product" under the SFA.

5.3    We set out below the relevant categories of "capital markets products" under the SFA and assess whether CEL will fall within the scope of a "capital markets product".

*Shares*

5.4    The definition of "securities" under the SFA includes:

- shares, units in a business trust or any instrument conferring or representing a legal or beneficial ownership interest in a corporation, partnership or limited liability partnership;

- debentures; or

- any other product or class of products as may be prescribed

5.5    According to the Guide, a digital token may constitute a share[2] where it confers or represents an ownership interest in a corporation, represents liability of the token

---

[2] Under section 2(1) of the SFA, read with section 4(1) of the Companies Act (Cap. 50), "share" means "a share in the share capital of a corporation and includes stock except where a distinction between stocks and share is expressed or implied.".

holder in the corporation, and represents mutual covenants with other token holders in the corporation *inter se*.

5.6    We understand that CEL holders will be able to earn 'interest' for their lent coins, but they do not necessarily need to deposit coins to the Celsius wallet. As such any interest earned is not linked to the inherent nature of CEL but more the activity of depositing CEL.

5.7    Our view is that CEL is unlikely to be characterised as a share, as it does not represent any legal or beneficial title in the shares of CN, and it does not represent a right to claim dividends or return on capital. There is no indication that an equity interest is granted to the holders of CEL nor are they entitled to vote at the board meetings or shareholders. CEL holders do not participate in the corporate governance of CN and/or the Platform.

*Business trust*

5.8    A unit in a business trust constitutes a security, where such a unit confers or represents ownership interest in the trust property of a business trust.

5.9    A business trust is defined under the Business Trusts Act as a trust that is established in respect of any property and that has the following characteristics:

- the purpose or effect, or purported purpose or effect, of the trust is to enable the unitholders to participate in or receive profits arising from the management of the property or management or operation of a business;

- the unitholders of the trust do not have day-to-day control over the management of the property;

- the property subject to the trust is managed as a whole by a trustee or by another person on behalf of the trustee;

- the contributions of the unitholders and the profits or income from which payments are to be made to them are pooled; and

- either:

  o the units in the trust that are issued are exclusively or primarily non-redeemable; or

  o the trust invests only in real estate and real estate-related assets.

5.10   Based on the description of CEL, no unit in a trust will be created for the purpose of enabling the unit holders to participate in or receive profits arising from the management of the property. As such, our view is that the current model of CEL would not constitute a unit in a business trust.

*Debentures*

5.11   The definition of a debenture includes:

- any debenture stock, bond, note and any other debt securities issued by or

proposed to be issued by a corporation or any other entity, whether constituting a charge or not, on the assets of the issuer;

- any debenture stock, bond, note and any other debt securities issued by or proposed to be issued by a trustee-manager of a business trust in its capacity as trustee-manager of the business trust, or a trustee of a real estate investment trust in its capacity as trustee of the real estate investment trust, whether constituting a charge or not, on the assets of the business trust or real estate investment trust; or

- such other product or class of products as MAS may prescribe

5.12    A digital token may constitute a debenture where is constitutes or evidences the indebtedness of the issuer of the digital token in respect of any money that is or may be lent to the issuer by a token holder.

5.13    Case Study 11 of the Guide sets out a specific scenario to stablecoins:

> *"Company K intends to offer digital tokens ("Token K") to any person globally, including in Singapore, for US$1 per Token K. Company K aims to achieve a relatively constant price for Token K by pegging its value to the US dollar. To do so, Company K will only accept payments for Tokens K in the form of electronic deposits of US dollars into its US-dollar denominated bank account. These deposits will serve as a fiat currency reserve to back the purported US$1 value of each Token K in circulation. Holders of Tokens K will have the right to exchange Tokens K with Company K for US$1 per Token K. Company K will not have any rights to cancel or redeem Token K from token holders. Company K may consider future tie-ups with retail shops to enable Token K to be used to pay for purchases.*

> Application of relevant laws administered by MAS in relation to an offer of Token K

> *As Company K is under an obligation to the buy-back of Token K from the holders, Token K may constitute a debenture if Token K represents Company K's indebtedness to the holder to pay back the holder US$1 per Token K. However, if Token K falls within the definition of "e-money" under the PS Act, MAS' general regulatory stance is to not regulate Token K as a debenture.*

5.14    Pursuant to the Securities and Futures (Prescribed Debentures) Regulations 2018, the definition of "debenture" under section 2(1) of the SFA also includes an arrangement:

(a) that is entered into on or after 8 October 2018;

(b) under which —

(i) a person (A) transfers legal title to any amount of any precious metal (called in this regulation the specified precious metal) to another person (B), for consideration given by B;

(ii) at a predetermined time or within a predetermined period after the arrangement is entered into —

(A) B is required to transfer legal title to the same amount of the specified precious metal to A, for a predetermined consideration given by A; or

(B) B may exercise an option to require A to acquire the legal title to the same amount of the specified precious metal from B for a predetermined consideration given by A, whether or not B may only exercise the option on the fulfilment of one or more conditions; and

(iii) the predetermined consideration to be given by A under —

(A) sub-paragraph (ii)(A); or

(B) sub-paragraph (ii)(B) upon B's exercise of the option mentioned in that provision,

is greater than the value of consideration given by B under sub-paragraph (i); and

(c) that is neither entered into in the ordinary course of B's business, nor solely incidental to that business.

5.15    As noted above, the MAS has also issued a Consultation which also considered the categorisation of stablecoins.

5.16    In order to consider whether CEL constitutes a debenture, we will first have to consider whether CEL constitutes e-money under the PS Act, pursuant to which we set out our analysis below.

*E-money*

5.17    E-money is defined in the PS Act as any electronically stored monetary value that –

- is denominated in any currency or pegged by its issuer to any currency;

- has been paid in advance to enable the making of payment transactions through the use of a payment account;

- is accepted by a person other than its issuer; and

- represents a claim on its issuer,

but does not include any deposit accepted in Singapore, from any person in Singapore.

5.18    E-money, as a digital representation of fiat currency, encompasses the monetary value of that fiat currency that it is denominated in. It similarly also takes on the monetary value of the fiat currency that it is pegged to by its issuer (i.e. it has a fixed exchange rate to a given fiat currency, e.g. one token = $1).

*Assessment – E-money / Debenture*

5.19    We note that:

S

- CEL tokens would not have features that create, acknowledge, represent, constitute or evidence any indebtedness;

- The holders of the CEL tokens would not have any rights that require the issuer to re-purchase or redeem the tokens at a holder's election under any circumstances;

- The CEL tokens would not involve any precious metal buy-back arrangements which are in substance equivalent to collaterised borrowing;

- The consideration paid to the issuer by the holders for completed purchases of the CEL tokens would not constitute loans, debts, borrowings or other liabilities of the issuer in favour of the holders of the CEL tokens; and

- The CEL tokens would not impose any obligation, covenant, undertaking or guarantee on the issuer to make any payments to the holders of the of the CEL tokens or any other persons.

5.20    Hence, our view is that CEL will not fall within the scope of e-money or a debenture. CEL is not pegged or denominated in any currency, and has not been pre-paid in advance for goods and services. While CEL is exchangeable for fiat currency on third party exchanges, they do not have a fixed value in fiat currency and are not fixed to be redeemed at par value by CN.

5.21    Although CEL tokens are provided to purchasers in exchange for receipt of funds, they do not represent stored monetary value as represented by a claim on CN. This is because holders of CEL do not, by virtue of holding CEL, have a claim against CN relating to the funds provided by the purchasers.

5.22    Notwithstanding that fees for margin trading may be specified in fiat values, we understand that the CEL tokens issued to lenders on the Platform in return for lending the crypto-assets to borrowers do not themselves represent a fixed value to the lenders in fiat currency. We understand that the lenders will need to exchange CEL tokens for fiat currency on a third party exchange and the price of exchange will depend on market forces on the exchange.

*CIS*

5.23    A CIS is defined under the SFA to mean:

- An arrangement in respect of any property under which the participants do not have day-to-day control over the management of the property;

- Under which either the property is managed as a whole by or on behalf of a manager; or where the contributions or profits are pooled; and

- Under which the effect or purpose of the arrangement is to enable the participants to participate in or receive profits or to receive sums paid out of such profits.

