**DRAFT as of 12-6-18**

PRIVILEGED & CONFIDENTIAL
ATTORNEY - CLIENT COMMUNICATION

Celsius Network                                    17                         December [●], 2018

As discussed on the November 20 Call, though there may be a reasonable argument that at least some of Celsius's activities do not involve money transmission as defined by FinCEN,[66] other activities, including the CelPay feature, may require that Celsius register as an MSB, either now or in the future. It would therefore be prudent for Celsius to maintain its registration as an MSB. Because the FinCEN definition of money transmission may differ from state-level definitions of money transmission in important respects, maintaining a registration as an MSB does not necessarily imply that Celsius is a money transmitter under various state laws governing such activity.

## VII.    State Regulation of Money Transmission

### A.    Regulatory Framework

Forty-nine U.S. states,[67] as well as the District of Columbia, require nonbank entities engaged in the business of money transmission within their jurisdictions to be licensed. These licensing requirements are primarily intended to protect customers by ensuring that funds are handled by reputable and financially sound entities; they also provide a mechanism for oversight over the money transmitters' compliance with AML and other regulatory requirements. These licensing requirements are not preempted by registration with FinCEN as an MSB.

While not uniform across each state and the District of Columbia, "money transmission" is generally defined to mean the selling or issuing of payment instruments or stored value, or receiving money or monetary value for transmission. The term "payment instruments" generally refers to checks, drafts, money orders, traveler's checks or any other instrument for the transmission or payment of money or monetary value, whether or not negotiable.[68] These jurisdictions vary in their approach to applying money transmission regimes to virtual currency activities. This includes whether virtual currency is "money" or is otherwise covered by their money transmission statutes, which types of virtual currency activities may require a state money transmission license, and the jurisdictional nexus that triggers licensing. Some jurisdictions explicitly include virtual currency within the scope of their statutes,[69] other jurisdictions have through guidance explicitly excluded virtual currencies from the definition of money[70] and still

---

[66] We refer here to those activities in which currency (whether virtual or fiat) would not be received from one person for transmission by Celsius to another person. Rather, Celsius would be engaged in lending such currency or paying interest in the form of such currency in a way that is integral to the provision of those lending or interest-paying services. *See* 31 C.F.R. § 1010.100(ff)(5)(ii)(F) (providing an exemption from the definition of money transmitter on such grounds).

[67] Montana does not regulate money transmitters, but does, using the FinCEN definition of money transmitter, require money transmitters to register as a business with the Montana Secretary of State.

[68] *See* section 102(12) and (16) of the Uniform Money Services Act, available here, which has been adopted in 10 U.S. jurisdictions and is generally in line with similar definitions across all U.S. jurisdictions.

[69] *See, e.g.*, Washington's Uniform Money Services Act, Chapter 19.230 Revised Code of Washington (defining money transmission as the receipt of money or its equivalent value and explicitly stating that "equivalent value includes virtual currency"); Alabama Monetary Transmission Act, Code of Alabama, 1975 8-7a-1, et seq. (defining monetary value to include "a medium of exchange, including virtual or fiat currencies, whether or not redeemable in money").

#91482648v27

**DRAFT as of 12-6-18**

PRIVILEGED & CONFIDENTIAL
ATTORNEY - CLIENT COMMUNICATION

Celsius Network                                    18                        December [●], 2018

other jurisdictions have not provided guidance on the subject. Even in those jurisdictions where virtual currencies have been determined to be within the scope of money transmission statutes, other exemptions may be available, depending on the exact nature of the activities that Celsius conducts in a given jurisdiction. In general, a money transmission licensing obligation may arise where Celsius offers services to residents of a particular state or has an office in the state from which it is conducting the regulated activities.

As one example, New York's Money Transmitter Law prohibits a person from engaging in the business of selling or issuing checks, or engaging in the business of receiving money for transmission or transmitting the same without a license.[71] While the NY DFS does not currently classify virtual currencies as "money" for purposes of its money transmitter law, the NY DFS has taken the position that, although the BitLicense regime explicitly governs the transmission of virtual currencies, "[d]epending on the specific business activities in which they are engaged some companies may need both a money transmitter license and a BitLicense." The scope of the Money Transmitter Law in this context and more generally is quite broad and reaches even those businesses that have no office or physical location in New York.[72]

### B.   Analysis

The CelPay service is most likely to implicate state money transmitter laws because, as we understand it, CelPay will involve the receipt by Celsius of virtual currency or transmission of the same. As noted, state-level registration requirements may apply even if Celsius obtains a BitLicense in New York State or is registered as an MSB with FinCEN.

With respect to its other activities, application of the money transmitter laws to Celsius is not clear. Celsius may have a reasonable argument that any receipt or transmission of virtual currency in connection with such activities is incidental and secondary to its business of engaging in the lending of virtual currencies or the payment of interest in virtual currencies. Unlike the business of a classical money transmitter, such as Western Union, where the transfer of money is done merely for the sake of transferring money, without connection to a particular transaction, Celsius would transfer currency (whether fiat or virtual) only in connection with specific lending transactions or only in connection with the payment of interest in respect of customers' virtual currency that was placed with Celsius. However, these arguments may not be persuasive, depending on the approach taken by different state regulators and the specific facts and circumstances of the activities conducted by Celsius.

---

[70] *See, e.g.*, Illinois Department of Financial and Professional Registration, Digital Currency Regulatory Guidance (June 13, 2017), https://www.idfpr.com/Forms/DFI/CCD/IDFPR%20-%20Digital%20Currency%20Regulatory%20Guidance.pdf (concluding that digital currencies are not money for the purposes of Illinois's Transmitters of Money Act).

[71] NY Banking Law § 640 *et seq.*

[72] NY DFS, Industry Letter, Money Transmitters with No Physical Presence in New York, (Mar. 31, 2011), https://www.dfs.ny.gov/legal/industry/il110331.htm (concluding that, in contrast to a previous position taken by the NY DFS and its predecessor agency, "there is no basis in law or policy" for excluding from the scope of New York's money transmitter licensing regime those "money transmitters that do business with residents of New York or persons located in New York" even if those money transmitters "have no office or physical location in New York").

#91482648v27

99 Bishopsgate
London EC2M 3XF
United Kingdom
Tel: +44(0)20.7710.1000  Fax: +44(0)20.7374.4460
www.lw.com

# LATHAM&WATKINS

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Barcelona | Moscow |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | Rome |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

**MEMORANDUM**
19 February 2018

To:       Celsius Network Limited of 35 Great St. Helena's, London, United Kingdom, EC3A 6AP
From:     Latham & Watkins
File no:   061659-0001
Subject:  <u>Token Offering</u>

## 1.    INTRODUCTION

You have asked us to consider whether the issuance of Celsius Degree Tokens (**"Tokens"**) to purchasers pursuant to a token offering by Celsius Network Limited, a limited company incorporated in the UK (**"Celsius"**, and such token offering the **"Token Offering"**) will trigger regulatory requirements under the UK financial regulatory regime (the **"UK regime"**). We understand that Celsius intends to use the proceeds of the Token Offering to fund development of the Celsius platform (the **"Platform"**), as described in the draft whitepaper provided by you to us titled "*Celsius: A membership platform that enables a new way to lend and borrow any crypto-assets*" and dated 1 February 2018 (the **"Whitepaper"**).

In summary, we understand that Celsius is a new global P2P financial platform that will connect holders of crypto-assets with borrowers. It will allow borrowers to get a dollar margin loan against their crypto-assets. The platform will also enable margin traders (hedge funds and crypto funds) to borrow crypto-assets for various purposes, including hedging and shorting. Lenders of crypto-assets will earn fees on their assets in the form of Tokens (or other forms of cryptocurrency – such as Bitcoin) when their crypto-assets are being lent to borrowers. The Tokens will be purchased and used to pay borrower fees to lenders in relation to the borrowing of crypto-assets. Celsius will not take any positions and will not act as a counterparty to any trade. The Platform's primary purpose will be to facilitate transactions between lenders and borrowers, creating a liquid order book and maximizing return on capital on pledged assets. A more detailed description of the Platform is provided in the Whitepaper and we have relied on that description for the purposes of this analysis.

The purpose of this memorandum (the **"Memorandum"**) is to consider the following aspects of the UK regime:

(a)      whether the issuance of Tokens by Celsius constitutes a regulated activity in the UK for which a licence is required;

(b)      whether the Tokens constitute a regulated investment or asset in the UK;

Latham & Watkins is the business name of Latham & Watkins (London) LLP, a registered limited liability partnership organised under the laws of New York and authorised and regulated by the Solicitors Regulation Authority (SRA No. 203820). A list of the names of the partners of Latham & Watkins (London) LLP is open to

LATHAM&WATKINS

(c)  whether the Tokens fall within the UK prospectus requirements;

(d)  whether marketing of the Tokens falls within the UK financial promotions regime; and

(e)  whether the issuance of the Tokens by Celsius falls within the UK anti-money laundering regime.

2.  **EXECUTIVE SUMMARY**

In our view, the Token Offering will not trigger regulatory requirements under the UK Regime (subject to our comments below in relation to the UK anti-money laundering regime), on the basis that:

(a)  neither the Tokens nor the issuance of the Tokens to purchasers by Celsius pursuant to the Token Offering are or involve specified investments subject to the UK regime;

(b)  the issuance of the Tokens to purchasers by Celsius pursuant to the Token Offering will not involve Celsius engaging in a specified activity subject to the UK regime;

(c)  the Tokens will not constitute transferable securities for the purposes of the UK prospectus requirements; and

(d)  marketing of the Token Offering by Celsius will not constitute a financial promotion under the UK regime.

As a result, in our view, Celsius's participation in and completion of the Token Offering will not involve the performance of a licensable activity by Celsius, will not require an approved prospectus and will not be subject to the UK financial promotions regime. In addition, in our view, the Tokens will not constitute a regulated investment or asset in the UK.

In addition, it is arguable that Celsius will not be one of the types of entity caught by the UK anti-money laundering regime in relation to the Token Offering. However, there is some uncertainty for the reasons stated in section 8 below. Accordingly, we would recommend that Celsius does perform AML/KYC on the purchasers of Tokens despite the arguments in favour of the UK anti-money laundering regime not applying to the Token Offering. In practice, it may be beneficial for Celsius to perform AML/KYC on the purchasers of Tokens given that its regulated service providers (such as banks) will need Celsius to explain its source of funding during the onboarding process. This will be difficult to achieve if Celsius does not perform AML/KYC on the purchasers.

**Please note**: we have made a number of limited suggestions relating to potential amendments to the content of the Whitepaper, on the basis that at present the Whitepaper could be viewed as encouraging purchasers to participate in the Token Offering on a speculative basis contrary to regulatory expectations. See section 5 below for further detail.

Our full analysis in support of our conclusions is set out in sections 4-7 below, and is subject to the assumptions and qualifications set out in section 3.

3.  **ASSUMPTIONS AND QUALIFICATIONS**

For the purposes of this Memorandum, we have made the following assumptions and qualifications:

(a)  Our advice is based on the information set out in the Whitepaper. We have only reviewed the Whitepaper and have not received any other information regarding Celsius, the Platform or the Token Offering either from you or from your advisers, Herzog, Fox & Neeman.

**LATHAM&WATKINS**

(b)    Our advice is restricted to considering whether:

    (i)    the issuance of the Tokens to purchasers pursuant to the Token Offering constitutes a "*regulated activity*" as defined in s.22 of the UK Financial Services and Markets Act 2000 ("**FSMA**"), and hence whether the issuance of the Tokens to purchasers pursuant to the Token Offering may be undertaken by Celsius in the UK without triggering licensing requirements;

    (ii)    the Token Offering will be subject to the UK prospectus regime as set out in s.85 of FSMA;

    (iii)    Celsius's promotion of the Token Offering falls within the UK financial promotions regime set out in s.21 FSMA; and

    (iv)    Celsius will be subject to the UK anti-money laundering regime as set out in the UK's Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017.

Accordingly, we have not considered issues arising under the UK consumer rights regime, including the Consumer Rights Act 2015 and the Unfair Contract Terms Act 1977. Although there are certain regulatory requirements relating to consumer rights, we note that these issues generally give rise to civil (rather than regulatory or criminal) risks. In addition, we have not at this stage considered the steps for compliance with UK or international financial sanctions-related legislation but we would be happy to advise Celsius on the steps it should take to comply with such legislation in advance of the Token Offering.

(c)    We assume that Celsius is not a regulated entity for the purposes of the UK regime.[1]

(d)    We are not providing any analysis of the application of the UK regulatory regime to the Platform itself, to any transactions which may be carried out on the Platform or any services performed on the Platform. We would be happy to provide further advice on this issue at the appropriate time post-financing in advance of the Platform becoming operational.

(e)    We have not considered, and are not providing any advice on, whether any of the cryptocurrency assets (other than the Tokens) which may be borrowed or lent on the Platform are themselves specified investments subject to the UK regime (e.g. tokenised securities).

(f)    Our advice is limited to the position as at the date of this Memorandum. We note that cryptocurrencies and Token Offerings are currently subject to considerable regulatory attention, and it is not possible to rule out future changes to regulatory expectations or to the UK regime which would require us to revisit the analysis set out in this Memorandum. We note that there is a lack of customary practice and understanding in relation to the regulatory position of token offerings, and to our knowledge no judicial decisions have been issued with respect to the regulatory characterisation of the offering, sale or issuance of tokens or coins issued by a blockchain platform in exchange for value.

(g)    Consideration of the Token Offering under the UK regime requires consideration of all relevant facts and circumstances relating to the Token Offering and fact-specific distinctions will directly impact the legal analysis and resulting conclusions. While we

---

[1] i.e. that Celsius is not an authorised person for the purposes of FSMA s.19; similarly we assume that Celsius is *not an exempt person (such as certain kinds of investment exchanges or clearing houses) for the purposes of this provision.*

**LATHAM&WATKINS**

have not seen or reviewed any documentation relating to the Token Offering (aside from the Whitepaper), we have assumed that:

(i)   the terms and conditions of the Tokens do not:

(A)   entitle their purchasers/holders to a share in Celsius's profits (such as, but not limited to, payment of dividends), or to exercise voting rights in relation to Celsius;

(B)   entitle their purchasers/holders to any contractual right to be repaid the purchase price of the Tokens;

(C)   represent any other type of claim on Celsius for return of any monetary value;

(D)   provide purchasers/holders a *right* to subscribe for the borrowing or purchase of cryptocurrency assets on the Platform;

(E)   there is no optionality granted to purchasers to choose whether or not to take up their Token allocations once they have initially subscribed;

(F)   give purchasers/holders any other *right* over cryptocurrency assets on the Platform; and

(G)   themselves, without more, give purchasers/holders the *right* to receive profits from the reserve lending pool on the Platform.