5.24    In relation to the above, one of the main regulatory objectives of regulating collective investment schemes is to safeguard the interest of investors who have contributed money or assets to an investment scheme under circumstances in which they have no

day-to-day control of their investment because it is pooled or subject to collective management.[3]

5.25    "Property" as referred to in the definition of a "collective investment scheme" is not defined in the SFA and could include, for example, securities, futures, money, goods and real estate, whether located in Singapore or elsewhere.[4]

5.26    In this case, there will not be any centralised issuer or entity involved the arrangement in respect of any property, which will be managed as a whole by or on behalf of a manager, under which the effect or purpose of the arrangement is to enable the participants to participate in or receive profits or to receive sums paid out of such profits.

5.27    Although lenders on the Platform who commit cryptocurrency assets to the crypto lending reserve pool may be rewarded with CEL tokens according to fees paid by borrowers, the CEL tokens themselves do not constitute rights or interests to participate in or receive profits or income from CN. CEL holders will themselves have day-to-day control over the management of the CEL tokens (i.e. the CEL tokens will be held by the lenders in their own wallets and the lenders can choose when to sell the CEL tokens on a third party exchange at their own discretion.)

5.28    Lenders who receive the CEL tokens do not exchange those CEL tokens for pooled profits or income sitting on the Platform. Rather, the CEL tokens are sold on third party exchanges. Further, the CEL tokens awarded to lenders are not managed as a whole by or on behalf of the Platform operator. Rather, each lender will manage his/her own CEL tokens within the lenders' own wallet.

5.29    As such it is unlikely that CEL will be characterised as a unit in a collective investment scheme.

*Derivatives and futures contracts*

5.30    The definition of "derivatives contract" under the SFA means

- any contract or arrangement under which:

  o   a party to the contract or arrangement is required to, or may be required to, discharge all or any of its obligations under the contract or arrangement at some future time; and

  o   the value of the contract or arrangement is determined (whether directly or indirectly, or whether wholly or in part) by reference to, is derived from, or varies by reference to, either of the following:

  -   the value or amount of one or more underlying things;

  -   fluctuations in the values or amounts of one or more underlying things; or

---

[3] MAS, *"Response to Feedback Received on Proposals to Enhance Regulatory Safeguards for Investors in the Capital Markets"* (22 September 2015), paragraph 4.18.
[4] MAS, *"Consultation Paper on Proposals to Enhance Regulatory Safeguards for Investors in the Capital Markets"* (21 July 2014), paragraph 3.1 and footnote 10.

- any contract or arrangement that is, or that belongs to a class of contracts or arrangements that is, prescribed to be a derivatives contract.

5.31   The definition also includes "securities-based derivatives contracts", which includes any derivatives contract of which, the underlying thing is a share, debenture or unit in a business trust.

5.32   The definition of "futures contract" under the SFA means an exchange-traded derivatives contract under which —

- one party agrees to transfer title to an underlying thing, or a specified quantity of an underlying thing, to another party at a specified future time and at a specified price payable at that future time;

- the parties will discharge their obligations under the contract by settling the difference between the value of a specified quantity of an underlying thing agreed at the time of the making of the contract and at a specified future time; or

- the contract is an option on an exchange-traded derivatives contract.

5.33   Currently, a derivative is only regulated under the SFA if the "underlying thing" pertains to the following:

- a unit in a collective investment scheme;

- a commodity;

- a financial instrument, i.e. any currency, currency index, interest rate, interest rate instrument, interest rate index, securities, securities index, a group or groups of such financial instruments;

- the credit of any person;

- or an underlying thing prescribed by MAS.

5.34   MAS stated that payment tokens (i.e. crypto tokens) would not be defined as "underlying things" under the SFA in its Consultation Paper on Proposed Regulatory Approach for Derivatives Contracts on Payment Tokens dated 20 November 2019.

5.35   MAS also proposed in the same consultation that it does not regard it as necessary or appropriate at this point to scope all payment token derivatives (i.e. payment tokens based on derivatives, or "PTDs") within the regulatory scope of the SFA, as they do not pose risks to the financial system. Therefore, MAS took the view that it is not critical to regulate PTDs unless they are offered by an entity that is systemically important.

5.36   This position was confirmed by MAS in its response on 15 May 2020, where MAS affirmed that PTDs as a general asset class are not yet suitable to be regulated. Payment tokens tend to exhibit high volatility and are intrinsically difficult to value and the same applies to PTDs. However, this will be regulated where offered on an Approved Exchange .

5.37   Most importantly, MAS has said that the PS Act's requirements are right-sized to cover

the risks posed by the payment activities of payment service providers. MAS also clarified that PS Act licensees therefore should not offer PTDs under its suite of activities as the risks associated with PTDs are not intended to be addressed by the PS Act.

5.38    MAS also clarified that a derivatives contract referencing a token permanently fixed to one or more currencies is not a PTD, but is a derivatives contract regulated under the SFA as it is a derivatives contract based on currency. MAS said that it does not consider it necessary to publish a list of regulated derivatives at this point.

5.39    We note that in the consultation response, MAS differentiated between a "token permanently fixed to one or more currencies", which it has classified in Case Study 11 of the Guide as e-money (which is not a capital markets product), and a "derivatives contract referencing a token permanently fixed to one or more currencies", which it classifies as a "derivatives contract" regulated under the SFA.

5.40    CEL will not likely constitute a 'derivatives contract', given that the value of CEL is not derived from or linked to other "underlying things". No proprietary right is contractually established between the issuer and the CEL token purchasers. Although CEL tokens are intended to be used on the Platform to reward lenders in return for their committing cryptocurrency assets to the crypto lending reserve pool, there is no determined future performance, a pre-emptive option right to buy or sell or a swap of rights and obligations. There is no underlying asset to the CEL token. Derivative contracts can be settled physically or in cash at a pre-decided settlement date, which is not the case regarding the CEL token.

*Spot foreign exchange contracts for the purposes of leveraged foreign exchange trading*

5.41    "Spot foreign exchange contract" is defined in the Second Schedule to the SFA to mean a spot contract of which the underlying thing is a currency. A spot contract in turn is defined as *"a contract or arrangement for the sale or purchase of any underlying thing at the spot price, where it is intended for a party to the contract or arrangement to take delivery of the underlying thing immediately or within a period which must not be longer than the period determined by the market convention for delivery of the underlying thing".*

5.42    "Leveraged foreign exchange trading" means entering into a spot foreign exchange contract where one counterparty provides to the other counterparty or the counterparty's agent money, securities, property or other collateral which represents only a part of the value of the spot foreign exchange contract.

5.43    As we understand it:

- The CEL tokens would not constitute legal tender or any representation thereof (including electronic money);

- The CEL tokens would not relate to any contract or arrangement of which the underlying thing is a currency; and

- The CEL tokens would not confer any rights on holders other than a limited right of access, use and interact with the services on the Platform.

5.44  Given the above, we are of the view that the CEL tokens would not constitute spot foreign exchange contracts for the purposes of leveraged foreign exchange trading under the SFA.

*Prospectus requirements*

5.45  If CEL does not constitute a "capital markets product", the prospectus requirements under the SFA will not apply to an offer of CEL.

6.    **DIGITAL PAYMENT TOKENS**

6.1   Notwithstanding that CEL does not constitute "e-money" under the PS Act (see our analysis in paragraphs 5.17 to 5.18 above), we note that it will likely fall within the scope of another category, "digital payment token", under the PS Act, as it is a digital representation of value that —

      •    is expressed as a unit;

      •    is not denominated in any currency, and is not pegged by its issuer to any currency;

      •    is, or is intended to be, a medium of exchange accepted by the public, or a **section of the public,** as **payment for goods or services** or for the discharge of a debt; and

      •    can be transferred, stored or traded electronically.

6.2   In this regard, we note that the MAS in Question 21 of the PS Act FAQs had indicated that *"what comprises a "section of the public" under the PS Act is a fact-sensitive determination."* The MAS noted that a group of individuals with a subsisting relationship with the service provider, or a group of individuals selected because of rational characteristics common to them may not be regarded as a section of the public per se. This determination depends on factors such as size of the group, nature of the service offered, and the significance of the particular characteristic that is common.

6.3   However, a group of individuals selected with reference to the public, i.e. with a certain degree of indiscrimination, would likely be regarded as a section of the public.

6.4   For example, the MAS stated that a token may be regarded as a medium of exchange accepted by a "section of the public", where the token is accessible by individuals who do not subscribe to the services of the issuer, and is used by them as payment for goods and services that are not exclusively provided by the issuer.