(ii)   participation in the Token Offering by purchasers simply involves purchasers agreeing to purchase an amount of Tokens to be received in exchange for their payment of the required subscription amounts, and there is no optionality granted to purchasers to whom Tokens are allocated as to whether or not to choose to take up their Token allocations; and

(iii)   the value of the Tokens is not pegged to the value of fiat currency, or any other asset, property or index.

Unless otherwise stated, all reference to Articles in this Memorandum are reference to Articles of the Financial Services and Markets Act 2000 (Regulated Activities) Order 2001 (SI 2001/544) (the "**RAO**").

**4.    THE UK REGIME AND REGULATED ACTIVITIES**

**4.1    Specified investments and activities**

The UK regime contains a general prohibition on carrying on a regulated activity in the UK, or purporting to do so, unless one is either an authorised person or an exempt person (FSMA s.19). Given this general prohibition, if an activity counts as a regulated activity a firm will generally need to be authorised to carry out the activity.[2] By virtue of being authorised the firm will thereby become subject to various requirements under the UK regime, both in relation to its performance of the particular activities which it is authorised to undertake, but also more generally in ways which do not relate purely to its performance of such activities. In order to determine whether the issuance of Tokens by Celsius pursuant to the Token Offering will give rise to such requirements, it is therefore necessary to determine whether the issuance of the Tokens to purchasers pursuant to the Token Offering is a regulated activity.

---

[2] Assuming the person is not exempt for the purposes of FSMA s.19; see footnote 1

LATHAM&WATKINS

An activity is generally a regulated activity if it is (i) an activity of a specified kind, (ii) which is carried on by way of business, and (iii) which relates to an investment of a specified kind (FSMA s. 22(1)(a)). However certain activities are also specified without reference to particular specified investments, and so will count as regulated regardless of what property they are carried on in relation to (or even in some cases irrespective of whether they are carried on in relation to any property) (see FSMA s.22(1)(b) and s.22(1A)). The relevant categories of specified activity and specified investment are set out in Parts II (*Specified activities*), III (*Specified investments*) and 3A (*Specified activities in relation to information*) of the RAO. A full list of the various UK specified activities, and the specified investments in relation to which each may be performed, is set out in Schedule 1 to this Memorandum.

In order to determine whether the issuance of the Tokens pursuant to the Token Offering will constitute a regulated activity under the UK regime, it is therefore sufficient to consider (i) whether the Token Offering will involve specified investments (and in particular whether the Tokens to be issued pursuant to the Token Offering will constitute specified investments), and (ii) whether the issuance of the Tokens pursuant to the Token Offering will fall into any of the other various categories of activities which are specified without reference to specified investments. We have therefore set out our analysis of whether the Tokens or the Token Offering fall into any of the categories of specified investments set out in the RAO in section 6 below, and have further considered whether the issuance of the Token involves Celsius undertaking any other specified activities in section 7 below. For completeness, we have considered all categories of specified investment and activity, even where the investment or activity is not directly relevant to the Token offering.

In our view, the Tokens and the Token Offering do not involve specified investments and the issuance of the Tokens does not otherwise constitute a specified activity. Accordingly, in our view the issuance of the Tokens is not a regulated activity, and Celsius will not trigger licensing and other consequential regulatory requirements by virtue of its issuance of the Tokens to purchasers pursuant to the Token Offering.

## 4.2    UK prospectus regime

The UK prospectus requirements are set out in FSMA s.85. The key restrictions are as follows:

(a)     it is unlawful for transferable securities (other than a limited number of exempted transferable securities) to be offered to the public in the UK unless an approved prospectus has been made available to the public before the offer is made; and

(b)     it is unlawful to request the admission of transferable securities (other than a limited number of exempted transferable securities) to trading on a regulated market situated or operating in the UK unless an approved prospectus has been made available to the public before the request is made.

"*Transferable securities*" are defined by FSMA s.102A(3) to mean anything which is a transferable security for the purposes of the Markets in Financial Instruments Directive ("**MiFID II**"[3]), other than money-market instruments which have a maturity of less than 12 months. MiFID II is a European directive which must be implemented across EU member states. However although MiFID II contains its own definition of "*transferable security*", the European regulatory regime underpinned by MiFID II has been implemented in the UK by, amongst other things, the categories of specified investment set out in the RAO. Accordingly, for the purposes of our analysis it is not necessary to independently consider whether the Tokens will constitute transferable securities provided that they do not constitute specified investments.

[3] Directive 2014/65/EU of the European Parliament and of the Council of 15 May 2014 on markets in financial instruments and amending Directive 2002/92/EC and Directive 2011/61/EU

LATHAM&WATKINS

MiFID II defines transferable securities to mean those classes of securities which are negotiable on the capital market, with the exception of instruments of payment, such as:

(a)     shares in companies and other securities equivalent to shares in companies, partnerships or other entities, and depositary receipts in respect of shares;

(b)     bonds or other forms of securitised debt, including depositary receipts in respect of such securities;

(c)     any other securities giving the right to acquire or sell any such transferable securities or giving rise to a cash settlement determined by reference to transferable securities, currencies, interest rates or yields, commodities or other indices or measures.

Each type of security referenced by the definition of transferable securities is covered by the specified investments listed in Part III of the RAO (the list of specified investments is broader than the definition of transferable securities).

Accordingly, given our conclusion above that the Tokens will not constitute specified investments, it is also our view that the Tokens will not constitute transferable securities for the purposes of MiFID II or FSMA s.85.

Therefore, in our view, the UK prospectus requirements will not apply to the Token Offering.

5.     **FINANCIAL PROMOTIONS**

The UK regime also contains a restriction on financial promotions, according to which a person who is not authorised must not, in the course of business, communicate an invitation or inducement to engage in investment activity (FSMA s.21(1)). The term "*engaging in investment activity*" is in turn defined in FSMA s.21(8) by reference to various "*controlled activities*" and "*controlled investments*" which are set out in Schedule 1 to the UK Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the "**FPO**"). In order to determine whether the promotion of the Token Offering by Celsius complies with this prohibition, it is therefore necessary to consider whether the Token Offering involves controlled activities or controlled investments.

Although the notions of controlled activities and controlled investments broadly correspond to those of specified activities and specified investments, there are some technical differences in the scope of the FPO as compared with the RAO. These differences arise due to two factors: (i) certain activities and investments included in the RAO are not listed in the FPO as controlled activities or investments, making the RAO regime broader than the FPO regime in this respect, and (ii) certain exclusions included in the RAO are not included in the FPO, making the RAO regime narrower in this respect. However notwithstanding these differences, provided that our analysis in sections 6 and 7 does not rely on any exclusions in order to reach the view that the Tokens and the Token Offering do not involve RAO specified investments or activities, it will follow that the Tokens and the Token Offering do not involve controlled investments or activities for the purposes of the FPO. The analysis set out in sections 6 and 7 does not rely on any such exclusions, and so in our view Celsius will not violate the prohibition on financial promotion by promoting the Token Offering.

We do however note that various parts of the Whitepaper refer to the Platform being used for speculation, and to a Celsius Token Economy which involves Token holders seeking to profit by rapid appreciation in the value of the Tokens over time. In addition, we note that various diagrams in the Whitepaper refer to a "tokenized flywheel" which presents the Tokens as following a lawful increase in price. In our view, and notwithstanding that the Token Offering is not caught by the UK financial promotions regime, these aspects of the Whitepaper could be viewed as encouraging purchasers to participate in the Token Offering for speculative reasons. Any such suggestion would, in our view, be contrary to regulatory expectations in this evolving

**LATHAM&WATKINS**

area. In addition, such a suggestion could weaken the arguments that the Tokens are not specified investments for the reasons stated in sections 6.15 and 6.16 below. We therefore strongly advise you to remove these aspects of the Whitepaper given our understanding that speculative activity is not a material purpose of the Tokens (which is as a value transfer mechanism on the Platform).

## 6.    SPECIFIED INVESTMENTS

This section sets out our analysis in support of our conclusion that the Tokens do not constitute any of the kinds of specified investment set out in Part III (*Specified investments*) of the RAO.

### 6.1    Deposits (Article 73)

Deposits are defined under Article 5, in relation to the specified activity of accepting deposits (which is the main activity for which this kind of specified investment is relevant). For the purposes of this Article, deposits involve sums of money which are paid on terms under which they must be repaid.

In the context of the Token Offering, purchasers will pay sums and receive the Tokens in return. However neither the sums paid, nor the Tokens received, must be repaid. On this basis neither the Tokens not the Token Offering involve deposits, and the Token Offering does not involve the activity of accepting deposits specified by Article 5.

### 6.2    Electronic money (Article 74)

Electronic money is defined in Article 3 by reference to the definition of "*electronic money*" set out in Regulation 2(1) of the UK Electronic Money Regulations 2011 (and which itself implements the definition set out in the European Electronic Money Directive[4]). In particular:

> "*electronic money" means electronically (including magnetically) stored monetary value as represented by a claim on the electronic money issuer which—*
>
> *(a) is issued on receipt of funds for the purpose of making payment transactions;*
>
> *(b) is accepted by a person other than the electronic money issuer; and*
>
> *(c) is not excluded by regulation 3;*

In our view, although the Tokens are provided to purchasers in exchange for receipt of funds, they do not represent stored monetary value as represented by a claim on Celsius. This is because holders of Tokens do not, by virtue of holding the Tokens, have a claim against Celsius relating to the funds provided by the purchasers. Similarly, the Token Offering itself does not involve provision of deposits as purchasers have no contractual right to be repaid their subscription moneys.

According to the EBA[5], the difference between electronic money and a virtual currency is that the latter is not necessarily attached to a fiat currency, i.e. it does not have a fixed value in a fiat currency and, furthermore, is not necessarily fixed to be redeemed at par value by an issuer. We understand that while the Tokens may be exchanged for fiat currency on third party exchanges, they do not have a fixed value in fiat currency and are not fixed to be redeemed at par value by Celsius. Notwithstanding that fees for margin trading may be specified in fiat values, we understand that the Tokens issued to lenders on the Platform in return for lending the crypto-

---

[4] Directive 2009/110/EC of the European Parliament and of the Council of 16 September 2009 on the taking up, pursuit and prudential supervision of the business of electronic money institutions amending Directives 2005/60/EC and 2006/48/EC and repealing Directive 2000/46/EC.

[5] EBA Opinion on 'Virtual Currencies', 4 July 2014; EBA/Op/2014/08

LATHAM&WATKINS

assets to borrowers do not themselves represent a fixed value to the lenders in fiat currency. We understand that the lenders will need to exchange Tokens for fiat currency on a third party exchange and the price of exchange will depend on market forces on the exchange.

On this basis, in our view the Tokens do not constitute electronic money for the purposes of the RAO, and the Token Offering does not involve this category of specified investment.

**6.3      Contracts of insurance (Article 75)**

The RAO contains an extensive definition of "*contracts of insurance*" set out in Article 3. However associated regulatory guidance makes clear that this definition is non-exhaustive, and so the common law judicial interpretation of this term is relevant to determine whether a contract is caught by Article 75 (see regulatory guidance set out in PERG 5.3.2 of the UK Financial Conduct Authority (the "**FCA**") Handbook). The common law interpretation of "*contract of insurance*" is again highly complex, however in general a contract of insurance will provide for payment of a sum of money (or some corresponding benefit) to become due on the occurrence of an event which has both some amount of uncertainty to it, and some adverse character in relation to the interests of the person effecting the insurance.[6]

Given this definition, it is clear that the Token Offering (and the Tokens themselves) do not involve contracts of insurance, and so will not involve specified investments under Article 75. Celsius will not be required to make any payment of money (or a corresponding benefit) to holders of the Tokens on the occurrence of an event which has an adverse character in relation to the interests of purchasers/holders. The purpose of the arrangements relating to the Token is not to insure against such an event.

**6.4      Shares etc (Article 76)**

Shares are defined in Article 76 as shares or stock in the share capital of any body corporate (wherever incorporated) or any unincorporated body constituted under the law of a country or territory outside the UK.

The Tokens do not constitute shares in any entity (they do not, for example, entitle the holder to Celsius's profits in the form of dividends, or to exercise voting rights in relation to Celsius). Accordingly, in our view the Tokens are not shares for the purposes of Article 76 and the Token Offering does not involve this category of specified investment.

**6.5      Instruments creating or acknowledging indebtedness (Article 77)**

Article 77 of the RAO specifies various kinds of instrument which create or acknowledge indebtedness (including but not limited to debentures, debenture stock, loan stock, bonds and certificates of deposit). Common to all such instruments is the fact that they give rise to (or 'acknowledge') a legal right of indebtedness, which would generally be constituted by a contractual obligation to repay a certain amount of money. The Tokens do not create or record any such right (see section 6.1 for analysis of why the Tokens do not give purchasers a right to be repaid sums invested), and so do not constitute instruments creating or acknowledging indebtedness. The Token Offering does not therefore involve this category of specified investment.

**6.6      Alternative finance investment bonds (Article 77A)**

As for instruments creating or acknowledging indebtedness (see section 6.5 above), an alternative finance investment bond must involve an arrangement in which there is a legal right

---

[6] *Prudential Insurance Co Ltd v IRC* [1904] 2 KB 658 at 664

LATHAM&WATKINS

for repayment of a certain sum of money.[7] The Tokens do not involve such an arrangement and so are not alternative finance investment bonds. The Token Offering does not therefore involve this category of specified investment.

**6.7    Government and public securities (Article 78)**

Government and public securities are also instruments creating or acknowledging indebtedness. As a result and for the reasons set out in section 6.5 above, the Tokens will not constitute government or public securities and the Token Offering does not involve this category of specified investment.

**6.8    Instruments giving entitlements to investments (Article 79)**

Instruments giving entitlements to investments are defined in terms of warrants (and other instruments) entitling the holder to subscribe for any investments of the kinds specified by Articles 76-78 (discussed in sections 6.4-6.7 above).