6.5   CEL will be available for trading on secondary exchanges such as Liquid and will be exchangeable for other cryptocurrencies or fiat, and in some cases, a portion may be payable for exchange / service fees to third parties. As such, we consider that the availability of secondary trading options means that CEL likely constitutes a medium of exchange accepted by the public as payment for goods or services, as *cryptocurrencies may constitute an intangible good.*

6.6   As such, an entity facilitating the exchange of CEL, or dealing in CEL, will need to obtain a payments services licence under the PS Act.

**APPENDIX 1: ASSUMPTIONS**

Please note that our analysis and view is given:

- in the absence of clear regulatory guidance; and

- subject to Singapore legislative language and MAS guidance as set in the MAS Guide to Digital Token Offerings (last updated on 26 May 2020).

Given the novel nature of the CEL token, our advice has been developed based on our interpretation of how existing Singapore laws will be applied for the issuance of CEL and a platform integrating CEL into their offering.

Accordingly, our advice necessarily focuses on certain specific aspects of Singapore law which we consider to be the most crucial issues at hand. Any other aspects of law or regulation (including law and regulation beyond Singapore law) not specifically covered in this note have not been considered. The scope of our advice is limited to the matters set out expressly in this advice, and our advice must not be read as extending, by implication or otherwise, to any other matter.

Our advice in this note is based on current rules, regulations and guidance in force in Singapore as of today's date. The laws and regulations, or judicial or administrative interpretations thereof, referred to in this advice may change at any time and from time to time, and such changes, which may be prospective or retrospective, may affect the conclusions reached in this advice. We will not be responsible to carry out any review or update this advice for any subsequent changes to any relevant laws or regulations, or judicial or administrative interpretations thereof, unless we are specifically engaged to do so. Celsius Network Limited (**"CN"**) should therefore continue to monitor the regulatory landscape on an on-going basis in light of any future developments.

For the purposes of our analysis, we have reviewed only we have reviewed the information set out in the following sources:

- The Whitepaper for Celsius dated March 2019[5]; and

- The Legal Opinion for Celsius dated 19 February 2018 by Latham & Watkins (**"Legal Opinion"**).

We have not specifically reviewed or commented on any other documentation, in providing this advice. We have also assumed the correctness of the factual matters provided to us, whether or not referred to in this advice, and have made no investigation or verification of any factual matters(s) contained herein. We assume that there are no other facts that are relevant other than those which are stated in this advice.

Our advice does not constitute an assurance, guarantee or warranty that the MAS or Singapore Courts would necessarily agree with the views stated in this advice or that any challenge would not be made or would necessarily fail. This advice is not intended to be used, and cannot be used, for the purpose of avoiding penalties that may be imposed by any applicable law.

This advice (including any enclosures and attachments) has been prepared solely for the

---

[5] We understand that the Whitepaper has been updated based on comments by Latham & Watkins in their legal opinion dated 19 February 2018.

S

benefit and use of Celsius Network Ltd, and may be provided to the MAS in support of Quoine Pte Ltd's licensing application. We are happy for you to share the opinions with potential investors/ customers, but please kindly notify us of the other parties the advice is to be shared with for our tracking. **Please not that this memorandum is not to be quoted or referred to in any document, or used in a filing with any other applicable authority, governmental agency or regulatory body without our prior written consent.**

For avoidance of doubt, where Simmons & Simmons permits the sharing of such advice with another third party for view only, such a third party is not able to rely on this advice as it has been prepared solely for the benefit and use of Celsius Network Ltd.

**DRAFT as of 12-6-18**

New York          Paris
Northern California   Madrid
Washington DC     Tokyo
São Paulo         Beijing
London            Hong Kong

# Davis Polk

Davis Polk & Wardwell LLP   202 962 7000 tel
901 15th Street, NW         202 962 7111 fax
Washington, DC 20005

PRIVILEGED & CONFIDENTIAL
ATTORNEY - CLIENT COMMUNICATION

## MEMORANDUM

| | |
|---|---|
| Date: | December [●], 2018 |
| To: | S. Daniel Leon<br>Ann LaCarrubba<br>Celsius Network |
| From: | Annette L. Nazareth<br>Joseph A. Hall<br>Luigi L. De Ghenghi<br>Jai R. Massari<br>Zachary J. Zweihorn<br>Ryan Johansen<br>Eric B. Lewin |
| Re: | Certain Virtual Currency Activity Regulatory Considerations |

We understand from you that Celsius Network ("**Celsius**") is engaged in, or is considering engaging in, several virtual currency-related lines of business.[1] You have asked us to assess the legal implications of engaging in these activities under key U.S. regulatory regimes relevant to these activities. In particular, the memorandum analyzes the likely implications for Celsius of engaging in the activities under:

1) U.S. federal and state banking laws and regulations governing deposit-taking and other banking activities;

2) regulations of the New York State Department of Financial Services ("**NY DFS**") under the so-called "**BitLicense regime**," which governs virtual currency business activities conducted within or involving the state of New York;

3) the Commodity Exchange Act (the "**CEA**") and regulations adopted by the U.S. Commodity Futures Trading Commission ("**CFTC**") governing retail commodity transactions;

---

[1] This memorandum uses the term "virtual currency" to encompass digital assets generally, though in each case it means a digital asset represented by a ledger entry recorded on distributed ledger. The use of the term "currency" is not intended to represent a legal conclusion regarding the classification of a particular asset.

#91482648v27

# DRAFT as of 12-6-18

PRIVILEGED & CONFIDENTIAL
ATTORNEY - CLIENT COMMUNICATION

Celsius Network                                    2                           December [●], 2018

4) the federal securities laws, in particular the Securities Act of 1933 (the "**Securities Act**") and the Securities Exchange Act of 1934 (the "**Exchange Act**") and regulations adopted to implement those Acts by the U.S. Securities and Exchange Commission ("**SEC**") governing activities involving securities;

5) the rules regulating money service businesses ("**MSBs**") enforced by the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("**FinCEN**"); and

6) U.S. state regulations applicable to money transmission businesses.

We refer to these statutory and regulatory frameworks collectively as the "**Covered Regulations**." This memorandum does not include an exhaustive analysis of issues that may arise under the Covered Regulations and does not address other U.S. federal or state laws or regulations or non-U.S. laws that the activities may implicate.[2]  The table below summarizes our analysis of Celsius's activities under the Covered Regulations.

| Covered Regulations | Analysis |
| --- | --- |
| Federal and State Banking Laws and Regulations | While not free from doubt, Celsius's activities likely would not result in Celsius being subject to regulation as a bank under U.S. federal or state law. [*Trust company/fiduciary activities sentence TBD*] |
| NYDFS Regulation of Virtual Currency and the BitLicense Regime | A BitLicense will be required if Celsius conducts certain of its activities within New York or if those activities otherwise involve New York. |
| CEA and CFTC Regulations | Certain Celsius activities likely fall within the CEA's definition of retail commodity transaction and, unless an exception applies, must generally be conducted only with a limited category of counterparties known as eligible contract participants ("**ECPs**"). |
| Federal Securities Laws | To the extent any of the virtual currencies used by Celsius in its activities are securities, there is a risk that Celsius's borrowing and lending of those virtual currencies, or effecting purchases or sales of such virtual currencies, would require it to register with the SEC as a broker-dealer or would otherwise implicate the federal securities laws. |
| FinCEN Regulation of MSBs | You have informed us that Celsius is currently registered as an MSB, and it would be prudent to maintain that registration. |
| State Regulation of Money Transmission | Certain Celsius activities are likely to require Celsius to obtain a license as a money transmitter in one or more states. |

---

[2] Davis Polk & Wardwell LLP is authorized to practice law in New York, California and the District of Columbia but is not authorized to practice law in the other U.S. states that are discussed herein. Our discussion in this memorandum is based on an evaluation of statutory and regulatory provisions in those states, using principles of interpretation that are commonly applied to statutory construction. We are unable to provide definitive advice on the laws of states in which we are not authorized to practice and recommend that Celsius consult attorneys admitted in those states if definitive guidance is required.