Although Tokens are intended to be used on the Platform to reward lenders in return for their committing cryptocurrency assets to the crypto lending reserve pool, Tokens do not themselves provide their holders with a legal right to subscribe for such cryptocurrency assets. Given this, even if the cryptocurrency assets themselves were to constitute specified investments under the UK regime (and which we have not considered for the purposes of this Memorandum), the Tokens would not count as instruments giving entitlements to such investments and the Tokens do not fall under this category of specified investment. Accordingly, the Token Offering does not involve this category of specified investment.

Please note, however, that if the Platform were to provide services in relation to tokenised securities, we would need to consider further whether the Platform could involve instruments giving entitlements to investments, even though the Tokens themselves would not constitute such a specified investment.

**6.9    Certificates representing certain securities (Article 80)**

Article 80 captures certificates or other instruments which confer "*contractual or property rights*" in respect of investments of the kinds specified by Articles 76-79, held by another person and which may be transferred without the consent of the person holding the certificate. This provision is intended to capture, amongst other things, instruments such as depositary receipts.

Although the expression "*contractual or property rights*" is not defined for the purposes of this Article, in our view the Tokens do not confer any contractual or property rights in any other instruments of the kinds specified by Articles 76-79. In particular (and as noted in section 6.8 above), although the Tokens may be used on the Platform to reward lenders in return for their committing cryptocurrency assets to the crypto lending reserve pool, even if the cryptocurrency assets themselves constitute investments of the kinds specified by Article 76-79 this would not bring the Tokens in scope of the UK regime on the assumption that simply holding Tokens does not by itself give one any rights over assets held by members of the Platform, or over any assets in the crypto lending reserve pool. The Token Offering does not therefore involve this category of specified investment.

Please note, however, that if the Platform were to provide services in relation to tokenised securities, we would need to consider further whether the Platform could involve certificates representing certain securities, even though the Tokens themselves would not constitute such a specified investment.

---

[7] Under Article 77A(2)(d)(i) the bond issuer of an alternative finance investment bond must undertake to make repayments to the bond-holder.

LATHAM&WATKINS

**6.10    Units in a collective investment scheme (Article 81)**

Collective investment schemes are defined in FSMA s.235(1) as "*any arrangements with respect to property of any description, including money, the purpose or effect of which is to enable persons taking part in the arrangements (whether by becoming owners of the property or any part of it or otherwise) to participate in or receive profits or income arising from the acquisition, holding, management or disposal of the property or sums paid out of such profits or income*".

The arrangements must be such that the persons who are to participate ("participants") do not have day-to-day control over the management of the property, whether or not they have the right to be consulted or to give directions.

The arrangements must also have either or both of the following characteristics—

(a)    the contributions of the participants and the profits or income out of which payments are to be made to them are pooled;

(b)    the property is managed as a whole by or on behalf of the operator of the scheme.

Although lenders on the Platform who commit cryptocurrency assets to the crypto lending reserve pool may be rewarded with Tokens according to fees paid by borrowers, the Tokens themselves do not constitute rights or interests to participate in or receive profits or income, and so do not constitute units in a collective investment scheme for the purposes of Article 81. We understand that holders of Tokens will themselves have day-to-day control over the management of the Tokens (i.e. the Tokens will be held by the lenders in their own wallets and the lenders can choose when to sell the Tokens on a third party exchange at their own discretion). In addition, lenders who receive Tokens do not exchange those Tokens for pooled profits or income sitting on the Platform. Rather, the Tokens are sold on third party exchanges. Finally, the Tokens awarded to lenders are not managed as a whole by or on behalf of the Platform operator. Rather, each lender will manage his/her own Tokens within the lenders' own wallet.

The Token Offering does not therefore involve this category of specified investment.

Please note that we will need to separately consider whether other aspects of the Platform involve a collective investment scheme once operational.

**6.11    Rights under a pension scheme (Article 82)**

Article 82 specifies rights under particular UK regulated pension schemes (i.e. personal pension schemes and stakeholder pension schemes, each as defined in Article 3). The Tokens do not grant their holders any such rights, and so are not caught by this Article. As such, this category of specified investment is not relevant to the Tokens or the Token Offering.

**6.12    Greenhouse gas emissions allowances (Article 82A)**

Greenhouse gas emissions allowances are a kind of emissions allowance. Given that the Tokens will not constitute emissions allowances (see section 6.13), they will not constitute greenhouse gas emissions allowances. As such, this category of specified investment is not relevant to the Tokens or the Token Offering.

**6.13    Emission allowances (Article 82B)**

Article 82B specifies emission allowances which comply with requirements set out in the Emission Allowance Trading Directive[8]. The Tokens are not emission allowances, and so are not caught by this Article. As such, this category of specified investment is not relevant to the Tokens or the Token Offering.

6.14   **Options (Article 83)**

Article 83 of the RAO captures as specified investments options relating to various kinds of asset. However irrespective of the underlying asset to which instruments of this kind must relate, each must involve an option, i.e. a right (but not obligation) to acquire the relevant underlying asset. The Tokens do not grant their holders such rights, and so will not constitute options for the purposes of the RAO.

We assume however that the Token Offering itself will involve granting purchasers the right to acquire the Tokens. There is therefore a further question as to whether, even if the Tokens are not themselves options, the Token Offering involves the granting of options to purchasers. However in our view the Token Offering will not involve the granting of options to purchasers for the following two reasons:

(a)   In our view participation by purchasers in the Token Offering is best analysed as a simple purchase of the Tokens by purchasers, rather than as the granting of an option to purchasers which they may then exercise to take possession of the Tokens. Given this, the Token Offering will not involve options for the purposes of Article 83. We do note, however, that this argument is reliant on assuming that there is no optionality granted to subscribing purchasers to choose whether or not to take up their Token allocations (see our assumption set out in section 3(g)(ii) above, and so we would need to revisit this point if this assumption is not correct).

(b)   If the Token Offering were to involve options specified under Article 83, any such option would presumably be an *option over the Tokens, and so would only count as a* specified investment if the Tokens fall into any of the relevant categories of assets listed in Article 83, i.e. those listed in paragraphs 83(1), 83(2) and 83(3). However:

(i)   The Tokens do not count as any of the assets listed in paragraph 83(1). This paragraph includes securities, contractually based investments, currencies of a country or territory, and certain precious metals. Although the Tokens could arguably constitute currency, they are not a currency of any country or territory, and so do not fall under this paragraph.

(ii)   The Tokens do not count as any of the assets listed in paragraph 83(2). Paragraph 83(2) captures certain options over commodities, and the Tokens are not commodities. Although "*commodity*" is not defined in the RAO, the relevant RAO provisions implement MiFID II requirements relating to commodity derivatives, and so may be interpreted in line with the MiFID II definition of commodities as "*goods of a fungible nature that are capable of being delivered, including metals and their ores and alloys, agricultural products, and energy such as electricity*" (Article 2(6) of the MiFID Org Regulation[9]). Notwithstanding the fact that the Tokens are fungible, UK regulatory guidance set out in PERG 13.4 Q33 (of the FCA Handbook) makes clear that from a UK regulatory perspective "*currencies or rights in real estate,*

---

[8] Directive 2003/87/EC of the European Parliament and of the Council of 13 October 2003 establishing a scheme for greenhouse gas emission allowance trading within the Community and amending Council Directive 96/61/EC.

[9] Commission Delegated Regulation (EU) 2017/565 of 25 April 2016 supplementing Directive 2014/65/EU of the European Parliament and of the Council as regards organisational requirements and operating conditions for investment firms and defined terms for the purposes of that Directive.

LATHAM&WATKINS

*or that are entirely intangible"* are not *"goods"*, and therefore will not constitute commodities. On this basis, as both currency and being entirely intangible, the Tokens will not constitute commodities.

(iii)     The Tokens do not count as any of the assets caught by paragraph 83(3). Paragraph 83(3) captures certain options covered by MiFID II Annex I Section C(10) (**"C(10) derivatives"**). The MiFID II concept of a C(10) derivative itself captures various miscellaneous types of derivative over items as varied as climatic variables, freight rates, economic statistics, storage and transportation capacity, physical variables, and indices. The Tokens do not count as any such items, and so the Token Offering does not involve C(10) derivatives[10].

We also note that even if the Token Offering did involve options caught under RAO paragraphs 83(2)-83(3) (but not paragraph 83(1)), these paragraphs apply only to options in relation to which various kinds of regulated entity are providing investment or ancillary services. Given that we understand that Celsius is not a regulated entity, these Articles are not relevant to the Token Offering.

**6.15     Futures (Article 84)**

Article 84 captures (i) rights under a contract for the sale of a commodity or property of any other description under which delivery is to be made at a future date and at a price agreed on when the contract is made, which are made for commercial and not investment purposes, and (ii) certain futures and forwards over commodities or which are caught by the MiFID II concept of C(10) derivative and in relation to which certain regulated entities are providing investment services and activities.

The Tokens do not themselves count as futures or forwards, or otherwise involve rights under a contract for delivery of an asset to be made at a future date. The Tokens do not therefore count as futures under Article 84.

The Token Offering itself does involve purchasers agreeing a price under which the Tokens will be delivered, and it is therefore necessary to consider whether the Token Offering itself involves futures as specified under Article 84. In our view it does not - as set out in section 6.14(b)(iii), the UK regulatory position is that Tokens will not count as *"commodities"*, or as any of the assets which are relevant to C(10) derivatives. We note that it is arguable (and perhaps likely) that the Tokens could constitute *"property of any other description"*, however even if this is the case, any contract made by purchasers of the Tokens will arguably count as being made for commercial purpose and so will not count as a future for the purposes of Article 84.

We reach this view on the basis of consideration of RAO paragraphs 84(4)-(8), which set out various factors which indicate whether a contract is made for commercial or for investment purposes. For current purposes, we note that the Token Offering does not involve any of the factors which are indicative of an investment purpose. These are as follows:

(a)     a contract is to be regarded as made for investment purposes if it is made or traded on a recognised investment exchange, or is made otherwise than on a recognised investment exchange but is expressed to be as traded on such an exchange or on the

---

[10] Once listed on a cryptocurrency exchange, the exchange will presumably publish indices relating to the Tokens (i.e. the published bid/offer spread of the relevant exchange). However, no such indices will exist before the completion of the Token Offering given that there will be no listing of the Tokens prior to completion of the Token Offering. Accordingly, the Token Offering cannot involve a derivative over any indices linked to the Token, given that no such indices exist. In any event, there will be no contract between Celsius and the purchaser/holder of the Tokens which allows the Token to be cash-settled by reference to the value of any of these indices. Trading is determined by market forces on the exchange and there is no optionality for the purchaser/holder of Tokens to

LATHAM&WATKINS

same terms as those on which an equivalent contract would be made on such an exchange;

(b)   the contract is expressed to be as traded on an investment exchange;

(c)   performance of the contract is ensured by an investment exchange or a clearing house; and

(d)   there are arrangements for the payment or provision of margin. While the Platform does involve arrangements for the payment or provision of margin in relation to margin loans, the purchase or holding of Tokens does not itself involve the payment or provision of margin.

In addition, we note that the Token Offering does involve a number of the factors which are indicative of a commercial purpose (in particular, those factors set out in paragraph 84(5)-(6)):

(a)   one or more of the parties is a producer of the commodity or other property, or uses it in his business (assuming that the Tokens are considered to be "*property*", this would apply to Celsius as issuer of the Tokens (i.e. producer) and, potentially, operator of the Platform[11]);

(b)   the seller delivers or intends to deliver the property or the purchaser takes or intends to take delivery of it (Celsius will deliver the Tokens to the purchaser's wallet); and

(c)   the prices, the lot, the delivery date or other terms are determined by the parties for the purposes of the particular contract and not by reference (or not solely by reference) to regularly published prices, to standard lots or delivery dates or to standard terms. Given that the Tokens will not be listed on any exchange prior to the completion of the Token Offering, the prices, the lot, the delivery date and any other terms relating to the Tokens will be agreed between Celsius and purchasers in the terms and conditions of the Tokens and not by reference to regularly published prices, to standard lots or delivery dates. The terms and conditions of the Tokens will likely constitute "*standard terms*". However, in our view this does not impact the overall characterisation of the Tokens being for commercial purposes. Many property contracts are entered into by reference to standard terms without those contracts falling within the definition of a future.

In addition, while there is no definition in the RAO of what constitutes future delivery of property for the purposes of Article 84, this is typically understood by the industry to involve delivery of the property more than 2 days after execution of the contract to buy the property (and this is aligned with the EU position in MiFID II). Assuming that the Tokens will be delivered to purchasers within 2 days following completion of the Token Offering, it is unlikely that the agreement to purchase the Tokens would constitute a future. In any event, even if the delivery of the tokens will be made more than 2 days following completion of the Token Offering, in our view the agreement to purchase the Tokens would still be for commercial purposes for the reasons stated above.

As a result, in our view the Token Offering will not itself involve futures specified under Article 84.

However, it should be noted that, while we understand that the primary purpose of the Tokens is as a value transfer mechanism on the Platform, various parts of the Whitepaper refer to the Platform being used for speculation, and to a Celsius Token Economy which involves Token holders seeking to profit by rapid appreciation in the value of the Tokens over time (please see

---

[11] We note that while Celsius will be the issuer of the Tokens, it is possible that an affiliate of Celsius will be the operator of the Platform. Nonetheless, Celsius will still be the producer of the Tokens and, therefore, this does not impact our conclusion that the Tokens are not futures for the purposes of Article 84

LATHAM&WATKINS

section 5 above for more information). In our view, any such references to speculation in the Whitepaper and other marketing documentation could indicate that the Token Offering is for an investment, rather than a commercial purpose. While we understand that this is not the intention of Celsius or the Platform, we would recommend that any such statements are removed from the Whitepaper and any other marketing documentation relating to the Token Offering or the Platform.

**6.16    Contracts for differences etc (Article 85)**

Article 85 captures both a *"(a) contract for differences; or (b) any other contract the purpose or pretended purpose of which is to secure a profit or avoid a loss by reference to fluctuations in- (i) the value or price of property of any description; or (ii) an index or other factor designated for that purpose in the contract"*. Although the Tokens will not themselves constitute contracts for difference, it is necessary to consider whether the Token Offering itself is caught by this Article as purchasers may be motivated to participate in the Token Offering in order to secure a profit by reference to fluctuations in the price or value of the Tokens.

However we note that paragraph 85(2) excludes from this category of specified investment *"rights under a contract if the parties intend that the profit is to be secured or the loss is to be avoided by one or more of the parties taking delivery of any property to which the contract relates"* - given that purchasers will take delivery of the Tokens, this exemption will apply and the Token Offering will not be caught by this Article.