#91482648v27

**DRAFT as of 12-6-18**

PRIVILEGED & CONFIDENTIAL
ATTORNEY - CLIENT COMMUNICATION

Celsius Network                                    3                        December [●], 2018

As we have discussed, the regulatory treatment of virtual currency activities under the Covered Regulations and U.S. federal and state law generally is unsettled and in a state of flux. At the federal level, Congress has not allocated responsibility for virtual currency oversight to any particular regulator and has not adopted legislation that would clarify the application of existing financial regulatory schemes to virtual currency. As a result, the various federal financial regulators are currently applying (or attempting to apply) statutory principles and existing laws and regulations to a new asset class that is different from the asset classes around which the existing financial regulatory regimes were built. Therefore, while the analysis and conclusions in this memorandum are based upon the current state of the Covered Regulations, our analysis and our conclusions may change based upon decisions, guidance or new law issued by U.S. federal or state regulators, courts or legislators.

## I.    Factual Background

We describe below our understanding of the activities that Celsius currently conducts, or is contemplating conducting. The description is based upon how these activities are described on the Celsius website[3] or as you have otherwise explained to us, including during a November 20, 2018, conference call (the "**November 20 Call**") and in subsequent email correspondence. We have not independently verified these facts but instead have based our analysis upon this information as it has been presented to us.

### A.    U.S. Dollar Lending Activities[4]

Celsius currently engages in U.S. dollar lending activity.[5] Its U.S. dollar loans are secured by virtual currency collateral posted by customers to Celsius, with the amount of virtual currency collateral required for a loan specified by a formula developed by Celsius. As the Celsius website explains, when a customer borrows U.S. dollars against virtual currency collateral, the customer's virtual currency collateral is held by Celsius with "trusted custodians like BitGo as well as major exchanges." Celsius may, however, rehypothecate this virtual currency collateral as part of its virtual currency lending program, as described in Section I.B, below.[6] Customers must use U.S. dollars to both repay the principal amount of their U.S. dollar loans and to pay interest owed on those loans. In the future, Celsius intends to permit its customers to pay interest either

---

[3] https://celsius.network/. The facts set out in this memorandum are based on the information available on the website as of December 6, 2018 unless otherwise noted.

[4] Information and quotations in this Section I.A are drawn from the descriptions of these activities on the Celsius website as of December 6, 2018. *See* Celsius Network, Borrow Dollars Using Crypto As Collateral, https://celsius.network/borrow-dollars-using-crypto-as-collateral/.

[5] We understand that Celsius has obtained an analysis from other legal counsel regarding the implications of its U.S. dollar lending activities under U.S. state lending licensing requirements and other U.S. federal and state regulatory requirements. Accordingly, this memorandum does not undertake an analysis of this activity under the Covered Regulations or otherwise.

[6] As discussed on the November 20 Call, we understand that Celsius intends to review the disclosures it makes to borrowers in connection with this rehypothecation of collateral.

#91482648v27

DRAFT as of 12-6-18

PRIVILEGED & CONFIDENTIAL
ATTORNEY - CLIENT COMMUNICATION

Celsius Network                            4                         December [●], 2018

in U.S. dollars or in the form of virtual currency such as in Bitcoin, Ether or CEL, the native token of the Celsius Network.[7]

Celsius currently engages in U.S. dollar lending with individuals and businesses. The Celsius website explains that its loans to individuals may be used, for example, to assist customers with "buy[ing] a car" or "start[ing] a small business."[8] Loans to businesses may be used, for example, to provide liquidity to firms that hold sizable amounts of virtual currency but require access to U.S. dollars to manage cash flow. Interest rates for loans made by Celsius are determined based on a loan-to-value ratio calibrated based on the amount of virtual currency that the customer posts as collateral. The standard loan is based on a one-year term, but customers are permitted to prepay the full amount of their loans at any earlier time without penalty.

If the value of a customer's collateral drops by more than an agreed-upon amount (usually between 20% and 50% of the value at the time of execution), Celsius makes a margin call. In those cases, the customer is required to either repay a portion of the loan, post additional virtual currency as collateral or sell a portion of the previously posted collateral in order to repay a portion of the loan.

### B.    Virtual Currency Lending Activities

We understand that Celsius also provides certain customers[9] with loans of virtual currencies to facilitate the customers' short sales of virtual currency. Celsius requires collateral for these loans either in U.S. dollars, Bitcoin or Ethereum.[10] These virtual currency loans facilitate customers making delivery on their short sales. Customers do not execute virtual currency short sale transactions through Celsius, but instead do so separately through a dealer or exchange unaffiliated with Celsius.[11]

Celsius uses virtual currency posted as collateral for U.S. dollar loans (described in Section I.A above) to make virtual currency loans to customers. Specifically, Celsius states that such virtual

---

[7] You have not asked for, and we have not undertaken, an analysis of the legal or regulatory issues related to Celsius's issuance or use of the CEL token as part of the activities or otherwise, including an analysis of CEL's status under the U.S. federal securities laws or implications for Celsius under the Covered Regulations or otherwise.

[8] As discussed on the November 20 Call, these activities may, in certain states, implicate laws and regulations related to consumer lending. We understand that Celsius has received advice from another law firm with respect to this aspect of its activities and conducts its activities in accordance with that advice. Further discussion of U.S. federal and state laws and regulations is outside the scope of this memorandum.

[9] On the November 20 Call, you explained to us that Celsius does not conduct this aspect of its activities with individuals and instead makes loans only to Celsius corporate customers that meet certain eligibility criteria.

[10] DPW Note to Celsius: We base this statement on the Digital Asset Lending Agreement which you have provided to us. We note, however, that your website may be read to suggest that only U.S. dollars are used as collateral. In an FAQ on the Borrow page, the website states "How are my coins secured? They are held in encrypted accounts and once deployed (lent out), they are backed by cash collateral to ensure the lender is always protected."

[11] DPW Note to Celsius: We noticed a part of the website that seems to offer customers the ability to short virtual currencies through Celsius, https://celsius.network/short/. [Internal NTD: As of 12/6/18, this is still on the Celsius website.]

#91482648v27


PRIVILEGED & CONFIDENTIAL
ATTORNEY - CLIENT COMMUNICATION

Celsius Network                     5                     December [●], 2018

currency collateral posted by customers for U.S. dollar loans will "be deployed in a number of ways, the most common being used in margin lending and shorting." When deployed in this manner, customers' virtual currency collateral is "backed by cash collateral to ensure the lender is always protected." The interest and fees paid to Celsius in connection with these virtual currency lending activities is used to pay interest to customers for virtual currencies deposited by them and held in a Celsius digital wallet, as described in Section I.C below.

### C.    Digital Wallet and Interest-Paying Activities

The Celsius website explains that customers may hold their virtual currency in a Celsius digital wallet. Celsius will pay interest to customers on the virtual currency held in the Celsius digital wallet.[12] Interest is calculated daily and distributed weekly. "Right now," according to the Celsius website, Celsius pays "interest in-kind every Monday." For example, interest on Bitcoin is paid in Bitcoin and interest on Ether is paid in Ether.

The interest rates paid by Celsius vary by virtual currency. With respect to virtual currencies other than CEL, Celsius pays interest at rates are "somewhere between 3-9%, depending on the demand for the deposited coin." The specific interest rate "is determined by total supply and demand and what's best for the community." In the future, for CEL, interest will be paid based on a formula that takes into account three factors, weighted as follows: 50% based on the amounts of virtual currency held in the customer's Celsius digital wallet; 25% based on the amount of time that a Celsius customer has been part of the Celsius community relative to other Celsius customers without withdrawing his or her virtual currency; and 25% based on the amount of CEL the customer holds relative to the CEL the customer has earned in interest.

### D.    CelPay[13]

Celsius may facilitate transfers of virtual currency between customers through their use of CelPay. As the Celsius website explains, CelPay may be used to "[i]nstantly send your friends digital assets, for free!"[14] We understand that CelPay is a recent addition to the Celsius application, and as such the information currently available to us with respect to CelPay is particularly limited.

---

[12] **DPW Note to Celsius**: We assume that Celsius has the ability to hypothecate customer assets held in the Celsius digital wallet, for example, to use in its virtual currency lending business. If so, this is not clearly described on the website (at least that we could find), and we would need more information about how the wallet operates in order to assess legal implications of Celsius providing this service.

[13] **DPW Note to Celsius**: We would need significantly more information about CelPay and details on the services and mechanics to advise on legal implications for those services.

[14] Celsius Network, https://celsius.network/app/#celpay.