We understand that it is the intention of Celsius that the Tokens will be listed for trading on one or more cryptocurrency exchanges. Once listed on a cryptocurrency exchange, the exchange will presumably publish indices relating to the Tokens (i.e. the published bid/offer spread of the relevant exchange). However, no such indices will exist before the completion of the Token Offering given that there will be no listing of the Tokens prior to completion of the Token Offering. Accordingly, the Token Offering should not involve a contract between Celsius and the purchasers/holders with the purpose or pretended purpose of securing a profit or avoiding a loss by reference to such indices. No such indices will exist at the time of the Token Offering. In any event, any profit (or avoidance of loss) made by the purchasers/holders of Tokens will not be a matter for the token sale agreement (or any other agreement) between Celsius and the purchasers/holders of the Tokens. Whether or not a profit is in fact made by a purchaser/holder by reference to any indices will depend on a separate agreement for sale of the Tokens on the cryptocurrency exchange which Celsius will not by privy to. There will be no contract between Celsius and the purchaser/holder of the Tokens which allows the Token to be cash-settled by reference to the value of any of these indices.

We note for completeness that paragraphs 85(3) and 85(5) capture *"derivative instruments for the transfer of credit risk"* and derivative contracts *"of a binary or other fixed outcomes nature"* (which will include, amongst other things, binary options). The Tokens and the Token Offering do not involve such derivatives, and in any case these types of contract for difference are only caught by Article 85 if certain regulated entities are providing investment services and activities in relation to them. Accordingly, these paragraphs are not relevant to the Tokens or the Token Offering.

Please note that there is a risk that the statements made in the Whitepaper referring to speculation and the potential profit-motives of token holders could indicate that the intended purpose of the Token Offering is to create an environment in which certain purchasers can make a speculative profit on their purchases of Tokens (please refer to Section 5 for more information). While we understand that this is not the intention of Celsius or the Platform, we would recommend that any such statements are removed from the Whitepaper and any other marketing documentation relating to the Token Offering or the Platform.

**6.17    Lloyd's syndicate capacity and syndicate membership (Article 86)**

LATHAM&WATKINS

These specified investments relate to membership of syndicates carrying out or effecting contracts of insurance written at Lloyd's of London. As such, this category of specified investment is not relevant to the Tokens or the Token Offering.

6.18    **Funeral plan contracts (Article 87)**

These specified investments relate to contracts under which the provider undertakes to provide, or secure that another person provides, a funeral in the UK. As such, this category of specified investment is not relevant to the Tokens or the Token Offering.

6.19    **Regulated mortgage contracts (Article 88)**

Regulated mortgage contracts are defined by reference to the regulated activity of entering and administering regulated mortgage contracts (specified in Article 61). Regulated mortgage contracts involve the provision of credit secured by a mortgage on land in the EEA - as neither the Token Offering nor the Tokens involve such an arrangement they do not involve regulated mortgage contracts.

6.20    **Regulated home reversion plans, regulated home purchase plans and regulated sale and rend back agreements (Articles 88A-88C)**

These specified investments are defined in relation to particular activities set out in Articles 63B, 63F and 63J all concerning arrangements relating to particular interests in land in the UK. As neither the Token Offering nor the Tokens involve such arrangements, they will not constitute these types of specified investment.

6.21    **Credit agreements, consumer hire agreements and Article 36H agreements[12] (Articles 88D, 88E and 36H)**

These specified investments involve certain agreements for the provision of credit which are covered by the UK consumer credit regime. As such, this category of specified investment is not relevant to the Tokens or the Token Offering.

However, please note that this category of specified investment may be relevant to the Platform once operational.

6.22    **Rights to or interests in investments (a) or (b) (Article 89)**

These specified investments involve rights to or interests in investments specified elsewhere in Part III (*Specified investments*) of the RAO. Given that the Tokens and the Token Offering do not fall under any of the other categories of specified investment listed in this part, and do not involve rights to or interests in any other investments, they will not fall under this category of specified investment.

7.    **SPECIFIED ACTIVITIES**

This section sets out our analysis in support of our conclusion that the issuance of the Tokens by Celsius pursuant to the Token Offering does not involve Celsius performing any of the kinds of activity which are specified in the RAO without reference to specified investments. Given that the Tokens and the Token Offerings do not constitute specified investments, it is not necessary to consider whether the issuance of the Tokens involves the performance by Celsius

---

[12] Technically Article 36H agreements are not included in the list of specified investments set out in Part III (*Specified investments*) to the RAO, however count as specified investments in relation to particular kinds of activity specified in the RAO under Article 36H(10) (and are also used to characterise certain other categories of specified activity)

LATHAM&WATKINS

of any of the other kinds of activities which are specified in the RAO by reference to particular kinds of specified investment.

### 7.1 Collective investment activities

Chapter X of Part II (*Specified activities*) to the RAO specifies various kinds of activity involving units in collective investments, in particular the activities of (i) managing a UCITS, (i) acting as trustee or depositary of a UCITS, (iii) managing an AIF, (iv) acting as trustee or depositary of an AIF, and (v) establishing etc a collective investment scheme (specified under Articles 51ZA-51ZE). These activities are not specified by reference to particular kinds of specified investment, but are characterised by reference to certain kinds of collective investment scheme (i.e. UCITS and authorised unit trust schemes) or alternative investment funds.

As set out in section 6.10, neither the Tokens nor the Token Offering constitute collective investment schemes. In addition, in our view neither the Tokens nor the Token Offering involve alternative investment funds. Although this term is not defined in the RAO it may be interpreted in line with the definition set out in the AIFMD,[13] and which captures collective investment undertakings which raise capital from a number of purchasers, with a view to investing it in accordance with a defined investment policy for the benefit of those purchasers, and which do not require authorisation under the UCITS Directive[14]. Although capital raised by Celsius from purchasers pursuant to the Token Offering may be used to fund the development of the Platform, such capital is used pursuant to Celsius's objective to create and establish the Platform and is not invested for the benefit of the purchasers. The issuance of the Tokens pursuant to the Token Offering will not therefore involve either collective investment schemes or alternative investment funds, and will not fall under any of the categories of activity specified in Chapter X of Part II (*Specified activities*) to the RAO.

### 7.2 Establishing etc a pension scheme (Article 52)

Although pension schemes are specified investments under Article 82 of the RAO, the activities relating to establishing, operating or winding up such schemes specified under this Article are technically specified without reference to specified investments and so count as regulated activities irrespective of the property in relation to which they are carried on. Notwithstanding this technical point, these activities are defined by reference to the kinds of pension funds which are caught by Article 82 of the RAO, and so the issuance of the Tokens pursuant to the Token Offering will not therefore involve these kinds of specified activity.

### 7.3 Providing basic advice on stakeholder products (Article 52)

Stakeholder products are not included in the list of specified investments set out in Part III (*Specified investments*) of the RAO, however the specified activity of providing basic advice on stakeholder products is characterised by reference to stakeholder product.[15] It is therefore necessary to consider whether the Tokens or the Token Offering involve such products.

---

[13] Directive 2011/61/EU of the European Parliament and of the Council of 8 June 2011 on Alternative Investment Fund Managers and amending Directives 2003/41/EC and 2009/65/EC and Regulations (EC) No 1060/2009 and (EU) No 1095/2010.

[14] Directive 2014/91/EU of the European Parliament and of the Council of 23 July 2014 amending Directive 2009/65/EC on the coordination of laws, regulations and administrative provisions relating to undertakings for collective investment in transferable securities (UCITS) as regards depositary functions, remuneration policies and sanctions.

[15] Notwithstanding the fact that stakeholder products are not specified investments, formally the specified activities which are characterised in relation to stakeholder products are specified under Article 4(1), which does require that they are carried on in relation to specified investments in order to constitute regulated activities. This technical point does not affect the analysis set out in this Memorandum.

LATHAM&WATKINS

The term "*stakeholder product*" is defined in paragraph 52B(3) of the RAO to capture certain child trust fund accounts, stakeholder pension schemes, and certain other kinds of product specified in the Financial Services and Markets 2000 (Stakeholder Products) Regulations 2004. The Tokens and the Token Offering do not involve any such products, and therefore are not caught by this definition or the associated specified activity.

7.4    **Reclaim funds (Article 62N)**

The activities relating to dormant account funds specified by this Article are characterised by reference to reclaim funds, and it is therefore necessary to consider whether the Tokens or the Token Offering involve such funds.

The term "*reclaim fund*" is defined in s.5(1) of the Dormant Bank and Building Society Accounts Act 2008 to capture certain kinds of company which manage dormant account funds. The Tokens and the Token Offering do not involve any such companies, and therefore are not caught by this definition or the associated specified activity.

7.5    **Specified benchmark activities (Article 63N)**

Specified benchmarks are not included in the list of specified investments set out in Part III (*Specified investments*) of the RAO, however the specified activities of providing information in relation to a specified benchmark and administering a specified benchmark are characterised by reference to specified benchmarks.[16] It is therefore necessary to consider whether the Tokens or the Token Offering involve such benchmarks.

The relevant benchmarks are specified in Schedule 5 (*Specified benchmarks*) to the RAO, and include various benchmarks including (amongst others) the London Interbank Offered Rate ("**LIBOR**"), ISDAFIX, and the WM/Reuters London 4 pm Closing Spot Rate. Neither the Tokens not the Token Offering involve such benchmarks, and therefore are not caught by this definition or the associated specified activity.

7.6    **Specified activities in relation to information (Part 3A)**

Articles 89A and 89B of the RAO specify certain kinds of activity relating to information held by credit agencies and the provision of credit references. The issuance of the Tokens pursuant to the Token Offering does not involve such information or references, and therefore is not caught by these categories of specified activity.

8.    **UK ANTI-MONEY LAUNDERING REGIME**

The UK anti-money laundering regime is set out in the Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017 (the "**MLRs 2017**"). The MLRs 2017 apply the following types of institution, entity or person:

(a)    credit institutions;

(b)    financial institutions;

(c)    auditors, insolvency practitioners, external accountants and tax advisers;

(d)    independent legal professionals;

---

[16] As for stakeholder products, the specified benchmark activities are not specified by reference to any specified investments, however are specified under Article 4(1), which does require that they are carried on in relation to specified investments in order to constitute regulated activities. This technical point does not affect the analysis set out in this Memorandum.

LATHAM&WATKINS

(e)     trust or company service providers;

(f)     estate agents;

(g)     casinos; and

(h)     high value dealers[17].

At the time of completion of the Token Offering, Celsius will not fall within any of the types of institution, entity or person listed in paragraphs (a)-(g) above.

"*High value dealers*" are defined in Article 14(1)(a) of the MLRs 2017 to mean a firm or sole trader who by way of business trades in goods (including an auctioneer dealing in goods), when the trader makes or receives, in respect of any transaction, a payment or payments in cash of at least 10,000 euros in total, whether the transaction is executed in a single operation or in several operations which appear to be linked.

There is no definition of "*goods*" in the MLRs 2017 and, therefore, it is not clear whether the Tokens would fall within the definition of goods for the purposes of the MLRs 2017. In relation to MiFID II, the FCA has clarified that in PERG 13.4 Q33 (of the FCA Handbook) "*currencies or rights in real estate, or that are entirely intangible*" are not "*goods*", and therefore will not constitute commodities. However, it is not clear that the same interpretation would be adopted in relation to the MLRs 2017 and there is no guidance on this point.

In addition, "*cash*" is not defined. It is arguable that the reference to cash relates to banknotes and coins. However, the term cash is often given a broader definition by UK regulation to distinguish cash transactions (including commercial bank money and e-money) from credit transactions or physically settled derivatives. Guidance is provided by the UK government on its webpage for "*Money laundering supervision for high value dealers*", which states that dealers who are only ever paid large amounts by credit card, debit card or cheque do not need to register as high-value dealers[18]. This suggests that the narrower definition of cash (as banknotes and coins) should be adopted. However, it is not clear how definitive these guidelines are and whether a court would take the same view.

In any event the EU's fifth Money Laundering Directive ("**MLD5**") is currently being agreed by the European legislators. While it is not yet clear when MLD5 will come into force, it is very likely that cryptocurrency exchanges and cryptocurrency custody wallet providers will be brought within the scope of the EU's money laundering regime.

Accordingly, we would recommend that Celsius does perform AML/KYC on the purchasers of Tokens despite the arguments in favour of the UK anti-money laundering regime not applying to the Token Offering. In practice, it may be beneficial for Celsius to perform AML/KYC on the purchasers of Tokens given that its regulated service providers (such as banks) will need Celsius to explain its source of funding during the onboarding process. This will be difficult to achieve if Celsius does not perform AML/KYC on the purchasers of Tokens.

9.     **CONCLUSION**

For the reasons set out in sections 4 to 7 of this Memorandum, in our view the Tokens and the Token Offering do not:

---

[17] Article 8, MLRs 2017.

[18] https://www.gov.uk/guidance/money-laundering-regulations-high-value-dealer-registration

LATHAM&WATKINS

(a)    involve specified investments and do not otherwise constitute specified activities. Accordingly, in our view Celsius will not trigger authorisation and other consequential regulatory requirements by virtue of the Token Offering;

(b)    fall within the scope of the UK prospectus regime;

(c)    fall within the UK rules on financial promotions.

In addition, it is arguable that Celsius will not be one of the types of entity caught by the UK anti-money laundering regime in relation to the Token Offering. However, there is some uncertainty for the reasons stated in section 8 above. Accordingly, we would recommend that Celsius does perform AML/KYC on the purchasers of Tokens despite the arguments in favour of the UK anti-money laundering regime not applying to the Token Offering. In practice, it may be beneficial for Celsius to perform AML/KYC on the purchasers of Tokens given that its regulated service providers (such as banks) will need Celsius to explain its source of funding during the onboarding process. This will be difficult to achieve if Celsius does not perform AML/KYC on the purchasers.

**Please note**: we have made a number of limited suggestions relating to potential amendments to the content of the Whitepaper, on the basis that at present the Whitepaper could be viewed as encouraging purchasers to participate in the Token Offering on a speculative basis contrary to regulated expectations. See section 5 above for further detail.