#91482648v27

DRAFT as of 12-6-18

PRIVILEGED & CONFIDENTIAL
ATTORNEY - CLIENT COMMUNICATION

Celsius Network                                6                            December [●], 2018

## II.    Federal and State Banking Laws and Regulations

### A.    Regulatory Framework

The United States maintains a dual banking system under which banks may hold either a national or a state charter.[15] As a general matter, both federal and state banking laws and regulations define "banking" with respect to whether a firm takes deposits or engages in other specified activities. For example, the OCC has repeatedly described the three core banking functions as taking deposits, paying checks and lending money.[16] The Federal Deposit Insurance Act ("FDI Act") similarly defines "state bank" with respect to whether that bank is "engaged in the business of receiving deposits."[17] At the state level, banking is also often defined in whole or in part based on whether a company takes deposits.[18] For example, in 2006, the predecessor to the NY DFS explained that, under Section 131 of the New York State Banking Law, companies are, "as a general rule," prohibited from "deposit-taking and other activities indicative of a banking business in New York, unless of course, a company [is] properly licensed to engage in banking business in New York."[19]

As a general matter, therefore, any business that is in the business of receiving deposits is a bank and is subject to regulation as such. The term "deposit," in turn is generally defined, as relevant here, to mean an "unpaid balance of money or its equivalent" held by a bank in the course of its business.[20] In determining the scope of the phrase or "its equivalent" in this context, that phrase should be read in the context of the instruments mentioned in the relevant section of

---

[15] At the federal level, the U.S. Office of the Comptroller of the Currency ("OCC") regulates nationally-chartered banks while either the Board of Governors of the Federal Reserve System ("Federal Reserve") or the U.S. Federal Deposit Insurance Corporation ("FDIC") regulates state-chartered banks. State-chartered banks that are members of the Federal Reserve System are known as state member banks and are regulated by the Federal Reserve. State-chartered banks that are not members of the Federal Reserve System are known as state non-member banks and are regulated by the FDIC. The Federal Reserve, FDIC and OCC together are referred to as the "federal banking regulators." State-chartered banks are also regulated by the state banking regulator in the state in which they are chartered.

[16] See 12 U.S.C. § 24 (Seventh) (national banks possess "all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidence of debt; by receiving deposits, by buying and selling exchange, coin and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes"). See also OCC, Policy Statement on Financial Technology Companies, https://www.occ.treas.gov/publications/publications-by-type/other-publications-reports/pub-other-occ-policy-statement-fintech.pdf ("As defined in the OCC's regulations, the 'business of banking' includes any of the three core banking functions of receiving deposits, paying checks, or lending money.").

[17] 12 U.S.C. § 1813(a)(2)(A).

[18] See, e.g., Florida Statutes § 658.12 (2),(9) (defining "bank" as a person having the authority to conduct a "commercial banking business" and defining commercial banking business to include receiving deposits, paying checks and conducting a trust business when duly authorized); Revised Code of Washington 30A.04.010 (4) (defining banking as including "the soliciting, receiving or accepting of money or its equivalent on deposit as a regular business.")

[19] NY DFS, Banking Interpretations NYSBL 131(1), 222 (June 20, 2006), https://www.dfs.ny.gov/legal/interpret/lo060620.htm.

[20] 12 U.S.C. § 1813(l).

#91482648v27

**DRAFT as of 12-6-18**

PRIVILEGED & CONFIDENTIAL
ATTORNEY - CLIENT COMMUNICATION

Celsius Network                              7                    December [●], 2018

the FDI Act—i.e., drafts, checks, cashier's checks, promissory notes and the like.[21] Consistent with this reading of the statute, the federal banking regulators have not, to date, taken any action to indicate that virtual currencies are "money or its equivalent;" however, they could do so in the future.

### B.    Analysis

While not free from doubt, and though state banking laws vary from state to state, we believe Celsius's activities as described above likely would not result in Celsius being a bank under U.S. federal or state law. First, lending activity in itself does not subject a firm to being viewed as a bank. Lending activity alone—even if that lending is secured by collateral collected from a customer—is not generally viewed as deposit-taking activity. Similarly, providing digital wallet services, absent those services being structured or offered as deposit arrangements, would not be viewed in themselves as deposit-taking. In addition, given that U.S. federal and state banking regulators have not described virtual currencies as "money or its equivalent," for the purpose of defining the scope of deposit-taking activities, there may be additional arguments to support this view where Celsius is engaged in activities involving holding customer virtual currencies.

However, the analysis of whether Celsius is engaged in deposit-taking, such that it would be viewed as a bank, is highly dependent on how its activities are structured, how it offers those services to customers, and how the services are documented in its agreements with customers and marketed on its website and otherwise. As discussed on the November 20 Call, for example, Celsius should avoid characterizing its services as "deposit" services or describing itself as offering "banking" services. Statements like these and other uses of the term "deposit" may attract scrutiny from various U.S. banking regulators.

[In addition, even if Celsius is not engaged in "banking" as defined under federal or state banking laws and regulations, if Celsius is viewed as taking custody of customers' virtual currency and acting in a fiduciary capacity with respect to those virtual currencies, Celsius may be required to be licensed as a trust company or other entity permitted to exercise fiduciary powers.[22] These licensing requirements could be implicated, for example, in connection with holding customer funds in the Celsius digital wallet, depending on how the wallet services are structured and documented.] [*Approach here TBC based on response from Celsius*]

### III.    NY DFS Regulation of Virtual Currency Activities and the BitLicense Regime

### A.    Regulatory Framework

The State of New York has shown a particular interest in the regulation of virtual currency activities. In 2015, the NY DFS adopted a comprehensive registration and regulatory regime

---

[21] *Id.*

[22] *See, e.g.,* NY DFS, Information and Procedure for the Organization of a Trust Company for the Limited Purpose of Exercising Fiduciary Powers, https://www.dfs.ny.gov/banking/iaus1b.htm (explaining that New York licenses limited purpose trust companies that are "chartered under the bank and trust company provisions of the New York Banking Law" but that do not have "the power to take deposits or make loans").

#91482648v27

as of 12-6-18

PRIVILEGED & CONFIDENTIAL
ATTORNEY - CLIENT COMMUNICATION

Celsius Network                                8                    December [●], 2018

applicable to any person engaged in "virtual currency business activity."[23] Virtual currency business activity is the conduct of any one of the following types of activities that involves either the State of New York or a New York Resident:[24]

- receiving Virtual Currency[25] for Transmission[26] or Transmitting Virtual Currency except where the transaction is undertaken for non-financial purposes and does not involve the transfer of more than a nominal amount of Virtual Currency;

- storing, holding or maintaining custody or control of Virtual Currency on behalf of others;

- buying and selling Virtual Currency as a customer business;

- performing Exchange Services[27] as a customer business; or

- controlling, administering or issuing a Virtual Currency.

The NY DFS has also released a series of Frequently Asked Questions ("**FAQs**") with respect to the BitLicense regime.[28] In response to a question as to whether "an out-of-state business [is] required to obtain a BitLicense to engage in virtual currency business activity in New York State or with New York State residents," the NY DFS explains that "[a] business must obtain a

---

[23] New York Codes, Rules and Regulations ("**NYCRR**") § 200.2(h). Unlike certain other regulatory regimes, the BitLicense regime applies to *all* persons within the scope of its regulations, without conditional exceptions for accredited investors, ECPs or the like.

[24] A New York Resident is "any Person that resides, is located, has a place of business, or is conducting business in New York." NYCRR § 200.2(a). Person is in turn defined to include "an individual, partnership, corporation, association, joint stock association, trust, or other entity, however organized." NYCRR § 200.2(i).

[25] Subject to certain exclusions not relevant here, Virtual Currency "means any type of digital unit that is used as a medium of exchange or a form of digitally stored value. Virtual Currency shall be broadly construed to include digital units of exchange that (i) have a centralized repository or administrator; (ii) are decentralized and have no centralized repository or administrator; or (iii) may be created or obtained by computing or manufacturing effort." NYCRR § 200.2(p).

[26] Transmission "means the transfer, by or through a third party, of Virtual Currency from a Person to a Person, including the transfer from the account or storage repository of a Person to the account or storage repository of a Person." NYCRR § 200.2(o). Based upon our experience, the staff of the NY DFS interprets the term Transmission very broadly so that activities that involve the transfer of virtual currency generally could be viewed as Transmission. No formal guidance has been issued to further define the scope of this term by the NY DFS or courts.