# SCHEDULE 1

## SPECIFIED INVESTMENT AND ACTIVITIES

Case 1:23-cr-00347-JGK   Document 189-6   Filed 05/26/26   Page 22 of 64

| | | Deposits (Art 74) | Electronic money (Art 74A) | Contracts of insurance (Art 75) | Shares etc. (Art 76) | Instruments creating or acknowledging indebtedness (Art 77) | Alternative finance investment bonds (Art 77A) | Government and public securities (Art 78) | Instruments giving entitlements to investments (Art 79) | Certificates representing certain securities (Art 80) | Units in a collective investment scheme (Art 81) | Rights under a pension scheme (82) | Greenhouse gas emissions allowances (Art 82B) | Emission allowances (Art 82A) | Options (Art 83) | Futures (Art 84) | Contracts for differences etc (Art 85) | Lloyd's syndicate capacity and syndicate membership (Art 86) | Funeral plan contracts (Art 87) | Regulated mortgage contracts (Art 88A) | Regulated home reversion plans (Art 88B) | Regulated home purchase plans (Art 88C) | Regulated sale and rent back agreements (Art 88D) | Credit agreement (Art 88E) | Consumer Hire agreement (Art 88F) | Rights to or interests in investments (Art 89) | Article 3(64) agreements (Art 82(110)) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | Accepting deposits | ✓ | | | | | | | | | | | | | | | | | | | | | | | | | |
| 9B | Issuing electronic money | | ✓ | | | | | | | | | | | | | | | | | | | | | | | | |
| 10 | Effecting and carrying out contracts of insurance | | | ✓ | | | | | | | | | | | | | | | | | | | | | | | |
| 13A | Transformer vehicles: insurance risk transformation | | | ✓ | | | | | | | | | | | | | | | | | | | | | | | |
| 14 | Dealing in investments as principal | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | | | | | | | | | ✓ | |
| 21 | Dealing in investments as agent | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | | | | | | | | | ✓ | |
| 24A | Bidding in emissions auctions | | | | | | | | | | | | ✓ | | | | | | | | | | | | | | |
| 25 | Arranging deals in investments | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | | | ✓ | |
| 25A | Arranging regulated mortgage contracts | | | | | | | | | | | | | | | | | | | ✓ | | | | | | | |
| 25B | Arranging regulated home reversion plans | | | | | | | | | | | | | | | | | | | | ✓ | | | | | | |
| 25C | Arranging regulated home purchase plans | | | | | | | | | | | | | | | | | | | | | ✓ | | | | | |
| 25D | Operating a multilateral trading facility | | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | | | | | | | | | ✓ | |
| 25DA | Operating an organised trading facility | | | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | | | | | | | | | | |
| 25E | Arranging regulated sale and rent back agreements | | | | | | | | | | | | | | | | | | | | | | ✓ | | | | |
| 36A | Credit broking | | | | | | | | | | | | | | | | | | | | | | | ✓ | ✓ | | |
| 36H | Operating an electronic system in relation to lending | | | | | | | | | | | | | | | | | | | | | | | | | | ✓ |
| 37 | Managing investments | ✓ | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | | | ✓ | |
| 39A | Assisting in the administration and performance of a contract of insurance | | | ✓ | | | | | | | | | | | | | | | | | | | | | | | |
| 39D | Debt adjusting | | | | | | | | | | | | | | | | | | | | | | | ✓ | ✓ | | |
| 39E | Debt-counselling | | | | | | | | | | | | | | | | | | | | | | | ✓ | ✓ | | |
| 39F | Debt-collecting | | | | | | | | | | | | | | | | | | | | | | | ✓ | ✓ | | |
| 39G | Debt administration | | | | | | | | | | | | | | | | | | | | | | | ✓ | ✓ | | |
| 40 | Safeguarding and administering investments | | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | | | ✓ | |
| 45 | Sending dematerialised instructions | | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | | | | | | | | | ✓ | |
| 51ZA | Managing a UCITS | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 51ZB | Acting as trustee or depositary of a UCITS | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 51ZC | Managing an AIF | | | | Not applicable - these activities are specified for the purposes of FSMA s.22(1)(b), and so are not specified by reference to specified investments. | | | | | | | | | | | | | | | | | | | | | | |
| 51ZD | Acting as trustee or depositary of an AIF | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 51ZE | Establishing etc a collective investment scheme | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 52 | Establishing etc a pension scheme[3] | | | | Not applicable - this activity is specified for the purposes of FSMA s.22(1)(b), and so is not specified by reference to specified investments. | | | | | | | | | | | | | | | | | | | | | | |
| 52B | Providing basic advice on stakeholder products[4] | | | | Not characterised in relation to any product - however formally this activity is specified for the purposes of FSMA s.22(1) as one which constitutes a regulated activity only when carried on in relation to specified investment. | | | | | | | | | | | | | | | | | | | | | | |
| 53 | Advising on investments | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | | | ✓ | ✓ |
| 53A | Advising on regulated mortgage contracts | | | | | | | | | | | | | | | | | | | ✓ | | | | | | | |
| 53B | Advising on regulated home reversion plans | | | | | | | | | | | | | | | | | | | | ✓ | | | | | | |
| 53C | Advising on regulated home purchase plans | | | | | | | | | | | | | | | | | | | | | ✓ | | | | | |
| 53D | Advising on regulated sale and rent back agreements | | | | | | | | | | | | | | | | | | | | | | ✓ | | | | |
| 53DA | Advising on regulated credit agreements for the acquisition of land | | | | | | | | | | | | | | | | | | | | | | | ✓ | | | |
| 53E | Advising on conversion or transfer of pension benefits | | | | | | | | | | ✓ | | | | | | | | | | | | | | | | |
| 56 | Advice on syndicate participation at Lloyd's | | | | | | | | | | | | | | | | | ✓ | | | | | | | | | |
| 59 | Funeral plan contracts | | | | | | | | | | | | | | | | | | ✓ | | | | | | | | |
| 60B | Regulated credit agreements | | | | | | | | | | | | | | | | | | | | | | | ✓ | | | |
| 60N | Regulated consumer hire agreements | | | | | | | | | | | | | | | | | | | | | | | | ✓ | | |
| 61 | Regulated mortgage contracts | | | | | | | | | | | | | | | | | | | ✓ | | | | | | | |
| 63B | Entering into and administering regulated home reversion plans | | | | | | | | | | | | | | | | | | | | ✓ | | | | | | |
| 63F | Entering into and administering regulated home purchase plans | | | | | | | | | | | | | | | | | | | | | ✓ | | | | | |
| 63J | Entering into and administering regulated sale and rent back agreements | | | | | | | | | | | | | | | | | | | | | | ✓ | | | | |

EXHIBIT AI

Exhibit (AI)

SEC & CFTC

"Tokens not Securities"

Case 1:23-cr-00347-JGK    Document 189-6    Filed 05/26/26    Page 25 of 64



**U.S. Securities and Exchange Commission**

## PRESS RELEASE

# SEC Clarifies the Application of Federal Securities Laws to Crypto Assets

**FOR IMMEDIATE RELEASE** | 2026-30

Washington D.C., March 17, 2026 — The Securities and Exchange Commission (SEC) today issued an interpretation clarifying how the federal securities laws apply to certain crypto assets and transactions involving crypto assets. This is a major step in the Commission's efforts to provide greater clarity regarding the Commission's treatment of crypto assets, and complements Congressional endeavors to codify a comprehensive market structure framework into statute. The Commodity Futures Trading Commission (CFTC) joined the interpretation to provide guidance that the CFTC and its staff will administer the Commodity Exchange Act consistent with the Commission's interpretation.

"After more than a decade of uncertainty, this interpretation will provide market participants with a clear understanding of how the Commission treats crypto assets under federal securities laws. This is what regulatory agencies are supposed to do: draw clear lines in clear terms," said SEC Chairman Paul S. Atkins. "It also acknowledges what the former administration refused to recognize – that most crypto assets are not themselves securities. And it reflects the reality that investment contracts can come to an end. This effort serves as an important bridge for entrepreneurs and investors as Congress works to advance bipartisan market structure legislation, which I look forward to implementing with Chairman Selig in the near future."

EXHIBIT AJ



U.S. Department of Justice

Office of the Deputy Attorney General

---

The Deputy Attorney General

*Washington, D.C. 20530*

April 7, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:                    THE DEPUTY ATTORNEY GENERAL

SUBJECT:                 Ending Regulation By Prosecution

The digital assets industry is critical to the Nation's economic development and innovation. Thus, as noted in Executive Order 14178, clarity and certainty regarding enforcement policy "are essential to supporting a vibrant and inclusive digital economy and innovation in digital assets." President Trump has also made clear that "[w]e are going to end the regulatory weaponization against digital assets."

The Department of Justice is not a digital assets regulator.  However, the prior Administration used the Justice Department to pursue a reckless strategy of regulation by prosecution, which was ill conceived and poorly executed.  The Justice Department will no longer pursue litigation or enforcement actions that have the effect of superimposing regulatory frameworks on digital assets while President Trump's actual regulators do this work outside the punitive criminal justice framework.  Rather, consistent with President Trump's directives and the Justice Department's priorities, the Department's investigations and prosecutions involving digital assets shall focus on prosecuting individuals who victimize digital asset investors, or those who use digital assets in furtherance of criminal offenses such as terrorism, narcotics and human trafficking, organized crime, hacking, and cartel and gang financing.[1]

### I.    Digital Assets Enforcement Priorities

Executive Order 14178 tasks the Justice Department and others with "protecting and promoting" (1) "the ability of individual citizens and private-sector entities alike to access and use for lawful purposes open public blockchain networks without persecution"; and (2) "fair and open access to banking services for all law-abiding individual citizens and private-sector entities alike." In response to those taskings, the Justice Department will stop participating in regulation by prosecution in this space.  Specifically, the Department will no longer target virtual currency exchanges, mixing and tumbling services, and offline wallets for the acts of their end users or unwitting violations of regulations—except to the extent the investigation is consistent with the priorities articulated in the following paragraphs.

---

[1] This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

The policy outlined in Executive Order 14178 requires the Justice Department to prioritize investigations and prosecutions that involve conduct victimizing investors, including embezzlement and misappropriation of customers' funds on exchanges, digital asset investment scams, fake digital asset development projects such as rug pulls, hacking of exchanges and decentralized autonomous organizations resulting in the theft of funds, and exploiting vulnerabilities in smart contracts. Such enforcement actions are important to restoring stolen funds to customers, building investor confidence in the security of digital asset markets, and the growth of the digital asset industry.

Pursuant to the "total elimination" policy set forth in Executive Order 14157, entitled *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, the Justice Department will also prioritize cases involving use of digital assets in furtherance of unlawful conduct by cartels, Transnational Criminal Organizations, Foreign Terrorist Organizations, and Specially Designated Global Terrorists. For example, cartels and human trafficking and smuggling rings have increasingly turned to digital assets to fund their operations and launder the proceeds of their illicit businesses. The same is true of fentanyl production: increasingly dangerous precursors purchased from China and used in the production of fentanyl in Central and South America are often paid for using digital assets. Terrorist groups, such as Hamas and ISIS, and nation states subject to US sanctions, like North Korea, also continue to transact using digital assets in an attempt to conceal their financing from law enforcement. As part of the Justice Department's ongoing work against fentanyl trafficking, terrorism, cartels, and human trafficking and smuggling, the Department will pursue the illicit financing of these enterprises by the individuals and enterprises themselves, including when it involves digital assets, but will not pursue actions against the platforms that these enterprises utilize to conduct their illegal activities.

Ongoing investigations that are inconsistent with the foregoing should be closed. The Office of the Deputy Attorney General will work with the Criminal Division and EOUSA to review ongoing cases for consistency with this policy. All previously issued policies and directives that are inconsistent with any of the foregoing are rescinded, effective today.

## II.    Digital Assets Charging Considerations

Based on the foregoing priorities—while charging decisions must be based upon the facts and evidence of each particular case—federal prosecutors are directed to consider the following factors when deciding whether to pursue criminal charges involving digital assets:

Prosecutors shall prioritize cases that hold accountable individuals who (a) cause financial harm to digital asset investors and consumers; and/or (b) use digital assets in furtherance of other criminal conduct, such as fentanyl trafficking, terrorism, cartels, organized crime, and human trafficking and smuggling. Seeking accountability from individuals who perpetrate these types of wrongdoing deters future illegal activity, compensates victims, and promotes the public's confidence in the digital asset markets and broader industry. On the other hand, criminal matters premised on regulatory violations resulting from diffuse decisions made at lower levels of digital asset companies often fail to advance the priorities of the Department.

Prosecutors should not charge regulatory violations in cases involving digital assets—including but not limited to unlicensed money transmitting under 18 U.S.C. § 1960(b)(1)(A) and (B), violations of the Bank Secrecy Act, unregistered securities offering violations, unregistered

broker-dealer violations, and other violations of registration requirements under the Commodity Exchange Act—unless there is evidence that the defendant knew of the licensing or registration requirement at issue and violated such a requirement willfully. This priority is not required by law, but is being imposed as a matter of discretion, in recognition of the Justice Department's priorities and the fact that the Biden Administration created a particularly uncertain regulatory environment around digital assets.[2]

Prosecutors should not charge violations of the Securities Act of 1933, the Securities Exchange Act of 1934, the Commodity Exchange Act, or the regulations promulgated pursuant to these Acts, in cases where (a) the charge would require the Justice Department to litigate whether a digital asset is a "security" or "commodity," and (b) there is an adequate alternative criminal charge available, such as mail or wire fraud. The following types of positions are permissible under this policy in connection with proposed prosecutions that would otherwise be consistent with the guidance in this memorandum: (i) taking the position that bitcoin or ether is a "commodity" under the Commodity Exchange Act; and (ii) filing securities fraud charges where the "security" at issue is the equity or stock in a digital asset company. Any exceptions to this policy must be approved by the Deputy Attorney General, or his designee(s). Relevant considerations for such an exception include whether the digital asset is widely accepted to be a "security" or "commodity," whether the parties to the litigation have an interest in defending the position that a digital asset is a "security" or "commodity," and whether there is no alternative criminal charge under Title 18.

### III.    Compensating Victims In The Digital Assets Space

Following the prolonged period of price decline in the digital asset market in 2022, multiple companies with custody of investors' digital assets collapsed and entered bankruptcy, including FTX, Voyager Digital, Celsius Network, Genesis Global, BlockFi, and Gemini Trust. In some instances, investor losses have been directly attributable to fraud and theft. In those cases, and others, prosecutors have been able to forfeit proceeds of criminal activity including digital assets that in some instances became worth billions of dollars. However, as a result of regulations, some digital asset investor victims have only been able to recover the value of their digital assets at the time the fraud was perpetrated. *See* 28 C.F.R. § 9.8(c). The effect: digital asset investors' losses may be calculated at a value when the digital asset market was at a lower point, and victims who bore the risk of loss are unable to benefit from corresponding gains that occurred during or after the period in which they were victimized and would otherwise have possessed the asset. Accordingly, the Office of Legal Policy and the Office of Legislative Affairs are directed to evaluate and propose legislative and regulatory changes to address this concern and improve asset-forfeiture efforts in the digital assets space.