[27] Exchange Services involve the conversion or exchange of Fiat Currency or other value into Virtual Currency, the conversion or exchange of Virtual Currency into Fiat Currency or other value, or the conversion or exchange of one form of Virtual Currency into another form of Virtual Currency. NYCRR § 200.2(d). Fiat Currency is defined to mean "government-issued currency that is designated as legal tender in its country of issuance through government decree, regulation, or law." NYCRR § 200.2(e).

[28] NY DFS, BitLicense Frequently Asked Questions, https://www.dfs.ny.gov/legal/regulations/bitlicense_reg_framework_faq.htm.

#91482648v27

RAFT as of 12-6-18

PRIVILEGED & CONFIDENTIAL
ATTORNEY - CLIENT COMMUNICATION

Celsius Network                              9                        December [●], 2018

BitLicense if it engages in virtual currency business activity involving New York State or persons that reside, are located, have a place of business, or are conducting business in New York."[29]

NY DFS Superintendent Maria T. Vullo has repeatedly stressed the need for "regulatory safeguards" to govern virtual currency activities, even when granting licenses to conduct certain activities under the BitLicense regime.[30] According to Superintendent Vullo, the virtual currency space is one where "regulators absolutely need to be," and virtual currency businesses cannot be left alone in what is sometimes known as a regulatory sandbox.[31] The New York Office of the Attorney General has also indicated its intention to assert its regulatory authority with respect to virtual currencies, releasing in September 2018 a report expressing concern over potential shortcomings with individual virtual currency platforms, including the presence of only minimal protections for customer funds.[32]

In addition, and as relevant to the discussion in Section VI below, the NY DFS states that "BitLicensees that are already subject to suspicious activity report ("**SAR**") filing requirements under federal law are not required to file separately with the [NY DFS]."[33] BitLicensees are, however, required to notify the NY DFS with respect to a transaction or a series of transactions with one Person over the course of one day in an aggregate amount exceeding $10,000.[34]

### B.    Analysis

Several of Celsius's activities would be viewed as constituting virtual currency business activities, and thus requiring a BitLicense, if conducted from within or involving New York. Specifically, we believe that the NY DFS would characterize Celsius's activities as follows.

- The virtual currency lending activities would be viewed either as the Transmission of virtual currency (see footnote 26 above) or as buying or selling virtual currency as a customer business.

- The Celsius digital wallet as part of its interest-paying service or otherwise, may be viewed as storing, holding or maintaining custody of virtual currency for customers,

---

[29] *Id.*

[30] Press Release: DFS Grants Virtual Currency and Money Transmitter License to NYDIG Execution, LLC (Nov. 14, 2018), available at https://www.dfs.ny.gov/about/press/pr1811141.htm; Press Release: DFS Grants Virtual Currency License to Coinsource, Inc. (Nov. 1, 2018), available at https://www.dfs.ny.gov/about/press/pr1811011.htm.

[31] Coindesk, NY DFS Chief Defends State Regulator's Crypto Approach (June 7, 2018), https://www.coindesk.com/NY DFS-chief-defends-state-regulators-crypto-approach (quoting Superintendent Vullo: "Toddlers play in the sandbox. Adults play by the rules.").

[32] Office of the New York State Attorney General, Virtual Markets Integrity Initiative Report (Sept. 18, 2018), https://virtualmarkets.ag.ny.gov/.

[33] *Id.*

[34] *Id.*

#91482648v27

**DRAFT as of 12-6-18**

PRIVILEGED & CONFIDENTIAL
ATTORNEY - CLIENT COMMUNICATION

Celsius Network                                    10                    December [●], 2018

depending on its operations and the level of control or use of customer digital currency available to Celsius.[35]

- Celsius receiving interest payments in virtual currencies for its U.S. dollar loans may be viewed as performing Exchange Services (see footnote [27] above) or Transmitting virtual currencies (see footnote 26 above).

- CelPay may involve Celsius engaging in the Transmission of virtual currency (see footnote 26 above).

Aside from the first FAQ described above, the NY DFS has not provided public guidance as to what it means for a virtual currency activity to "involv[e]" New York or New York Residents. Nor has the NY DFS provided public guidance as to what it means to "conduct[] business in New York," as that phrase is used in the FAQ. Therefore, while the BitLicense regime is relatively new and accordingly precedent is not well developed, it seems likely that, should Celsius conduct these activities in New York or "involv[e]" New York or New York Residents in such activities, the NY DFS would require that Celsius obtain a BitLicense.[36] As a threshold matter, if Celsius were to conduct its activities from an office in New York, a BitLicense would be required. In addition, without further guidance from the NY DFS, we believe that the following activities, if conducted by Celsius or its personnel, would require a BitLicense (even if not conducted from a Celsius office in New York): (1) senior personnel of Celsius who reside in New York participating materially in the conduct of the activities while located in New York or (2) services being offered or provided to New York residents, including where Celsius does not take active steps to restrict access to the services to New York residents.[37]

## IV.   CEA and CFTC Regulations

### A.   Regulatory Framework

####       1.      Virtual Currencies Are Commodities Within the Scope of the CEA

The CFTC's authority over virtual currency activities stems from the regulation of specific activities involving any "commodity," as that term is defined under the CEA. The CEA definition of commodity is broad and includes, in addition to specifically named commodities and with exceptions not relevant here, "all other goods and articles . . . and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in."[38] In a 2015

---

[35] **DPW note to Celsius:** In some cases, firms have structured their digital wallet services to avoid such a characterization and instead provide this type of service as a mere software service. The analysis of whether the digital wallet would trigger a BitLicense requirement will depend heavily on the specific services provided. We will need additional facts to complete our analysis.

[36] It is worth noting here that, in connection with its Virtual Markets Integrity Initiative, the New York Office of the Attorney General investigated certain virtual currency platforms, determined that such platforms may have accepted virtual currency trades from within New York State (despite the platforms' assertions to the contrary) and referred the platforms to the NY DFS for potential violation of New York's virtual currency regulations. Virtual Markets Integrity Initiative Report, *supra* note 32 at 2.

[37] *Id.*

[38] 7 U.S.C. § 1a(9). *see also* 17 C.F.R. § 1.3.

#91482648v27

**DRAFT as of 12-6-18**

PRIVILEGED & CONFIDENTIAL
ATTORNEY - CLIENT COMMUNICATION

Celsius Network                                  11                      December [●], 2018

enforcement action, the CFTC took the position that Bitcoin and other virtual currencies are appropriately treated as commodities under the CEA.[39] Since then, several federal courts have also found that virtual currencies are commodities and are properly within the scope of the CFTC's jurisdiction.[40]

The CFTC's regulatory purview extends to several different, but related, types of transactions in commodities. Most relevant to Celsius's activities, and in particular its virtual currency lending activities, are the CEA's provisions governing retail commodity transactions. These are discussed in detail below.

Other provisions of the CEA and CFTC regulations, including those governing futures contracts and swaps, are less relevant to the activities based upon the facts described in this memorandum. This is because true loans (whether of U.S. dollars or virtual currency) that are documented and structured as loans—without optionality, payments based upon the value of an underlying virtual currency, or other features that result in payments designed to reflect factors other than Celsius's funding rates and credit risk—are relatively unlikely to fall within the CEA's definition of futures or swaps.[41] However, the types of transactions that the CFTC may seek to characterize as futures contracts or swaps is broad, and any changes to the facts may cause the activities to be viewed as falling within these provisions. In addition, while the CEA does not provide the CFTC with broad regulatory authority over spot commodity transactions,[42] the CFTC has anti-fraud and anti-manipulation authority with respect to spot commodity transactions, including transactions in virtual currencies. The CFTC has, in recent years, brought a variety of

---

[39] *In re Coinflip, Inc., d/b/a Derivabit, and Francisco Riordan*, CFTC Docket No. 15-29, http://www.cftc.gov/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfcoinfliprorder09172015.pdf.

[40] *See* CFTC, Federal Court Finds that Virtual Currencies Are Commodities (Oct. 3, 2018), https://www.cftc.gov/PressRoom/PressReleases/7820-18 (describing an October 2018 decision as well as prior federal court decisions reaching the same conclusion).