---

[2] This guidance does not reflect a view by the Department that the criminal offense set forth in 18 U.S.C. § 1960 requires proof of willfulness in other contexts, and it casts no doubt on existing case law. Moreover, 18 U.S.C. § 1960(b)(1)(C) requires that the transmission of funds "are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity," and is therefore outside the scope of this policy.



### IV.    Shifting Resources Relating To Digital Assets

U.S. Attorneys' Offices will use long-recognized criminal justice tools to lead appropriate prosecutions consistent with the foregoing enforcement priorities and charging consideration. Consistent with the narrowing of the enforcement policy relating to digital assets, the Market Integrity and Major Frauds Unit shall cease cryptocurrency enforcement in order to focus on other priorities, such as immigration and procurement frauds.    The National Cryptocurrency Enforcement Team (NCET) shall be disbanded effective immediately.    The Criminal Division's Computer Crime and Intellectual Property Section (CCIPS) will continue to provide guidance and training to Department personnel and serve as liaisons to the digital asset industry.

### V.    The President's Working Group on Digital Asset Markets

The Justice Department will fully participate in President Trump's Working Group on Digital Asset Markets, which was established in Executive Order 14178, via attorneys designated by the Justice Department's senior leadership.  As directed by President Trump, the Department's designees will identify and make recommendations regarding regulations, guidance documents, orders, or other items that affect the digital asset sector.  Additionally, the Department will participate in the preparation of a report to President Trump recommending regulatory and legislative proposals that advance the policies and priorities set forth in the President's Executive Order. Following the submission of the report, the Justice Department will take all steps necessary to implement the recommendations in the report that President Trump adopts.

FILED: NEW YORK COUNTY CLERK 11/22/2025 11:47 AM    INDEX NO. 450040/2023
NYSCEF DOC. NO. 73    RECEIVED NYSCEF: 11/22/2025

P58KMASS

*Young*

It was not a shell.  It was not a sham.  And Alex did not clutch onto control or surround himself with dupes or lackies or pawns.  For years, he surrounded himself with outside lawyers from the most prestigious of firms — Davis Polk, Morrison Foerster, Latham & Watkins, Akin Gump, and I could go on.

*Celsius Lawyers*

And Alex also culled comments from the executive team --

*Advice of Council*

THE COURT:  There is no allegation of an advice-of-counsel defense to any of the charges, right?

MS. YOUNG:  Correct, your Honor.

THE COURT:  Okay.  Go ahead.

MS. YOUNG:  Alex also culled an executive team with the most stellar of backgrounds — a chief investment officer from TIAA-CREF, a chief operating officer from Citigroup, head of corporate from Bank of America, chief risk officer from Morgan Stanley, and a chief financial officer from RBC.  And these were not trophy advisory board members, like in other startup fraud cases, such as their names or big names are used to give the veneer of substance to the company.  These were the day-to-day executives working at Celsius with Alex.

So, when my colleague, Mr. Westfal, discusses Alex's conduct in a few minutes, please keep in mind the caliber of people who came and stayed at Celsius.  You might have seen them seated next to him on a marketing video, or supplied him

**b9c42fef-54ce-4042-a655-1877d4b7466c - 972504446020@s.whatsapp.net**

**Chat Filters**        **Events**        **History**        **Disclaimers**

| Participant | Entity | Login | Email | | |
|---|---|---|---|---|---|
| 16465524499@s.whatsapp.net Alex Mashinsky | S.whatsapp 16465524499@s.whatsapp.net | 16465524499@s.whatsapp.net | 16465524499@s.whatsapp.net | 13 | 1 |
| System Message System Message | System Message | | | 0 | 0 |
| 972504446020@s.whatsapp.net Roni Cohen pavon Celsius | S.whatsapp 972504446020@s.whatsapp.net | 972504446020@s.whatsapp.net | 972504446020@s.whatsapp.net | 25 | 0 |

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 12:32:40.000 AM

Prospect Sites we can start with: https://cryptopotato.com/ (around 2,500,000 monthly, definitely in the top 7-8 news outlets). This is a highly profitable website. https://coinstats.app/ (around 4,000,000 monthly). https://cryptoslate.com/ (around 1,600,000 monthly, definitely in the top 10 news outlets). This is a profitable website. https://cryptobriefing.com/ (almost 1,500,000 monthly, definitely in the top 10 news outlets). This is a profitable website. https://www.financemagnates.com/ (around 500,000 monthly). https://blockonomi.com/ (around 300,000 monthly). This can be a profitable website (already is) https://usethebitcoin.com/ (around 150,000 monthly). This can be a profitable website (already is)

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 12:32:51.000 AM

That's the list they've prepared

16465524499@s.whatsapp.net Alex Mashinsky

2022-01-06 12:34:52.000 AM

Kk

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 12:35:26.000 AM

They said FTX are also chasing some of them, but they're pretty sure we can get them if we want

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 01:44:02.000 AM

i did $130M last night but we can do a lot more

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 01:44:03.000 AM

i can do a few hundred more tonight

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 01:44:03.000 AM

that's the goal

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 01:44:03.000 AM

not a satoshi less

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 01:44:03.000 AM

*[handwritten annotation:]* Alex relies on Pavon Legal opinions for PR & CEL transactions

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS                    CELSIUSNETWORK_00417698
SDNY_R01_00485590

i still think we can get to 1B this week

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 01:44:08.000 AM

Gerrit got the message

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 02:18:42.000 AM

Someone is selling millions of dollars of CEL in the market. I'm handling this.

16465524499@s.whatsapp.net Alex Mashinsky

2022-01-06 02:54:43.000 AM

I will buy CEL now and tweet.

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 02:55:35.000 AM

It's one person

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 02:55:47.000 AM

I think he ran out of ammunition

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 02:55:53.000 AM

I'm running some tests now

16465524499@s.whatsapp.net Alex Mashinsky

2022-01-06 02:56:03.000 AM

We can not track the wallet

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 02:56:51.000 AM

It's on FTX

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 02:56:58.000 AM

I'm focusing on recovering now

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 02:57:04.000 AM

Will teach withdrawals later

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 03:01:19.000 AM

Check, not teach

16465524499@s.whatsapp.net Alex Mashinsky

2022-01-06 03:01:36.000 AM

Is it the perpetuals on FTX. Maybe someone is shorting CEL

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 03:02:12.000 AM

We are checking this as well, but at these numbers, it doesn't make sense

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS

CELSIUSNETWORK_00417699
SDNY_R01_00485591

16465524499@s.whatsapp.net Alex Mashinsky

2022-01-06 03:03:07.000 AM

Let's buy and issue buyback PR.

16465524499@s.whatsapp.net Alex Mashinsky

2022-01-06 03:11:24.000 AM

Must be someone who had margin calls in other coins and decided to dump CEL for liquidity.

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 03:12:36.000 AM

It's possible. I'm waiting for him to stop selling. Don't want to take the price us just for him to dump again

16465524499@s.whatsapp.net Alex Mashinsky

2022-01-06 12:37:46.000 PM

Any updates on who is the seller ?

16465524499@s.whatsapp.net Alex Mashinsky

2022-01-06 12:38:35.000 PM

Mining should accumulate BTC at these prices instead of selling.

16465524499@s.whatsapp.net Alex Mashinsky

2022-01-06 12:46:25.000 PM

Rod the CFO candidate wants to talk to Deloitte. Do you see a problem with that or should we wait until he is hired.

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 01:27:50.000 PM

They don't know yet. Waiting for the US guys to wake up and also asked Shiraz to check

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 01:28:13.000 PM

Don't see an issue. I'm speaking with him again today. You want me to raise this?

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 01:40:27.000 PM

I didn't see significant CEL movements but read about liquidations on FTX. Looks like few people got automatically liquidated. A friend of mine as well, not big but big enough .. they liquidated him at $3 … 🪦 bad luck ..

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 01:40:41.000 PM

This is what Johannes is saying

16465524499@s.whatsapp.net Alex Mashinsky

2022-01-06 01:42:59.000 PM

Sure. Mention some names. See if he knows them

16465524499@s.whatsapp.net Alex Mashinsky

2022-01-06 01:43:42.000 PM

Should we buy back more before the US accredited launch ?

972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 01:45:08.000 PM

We started recently

16465524499@s.whatsapp.net Alex Mashinsky

2022-01-06 09:29:41.000 PM

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS

CELSIUSNETWORK_00417700
SDNY_R01_00485592
SDNY_R01_00489562

Can we offer them a JV so every shareholder gets a Celsius wallet.
https://twitter.com/blockworks_/status/1478732789834997762?s=12 "JUST IN: BTCS, a Nasdaq-listed company, will pay dividends in #Bitcoin"



972504446020@s.whatsapp.net Roni Cohen pavon Celsius

2022-01-06 10:01:51.000 PM

Yes

16465524499@s.whatsapp.net Alex Mashinsky

2022-01-06 10:02:07.000 PM

Give it to Leah

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS

CELSIUSNETWORK_00417701
SDNY_R01_00485593

EXHIBIT AK

9e570659-e3b5-445a-8c15-9e58c9e2c7ae

**Chat Filters**          **Events**          **History**          **Disclaimers**

| Participant | Entity | Login | Email | |
|---|---|---|---|---|
| +16476253763 Rod Bolger | | +16476253763 | | 3 2 |
| alex@mashinsky.com Alex Mashinsky | Mashinsky | alex@mashinsky.com | alex@mashinsky.com | 0 0 |
| +16465524499 Tmobile | | +16465524499 | | 2 0 |

+16476253763 Rod Bolger

2022-03-17 10:35:34.000 PM

Tesla Halts Bond Sale Backed by Auto Leases Amid Market Turmoil

+16476253763 Rod Bolger

2022-03-17 10:35:47.000 PM

https://www.bloomberg.com/news/articles/2022-03-16/tesla-halts-bond-sale-backed-by-auto-leases-amid-market-turmoil
~/Library/SMS/Attachments/d0/00/137FF931-70A7-4B2D-8D94-563324274C09/D9757B75-1AD3-4030-A8AC-
D7231AB7FA59.pluginPayloadAttachment
    Libr_1(2)
D9757B75-1AD3-4030-A8AC-D7231AB7FA59.pluginPayloadAttachment

+16476253763 Rod Bolger

2022-03-17 10:36:45.000 PM

Tough markets Even Elon is having trouble raising funding.

+16465524499 Tmobile

2022-03-17 10:37:34.000 PM

It is going to get much worse. Let's Derisk as fast as we can. Any crypto we own that we can sell to go into cash we should
start doing now.

+16465524499 Tmobile

2022-03-17 10:38:25.000 PM

Use this bear trap to unload 1Inch, Matic, QRDO and other assets by borrowing coins and hedging our locked tokens.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
SUBJECT TO JANUARY 13, 2023 STIPULATION

CELSIUSNETWORK_00614306

SDNY_R01_00682124

# EXHIBIT AL

01/19/2022, 21:10 - ronsabo: That's great
01/19/2022, 21:10 - ronsabo: sending an invite
19/01/2022, 23:24 - Roni Pavon Cohen: Did you speak with Vlad about the coins ?
19/01/2022, 23:25 - Roni Pavon Cohen: And is it possible to postpone for fifteen minutes ?
19/01/2022, 23:30 - ronsabo: Yes
19/01/2022, 23:30 - ronsabo: But I have to finish at 18:30
19/01/2022, 23:30 - ronsabo: No
19/01/2022, 23:34 - Roni Pavon Cohen: Me too
19/01/2022, 23:44 - ronsabo: Vlad says they will start working on Solana and Songbird tomorrow with the aim of finishing by the first of February
01/20/2022, 00:10 - Roni Pavon Cohen : How is this legal https://twitter.com/thefinancer/status/1483349807846596609?s=24
01/20/2022, 03:36 - ronsabo: ITB had an incident / were attacked / something else dirty . they lost 90 BTC for us. They intend to pay us back from the commissions they deserve. About two months of fees .
01/20/2022, 03:37 - Roni Pavon Cohen: Does Shiran know ?
20/01/2022, 03:37 - ronsabo: It happened on Thursday a week ago and they waited until now to share it with us. In my opinion it's worse than the issue itself
01/20/2022, 03:37 - ronsabo: Not yet. Now I got off the conversation with them
20/01/2022, 04:34 - ronsabo: https://www.theblockcrypto.com/post/130857/crypto-com-ceo-confirms-400-accounts-were-compromised-in-recent-hack
01/20/2022, 04:35 - ronsabo: 33 million dollars
01/21/2022, 19:10 - Roni Pavon Cohen: Can you make sure that money is transferred to the FTX account?
21/01/2022, 19:39 - ronsabo: Yes. 2.5 million on the way
01/21/2022, 19:39 - ronsabo: Total rewards this week - 11.6 million
01/21/2022, 19:39 - ronsabo: significant decrease
21/01/2022, 19:42 - Rony Pavon Cohen: It's still less than Johannes lost
01/21/2022, 19:42 - Roni Pavon Cohen: How much CEL?
21/01/2022, 19:43 - ronsabo: 2.15
01/21/2022, 19:43 - Roni Pavon Cohen: In coins ?
01/21/2022, 19:43 - Roni Pavon Cohen: Was there an increase after we opened the US ?
01/21/2022, 19:43 - ronsabo: not in dollars
01/21/2022, 19:43 - Roni Pavon Cohen: Of course not
01/21/2022, 19:43 - ronsabo: 700 thousand coins
01/21/2022, 19:43 - Roni Pavon Cohen: We went up by a hundred thousand CEL?
01/21/2022, 19:44 - ronsabo: last week was 682 thousand
01/21/2022, 19:44 - Roni Pavon Cohen: including the burn
01/21/2022, 19:45 - ronsabo: and the one before it was 636 thousand
01/21/2022, 19:45 - ronsabo: No
01/21/2022, 19:45 - ronsabo: I saw correspondence that cel is being included in the loyalty tiers
01/21/2022, 19:47 - Roni Pavon Cohen: So no one started earning in CEL?
01/21/2022, 19:48 - ronsabo: It is impossible to know without calculating the effect of the change in price

01/21/2022, 19:49 - ronsabo: it is better to ask the data team for the information about US accredited directly

01/21/2022, 19:49 - Roni Pavon Cohen: Nobody knows how to get this

21/01/2022, 19:50 - ronsabo: Really? Why is it so complicated ?