[41] *See* Commodity Futures Trading Commission & Securities and Exchange Commission, Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48208, 46–47 (Aug. 13, 2012) [hereinafter **"Swap Definition Release"**] (explaining that the CFTC and SEC "do not believe that Congress intended" to capture certain types of "customary consumer and commercial agreements, contracts, or transactions" in the definition of swap or security-based swap and providing a list of transactions, including various types of loans, that will not be considered swaps or security-based swaps).

[42] A spot transaction, for purposes of the CEA, includes the purchase or sale of a commodity that provides for immediate delivery of the commodity (and not future delivery) and the transaction must result in actual delivery of the underlying commodity. *See* Swap Definition Release, 77 Fed. Reg. at 48256 ("The CEA generally does not confer regulatory jurisdiction on the CFTC with respect to spot transactions."); *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 970 (4th Cir. 1993) (discussing the legislative history of the CEA and broadly stating that "Congress never purported to regulate 'spot' transactions or 'cash forward' transactions"). This jurisdictional boundary has been central to a number of case law determinations. *See generally CFTC v. Midland Rare Coin Exchange, Inc.*, 71 F. Supp. 2d 1257 (D. Fla. 1999); *CFTC v. Zelener*, 373 F.3d 861 (7th Cir. 2004); *Salomon Forex*, 8 F.3d at 970 (defining spot transactions as "transactions for the immediate sale and delivery of a commodity"); *see also Dunn v. CFTC*, 519 U.S. 465 (1997) (spot transactions "anticipate near-term delivery"); *CFTC v. Noble Wealth Data Information Serv.*, 90 F. Supp. 2d 676 (D. Md. 2000) (same); *In re Joseph Glenn Commodities LLC*, CFTC Docket No. 13-18 (Mar. 27, 2013).

DRAFT as of 12-6-18

PRIVILEGED & CONFIDENTIAL
ATTORNEY - CLIENT COMMUNICATION

Celsius Network                              12                         December [●], 2018

enforcement actions and litigation against alleged fraudulent activity involving spot transactions (and other types of transactions) in virtual currencies.[43]

> 2.    General Prohibition on Retail Commodity Transactions

With exceptions likely not relevant here, the CEA generally prohibits a person from offering to enter into, or entering into, a retail commodity transaction as defined in Section 2(c)(2)(D) of the CEA.[44] A retail commodity transaction is any agreement, contract or transaction in any commodity (including a virtual currency) that is entered into with, or offered to (even if not entered into with):

- a person that is not an ECP; and

- on a leveraged or margined basis, or financed by the offeror, the counterparty or a person acting in concert with the offeror or counterparty.[45]

The CEA's definition of ECP includes corporations or other unregulated entities with $10 million or more of total assets, individuals with $10 million or more in investable assets and some types of regulated financial institutions.[46]

The CEA's definition of retail commodity transaction excludes contracts of sale that either (i) result in "actual delivery" within 28 days (or such other longer period as the CFTC determines) or (ii) create an enforceable obligation to deliver between a seller and a buyer that have the ability to deliver and accept delivery, respectively, in connection with the line of business of the seller and buyer.[47] The CFTC has proposed to interpret this actual delivery requirement in the context of virtual currencies to require:

1) A customer having the ability to: (i) take possession and control of the entire quantity of the virtual currency, whether it was purchased on margin, or using leverage, or any other financing arrangement, and (ii) use it freely in commerce (both within and away from any particular platform) no later than 28 days from the date of the transaction; and

---

[43] *See, e.g., In re Joseph Kim*, CFTC Docket No. 19-02 (Oct. 29, 2018) (fraudulent Bitcoin and Litecoin transactions; *CFTC v. Patrick K. McDonnell and Cabbagetech, Corp. d/b/a Coin Drop Markets*, Case No. 18-CV-0361 (E.D.N.Y. Jan. 18, 2018) (fraud and misappropriation in connection with purchases and trading of Bitcoin and Litecoin); *CFTC v. Gelfman*, Case No. 17-7181 (S.D.N.Y. Sept. 21, 2017) (Bitcoin Ponzi scheme).

[44] Retail commodity transactions are permitted if they are conducted as futures transactions, including being traded on a futures exchange, through a futures commission merchant and centrally cleared through a derivatives clearing organization. 7 U.S.C. § 6a-6c. Given that conducting the virtual currency lending activities as if they were futures transactions would be a fundamentally different commercial and business proposition, including requiring licensing with and regulation by the CFTC, we do not discuss this alternative or the regulation of futures activities under the CEA and CFTC regulations in this memorandum.

[45] 7 U.S.C. § 2(c)(2)(D)(i).

[46] 7 U.S.C. § 1a(18); *see also* 17 C.F.R. § 1.3.

[47] 7 U.S.C. § 2(c)(2)(D)(ii)(III).

#91482648v27

**DRAFT as of 12-6-18**

PRIVILEGED & CONFIDENTIAL
ATTORNEY - CLIENT COMMUNICATION

Celsius Network                                    13                    December [●], 2018

2) The offeror and counterparty seller (including any of their respective affiliates or other persons acting in concert with the offeror or counterparty seller) not retaining any interest in or control over any of the virtual currency purchased on margin, leverage or other financing arrangement at the expiration of 28 days from the date of the transaction.[48]

### B.    Analysis

The virtual currency lending activity described in Section I.B above, on its face, likely falls within the CEA's definition of retail commodity transaction. A virtual currency loan is a transaction conducted on a financed basis and in a commodity (the virtual currency being financed). As a result, these activities are prohibited by the CEA unless the activity either (1) is offered to and conducted solely with ECPs or (2) results in the actual return of the virtual currency and full return of fiat collateral within 28 days in a manner consistent with the CEA's "actual delivery" requirement.

Celsius's facilitation of short selling by its borrower clients as part of or as a supplement to its U.S. dollar lending activity also likely involves retail commodity transactions. This is because the definition of retail commodity transaction includes persons "acting in concert" to provide for financed or margined transactions in commodities. Therefore, to the extent that Celsius partners with a dealer or exchange in its U.S. dollar lending activities to facilitate customer shorting of virtual currency, it will need to ensure that those transactions in virtual currency are offered to and involve only ECPs or meet the 28-day actual delivery requirement.

## V.    Federal Securities Laws

### A.    Regulatory Framework

Under certain circumstances, virtual currencies may be regulated as "securities," under the federal securities laws, including the Securities Act, the Exchange Act and the implementing regulations thereunder. Should the activities that Celsius conducts or plans to conduct involve virtual currencies that are securities ("**security tokens**"), Celsius would be prohibited from engaging in certain of the activities unless it registers with the SEC in each appropriate capacity and conducts the activities in accordance with the federal securities laws and implementing regulations.[49]

---

[48] CFTC, Retail Commodity Transactions Involving Virtual Currency, 82 Fed. Reg. 60355, 60339 (Dec. 20, 2017) (footnotes omitted).

[49] Engaging in the described services with respect to security tokens could have wide-ranging legal implications under the federal securities laws beyond those highlighted here. For example, (i) under the Securities Act, the sale of a security must be registered with the SEC or qualify for an exemption from registration, (ii) under the Investment Company Act, of 1940, pooling of investors' securities may constitute the creation of an investment company subject to registration and regulation as a mutual fund, and (iii) under the Investment Advisers Act of 1940, a person providing advice with respect to investments in securities for compensation is subject to registration. In addition, even if not directly engaging in the activity that may violate such securities law requirements, the federal securities laws often impose liability on persons aiding, abetting, or causing a violation.

#91482648v27



PRIVILEGED & CONFIDENTIAL
ATTORNEY - CLIENT COMMUNICATION

Celsius Network                                    14                         December [●], 2018

1.      Security Status

Most virtual currencies currently in circulation today do not clearly fall into any of the more common types of instruments within the definition of "security" in the Securities Act or the Exchange Act, such as notes, stock or bonds.[50] Absent falling into one of those categories, the analysis for whether a virtual currency is a security is based upon the test for an "investment contract" originally announced by the Supreme Court in *SEC v. W.J. Howey Co.*[51] An investment contract under the *Howey* test is a contract or scheme that involves (i) an investment of money (ii) in a common enterprise (iii) made with a reasonable expectation of profits (iv) that is based predominantly upon the entrepreneurial or managerial efforts of the promoter or other third parties.[52]

The SEC has made clear that many virtual currencies are securities under this *Howey* framework. For example, the SEC's July 2017 report pursuant to Section 21(a) of the Exchange Act analyzing virtual currencies distributed by The DAO[53] and the SEC's December 2017 order instituting cease-and-desist proceedings against Munchee, Inc.[54] each reached such a conclusion. In recent days, the SEC further brought actions against two virtual currency issuers on the basis that the virtual currencies were securities and that the issuers failed to register them with the SEC or qualify for an exemption.[55] In addition, in the past few months alone, the SEC has brought several "first of their kind" enforcement actions against persons engaged in various virtual currency-related activities without complying with the federal securities laws, on the basis that the virtual currencies involved were in fact securities.[56]

At the same time, SEC staff have informally suggested that certain virtual currencies are not securities, at least currently. In June 2018, William Hinman, Director of the SEC's Division of Corporation Finance, explained that in his view neither Bitcoin nor Ether are currently

---

[50] Despite differences, the Supreme Court has indicated that the definitions of "security" under the Securities Act and the Exchange Act are treated the same. *SEC v. Edwards*, 540 U.S. 389, 393 (2004), citing *Reves v. Ernst & Young*, 494 U.S. 56, 61 n.1 (1990).