01/21/2022, 19:51 - Roni Pavon Cohen: Because they don't understand anything

01/21/2022, 19:51 - ronsabo: Gabe ?

01/21/2022, 22:27 - Roni Pavon Cohen: Are you free for a moment ?

01/21/2022, 22:31 - ronsabo: Yes

01/21/2022, 23:21 - Roni Pavon Cohen : <Media omitted>

21/01/2022, 23:34 - ronsabo: https://meet.google.com/vjw-nknk-ctz?authuser=0

01/22/2022, 00:02 - Roni Pavon Cohen: I spoke with Alex, he said to lower the hedge by ten percent in the meantime

01/22/2022, 00:02 - Roni Pavon Cohen: Can you tell them ?

22/01/2022, 00:02 - Rony Pavon Cohen: He still hasn't caught Frank

01/22/2022, 00:03 - ronsabo: Yes

22/01/2022, 00:03 - Rony Pavon Cohen: Can you just talk to Paul to understand where the market is now in terms of GBTC and what are his plans? Alex and I went on another conversation

22/01/2022, 00:04 - ronsabo: it means we sell 955 BTC

01/22/2022, 00:04 - ronsabo: I will try

22/01/2022, 00:05 - Rony Pavon Cohen: Look, the more Bitcoin goes down, the more likely EFH will pay

22/01/2022, 00:05 - Rony Pavon Cohen: And if Bitcoin crashes, as Alex said, we crash twice

01/22/2022, 00:05 - Roni Pavon Cohen: He said 15, I told him to start with ten and we'll see

22/01/2022, 00:20 - ronsabo: I talked to him, he is looking at it

01/22/2022, 00:22 - ronsabo: Rodney asks why are we selling part of hedge

01/22/2022, 00:22 - Roni Pavon Cohen: Let me finish with Alex and we'll get to the conversation

01/22/2022, 00:22 - ronsabo: Both of us? Or with Rodney ?

01/22/2022, 00:22 - Roni Pavon Cohen: with Rodney

01/22/2022, 00:22 - Roni Pavon Cohen: And maybe with Ale too

01/22/2022, 00:22 - Roni Pavon Cohen: x

01/22/2022, 00:22 - Roni Pavon Cohen: Rodney thinks it shouldn't be closed ?

01/22/2022, 00:23 - ronsabo: He didn't say that. He just asked what the reason for the sale was

01/22/2022, 00:23 - Rony Pavon Cohen: Currently we are long on Bitcoin, they pay, the drop in price increases the chance that they will pay, to avoid a double loss, so we reduce the hedge

01/22/2022, 00:26 - Roni Pavon Cohen: Do you think this is a mistake ?

01/22/2022, 00:30 - ronsabo: No. But the decision-making process needs to be more organized

01/22/2022, 00:31 - Roni Pavon Cohen: So let's go up to talk with Rodney

01/22/2022, 00:31 - ronsabo: Say when

01/22/2022, 00:31 - Roni Pavon Cohen: You tell me and I'll come down here

01/22/2022, 00:35 - ronsabo: Rodney called for a meeting at 9:30 about this

01/22/2022, 00:36 - Roni Pavon Cohen: 9:30 in the evening ?

01/22/2022, 00:36 - ronsabo: Yes

01/22/2022, 00:36 - ronsabo: should I add you ?

01/22/2022, 00:36 - Roni Pavon Cohen: Yes

01/22/2022, 00:36 - Roni Pavon Cohen: Thank you

01/22/2022, 00:59 - Roni Pavon Cohen : We are massively long crypto, but the Freeze does not reflect our longs:
* EFH (we are economically short a massive put -- Al Christy owns that put)
* Mining (PV of forward production of BTC is not captured)
* OpEx and BorrEx (future expenses are not captured)

01/22/2022, 01:00 - Roni Pavon Cohen: It is yes in Freeze

22/01/2022, 01:01 - ronsabo: The first - yes, but not precisely. We bought the entire amount, but the fact that the chances of recovery depend on the bitcoin price was not reflected in Freezw

22/01/2022, 01:06 - ronsabo: Now Frank is jumping on the fact that the he was not involved in the process

01/22/2022, 01:06 - ronsabo: see email

01/22/2022, 01:09 - Roni Pavon Cohen: He is not wrong. Alex was supposed to talk to him. I understood that he couldn't reach him

22/01/2022, 01:11 - Roni Pavon Cohen: It could be that Alex is just saying and didn't even try to contact him

01/22/2022, 02:59 - ronsabo: not surprising

01/22/2022, 02:59 - ronsabo: Regarding ITB - did you see the email I sent to Legal ?

01/22/2022, 05:04 - Roni Pavon Cohen: I saw that you sent, I haven't read it yet

01/22/2022, 05:05 - ronsabo: a decision needs to be made on how to respond to this loss

01/22/2022, 05:06 - ronsabo: The conversation with Rodney ended 5 minutes ago. He is 'OK' with the decision to sell

01/22/2022, 05:07 - Roni Pavon Cohen: 90 minutes ?

01/22/2022, 05:07 - ronsabo: But if Alex wouldn't give instructions to sell it wouldn't have happened

01/22/2022, 05:07 - ronsabo: Yes

01/22/2022, 05:07 - Roni Pavon Cohen: you are kidding me

22/01/2022, 05:08 - ronsabo: the kind of conversations that Rodney likes, talking over and over about the same topic

22/01/2022, 05:08 - ronsabo: Frank was in the first 30 minutes and then went down

01/22/2022, 05:09 - ronsabo: Rodney said he and Frank had a conversation with Alex this afternoon, that he doesn't know what the agenda is but he is guessing it's EFH

01/22/2022, 05:09 - Roni Pavon Cohen: Who called that meeting?

01/22/2022, 05:09 - Roni Pavon Cohen: Alex ?

01/22/2022, 05:10 - ronsabo: From what I understand, yes

01/22/2022, 05:10 - Roni Pavon Cohen: I am very disturbed by their indifference

01/22/2022, 05:11 - Roni Pavon Cohen: Alex is also weak against them, it is not clear why

22/01/2022, 05:11 - ronsabo: Frank about Johannes' team - totally

01/22/2022, 05:11 - Roni Pavon Cohen: And it seems that if I won't start world wars like with Haromi, nothing will happen

01/22/2022, 05:11 - Roni Pavon Cohen : <Media omitted>

01/22/2022, 05:12 - ronsabo: And do you have the strength/time/patience for that ?

01/22/2022, 05:13 - ronsabo: that everyone is afraid of declines, now is the time to buy

AL

01/22/2022, 05:14 - Roni Pavon Cohen: No, I really want to move on to the interesting projects
01/22/2022, 05:15 - Roni Pavon Cohen: I didn't come here to manage the deployment and apparently I brought people who understand it much more than I do
01/22/2022, 05:15 - Roni Pavon Cohen: And the more you give them space, the more nonsense they do
01/22/2022, 05:16 - ronsabo: the direction in recent weeks is positive
01/22/2022, 05:17 - Roni Pavon Cohen: not in performance
01/22/2022, 05:17 - Roni Pavon Cohen: only in the structure, and it doesn't work either
22/01/2022, 05:18 - ronsabo: The problematic areas are Frank and the Johannes/the Trading team and Risk who are still in the mode of 'let's stop these crazy people' and not let's work together
01/22/2022, 05:18 - ronsabo: Agree
22/01/2022, 05:19 - ronsabo: Frank is much more involved and we talked about Jason in the past
01/22/2022, 05:19 - Roni Pavon Cohen: Regarding Frank - this is most of his activity
01/22/2022, 05:19 - Rony Pavon Cohen: Most of his money should come from there
22/01/2022, 05:19 - Rony Pavon Cohen: Connor knows what he's doing
01/22/2022, 05:19 - Roni Pavon Cohen: Kobi too
01/22/2022, 05:19 - ronsabo: He doesn't see it that way
01/22/2022, 05:20 - Rony Pavon Cohen: In the end he has to mainly manage the trading
01/22/2022, 05:20 - Roni Pavon Cohen: And in the end they just bet on the market
01/22/2022, 05:21 - ronsabo: Do you know what is happening with Johannes ?
01/22/2022, 05:21 - ronsabo: you told me that answers Alex, but apart from that he doesn't communicate with anyone
01/22/2022, 05:34 - Roni Pavon Cohen: Did they try to talk to him ?
01/22/2022, 05:36 - ronsabo: I don't know. I wrote him a message earlier. Just asking how he is doing .
01/23/2022, 01:36 - Roni Pavon Cohen: We let the CEL go, now we are already negative with CEL as well
01/23/2022, 01:36 - Roni Pavon Cohen: We need to understand what we are doing
01/23/2022, 02:13 - ronsabo: You deleted this message
01/23/2022, 02:13 - Roni Pavon Cohen: Thank you
01/23/2022, 02:13 - Roni Pavon Cohen: I love you too
01/23/2022, 02:13 - Roni Pavon Cohen : <Media omitted>
23/01/2022, 02:13 - ronsabo: 😃
01/23/2022, 02:14 - ronsabo: No magic. We need to return to profitability as soon as possible
01/23/2022, 02:14 - Roni Pavon Cohen: Profitability ?
01/23/2022, 02:15 - Roni Pavon Cohen: I'm talking about CEL
01/23/2022, 02:16 - ronsabo: I thought you wrote that we let it go ...
01/23/2022, 02:16 - Roni Pavon Cohen: So I ask if it's time to stop releasing
01/23/2022, 02:16 - ronsabo: and increase the buy ups ?
01/23/2022, 02:17 - Roni Pavon Cohen: I don't know
01/23/2022, 02:17 - Roni Pavon Cohen: We don't really have a plan
01/23/2022, 02:17 - Roni Pavon Cohen: we live from day to day

**SDNY_R01_00955931**

## Metadata

| Begin Family | SDNY_R01_00955931 | SEMANTIC |
|---|---|---|
| Custodian | Celsius Network | SEMANTIC |
| End Family | SDNY_R01_00955933 | SEMANTIC |

D022ZQJ7MV0

**Chat Filters**       **Events**       **History**       **Disclaimers**

| Participant | Entity | Login | Email | | |
|---|---|---|---|---|---|
| Rodney Sunada-Wong | Celsius | U01RFJFGJRF | rodney.sunada-wong@celsius.network | 13 | 0 |
| Ron Sabo | Celsius | U01QYGT9MT9 | ron.sabo@celsius.network | 6 | 0 |

Rodney Sunada-Wong

2021-09-22 05:24:00.007 AM

I think I have made it clear that there are 3 levels of FX risk to be managed, and I am SURPRISED that you thought Treasury would be responsible for managing the first level, which is managing day-to-day FX risk. I have never ever discussed the formula for hedging that risk with Yaron's team, only with you and Ivan. Your team (Frank's team) knows what is going on day to day and is best able to manage it.

Rodney Sunada-Wong

2021-09-22 05:24:31.007 AM

The second level of FX risk is managing Revenues vs Expenses ("the crypto winter FX hedge"). Your team would NOT know how large the fiat-denominated expenses would be and would not have the ability to hedge it. Treasury is in the process of figuring out how to manage that risk.

Rodney Sunada-Wong

2021-09-22 05:25:04.007 AM

The third level of FX risk is a more strategic concept, and it is whether or not to hedge our Retained Earnings. Making that decision would be a "high quality problem", and unfortunately we don't currently have a high quality problem.

Rodney Sunada-Wong

2021-09-22 05:52:58.020 AM

Regarding your comment about the long1 position, I think one of the things this company is bad at is separating things, making decisions based on individual business activities, and then acting. Whatever Johannes is doing should be kept separate from this discussion.

Rodney Sunada-Wong

2021-09-22 05:54:41.023 AM

Think about how a large global bank makes decisions. There are limits on every business. Each business needs to stay within its limits. End of story.

Rodney Sunada-Wong

2021-09-22 05:56:01.027 AM

The issue about Johannes is that the process was broken. There was woefully inadequate separation of his activities, and enforcing limits was a problem. That is a separable problem.

Ron Sabo

2021-09-22 05:58:56.027 AM

Seems like we had miscommunication about this - I understood the conversation I had with you and Ivan around the FX formula more as you consulting with me on how this should be built, and definitely not as a plan I am in charge of executing. Regarding the topic itself, I would like to suggest a different categorization: a per-startegy level and portfolio one. The first one is clearly the front-office responssebility and it is done on an on-going basis, i.e selling rewards token etc. The only exception is the posted collateral "strategy" - where we need to define who's responsible on that. Given the size here, we might want to combine it with the portfolio level FX mangment. For the portfolio level, I think we should have one FX hedging goal that includes all considerations, including "crypto winter" and retained earnings (once we decide on our approach) since it doesn't make sense we will both buy BTC exposure (to cover lack of earnings on posted collateral, for

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY CELSIUS
SUBJECT TO JANUARY 13, 2023
STIPULATION

CELSIUSNETWORK_00888127

SDNY_R01_00955931

example) and on the same time sell it (as part of the crypto winter, for example).

**Rodney Sunada-Wong**

2021-09-22 05:59:38.030 AM

Aside from transaction costs, I disagree.

**Ron Sabo**

2021-09-22 06:00:56.033 AM

Portfolio level FX risk mangment necessities the wide visibility into all of our earnings and expenses, and this is why I believe it should be managed by finance and not the front office.

**Rodney Sunada-Wong**

2021-09-22 06:01:47.033 AM

The CFO organization is not nimble. In at least three weekly discussions with Yaron I have asked him whether our recommendation to sell BTC (related to the BTC-denominated hedge) had happened, and each time the answer is no, and each time I have to go through an explanation for why it makes sense to do so.

**Ron Sabo**

2021-09-22 06:04:28.040 AM

Long1 - I agree that this should be treated separately, but currently this position is being counted as part of the freeze, so we must take it into account when making descision to sell BTC based on the freeze. Otherwise, we end up holding it in one hand and sell it with the other.

**Rodney Sunada-Wong**

2021-09-22 06:05:54.040 AM

I am going to stop messaging with you because I am getting upset and I will write something I will regret.