[51] 328 U.S. 293, 301 (1946).

[52] *Id.* at 301.

[53] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO, Exchange Act Rel. No. 81207 (July 25, 2017) (the "DAO report").

[54] *In re Munchee, Inc.*, Securities Act Rel. No. 10445 (Dec. 11, 2017).

[55] *In re Paragon Coin, Inc.*, Securities Act Rel. No. 10574 (Nov. 16, 2018); *In re CarrierEQ, Inc.*, Securities Act Rel. No. 10575 (Nov. 16, 2018).

[56] *See In re Crypto Asset Management LP and Timothy Enneking*, Securities Act Rel. No. 10544 (Sept. 11, 2018) (described by the SEC as the "first-ever enforcement action finding an investment company registration violation by a hedge fund manager based on its investments in digital assets"); *In re Zachary Coburn*, Exchange Act Rel. No. 84533 (Nov. 8, 2018) (described by the SEC as the "first enforcement action based on findings that such a [virtual currency trading] platform operated as an unregistered national securities exchange"). The SEC's focus on virtual currency activities has continued, with another public statement in recent days reminding market participants of potential securities law implications. *See* SEC Divisions of Corporation Finance, Investment Management and Trading and Markets, Statement on Digital Asset Securities Issuance and Trading (Nov. 16, 2018), https://www.sec.gov/news/public-statement/digital-asset-securites-issuuance-and-trading.

#91482648v27

DRAFT as of 12-6-18

PRIVILEGED & CONFIDENTIAL
ATTORNEY - CLIENT COMMUNICATION

Celsius Network                    15                    December [●], 2018

securities.[57] These statements were not accompanied by an extensive *Howey* analysis and do not constitute official SEC interpretations (and would not in any case be binding on a court interpreting federal securities laws). Even so, these statements are useful indicators of the SEC staff's current view of important factors in the application of *Howey* to virtual currencies.[58]

### B.    Analysis

If one or more of the virtual currencies used in connection with the activities are security tokens, there would be a number of significant regulatory implications for Celsius's business under the federal securities laws. We discuss here those issues of particular relevance to Celsius,[59] including the potential personal liability faced by persons who "control" persons found to violate the federal securities laws.

### 1.    Broker-Dealer Registration

The Exchange Act requires that, unless an exception is available, a broker or dealer must register with the SEC. In general, a person or entity is a "broker" if it effects transactions in securities for others, while a person or entity is a "dealer" if it buys and sells securities for its own account, other than a person doing so not as part of a regular business (i.e., a trader). Although the analysis is highly fact-specific and requires the consideration of a variety of factors, the SEC has found a wide range of activities to potentially trigger broker-dealer registration requirements, including the borrowing and lending of securities as a business activity, particularly where a person earns a "spread" between the rate at which it borrows and lends securities.[60]

We understand from information that you have provided to us and information made publicly available on the Celsius website that Celsius's activities currently involve, or may in the future

---

[57] Director William Hinman, Division of Corporation Finance, SEC, Remarks at the Yahoo Finance All Markets Summit: *Digital Asset Transactions: When Howey Met Gary* (Plastic) (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418.

[58] In particular, we believe the SEC would assess: (i) the existence of an identifiable developer and/or promoter and that party's continuing activities as an indication of whether the digital asset (or network or system in which it operates) relies upon a central actor "whose efforts are a key determining factor" to the success of the enterprise; (ii) whether the digital asset (or network or system) is operational as an indication of whether the digital asset has any practical uses other than for speculation; (iii) the degree of centralization either in the development of the digital asset or the community of users as an indication of whether the expectation of profit arises predominately from the efforts of others; and (iv) whether applying the disclosure regime of the federal securities laws to the offer and resale of the digital asset would add value under the circumstances. *Id.*

[59] As noted in footnote 49 above, there may be additional implications based on how the activities are conducted.

[60] Although the broker-dealer registration requirement is technically triggered by activities involving the purchase or sale of securities, activities involving borrowing and lending have been found to trigger registration as well. Indeed, Congress and the SEC have adopted exemptions that permit banks (but not others), in certain circumstances, to engage in securities borrowing and lending transactions without being subject to broker-dealer registration. *See e.g.*, Exchange Act § 3(a)(4)(B)(viii)(I)(cc) (exempting banks from being a "broker" where it "effects securities lending or borrowing transactions with or on behalf of customers" as part of its customary custody or safekeeping services); Regulation R Rule 772 (providing exemption for banks from "broker" status when providing certain agency securities lending services); Exchange Act Rule 3a5-3 (providing exemption for banks from "dealer" status when effecting certain conduit securities lending activities).

#91482648v27

**DRAFT as of 12-6-18**

PRIVILEGED & CONFIDENTIAL
ATTORNEY - CLIENT COMMUNICATION

Celsius Network                            16                        December [●], 2018

involve, the use of several virtual currencies, beyond Bitcoin and Ether.[61] To the extent any of these virtual currencies are security tokens, we believe that there is a risk that Celsius's borrowing and lending of virtual currencies, or effecting purchases or sales of such virtual currencies, would subject it to registration with the SEC as a broker-dealer. As a result, we recommend that, for so long as Celsius does not have all necessary securities registrations, Celsius adopt a procedure to analyze each virtual currency in relation to which it provides its services and ensure that it does not provide the services in connection with any virtual currency that is a security token.

2.      Liability

The risk of SEC enforcement with respect to unregistered broker-dealers engaged in security token activities is not merely hypothetical. In September 2018, the SEC charged an unregistered broker-dealer, *as well as its owners*, with violations of the securities laws stemming from their effecting of unregistered securities transactions as unregistered broker-dealers.[62] In addition to requiring disgorgement of profits, the SEC assessed monetary penalties against each owner and barred the owners from being associated with various regulated securities firms in the future.[63]

More generally, the Exchange Act provides that, subject to certain exceptions, persons who, directly or indirectly, control a person liable for a violation of the Exchange Act are themselves jointly and severally liable for such violations "to the same extent as such controlled person."[64] As a result, a person is not insulated from liability under the Exchange Act solely because the potentially violative conduct occurs through a separate legal entity the person controls.

## VI.      FinCEN Regulation of MSBs

FinCEN may penalize a party both for failing to register as an MSB and for failing to adopt an anti-money laundering ("**AML**") program suitable for an MSB, as well as neglecting to file SARs and other reports. [65]  In addition, failure to register as an MSB is a crime under U.S. federal law, and violators that attract the attention of U.S. authorities may also find themselves charged with criminal money laundering. We understand from you that Celsius is currently registered with FinCEN as an MSB and complies with the above requirements.

---

[61] As of December 6, 2018, the Celsius website makes explicit reference to the following virtual currencies: Bitcoin, Bitcoin Cash, Ether, Litecoin, Ripple, OmiseGO, Stellar, Cardano and Neo. We note that you have not asked us to conduct an analysis of whether any particular virtual currency, including CEL, may be deemed to be a security.

[62] See *In re: TokenLot LLC, Lenny Kugel and Eli L. Lewitt,* Securities Act Rel. No. 10543 (Sept. 11, 2018) (described by the SEC as "the first case charging unregistered broker-dealers for selling digital tokens after the SEC issued The DAO Report in 2017 cautioning that those who offer and sell digital securities must comply with the federal securities laws").

[63] *Id.*

[64] Exchange Act § 20(a).

[65] See generally 31 C.F.R. Part 1022.

#91482648v27