**Ron Sabo**

2021-09-22 06:07:42.043 AM

I see. Let's find time to discuss this tomorrow.

**Ron Sabo**

2021-09-22 06:11:20.047 AM

Yaron has asked me to relate to our present BTC and ETH exposure in the ALCO meeting. I wish we could have discussed this before, but not sure this is doable now.

**Rodney Sunada-Wong**

2021-09-22 12:02:50.000 PM

I didn't see your last messages until now because i shut down my slack

**Rodney Sunada-Wong**

2021-09-22 12:03:22.000 PM

over the past 20 minutes i messaged Yaron and warned him that asking the questions on page 4 could be very problematic

**Rodney Sunada-Wong**

2021-09-22 12:05:25.003 PM

I warned him that Alex will probably get upset because if you and Yaron ask this question that there will be a long drawn out discussion, and one thing that will come out is that the recommendation Risk Mgt made to sell BTC coins was not executed. And BTC has fallen since that time.

**Ron Sabo**

2021-09-22 12:11:01.003 PM

The FX formula that we were discussing would have led us to buying more BTC, not the other way around.

**Rodney Sunada-Wong**

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY CELSIUS
SUBJECT TO JANUARY 13, 2023
STIPULATION

CELSIUSNETWORK_00888128

SDNY_R01_00955932

2021-09-22 12:14:29.007 PM

S. AL

I agree. So there isn't a reason not to sell the 600

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY CELSIUS
SUBJECT TO JANUARY 13, 2023
STIPULATION

CELSIUSNETWORK_00888129

SDNY_R01_00955933

# EXHIBIT AM

*Fatico*

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

April 3, 2025

**BY ECF**

The Honorable John G. Koeltl
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

    Re:    *United States v. Alexander Mashinsky*, 23 Cr. 347 (JGK)

Dear Judge Koeltl:

    We write to respectfully request that in advance of the May 8, 2025 sentencing of defendant Alexander Mashinsky the Court (1) resolve the outstanding factual disputes concerning the offense conduct described in the Presentence Investigation Report ("PSR") and the factual bases for the Sentencing Guidelines enhancements, or, in the alternative, (2) schedule a multiday hearing so the Government may call witnesses to establish the relevant facts.

    The number and extent of outstanding disagreements relating to the nature and scope of the defendant's offense conduct pose a practical obstacle to sentencing. As things stand now, the parties dispute nearly every fact of consequence to understanding Mashinsky's role in the fraud at Celsius. Indeed, the defendant has objected to the entirety of the offense conduct described in the PSR, as well as to the factual underpinnings of many of the Guidelines enhancements. Defense counsel has informed the Government that although Mashinsky is not withdrawing any of these objections, he is also not seeking a *Fatico* hearing to resolve the factual disputes. However, the factual disputes require resolution. Much of what either party may argue at sentencing—and, indeed, what conduct constitutes the crimes for which Mashinsky will be sentenced—will depend on how the Court resolves the outstanding objections. By settling these disputes in advance of the sentencing proceeding, the Court will enable the parties to provide useful advocacy to the Court on the appropriate sentence.

    [handwritten: *False →*] To be clear: the Court already has ample record upon which to reject the defendant's objections and need not hold a hearing to do so. The defendant and the Government have each provided lengthy submissions about the disputed issues to the Probation Office. Based on the parties' submissions, the Probation Office resolved the disputed issues in the Government's favor. But we are also mindful of the critical importance of the contested issues and stand ready to present witnesses at a *Fatico* hearing if the Court believes that is necessary prior to adopting the facts in the PSR or fashioning an appropriate sentence.

AG

EXHIBIT AN

FILED: NEW YORK COUNTY CLERK 11/22/2025 11:47 AM    INDEX NO. 450040/2023
NYSCEF DOC. NO. 64                                          RECEIVED NYSCEF: 11/22/2025

22-10964-mg    Doc 23    Filed 07/14/22    Entered 07/14/22 14:27:45    Main Document
Pg 7 of 61

of its outstanding DeFi (as defined herein) and other counterparty loans to bring its collateral back under its control.

16.    These chapter 11 cases will provide a "breathing spell" for the Debtors to negotiate and implement a plan that will maximize the value of its business and generate meaningful recoveries to our stakeholders as quickly as possible.

### Celsius Network Inc.

Consolidated Assets & Liabilities, as of July 13, 2022

*(USD, MMs)*

| | |
|---|---:|
| **Liabilities** | |
| User Liabilities | $ (4,720) |
| CEL Liabilities | (210) |
| Custody Liabilities | (180) |
| Other | (390) |
| **Total Liabilities** | **$ (5,500)** |
| | |
| **Assets** | |
| Bank Cash | 170 |
| Crypto Assets | 1,750 |
| Loans | 930 |
| Allowance For Doubtful Accounts | (310) |
| Net Loans | 620 |
| Mining Assets | 720 |
| Custody Assets | 180 |
| CEL Token | 600 |
| Other | 270 |
| **Total Assets** | **$ 4,310** |
| **Surplus / (Deficit)** | **$ (1,190)** |

Note  These preliminary unaudited amounts are presented on a non-GAAP basis for illustrative purposes only and are rounded to the nearest $10 million USD. Amounts include non-Debtor subsidiaries. Celsius generally does not produce mid-month balances sheets, and the intent here is to provide a snapshot and directional sense for various assets and liabilities as of the petition date. Amounts from subsequent filings reflecting a petition date balance sheet may be materially different as a result of further review and diligence by management.

AN 1

Case 1:23-cv-06009-DLC    Document 14-1    Filed 04/27/26    Page 1 of 31

*According to F.T.C Total creditors Claims $4.72 B*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CELSIUS NETWORK INC., a corporation, CELSIUS NETWORK LLC, a limited liability company, CELSIUS NETWORKS LENDING LLC, a limited liability company, CELSIUS LENDING LLC, a limited liability company, CELSIUS KEYFI LLC, a limited liability company, CELSIUS MINING LLC, a limited liability company, CELSIUS US HOLDING LLC, a limited liability company; CELSIUS US LLC, a limited liability company; CELSIUS MANAGEMENT CORP., a corporation;<br><br>ALEXANDER MASHINSKY, individually and as an officer of Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, and Celsius US Holding LLC;<br><br>SHLOMI DANIEL LEON, individually and as an officer of Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, Celsius US Holding LLC; and<br><br>HANOCH "NUKE" GOLDSTEIN, individually and as an officer of Celsius Network LLC and Celsius Lending LLC,<br><br>Defendants. | Case No. 1:23-cv-6009<br><br>**STIPULATED ORDER FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF AGAINST ALEXANDER MASHINSKY** |

Plaintiff, the Federal Trade Commission ("Commission" or "FTC") filed its Complaint

for Permanent Injunction, Monetary Relief, and Other Relief ("Complaint"), for a permanent

injunction, monetary relief, and other relief in this matter, pursuant to Sections 13(b), 19, and

1

Case 1:23-cv-06009-DLC   Document 14-1   Filed 04/27/26   Page 2 of 31

16(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), and 57b, and the Gramm-Leach-Bliley Act ("GLB Act"), 15 U.S.C. §§ 6821 *et seq.* Defendants have waived service of the summons and the Complaint.

Defendants Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, and Celsius US LLC have filed petitions for relief under Chapter 11 of the Bankruptcy Code. *See In re Celsius Network LLC et al.*, No. 22-10964(MG) (Bankr. S.D.N.Y.) ("Bankruptcy Case"). The Commission and the Corporate Defendants entered into a Stipulated Order for Permanent Injunction, Monetary Judgment, and Other Relief, which the court entered on August 16, 2023.[1] This settlement included a suspended monetary judgment of $4,720,000,000, with the suspension premised upon the truthfulness of the Corporate Defendants' financial statements and with the suspension to be lifted if the Bankruptcy Case is closed without the estate being fully administered. Celsius Network, Inc. has emerged from its bankruptcy case and has begun making payments to its creditors, including consumer accountholders.

The Commission and Defendant Alexander Mashinsky now stipulate to the entry of this Stipulated Order for Permanent Injunction, Monetary Judgment, and Other Relief ("Order") to resolve all matters in dispute in this action between them.

THEREFORE, IT IS ORDERED as follows:

**FINDINGS**

1.      This Court has jurisdiction over this matter.

2.      The Complaint charges that Defendants participated in deceptive and unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, in the marketing and sale of

---

[1] *See FTC v. Celsius Network Inc., et al.*, Case No. 1:23-cv-06009, Docket No. 27.

2

Case 1:23-cv-06009-DLC    Document 114-31    Filed 04/28/26    Page 3 of 31

cryptocurrency lending and custody services. The Complaint further charges that Defendants obtained customer information of a financial institution relating to another person by making false, fictitious, or fraudulent statements, in violation of Section 521 of the GLB Act, 15 U.S.C. § 6821.

3.      Defendant Mashinsky neither admits nor denies any of the allegations in the Complaint, except as specifically stated in this Order. Only for purposes of this action, Defendant Mashinsky admits the facts necessary to establish jurisdiction.

4.      Defendant Mashinsky waives any claim that he may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agree to bear their own costs and attorney fees.

5.      Defendant Mashinsky and the Commission waive all rights to appeal or otherwise challenge or contest the validity of this Order.

6.      Entry of this Order is in the public interest.

## DEFINITIONS

For the purpose of this Order, the following definitions apply:

A.      **"Clear(ly) and conspicuous(ly)"** means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

1.      In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure

3

D.     Upon written request from a representative of the Commission, any consumer reporting agency must furnish consumer reports concerning Defendant Mashinsky, pursuant to Section 604(1) of the Fair Credit Reporting Act, 15 U.S.C. §1681b(a)(1).

## XIII.   RETENTION OF JURISDICTION

IT IS FURTHER ORDERED that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

SO ORDERED this 28th day of ___April___, 2026.

_____

THE HONORABLE DENISE L. COTE
UNITED STATES DISTRICT JUDGE

16

**FOR PLAINTIFF:** FEDERAL TRADE COMMISSION


*Stephanie Liebner*                          Date:   04/23/2026

Stephanie E. Liebner
Carlton Mosley
Attorneys
Federal Trade Commission
600 Pennsylvania Avenue NW
Mail Stop: CC 6316
Washington, D.C. 20580
202-640-0963
sliebner@ftc.gov
cmosley@ftc.gov

17

**FOR INDIVIDUAL DEFENDANT:** ALEXANDER MASHINSKY


_Daniel J. Fetterman_                          Date:  3/4/2026
Daniel J. Fetterman
Ronald R. Rossi
Fria R. Kermani
Kasowitz LLP
1633 Broadway
New York, New York 10019
212.506.1934
DFetterman@kasowitz.com
RRossi@kasowitz.com
FKermani@kasowitz.com
COUNSEL


Date:  2.23.2026
Alexander Mashinsky, Individually

18

P58KMASS

*Westfal*

importance in having the complete context.

The view of Alex's criminal conduct should not only be a clipped public statement here or a Slack chat about a boss there, otherwise there's a flawed understanding of reality. There's a need to see the whole elephant and the big picture, and to see things like Alex's statements being made within a real and complex company, that a $590 million loss was less than 2 percent of Celsius' assets at its peak, and that Celsius in many ways operated conservatively in the crypto space.

And with that, I'll turn it over to Mr. Westfal, who will address the nature of Alex's conduct.

THE COURT: All right. Thank you.

MR. WESTFAL: Good afternoon, your Honor.

THE COURT: Good afternoon.

MR. WESTFAL: I'd like to start by saying --

THE COURT: It's actually still morning.

MR. WESTFAL: It's still morning? I just scratched out morning and wrote afternoon.

I do want to start by saying that it is one of the great privileges of my career to speak to you today about Alex Mashinsky. I want to say it's been one of the great joys of my life to get to know Alex and his remarkable wife, Krissy, who's here today, these past few years. I'll be addressing the nature and circumstances of Alex's offense and what, we submit, was in his heart and in his mind over the five years of

FILED: NEW YORK COUNTY CLERK 11/22/2025 11:47 AM    INDEX NO. 450040/2023
NYSCEF DOC. NO. 73    Case 1:23-cr-00347-JGK   Document 165   Filed 07/07/25   Page 49 of 104   RECEIVED NYSCEF: 11/22/2025

P58KMASS

*[handwritten: Alex to Judge]*

THE COURT: Yes, please. Keep your voice up, use the microphone.

*[handwritten: objections I have not resolved.]*

First, as I've asked your counsel, are there any objections that I haven't resolved in connection with the presentence report that you want me to deal with?

THE DEFENDANT: Yeah, I have a prepared remark -- I'm sorry.

THE COURT: You want to take a moment?

THE DEFENDANT: I'm fine, your Honor.

THE COURT: Okay.

THE DEFENDANT: I have prepared remarks, but I would like to say a few more things.

Thank you, your Honor --

THE COURT: I'm going to listen to anything you would like to tell me in connection with sentence, but I always ask the first question as a matter of practice — whether there's anything else that I haven't dealt with in the presentence report that you want me to deal with, objections that I haven't already dealt with? Your lawyer says no, but I wanted to ask you.

*[handwritten: $590 m Loss.]*

THE DEFENDANT: I would like to comment that the $590 million in loss, in my view, are uncollected funds. These were things unavailable, and like Marc and others, my lawyers, have said, they were -- we had billions of dollars available on the platform; otherwise, we couldn't return billions of

EXHIBIT AO

P58KMASS    57

Celsius' collapse.

Celsius was probably a good idea. It was innovative. But it did not operate the way that the defendant said. And it was his lies that induced these customers to turn over their savings to the platform.

In the beginning, there was the ICO, and as the Court has already found, Mr. Mashinsky lied about the amount of money that the ICO raised, and this is right out the gate. Those lies were important and material because they gave Celsius a sense of momentum, a sense of proof of concept. So many people believed in this business model was essentially the claim, and it wasn't true.

In 2019, directional trading, explicitly, specifically, personally done by Mashinsky, caused a $13 million loss. And at that time, the company's assets under management were only about $100 million. So this loss was, frankly, catastrophic. And the CFO at the time came to Mashinsky at the end of 2019 and told him, you have to stop taking customer coins because the customers do not know that they are putting their money into an insolvent company. This was a face-to-face conversation with Mashinsky, and he did not take that advice. That CFO resigned.

At the beginning of 2020, uncollateralized loans made up more than 70 percent of Celsius' institutional book, fully uncollateralized. And as the chart in the government's